IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**KPH HEALTHCARE SERVICES, INC., individually and on behalf of all others similarly situated, a/k/a KINNEY DRUGS, INC.,**

  **Plaintiff,**

v.

**MYLAN N.V., et al.,**

  **Defendants.**

Case No. 20-2065-DDC-TJJ

**MEMORANDUM AND ORDER**

On February 14, 2020, plaintiff KPH Healthcare Services, Inc. filed this action against defendants Mylan N.V., Mylan Specialty L.P., Mylan Pharmaceuticals, Inc., Pfizer, Inc., King Pharmaceuticals, Inc., and Meridian Medical Technologies, Inc. (collectively, "defendants"). The Complaint asserts class action allegations for a putative Class of Direct Purchasers of the EpiPen (an epinephrine auto-injector used to treat anaphylaxis) and alleges various federal antitrust claims. They include a monopolization claim under § 2 of the Sherman Act, as well as claims for unlawful tying, exclusive dealing, and deceptive conduct. Doc. 1 at 1, 80, 83–89 (Compl. ¶¶ 1, 248, 171–205[1]).

On May 15, 2020, defendants Mylan N.V., Mylan Specialty L.P., and Mylan Pharmaceuticals, Inc. (collectively, "Mylan") filed a Motion to Compel Mandatory Pre-Suit Mediation and To Stay the Case (Doc. 37). Mylan argues that plaintiff is an assignee of a Core

---

[1] These paragraphs appear on pages 83 through 89. They are the second time that the Complaint numbers paragraphs as 171 through 205. The Complaint numbers the paragraphs sequentially from paragraph 1 on page 1 to paragraph 256 on page 83. Then, the next paragraph is renumbered as paragraph 171 and continues sequentially through the renumbered paragraph 205 on page 89.

Distribution Services Agreement ("Agreement"). That Agreement contains a multi-step alternative dispute resolution ("ADR") process that includes mediation. Mylan asserts that plaintiff's claims in this lawsuit fall within the scope of the Agreement's ADR clause. So, Mylan contends, the Agreement requires plaintiff to complete the ADR process before it can prosecute this lawsuit. Mylan thus asks the court to enforce the Agreement's ADR provision, compel plaintiff to mediate this case before pursuing litigation, and stay the case until the ADR process is complete.[2]

Plaintiff has filed an Opposition to Mylan's Motion to Compel Mandatory Pre-Suit Mediation and To Stay the Case (Doc. 44), and Mylan has submitted a Reply (Doc. 45). After carefully reviewing the parties' extensive arguments and the Agreement's ADR provision, the court grants Mylan's motion in part and denies it in part.

## I.     Factual Background

Plaintiff operates retail and online pharmacies under the name Kinney Drugs, Inc. Doc. 1 at 4 (Compl. ¶ 14). Defendants are the manufacturers and sellers of the EpiPen. *Id.* at 4, 5–6 (Compl. ¶¶ 13, 19–24). Plaintiff never purchased EpiPens directly from defendants. Instead, plaintiff "is the assignee of McKesson Corporation, who directly purchased EpiPen from [d]efendants . . . ." *Id.* at 4 (Compl. ¶ 14); *see also* Doc. 44-1 (Agreement for Assignment of Claims between McKesson Corporation and plaintiff). Plaintiff alleges that defendants engaged in anticompetitive conduct which, in turn, caused plaintiff (as the assignee of McKesson

---

[2]     The remaining defendants in the case—Pfizer, Inc., King Pharmaceuticals, Inc., and Meridian Medical Technologies, Inc. (collectively the "Pfizer defendants")—join Mylan's request to stay the case pending resolution of the ADR process between plaintiff and Mylan. Doc. 37 at 2 n.1. Mylan's motion asserts that it doesn't make sense—from both a practical standpoint and in the interests of judicial efficiency—to stay the case for Mylan but not the Pfizer defendants. *Id.*

Corporation) to pay supracompetitive prices for its EpiPen purchases. Doc. 1 at 4 (Compl. ¶ 14). And, plaintiff asserts, it sustained injury from defendants' allegedly illegal conduct. *Id.*

McKesson Corporation ("McKesson")—"a pharmaceutical distributor"—and Mylan Specialty, L.P—"a pharmaceutical manufacturer"—entered a "Core Distribution Services Agreement." Doc. 41 at 2 (Agreement). The Agreement recites that the parties' entered the Agreement "to define more precisely the Core Services to be performed and the consideration to be received by McKesson from Mylan Specialty for its performance of the Core Services." *Id.* The Agreement took effect on July 1, 2018, and it will "remain in effect for three (3) years." *Id.* at 6 (Agreement ¶ VI.a.).

As discussed, the Agreement contains a mandatory ADR provision. It provides:

> In the event of any dispute between the parties arising out of the existence, validity, construction, performance, or breach of this Agreement, either party shall give the other written notice of the dispute and the parties shall meet and attempt to resolve the dispute informally. If the parties are unable to resolve the dispute informally, either party shall give the other written notice to pursue mediation. If the dispute is not resolved by mediation, either party may file an action in any court of competent jurisdiction in the State of Delaware; provided, however, no party to any such action shall be entitled to punitive, exemplary, special, indirect, consequential, or similar damages of any kind, including lost profits and lost business opportunity.

*Id.* at 8–9 (Agreement ¶ VII.l.). Also, the Agreement recites that it "shall be binding upon and shall inure to the benefit of the successors and assigns of the parties." *Id.* at 8 (Agreement ¶ VII.k.). The Agreement includes a choice-of-law provision. It provides: "This Agreement will be governed by and construed in accordance with the laws of Delaware, without regard to or application of conflict of law, rules or principles." *Id.* at 6 (Agreement ¶ VII.a.).

The parties agree that plaintiff never completed the stages of the Agreement's mandatory ADR provision before filing this lawsuit. Plaintiff argues that it has no obligation to comply with the ADR provision because that Agreement doesn't apply to plaintiff's antitrust claims in

3

this lawsuit.  Mylan disagrees.  It argues that the ADR provision applies here and requires plaintiff to complete the ADR process—including mediation—before it can proceed in court. The court addresses this question, below.

## II.     Legal Standard

In Delaware,[3] the question whether an ADR provision[4] applies to a legal claim involves two issues.  *Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 155 (Del. 2002).

---

[3] Neither party argues that the Agreements' Delaware choice-of-law provision isn't enforceable. Mylan argues that the court need not resolve any choice of law issues because the law governing the interpretation of ADR provisions doesn't differ substantially between Delaware and Kansas.  Doc. 38 at 5 n.5.  Nevertheless, the court recognizes that it must "apply federal common law choice of law principles when [it] exercise[s] federal question jurisdiction over a case." *Singletary v. United Parcel Serv., Inc.*, 828 F.3d 342, 351 (5th Cir. 2016) (citation and internal quotation marks omitted); *see also Prudential Ins. Co. of Am. v. Doe*, 140 F.3d 785, 791 (8th Cir. 1998) (explaining that courts are "required to apply federal common law when deciding federal questions"); *Schoenberg v. Exportadora de Sal, S.A., de C.V.*, 930 F.2d 777, 782 (9th Cir. 1991) (holding in a federal question case that "federal common law applies to the choice of law rule determination"); *Barkanic v. Gen. Admin. of Civil Aviation of the People's Republic of China*, 923 F.2d 957, 961 (2d Cir. 1991) ("Where jurisdiction is based on the existence of a federal question . . . we have not hesitated to apply a federal common law choice of law analysis."); *Cyprus Amax Minerals Co. v. TCI Pac. Commc'ns, Inc.*, No. 11-CV-252-GKF-PJC, 2012 WL 4006122, at *4 (N.D. Okla. Sept. 12, 2012) ("[C]ircuit courts have concluded that a federal common law choice-of-law analysis should be conducted when the issue is a federal question" (citation and internal quotation marks omitted)); *Nat'l Fair Hous. All., Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 62 (D.D.C. 2002) ("Where federal question jurisdiction is invoked, as here, federal courts generally apply federal common law principles to resolve choice of law disputes.").

"[W]hen conducting a federal common law choice-of-law analysis, absent guidance from Congress," courts "consult the Restatement (Second) of Conflict of Laws."  *Eli Lilly Do Brasil, Ltda. v. Fed. Express Corp.*, 502 F.3d 78, 81 (2d Cir. 2007); *see also Cyprus Amax Minerals*, 2012 WL 4006122, at *4 ("[C]ourts have relied upon the Restatement (Second) of Conflicts of the Law for the content of federal common law." (citation and internal quotation marks omitted)); *Nat'l Fair Hous. All.*, 208 F. Supp. 2d at 62 ("Federal common law follows the approach of the Restatement (Second) of Conflicts of Laws.").  The Restatement (Second) of Conflict of Laws provides that "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Restatement (Second) of Conflict of Laws § 187(1) (Am. Law Inst. 1988).  The Agreement provides that Delaware law governs, neither party argues that this choice of law is unreasonable, and the parties don't argue that the court should apply a different state's law.  So, the court will apply Delaware contract law to interpret the Agreement.

[4] *Parfi Holding* analyzed whether a parties' dispute came within a contract's arbitration provision. And, many of the cases discussed in this Order consider whether a dispute was subject to ADR because of a contract's arbitration provision—not a mediation provision like the one at issue here.  But the parties don't cite any case law suggesting the court should apply a different standard when interpreting a

"First, the court must determine whether the [ADR] clause is broad or narrow in scope." *Id.* "Second, the court must apply the relevant scope of the provision to the asserted legal claim to determine whether the claim falls within the scope of the contractual provisions that require" ADR. *Id.* "If the court is evaluating a narrow [ADR] clause, it will ask if the cause of action pursued in court directly relates to a right in the contract." *Id.* "If the [ADR] clause is broad in scope, the court will defer to [ADR] on any issues that touch on contract rights or contract performance." *Id.*

When deciding whether an ADR agreement applies to a dispute, "Delaware courts strive to honor the reasonable expectations of the parties and ordinarily resolve any doubt as to arbitrability in favor of arbitration." *Id.* at 155–56. But still, ADR is "a mechanism of dispute resolution created by contract." *Id.* at 156. As the Delaware Supreme Court has explained,

> An [ADR] clause, no matter how broadly construed, can extend only so far as the series of obligations set forth in the underlying agreement. Thus, [ADR] clauses should be applied only to claims that bear on the duties and obligations under the Agreement. The policy that favors alternate dispute resolution mechanisms, such as arbitration, does not trump basic principles of contract interpretation.

*Id.* (citations omitted).

---

mediation clause. Indeed, both parties rely on *Parfi Holding* in their briefs. Doc. 38 at 5, 9; Doc. 44 at 6; Doc. 45 at 2–3. Also, other courts have found no differences between the law governing interpretation of mediation clauses versus arbitration clauses. *See, e.g.*, *Smoky Hills Wind Project, II, LLC v. City of Independence, Mo.*, No. 15-00054-CV-W-RK, 2016 WL 7043036, at *4 (W.D. Mo. Mar. 22, 2016) (citing Kansas cases construing both arbitration and mediation clauses and explaining, under Kansas law, "a party instituting suit who does not invoke mandatory contract grievance procedure is barred from suit to enforce the contract"); *3-J Hosp., LLC v. Big Time Design, Inc.*, No. 09-61077-CIV, 2009 WL 3586830, at *1 (S.D. Fla. Oct. 27, 2009) (Under Florida law, "[m]ediation clauses, like arbitration clauses, are contractual in nature, and construction of such provisions is a matter of contract interpretation"); *Travelers Prop. Cas. Co. v. Cormier Constr.*, No. CV010278215S, 2004 WL 335211, at *2 (Conn. Super. Ct. Feb. 4, 2004) (In Connecticut, "mediation clauses are interpreted by using the same legal analysis used in construing arbitration clauses").

### III.     Analysis

Mylan argues that the ADR provision at issue here is broad in scope and applies to plaintiff's antitrust claims because "McKesson's purchases of EpiPen products were made *pursuant to the* Agreement, which concerns the sale of certain branded pharmaceutical products manufactured and/or distributed by Mylan, including EpiPen products, to McKesson."  Doc. 38 at 6–7 (citing Doc. 41 at 2 & 15–17 (Attachment 1)).

As discussed above, Delaware law applies a two-step inquiry to analyze the question whether a legal claim is subject to a contract's ADR provision.  At the first step, the court considers whether "the [ADR] clause is broad or narrow in scope."  *Parfi Holding*, 817 A.2d at 155.  Here, the Agreement's ADR provision applies to "any dispute between the parties arising out of the existence, validity, construction, performance, or breach of this Agreement . . . ."  Doc. 41 at 8 (Agreement ¶ VII.l.).  Some courts have described similar ADR contract provisions as having "broad" clauses.  *See, e.g.*, *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 225 (2d Cir. 2001) (concluding that a contract provision mandating arbitration of "[a]ny dispute arising from the making, performance or termination of" the contract was a "broad clause"); *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1515 (10th Cir. 1995) (concluding that an arbitration clause contained "broad language" when it applied to "'any dispute arising in connection with the implementation, interpretation or enforcement'" of the contract); *GTSI Corp. v. Eyak Tech., LLC*, 10 A.3d 1116, 1118 (Del. Ch. 2010) (describing an arbitration clause that applied to "'any dispute between [the LLC's members] or between any of them and the Company arising out of, or in connection with, the execution, interpretation, performance or non-performance of this Agreement (including the validity, scope and enforceability of these arbitration provisions)'" as containing a "broad

arbitration provision"). Finding the reasoning of these cases persuasive, the court follows them and finds that the Agreement here contains a broad ADR clause because it applies to "any dispute between the parties arising out of the existence, validity, construction, performance, or breach of this Agreement . . . ." Doc. 41 at 8 (Agreement ¶ VII.l.).

The conclusion moves the analysis to its second step, where the court must "apply the relevant scope of the provision to the asserted legal claim to determine whether the claim falls within the scope of the contractual provisions that require" ADR. *Parfi Holding*, 817 A.2d at 155. Since the court has determined the ADR clause at issue is broad in scope, "the court will defer to [ADR] on any issues that touch on contract rights or contract performance." *Id.*

Here, Mylan argues that plaintiff's antitrust claims fall within the scope of the Agreement. Thus, Mylan contends, the ADR clause obligates plaintiff to comply with its provisions before filing suit. Plaintiff sees it differently. Plaintiff argues that none of the Agreement's terms touch on Mylan's alleged monopolistic and exclusionary conduct—*i.e.*, the conduct that forms the basis for plaintiff's antitrust claims. Instead, plaintiff asserts, the Agreement just obligates McKesson to perform certain distribution-related services and obligates Mylan Specialty to pay for those services. And importantly, plaintiff argues, the Agreement never discusses the price McKesson must pay Mylan for the pharmaceutical products it purchases.

Indeed, the parties agreed that the purpose of their contract was "to define more precisely the Core Services to be performed and the consideration to be received by McKesson from Mylan Specialty for its performance of the Core Services." Doc. 41 at 2 (Agreement). The Agreement requires McKesson to provide certain "core distribution" and other services to Mylan Specialty. *Id.* at 2–3 (Agreement ¶ I). In consideration for McKesson's services under the

7

Agreement, Mylan Specialty agreed to pay McKesson "a monthly service fee . . . equal to four and fifteen hundredths percent (4.15%) of Net Purchases." *Id.* at 4 (Agreement ¶ II.a.). The Agreement defines "Net Purchases" as "the total volume of McKesson's purchases of Products under this Agreement during the applicable month valued at the then-current WAC less the value of any Inventory Appreciation."[5] *Id.* Also, Mylan Specialty agreed "to fill McKesson's Product orders in a timely and efficient manner with Product that has at least twelve (12) months of expiration dating." *Id.* at 5 (Agreement ¶ IV.a.).

Although the Agreement never specifically discusses the price McKesson pays Mylan Specialty for pharmaceutical products, it mandates McKesson "only [to] purchase Mylan Specialty's Products directly from Mylan." *Id.* at 3 (Agreement I.d.v.). And, the Agreement requires McKesson to maintain certain inventory levels for products. *Id.* at 2–3 (Agreement ¶ I.d.i.).

Based on these terms, Mylan argues that the substance and purpose of the Agreement was providing for the sale of EpiPens and other products by Mylan to McKesson. Thus, Mylan contends, plaintiff's antitrust claims—which are premised on Mylan's sale of EpiPens to McKesson— "aris[e] out of the existence" and "performance . . . of this Agreement" such that the ADR clause applies and obligates plaintiff to submit its claims to mediation before filing suit. *Id.* at 8 (Agreement ¶ VII.l.).

To support its argument, Mylan relies on the Third Circuit's decision in *In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515 (3d Cir. 2019). There, plaintiff was the direct purchaser and wholesaler of a "biologic infusion drug" called Remicade. *Id.* at 518. Plaintiff sued the manufacturer of Remicade for trying "to maintain Remicade's monopoly by engaging in

---

[5] The Distribution Agreement later identifies the common industry term "WAC" as "Wholesale Acquisition Cost." Doc. 41 at 21 (Distribution Agreement Ex. A).

an anticompetitive scheme" that caused plaintiff to pay artificially inflated prices for the product. *Id.* Plaintiff and defendant had entered a Distribution Agreement that established plaintiff "as an 'Authorized Distributor of Record' and set[ ] out various logistical obligations for its distribution of [defendant's] pharmaceutical products, including Remicade." *Id.* The Distribution Agreement "[did] not specify an exact purchase price for Remicade," but did "provide that [defendant] 'will sell Products to the Distributor at the applicable Product's Wholesale Acquisition Cost (the "WAC" or "List Price").'" *Id.* (quoting the Distribution Agreement).

Also, the Distribution Agreement contained a "Dispute Resolution" provision requiring the parties to submit to mediation "'[a]ny controversy or claim arising out of or relating to this agreement . . . .'" *Id.* (quoting the Distribution Agreement). And, if mediation failed to resolve the dispute, the "Dispute Resolution" term required the parties to submit their dispute to "'arbitration in accordance with the Commercial Arbitration Rules of the AAA . . . and the Federal Arbitration Act, 9 U.S.C. § 1 et seq.'" *Id.* (quoting the Distribution Agreement).

Applying New Jersey law, the Third Circuit held that the "Dispute Resolution" provision in the Distribution Agreement applied to plaintiff's antitrust claims, and thus, required plaintiff to arbitrate its claims. *Id.* at 523–26. The Circuit explained:

> The gravamen of [plaintiff's] complaint is that [defendant's] anticompetitive Plan enabled it to sell its branded Remicade infliximab product at artificially inflated prices, and the only inflated price that could have caused [plaintiff's] injury was the price it paid [defendant] for Remicade, *i.e.*, the WAC or list price provided in the Agreement.

*Id.* at 523 (internal quotation marks and alterations omitted). Thus, the Circuit held, "[plaintiff's] antitrust claims are 'undeniably intertwined' with the [Distribution] Agreement because 'it is the fact of [plaintiff's] entry into the [Distribution Agreement] containing the allegedly inflated price

9

. . . that gives rise to the claimed injury.'" *Id.* at 523–24 (quoting *EPIX Holdings Corp. v. Marsh & McLennan Cos., Inc.*, 982 A.2d 1194, 1207 (N.J. Super. Ct. App. Div. 2009)).

Similarly, here, plaintiff alleges that defendants' anticompetitive conduct allowed them to sell and forced plaintiff to pay for EpiPens at supracompetitive prices. Those purchases are the transactions giving rise to the antitrust claims, and the parties' Agreement refers to them several times. And, while the Agreement never sets the price that McKesson pays Mylan for EpiPens, the Agreement refers to McKesson's purchases of pharmaceutical products as ones made *under the Agreement*. *See* Doc. 41 at 4 (Agreement ¶ II.a.) (defining "Net Purchases" as "*the total volume of McKesson's purchases of Products under this Agreement* during the applicable month valued at the then-current WAC less the value of any Inventory Appreciation." (emphasis added)).

The Agreement also imposes certain purchasing obligations on McKesson. It requires McKesson "only [to] purchase Mylan Specialty's Products directly from Mylan." *Id.* at 3 (Agreement ¶ I.d.v.). Also, the Agreement obligates McKesson to maintain certain inventory levels for Mylan Specialty's products. *Id.* at 2–3 (Agreement ¶ I.d.i.).

All of these purchases by McKesson—made "*under this Agreement*"—provide the foundation for plaintiff's antitrust claims. *Id.* at 4 (Agreement ¶ II.a.) (emphasis added). Thus, the court finds, plaintiff's antitrust claims here "touch on contract rights or contract performance," and thus require the court to apply the broad ADR clause in the Agreement. *See Parfi Holding*, 817 A.2d at 155 (explaining when "the arbitration clause is broad in scope, the court will defer to arbitration on any issues that touch on contract rights or contract performance"); *see also S+L+H S.p.A. v. Miller-St. Nazianz, Inc.*, 988 F.2d 1518, 1524 (7th Cir. 1993) (rejecting plaintiff's argument that arbitration clause wasn't triggered because "no breach

10

of the Agreement has occurred" because "[e]ven if no breach of the Agreement has occurred, if the dispute arises out of or relates to the Agreement *or its execution*, it is subject to arbitration" and holding that plaintiff's claim "is clearly encompassed by the arbitration clause's broad language" because it "draws its very essence *from the fact of and performance under the [Agreement] in question* [and] necessarily is a claim that arises out of and relates to the Agreement, its execution or its breach, even though the claim may be statutory in nature" (emphasis added) (citations and internal quotation marks omitted)).

Plaintiff argues that the antitrust claims here can't touch on the Agreement when they don't depend on either McKesson or Mylan Specialty's performance under the Agreement. In other words, it asserts, if every party to the Agreement honored every obligation the Agreement imposes on them, that performance wouldn't affect plaintiff's antitrust claims. For support, plaintiff relies on *Cavlovic v. J.C. Penney Corp.*, 884 F.3d 1051 (10th Cir. 2018). In *Cavlovic*, defendant argued that plaintiff's false advertising claims were subject to an arbitration provision found in a Rewards Program agreement. *Id.* at 1059. This arbitration clause in the Rewards Program agreement "cover[ed] all claims 'arising from or relating to' the Rewards Program." *Id.* Applying Texas law, our Circuit found that "a plain reading of the arbitration provision does not support the conclusion that [plaintiff] and [defendant] also agreed to arbitrate disputes about purchases [plaintiff] made at [defendant's store] on which she happened to earn J.C. Penney Rewards Points." *Id.* at 1060. The Circuit explained, "[t]he complaint's allegations of fraudulent advertising do not arise from the Rewards Program or the amount of Rewards Points [plaintiff] received for purchases." *Id.* (citation, internal quotation marks, and alteration omitted). Instead, "[t]he complaint's allegations arise from [defendant's] alleged practice of falsely inflating their original prices, only to subsequently mark the prices back down to leave an

11

impression of a deep discount." *Id.* Thus, the Circuit found it "difficult to see that this is a claim arising out of or relating to the contract because even if the parties honored their contractual obligations in every respect under the Rewards Program agreement, the contractual compliance would not affect [plaintiff's] allegations." *Id.* (citation and internal quotation marks omitted). The Circuit continued: "In other words, 'with respect to the alleged wrong, it is simply fortuitous that the parties happened to have a contractual relationship.'" *Id.* (quoting *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1516 (10th Cir. 1995)).

*Cavlovic*'s facts differ substantially from the facts alleged here. Here, plaintiff's antitrust claims arise from McKesson's purchases of pharmaceutical products that specifically are referenced in the Agreement as purchases made under that Agreement. *See* Doc. 41 at 4 (Agreement ¶ II.a.) (defining "Net Purchases" as "*the total volume of McKesson's purchases of Products under this Agreement* during the applicable month valued at the then-current WAC less the value of any Inventory Appreciation." (emphasis added)). So, it's not "simply fortuitous that the parties happen[ ] to have a contractual relationship." *Cavlovic*, 884 F.3d at 1060 (citation and internal quotation marks omitted). Instead, plaintiff's antitrust claims in this lawsuit arise from the Agreement because they touch on the parties' performance of their obligations under that Agreement.

Thus, the court holds that the Agreement's ADR provision applies to plaintiff's antitrust claims. And, the court concludes, the Agreement requires plaintiff to submit its claims to mediation before bringing suit in court. This they did not do.

Plaintiff asserts one last argument against applying the ADR provision to its claims: Plaintiff argues that the Agreement can't apply to any of its claims based on purchases made before the Agreement took effect on July 1, 2018. *See* Doc. 41 at 6 (Agreement ¶ VI.a.) ("This

12

Agreement shall become effective on July 1, 2018 and shall remain in effect for three (3) years."). Indeed, plaintiff brings "claims for the time period beginning November 1, 2013 until the anticompetitive effects of [d]efendants' conduct cease." Doc. 1 at 1 (Compl. ¶ 1). The Complaint doesn't even specify the end date of its claims. But, Mylan's Reply explains, McKesson and Mylan Specialty (at the time conducting business as Dey, L.P.) entered a similar Core Distribution Services Agreement that applies across the class period and contains an ADR clause requiring the parties to mediate any dispute "arising out of the existence, validity, construction, performance, or breach of this Agreement . . . ." Doc. 48-1 at 5–6 (Ex. A, 2005 Agreement ¶ VI.k.); *see also* Doc. 48-2 (Ex. B, 2007 Amendment); Doc. 48-3 (Ex. C, 2008 Amendment); Doc. 48-4 (Ex. D, 2010 Amendment); Doc. 48-5 (Ex. E, 2013 Amendment); Doc. 48-6 (Ex. F, 2014 Amendment); Doc. 48-7 (Ex. G, 2016 Amendment); Doc. 48-8 (Ex. H, Apr. 2017 Amendment); Doc. 48-9 (Ex. I, June 2017 Amendment); Doc. 48-10 (Ex. J, Apr. 2018 Amendment); Doc. 48-11 (Ex. K, June 2018 Amendment).[6] Also, the Agreement provides that it is the "entire agreement between the parties and supersedes all prior contracts, agreements and understandings between the parties . . . ." Doc. 41 at 6 (Agreement ¶ VII.b.). Thus, the court concludes, the ADR provision applies to plaintiff's claims asserted across the class period (or the vast majority of it). And, the ADR provision requires plaintiff to mediate those claims before bringing suit.

---

[6] Mylan's submissions appear to contain two possible omissions. The documents filed as Doc. 48 include the 2005 Agreement (Doc. 48-1) and 10 amendments to that Agreement (Docs. 48-2–48-11). But, based on the titles of the amendments, it appears the parties made 12 amendments to their 2005 Agreement. Mylan's filings don't include the First and Third Amendments to the contract. But, the court doesn't find that the possible omission requires a different outcome. Since the court is ordering mediation, and not arbitration, it will leave it to the parties and their mediator to decide whether a gap exists in the required span of the agreements to mediate.

### IV. Conclusion

For reasons explained, the court concludes that the Agreement's ADR clause requires plaintiff—as McKesson's assignee—to mediate the antitrust claims it asserts against Mylan before bringing this lawsuit. The court thus grants Mylan's request that the court compel plaintiff to mediate it claims.

Also, Mylan's motion asks the court to stay the case pending plaintiff's compliance with the Agreement's ADR clause. Plaintiff opposes a stay because the Agreement's ADR clause applies only to plaintiff's claims against Mylan but not the claims against the Pfizer defendants. But, Mylan's Reply asserts that its request for a stay now is mooted by Magistrate Judge Teresa James's Order granting the parties' Joint Motion to Extend the deadline for responding to the Complaint. Doc. 43. With that Order, the court tied defendants' responsive pleading deadline to the ruling on this Motion to Compel. *Id.* The court ordered that, if this motion is granted, "the parties will confer and shall submit, within ten (10) days of the order granting the motion, either an agreed proposal or a joint submission setting forth each parties' position on next steps, including when [d]efendants should be required to answer or otherwise respond to the Complaint." *Id.* Based on this Order, the court denies as moot Mylan's request for a stay. And, the court directs the parties to follow the instructions imposed by Judge James's Order granting the parties' Joint Motion to Extend the deadline for responding to the Complaint. Doc. 43.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants Mylan N.V., Mylan Specialty L.P., and Mylan Pharmaceuticals, Inc.'s Motion to Compel Mandatory Pre-Suit Mediation and To Stay the Case (Doc. 37) is granted in part and denied in part. The court grants the Motion to Compel Mandatory Pre-Suit Mediation. And the court denies as moot the Motion to Stay the Case.

**IT IS SO ORDERED.**

**Dated this 18th day of June 2020, at Kansas City, Kansas.**

                                        **s/ Daniel D. Crabtree**
                                        **Daniel D. Crabtree**
                                        **United States District Judge**