**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

|  |  |
|---|---|
| KPH HEALTHCARE SERVICES, INC., a/k/a KINNEY DRUGS, INC., individually and on behalf of all others similarly situated, | Case No. 2:20-cv-02065-DDC-TJJ |
| Plaintiff, | |
| v. | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| MYLAN N.V., MYLAN SPECIALTY L.P., MYLAN PHARMACEUTICALS, INC., PFIZER, INC., KING PHARMACEUTICALS, INC., MERIDIAN MEDICAL TECHNOLOGIES, INC., | DEMAND FOR JURY TRIAL |
| Defendants. | |

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................... 1

II.    NATURE OF THE CASE ...................................................................................... 2

III.   JURISDICTION AND VENUE ............................................................................. 4

IV.    THE PARTIES ....................................................................................................... 4

       A.     PLAINTIFF ................................................................................................. 4

       B.     DEFENDANTS .......................................................................................... 6

V.     LEGAL AND REGULATORY BACKGROUND ................................................ 7

       A.     The Regulatory Structure for Approval of Generic Drugs and Substitution of
              Generics for Brand Name Drugs ............................................................... 7

       B.     The Hatch-Waxman Amendments Advanced the Goal of Providing Access to
              Generic Pharmaceuticals ........................................................................... 9

       C.     ANDA Patent Certifications Provide Incentives to Generic Manufacturers to
              Challenge Patents ..................................................................................... 11

       D.     Generic Competition Serves the Public Interest. .................................... 12

       E.     EAI Drug Devices and FDA Approval .................................................... 17

       F.     Genuine Citizen Petitions to the FDA Serve a Public Good; Fraudulent Petitions
              Delay Generic Competition. .................................................................... 17

VI.    STATEMENT OF FACTS .................................................................................. 20

       A.     The Market for EpiPen ............................................................................. 20

       B.     Mylan Unlawfully Extends Its EpiPen Monopoly .................................. 25

              (1)    Mylan's Patent Litigation and Citizen Petition .............................. 22

                     a.     Teva Litigation ..................................................... 24

                     b.     Intelliject/Auvi-Q Litigation ............................... 29

                     c.     Sandoz Litigation .................................................. 31

                     d.     Mylan's Meritless Citizen Petition ...................... 31

              (2)    Mylan Stifles Competition from Sanofi's Auvi-Q ......................... 33

       C.     Mylan's Anticompetitive Tying ............................................................... 55

       D.     The Effects of Mylan's Conduct on EpiPen Prices ................................ 59

       E.     Mylan has been the Subject of Government Investigations ..................... 64

(1)     Exclusive Deadline Agreements for Lorazepam and Clorazepate ......... 61

(2)     Underpayments of Medicaid Rebates ……………………………….... 62

(3)     Congressional Investigation of EpiPen Pricing ……………………… 66

VII. DEFENDANTS' ACTIONS IMPACT INTERSTATE TRADE AND COMMERCE ........ 75

VIII.    MONOPOLY POWER AND MARKET DEFINITION.................................................. 76

IX.  DEFENDANTS' VIOLATIONS OF THE ANTITRUST LAWS ....................................... 80

X.   TOLLING OF STATUTES OF LIMITATION ..................................................... 81

XI.  CLASS ACTION ALLEGATIONS .................................................................... 84

XII. CAUSES OF ACTION.................................................................................... 87

COUNT I ....................................................................................................... 87

COUNT II ...................................................................................................... 90

COUNT III...................................................................................................... 92

COUNT IV...................................................................................................... 94

XIII.    PRAYER FOR RELIEF ............................................................................ 96

DEMAND FOR JURY TRIAL ............................................................................... 97

DESIGNATION OF PLACE OF TRIAL …...………………………………………….. 97

# I.   INTRODUCTION

1.      Plaintiff KPH Healthcare Services, Inc., a/k/a Kinney Drugs, Inc. ("Plaintiff") files this Second Amended Class Action Complaint pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure.[1]

2.      Plaintiff files this Second Amended Class Action Complaint on behalf of itself and a Class of Direct Purchasers ("Class Members") of EpiPen® (epinephrine auto-injector) against Defendants Mylan N.V.; Mylan Specialty L.P.; Mylan Pharmaceuticals, Inc. ("Mylan"); Pfizer, Inc.; King Pharmaceuticals, Inc.; and Meridian Medical Technologies, Inc. (collectively, "Defendants"). Plaintiff brings claims for the time period beginning November 1, 2013 until the anticompetitive effects of Defendants' conduct cease ("Class Period").

---

[1] Plaintiff KPH files this Second Amended Complaint "as a matter of course" within 21 days of service of the Defendants' Rule 12(b) motions (ECF Nos. 65, 68), in response to those motions. This is the first and only amended pleading KPH has filed "as a matter of course," because KPH filed the First Amended Complaint with all Defendants' consent and pursuant to the procedure set forth in the Court's Order Setting Pre- and Post-Mediation Deadlines (ECF No. 51). A Second Amended Complaint may be filed "as a matter of course" within 21 days of a responsive pleading where a prior Amended Complaint was filed with consent of the defendants or with leave of court. *Thompson v. Jiffy Lube Int'l, Inc.,* 505 F. Supp. 2d 907, 913 (D. Kan. 2007) (holding that Rule 15 entitled Plaintiffs to file a Second Amended Complaint as a matter of course because they had filed their First Amended Complaint with leave of court); *see also Ramirez v. County of San Bernadino*, 806 F.3d 1002, 1006-08 (9th Cir. 2015) (reversing district court decision to strike second amended complaint that had been filed as a matter of course after "first amendment was accomplished pursuant to a stipulation between the parties"); *Doe #1 v. Syracuse Univ.*, 335 F.R.D. 356, 359-60 (N.D.N.Y. 2020) (denying defendants' motion to strike a third amended complaint because plaintiffs had not lost or waived their right to amend once as a matter of course by previously amending under Rule 15(a)(2)). Because this Second Amended Complaint supersedes the First Amended Complaint, it moots the pending motions to dismiss (ECF Nos. 65, 68). *Saunders v. USD 353, Wellington Sch. Dist.*, No. 19-cv-2538, 2020 WL 3452976, at *1 (D. Kan. June 24, 2020) (collecting cases). If the Court were to adopt a different procedural view, however, Plaintiffs would promptly request leave to amend and/or file substantive responses to Defendants' motions.

3.      EpiPen® ("EpiPen")[2] is a pharmaceutical product that is crucial for the survival of those with severe allergies. Plaintiff seeks to recover damages in the form of overcharges incurred by itself and Class Members due to Defendants' unlawful monopolization in the market for Epinephrine Auto-Injector ("EAI") drug devices. Defendants engaged in a multi-faceted, overarching conspiracy to monopolize, and Mylan engaged in unlawful tying, exclusive dealing, and deceptive conduct, all in an effort to extend and maintain the EAI monopoly, and delay generic competition, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

4.      As a result of Defendants' anticompetitive conduct, Plaintiff and Class Members paid more for EpiPen than they otherwise would have paid in the absence of Defendants' unlawful conduct.

5.      Plaintiff makes the allegations herein based on personal knowledge relating to itself and upon investigation and information and belief as to all other matters.

## II.      NATURE OF THE CASE

6.      EpiPen is a disposable, prefilled EAI drug device for delivery of epinephrine for the treatment of severe allergic reactions known as anaphylaxis. By 2015, Mylan gained at least an 85% market share of the EAI drug device market. Mylan increased the list price for two EpiPens sixfold, from $100 in 2007 to $608 in 2016.[3] The large price increases were not attributable to increased manufacturing costs or any epinephrine supply shortage.

---

[2] The term "EpiPen", as used herein, refers to EpiPen®, EpiPen 2-Pak®, EpiPen Jr.®, EpiPen Jr. 2-Pak®, My EpiPen®, LIFE HAPPENS®, EpiPen4Schools®, Never-See-Needle®, and Be Prepared®.

[3] Mark Zaleski, *Mylan Overcharged Medicaid for EpiPen for Years, Despite Warnings*, STAT (Oct. 5, 2009), https://www.statnews.com/pharmalot/2016/10/05/mylan-overcharged-medicaid-epipen/.

7.     On January 30, 2017, the Federal Trade Commission announced that it was investigating numerous possible federal law violations by Mylan in connection with the EpiPen.[4]

8.     Defendants have effectuated an anticompetitive conspiracy to maintain market dominance and exclude competition by engaging in the following conduct: (1) illegally maintaining its monopoly powers by (a) restraining competitors, like Teva and Sanofi, via patent infringement suits, illegal pay-for-delay settlements, and the filing of citizen petitions with the Food and Drug Administration ("FDA"); (b) paying Pharmacy Benefit Managers large rebates to exclude Mylan's competition; (c) signing up schools to anticompetitive exclusive dealing contracts; and (d) using misleading advertising to damage competing products; (2) fraudulently paying doctors and committees to endorse the 2-Pak launch of the EpiPen as medically necessary and launching the EpiPen 2-Pak while simultaneously withdrawing the individual EpiPen in the United States; and (3) making materially misleading and false statements to conceal the ongoing EpiPen conspiracy.

9.     Thus, Defendants have unlawfully monopolized and foreclosed competition in the EAI market in the United States, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14. This misconduct enabled Mylan to overcharge direct purchasers for EpiPen.

10.     Through anticompetitive conduct, Mylan maximized profits and deprived Plaintiff and Class Members of a competitive market for EAI.

---

[4] David McLaughlin, et al., Bloomberg, *Mylan Faces U.S. Antitrust Investigation on EpiPen Practices*, January 30, 2017, https://www.bloomberg.com/news/articles/2017-01-30/mylan-faces-u-s-antitrust-investigation-on-epipen-practices.

11.     Plaintiff seeks overcharge damages arising out of Defendants' unlawful monopolization of the EAI market. Further, Plaintiff and Class Members seek treble damages for overcharges they paid to Mylan.

## III.     JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action as it arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Sections 3 and 4 of the Clayton Act, 15 U.S.C. §§ 14, 15. Further, this Court has jurisdiction under 28 U.S.C. §§ 1331, 1337(a).

13.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b) and (c) because during the Class Period, Defendants transacted business in the United States, including in this District.

14.     During the Class Period, Defendants sold and shipped EpiPen in a continuous and uninterrupted flow of interstate commerce, which included sales of EpiPen in the United States, including in this District. Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District.

## IV.     THE PARTIES

### A.     PLAINTIFF

15.     Plaintiff KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc. ("KPH") is a corporation organized under the laws of the state of New York, with headquarters in Gouverneur, New York. KPH operates retail and online pharmacies in the Northeast under the name Kinney Drugs, Inc.

16.     KPH is the assignee of McKesson Corporation, which, through its direct purchases of EpiPen from Mylan during the Class Period, was the first innocent purchaser within the chain of EpiPen purchasers. As a result of Defendants' alleged anticompetitive and conspiratorial

conduct, McKesson paid supracompetitive prices for its EpiPen purchases, and thus was the first direct victim within the chain of commerce to be injured by the illegal conduct of Mylan and its co-conspirators that is alleged herein. KPH pursues relief in this action as McKesson's assignee.

17.     KPH and McKesson entered into an Agreement for Assignment of Claims on December 12, 2018, understanding that the assignment encompassed all antitrust claims relating to EpiPen, so long as the complaint addressed generic delay and was limited to the EpiPens McKesson had purchased and resold to KPH on or after November 1, 2013.

18.     On August 30, 2020, KPH and McKesson entered into an Addendum to December 12, 2018 Agreement for Assignment of Claims, effective *nunc pro tunc* as of the original agreement date of December 12, 2018, to "further define … assigned rights." This addendum was executed to clarify the scope of the original agreement and to erase any doubt about the parties' intent. This addendum confirmed that McKesson assigned to KPH its "rights, title and interest in and to any antitrust cause of action … so long as the cause(s) of action include that the Manufacturers/Suppliers unlawfully delayed or frustrated the introduction or sale of generic EpiPen and/or participated in conduct which violated the Sherman Act or Clayton Act."

19.     Consistent with these terms – clarified on August 30, 2020 but in play since December 12, 2018 – this Second Amended Complaint, and each complaint that preceded it, includes claims that Defendants unlawfully delayed or frustrated the introduction or sale of generic EpiPen and/or participated in conduct which violated the Sherman Act or Clayton Act."

20.     On August 20, 2020, KPH and Mylan attempted to resolve their claims through mediation before Judge Jeffrey J. Keyes (Ret.). The mediation efforts were unsuccessful.

**B.      DEFENDANTS**

21.     Defendant Mylan N.V. is a Netherlands entity. Mylan N.V. was originally incorporated as a private limited liability company, New Moon B.V., in the Netherlands in 2014. On February 27, 2015, Mylan became a public limited liability company in the Netherlands through a corporate tax inversion, which it describes as an "acquisition of the EPD Business". Mylan's corporate headquarters is located in Amsterdam, the Netherlands; its principal executive offices are located in Hatfield, Hertfordshire, England; and its group's global headquarters are located in Canonsburg, Pennsylvania.

22.     Defendant Mylan Specialty L.P. is a limited partnership with its principal office address at 781 Chestnut Ridge Road, 3rd Floor, Morgantown, WV 26505. Mylan Specialty L.P.'s general partner is Dey, Inc., which is located at 110 Allen Road, Basking Ridge, NJ, 07920. Mylan Specialty, L.P. is a wholly owned subsidiary of Mylan N.V. and, as a result, is authorized to accept service on behalf of Mylan N.V. Mylan Specialty L.P. was known as Dey Pharma until 2012, when it changed its name to align its operations under the Mylan brand.

23.     Defendant Mylan Pharmaceuticals Inc. is headquartered in Canonsburg, Pennsylvania, and conducts extensive business nationwide.

24.     Mylan N.V., Mylan Specialty L.P., and Mylan Pharmaceuticals, Inc. are collectively referred to herein as "Mylan" and the "Mylan Defendants."

25.     Defendant Pfizer, Inc. is a global pharmaceutical company with its global headquarters at 235 East 42nd Street, New York, New York 10017. Through its subsidiaries King Pharmaceuticals, Inc. and Meridian Medical Technologies, Inc., Pfizer supplies Mylan with 100% of its EpiPens.

26.     Defendant King Pharmaceuticals, Inc. is headquartered at 501 5th Street, Bristol, Tennessee. King is a wholly-owned subsidiary of Pfizer, Inc. King performs basic research and develops, manufactures, markets and sells branded prescription pharmaceutical products and animal health products.

27.     Defendant Meridian Medical Technologies, Inc. is headquartered at 6350 Stevens Forest Road, Suite 301, Columbia, Maryland. In 2011, Pfizer acquired King Pharmaceuticals. As part of that acquisition, Pfizer also acquired Meridian, which "develops and manufactures the EpiPen" sold by Mylan.[5]

28.     Pfizer, Inc., King Pharmaceuticals, Inc., and Meridian Medical Technologies, Inc., are collectively referred to herein as "Pfizer" or the "Pfizer Defendants."

29.     Pfizer, through King and Meridian, manufacture epinephrine and hold the EpiPen patents, and Mylan sells EpiPen in the United States.

30.     Defendants and/or the Defendants' officers, agents, employees, or representatives have engaged in the conduct alleged in this Second Amended Class Action Complaint while actively involved in the management of Defendants' business and affairs.

## V.     LEGAL AND REGULATORY BACKGROUND

### A.     The Regulatory Structure for Approval of Generic Drugs and Substitution of Generics for Brand Name Drugs

31.     Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers who create a new drug product must obtain the approval of the FDA to sell the new drug by filing a New Drug Application ("NDA"). 21 U.S.C. §§ 301-392. An NDA must include submission of

---

[5] *2011 Financial Report*, PFIZER INC. (2011),
https://www.pfizer.com/files/annualreport/2011/financial/financial2011.pdf.

specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents. 21 U.S.C. §§ 355(a) & (b).

32.    When the FDA approves a brand name manufacturer's NDA, the brand manufacturer may list any patents that the brand manufacturer believes could reasonably be asserted against a generic manufacturer who makes, uses, or sells a generic version of the brand name drug prior to the expiration of the listed patents in the FDA's book of Approved Drug Products with Therapeutic Equivalence Evaluations, commonly referred to as the "Orange Book." Patents issued after NDA approval may be listed within 30 days of issuance. 21 U.S.C. §§ 355 (b) (1) & (c) (2).

33.    Not all patents claiming the brand product can be listed in the Orange Book. FDA regulations indicate that patents whose information "must" be submitted "consist of drug substance (active ingredient) patents, drug product (formulation and composition) patents, and method-of-use patents." 21 C.F.R. § 314.53(b)(1). "Process patents, patents claiming packaging, patents claiming metabolites, and patents claiming intermediates . . . must not be submitted to FDA." *Id.* Additionally, information on patents that only claim unapproved uses of a drug should not be submitted. 21 C.F.R. § 314.53(b)(1), (c)(2). The FDA does not confirm the patent listing information. Instead, the FDA performs merely a ministerial function in listing the patents in the Orange book, and relies on the truthfulness of the brand company in asserting in its NDA submission that a particular patent is eligible for Orange Book listing.

34.    A patent applicant is subject to special oaths and duties, such as the duties of disclosure, candor, and good faith, during patent prosecution. A patent applicant is required to disclose to the Patent and Trademark Office ("PTO") "all information known . . . to be material to patentability" including with respect to prior art. *See* 37 C.F.R. § 1.56. This duty extends to all

inventors named on a patent application and any "attorney or agent who prepares or prosecutes the application," as well as "[e]very other person who is substantively involved in the preparation or prosecution of the application." *Id*. § 1.56(c). Where fraud on the PTO "was practiced or attempted" or the duty of disclosure, candor, and good faith "was violated through bad faith or intentional misconduct," no patent should be granted. *Id*. § 1.56(a).

35.     The FDA relies completely on the brand name manufacturer's truthfulness about patents' validity and applicability; the FDA has neither the authority nor the resources to check the manufacturer's representations for accuracy or trustworthiness.

**B.     The Hatch-Waxman Amendments Advanced the Goal of Providing Access to Generic Pharmaceuticals.**

36.     The Hatch-Waxman Amendments, enacted in 1984, simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs. *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984). A generic manufacturer seeking approval to sell a generic version of a brand name drug may now file an Abbreviated New Drug Application (ANDA). An ANDA relies on the scientific findings of safety and effectiveness included in the brand name drug manufacturer's original NDA. For a generic drug to be designated "bioequivalent" to the brand name drug, the ANDA must show that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand name drug, and achieves the same blood level in the same time period as the brand name drug. The FDA assigns generic drugs that are bioequivalent to branded drugs an "AB" rating indicating that the AB-generic product is interchangeable with the brand product at the pharmacy level.

37.     Demonstrating bioequivalence to EpiPen is not required for FDA approval of a new entrant that is not interchangeable with EpiPen, but it is important for a new entrant to convince EpiPen customers to switch to a new EAI drug device.

38.     The FDCA and Hatch-Waxman Amendments operate on the presumption that bioequivalent drug products are therapeutically equivalent and may be substituted for one another because they contain identical amounts of the same active ingredients in the same route of administration and dosage form, and they meet applicable standards of strength, quality, purity and identity. Thus, bioequivalence demonstrates that the active ingredients of the proposed generic drug would be present in the blood of a patient to the same extent and for the same amount of time as the branded counterpart. 21 U.S.C. § 355(j) (8) (B).

39.     Through the Hatch-Waxman Amendments, Congress sought to expedite the entry of generic drugs and thereby reduce healthcare expenses nationwide. Congress also wanted to protect pharmaceutical companies' incentives to create new and innovative products.

40.     The Hatch-Waxman Amendments achieved both goals. They substantially advanced the rate of generic product launches and ushered in an era of historic high profit margins for brand name pharmaceutical companies. In 1983, pre-Hatch Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic versions available; by 1998, nearly all did. In 1984, prescription drug revenue for branded and generics totaled $21.6 billion and generic drugs accounted for 18.6% of prescriptions. By 2009, total prescription drug revenue had soared to $300 billion and generic drugs accounted for 75% of prescriptions.

**C.**     **ANDA Patent Certifications Provide Incentives to Generic Manufacturers to Challenge Patents.**

41.     To obtain FDA approval of an ANDA, a generic manufacturer must certify that the generic drug addressed in its ANDA will not infringe any patents listed in the Orange Book. Under Hatch-Waxman, a generic manufacturer's ANDA must contain one of four certifications:

   i.     that no patent for the brand name drug has been filed with the FDA (a "Paragraph I certification");

   ii.     that the patent for the brand name drug has expired (a "Paragraph II certification");

   iii.     that the patent for the brand name drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III certification"); or

   iv.     that the patent for the brand name drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").

42.     If a generic manufacturer files a Paragraph IV certification, a brand name manufacturer has the ability to delay FDA approval of an ANDA simply by suing the ANDA applicant for patent infringement. If the brand name manufacturer initiates a patent infringement action against the generic filer within 45 days of receiving notification of the Paragraph IV certification, the FDA may not grant final approval to the ANDA until the earlier of (a) the passage of 30 months, or (b) the issuance of a decision by a court that the patent is invalid or will not be infringed by the generic manufacturer's ANDA. The FDA may grant "tentative approval," but cannot authorize the generic manufacturer to go to market.

43.     As an incentive to spur generic companies to seek approval of generic alternatives to branded drugs, the first generic manufacturer to file an ANDA containing a Paragraph IV certification gets a period of protection from competition from other generic versions of the drug.

44.     Brand name manufacturers are incentivized to list patents in the Orange Book due to the high profit margins on brand name drugs and the erosion of those profits upon generic entry. Brand name manufacturers are motivated to sue any generic competitor that files an ANDA with Paragraph IV certifications even if the generic competitor's product does not actually infringe the listed patent and/or the patent is invalid and unenforceable. As a result, final FDA approval of an ANDA can be delayed for up to 30 months.

### D.     Generic Competition Serves the Public Interest.

45.     Typically, AB-rated generics cost much less than their branded counterparts. Over time, as more generic equivalents compete with each other, prices decline even further.

46.     Once a generic equivalent product hits the market, the generic quickly causes sales of the branded drug to diminish. More than 90% of prescriptions for drugs that are available in both branded and generic forms are filled with a generic. The speed with which generic drugs take over the market appears to be increasing. In a sample of drugs losing patent protection between 1991 and 1993, generics on average held a 44% market share after one year. By 2010, Intercontinental Medical Statistics ("IMS") industry data reflected that, on average, generics captured 80% of the brand's sales within 6 months.

47.     Because of the strong potential for generics to diminish sales of brand name drugs, brand name manufacturers are motivated to extend their market dominance for as long as possible.

48.     Since the passage of the Hatch-Waxman Amendments, every state has adopted laws that either require or permit pharmacies to automatically substitute AB-rated generic equivalents for brand prescriptions (unless the prescribing physician has specifically ordered otherwise). Substitution laws and other institutional features of pharmaceutical distribution and use create the

economic dynamic that the launch of AB-rated generics results both in rapid price decline and rapid sales shift from brand to generic purchasing.

49.     Experience and economic research demonstrate that the first generic manufacturer to launch prices its product below the price of its brand counterpart.[6] Because every state either requires or permits a prescription written for the brand drug to be filled with an AB-rated generic, the first generic manufacturer almost always captures a large share of sales from the brand form of the drug. At the same time, there is a reduction in average price paid for a prescription for the drug at issue (brand and AB-rated generic combined).

50.     During the 180-day exclusivity period, the first filer is the only ANDA-approved generic manufacturer permitted to place its drug on the market. This means the first filer will compete only with the brand manufacturer, and will need to price its product only below the price of the brand company. The brand company will rarely drop its price to match the first filer's price.

51.     However, a brand manufacturer may place its own authorized generic ("AG") on the market during the 180-day exclusivity period. If this occurs, the first filer will need to compete with the brand product and the brand company's AG product, and will price its product lower than it would have without an AG on the market.

52.     As recognized by the Supreme Court, a first-filer often will earn most of its profits during the 180-day exclusivity period. *See FTC v. Actavis, Inc.*, 570 U.S. 136, 143-44 (2013). Those profits will be maximized if the brand does not place an AG on the market.

---

[6] FTC, Authorized Generic Drugs: Short-Term Effects and Long-Term Impact, at ii-iii, (Aug. 2011) ("FTC 2011 AG Study"), *available at* https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf; FTC Pay-for-Delay Study, at 1.

53.     Once additional generic competitors enter the market, the competitive process accelerates and multiple generic sellers typically compete vigorously with each other for market share, lowering prices and driving them down toward marginal manufacturing costs.[7]

54.     According to the FDA and the FTC, the greatest price reductions are experienced when the number of generic competitors goes from one to two. In that situation, there are two commodities that compete on price. Some typical estimates are that a single generic launch results in a near term retail price reduction of around 30%, but with two generic entrants, near term retail price reduction is about 50% or more.

55.     Soon after generic competition begins, the vast majority of the sales formerly enjoyed by the brand shift to generic sellers. A 2011 FTC Study found that generics captured 80% or more of sales in the first six months after generics are launched.[8] In the end, total payments to the brand manufacturer of the drug decline to a small fraction of the amounts paid prior to generic entry. This is so because, although generic drugs are clinically identical to their brand counterparts, they are typically sold at substantial discounts from the brand price. Generic drugs save consumers an estimated $8 to $10 billion a year at retail pharmacies. Even more billions are saved when hospitals use generics.

56.     Nothing prevents a brand manufacturer from selling an AG at any time. An AG is chemically identical to the brand drug, but is sold as a generic product typically through either the brand manufacturer's subsidiary or through a third-party distributor. An AG is the brand drug but

---

[7] *See*, *e.g.*, Patricia Danzon & Li-Wei Chao, *Does Regulation Drive Out Competition in Pharmaceutical Markets?*, J.L. & ECON. (Oct. 2000); Tracy Regan, *Generic Entry, Price Competition, and Market Segmentation in the Prescription Drug Market*, INT'L J.L. INDUS. ORG. (Aug. 2007); R. Frank, *The Ongoing Regulation of Generic Drugs*, NEW ENG. J. MED., v. 357, pp. 1993-96 & n.20 (Nov. 2007).

[8] FTC 2011 AG Study, at 66-67.

in a different package. One study noted, "pharmaceutical developers facing competition from generics have large incentives to compete with their own or licensed 'authorized generics.'"[9] Brand manufacturers sometimes begin selling AGs before the first-filer generic launches in order to secure multi-year purchase contracts with direct purchasers and load the generic pipeline at the expense of the first-filer generic.

57.     Competition from an AG substantially reduces drug prices and the revenue of the first-filer generic (especially during the 180-day exclusivity period when no other generic can be on the market).

58.     A study analyzing three examples of AGs found that "[f]or all three products, authorized generics competed aggressively against independent generics on price, and both the authorized and independent generics captured substantial market share from the brand."[10] In a report by the FTC issued at the request of Congress in 2011, the FTC found that AGs capture a significant portion of sales, reducing the first-filer generic's revenues by approximately 50% on average.[11] The first-filer generic makes significantly less money when it faces competition from an AG because (a) the AG takes a large share of unit sales away from the first filer and (b) the presence of the AG causes prices—particularly generic prices—to decrease. Thus, if a brand manufacturer agrees to refrain from launching its AG, it can double the first-filer's revenue during the 180-day exclusivity period.

---

[9] K. A. Hassett & R. J. Shapiro, *The Impact of Authorized Generic Pharmaceuticals on the Introduction of Other Generic Pharmaceuticals*, SONECON, p. 3 (May 2007).

[10] E. R. Berndt et al., *Authorized Generic Drugs, Price Competition, and Consumers' Welfare*, HEALTH AFFAIRS, v. 26, p. 796 & n.3 (May/June 2007).

[11] FTC 2011 AG Study, at 139.

59.     While a brand manufacturer's agreement not to launch an AG has tremendous financial value to a first-filer generic manufacturer, such an agreement, when used to induce the first-filer to delay its own launch, injures drug purchasers in two ways: (1) purchasers are forced to pay the high brand prices for longer than they otherwise would have; and (2) purchasers pay more for the generic in the absence of the AG. In fact, the 2011 FTC AG Study shows prices with AG entry are lower during the 180-day exclusivity period.[12] Drug purchasers (including the proposed Class of direct purchasers) benefit from the lower prices caused by AG entry and are injured by the higher prices resulting from a lack of AG competition.

60.     Freedom from an AG is exceedingly valuable to the first-filer because it hands over all generic sales at higher, supracompetitive prices. Consequently, some brand companies wield the right to launch an AG as a powerful tool to induce the first-filer generic to delay its entry. The promise of payment to the first-filer generic in the form of an agreement not to launch an AG is economically equivalent to the promise of a cash payment by the brand manufacturer to the generic manufacturer because refraining from launching an AG under the agreement effectively and predictably doubles the revenues and profits of that generic company from its generic drug, and the brand manufacturer forgoes the sales and revenues it otherwise would have made with its AG.

61.     For a first-filer seeking to sell a generic version of a brand product that sold hundreds of millions of dollars annually (like EpiPen), the difference between selling its generic alone, without having to compete against an AG, versus selling in competition with an AG, can amount to hundreds of millions of dollars. These economic realities are well known in the pharmaceutical industry. "No AG" agreements thus allow competitors to benefit from an

---

[12] FTC 2011 AG Study, at 113-14.

agreement not to compete and deny purchasers the consumer surplus that should flow to them from increased competition.

### E.     EAI Drug Devices and FDA Approval

62.     Because EAI drug devices must be prescribed by a medical professional, there is a lengthy FDA approval process and any potential new entrant has a high barrier to enter the market: the new entrant must show that the epinephrine used in the device is bioequivalent to the EpiPen®.

63.     Typically, prescriptions for EAI drug devices are infrequently refilled, usually only once per year unless there is a further need due to an anaphylactic event. Additionally, because the EpiPen has been the dominant EAI drug device in the market for decades, most caregivers, physicians, and patients are trained on the EpiPen and would require additional training if they were to use a new product.

64.     Mylan itself noted the high regulatory hurdles for a generic to be listed as an AB-rated substitutable EAI drug device.[13]

### F.     Genuine Citizen Petitions to the FDA Serve a Public Good; Fraudulent Petitions Delay Generic Competition.

65.     Section 505(j) of the FDCA provides that a person may file a petition, known as a "citizen petition," with the FDA requesting, among other things, that the agency take, or refrain from taking, any form of administrative action.

---

[13] Even if a generic device is approved by the FDA and shown to be bioequivalent to the EpiPen, without an AB-rating to EpiPen, a pharmacist would not be able to automatically substitute the generic EAI drug device when a patient's prescription specifies the EpiPen. *See* U.S. Food & Drug Admin., Orange Book Preface, available at https://www.fda.gov/drugs/development-approval-process-drugs/orange-book-preface (last updated Feb. 5, 2018). A doctor would need to write a new prescription that specifies the alternative EAI drug device.

66.     Citizen petitions provide an opportunity for individuals to express their genuine concerns about safety, scientific, or legal issues regarding a product before, or after, its market entry.

67.     The FDA regulations concerning citizen petitions require the FDA Commissioner to respond to each citizen petition within 180 days of receipt. That response may be to approve the request in whole or in part, or deny the request. The Commissioner also may provide a tentative response with an estimate on a time for a full response.

68.     Reviewing and responding to citizen petitions is a resource-intensive and time-consuming task because the FDA must research the petition's subject; examine scientific, medical, legal and sometimes economic issues; and coordinate internal agency review and clearance of the petition response. These activities strain the FDA's limited resources.

69.     The FDA's longtime practice had been to withhold ANDA approval until after completing its consideration of, and response to, a citizen petition regarding that ANDA. The former director of the Office of Generic Drugs in the FDA's Center for Drug Evaluation and Research ("CDER") acknowledged that it was "very rare that petitions present new issues that CDER has not fully considered, but the Agency must nevertheless assure itself of that fact by reviewing the citizen petitions."

70.     Citizen petitions by rival companies rarely raise legitimate concerns about the safety or efficacy of generic products. They often request that the FDA require additional, unnecessary, and costly requirements on a generic competitor to delay competitive generic entry and thereby preserve their product monopolies after the end of a statutorily-granted patent or FDA exclusively periods. Brand name companies frequently file these citizen petitions on the eve of FDA approval of an ANDA for competing AB-rated generic drugs, even though the petitioner

could have made the same arguments months, or even years, earlier. This results in delay of approval of a pending ANDA for several months or longer while the FDA evaluates the merits of the citizen petition. Meanwhile, valid competition is foreclosed and consumers bear the costs.

71.     Since 2005, the FDA has acknowledged citizen petition abuse as it had "seen several examples of citizen petitions that appear designed not to raise timely concerns with respect to the legality or scientific soundness of approving a drug application but rather to try and delay the approval simply by compelling the agency to take the time to consider arguments raised in the petition whatever their merits and regardless of whether or not the petitioner could have made those very arguments months and months before."[14]

72.     The abuse of the citizen petition process in part helped lead Congress to enact the FDA Amendments Act of 2007, 21 U.S.C. 355(q) (the "FDAAA"), which added new section 505(q) to the FDCA providing that the FDA shall not delay approval of a pending ANDA because of a citizen petition unless the FDA determines that a delay is necessary to protect the public health. The FDAAA does not, however, provide the FDA with additional resources that might allow it to more promptly respond to citizen petitions. A brand-name drug manufacturer can still use the citizen petition process to delay generic approval while the FDA considers whether the company's citizen petition implicates issues of public health, regardless of whether the petition has any real merit.

73.     The FDA continues to have serious concerns about the abuse of the citizen petition process for anticompetitive purposes and noted in a 2015 report to Congress that "based on the

---

[14] Remarks of FDA Chief Counsel Sheldon Bradshaw before the Generic Pharmaceutical Association's (GPhA) policy conference in September 2005, at https://www.pharmacytimes.com/publications/gpr/2005/GPR_2005-12/GPR_2005-12_3282.

petitions that FDA has seen to date…. The Agency continues to be concerned that section 505(q) may not be discouraging the submission of petitions that are intended primarily to delay the approval of competitive drug products and do not raise valid scientific issues."[15]

## VI.     STATEMENT OF FACTS

### A.     The Market for EpiPen

74.     Anaphylaxis is a potentially life-threatening allergic reaction where a person's immune system releases a flood of chemicals causing the person to go into shock with a sudden drop in blood pressure and breathing problems.

75.     Symptoms of anaphylaxis may include a rapid, weak pulse, nausea, vomiting, and a rash. Anaphylaxis may occur within seconds or minutes of a person's exposure to an allergen, such as peanuts or bee stings, or from exercise or unknown substances. Each year, allergic reactions account for about 200,000 emergency room visits.[16]

76.     Mylan estimates that 1,500 people die from anaphylaxis every year.[17] Mylan has stated that 43 million people in the U.S. are at risk for life-threatening allergic reactions due to

---

[15] Robert M. Califf, M.D., Commissioner of Food and Drugs, Report to Congress, Eighth Annual Report on Delays in Approvals of Applications Related to Citizens Petitions and Petitions for Stay of Agency Action for Fiscal Year 2015, page 8 (FDA July 29, 2016), at https://www.fda.gov/media/99871/download.

[16] Selena Larson, *Outrageous EpiPen prices lead some people to make their own*, CNNMoney, Sept. 24, 2016.

[17] Mylan Press Release, "Get Schooled in Anaphylaxis™ Unveils Interactive Digital Resources to Educate School Communities about Potentially Life-Threatening Allergies," (Oct. 17, 2012), http://investor.mylan.com/releasedetail.cfm?releaseid=714156. *See also* Katie Thomas, *Tiny Lifesaver for a Growing Worry*, N.Y. Times (Sept. 7, 2012), http://www.nytimes.com/2012/09/08/business/mylan-invests-in-epipen-as-child-allergies-increase.html (noting that child food allergy rates are rising, and that in 2008, one in 70 children was allergic to peanuts, compared with one in 250 in 1997) (hereinafter "N.Y. Times, Tiny Lifesaver for a Growing Worry").

allergic sensitivities.[18] Mylan also has stated that "1 in 13 children [are] affected by food allergies."[19]

77.     Epinephrine, also known as adrenaline, is very effective at treating anaphylaxis, but it must be administered immediately. A delay of as little as 30 minutes can result in death.

78.     In the vast majority of cases, an EAI drug device is the most effective device for quickly administering epinephrine. EAI drug devices are available only by prescription.

79.     An EAI drug device injects epinephrine into a muscle through a device's spring-loaded needle. The diagram below shows how an EAI drug device is constructed and allows for the injection of epinephrine into a muscle through a device's spring-loaded needle:



---

[18] *See* Reviewing the Rising Price of EpiPens: Hearing Before the H. Comm. on Oversight & Gov't Reform (Sept. 21, 2016) (Statement of Heather Bresch, CEO of Mylan).

[19] Letter from Mylan to Senator Charles E. Grassley (Sept. 8, 2016), https://www.grassley.senate.gov/sites/default/files/constituents/Mylan%20Response%20to%20Sen%20Grassley%209%208%2016%20(002).pdf (citing Ruchi S. Gupta, et al., *The prevalence, severity and distribution of childhood food allergy in the United States*. 128 Pediatrics e9 (2011).

80.    In the 1970s, Survival Technology, Inc. developed the first auto-injector drug device, called the ComboPen, to administer a nerve agent antidote for the United States military. It subsequently modified the device to deliver epinephrine, thus creating the EpiPen.[20]

81.    The FDA approved the EpiPen on December 22, 1987, under New Drug Application 019430.

82.    In 1996, Survival Technology, Inc. merged with Meridian Medical Technologies, which one year later sold the exclusive right to market and distribute the EpiPen to Dey LP. Dey LP is a subsidiary of Merck KGaA, a German multinational pharmaceutical company.[21]

83.    Since 2007, Mylan has marketed the EpiPen in the United States. According to Mylan, the EpiPen "is used in the treatment of severe allergic reactions" and "is an epinephrine auto-injector that has been sold in the U.S. and internationally since the mid-1980s."[22]

84.    "[F]or doctors, who write prescriptions for the name they know best, the EpiPen brand 'is like Kleenex,' says Robert Wood, a pediatric allergist at Johns Hopkins University School of Medicine."[23]

---

[20] Matt Reimann, *The Story of the EpiPen: From Military Technology to Drug-Industry Cash Cow*, TIMELINE (Aug. 20, 2016), https://timeline.com/epipen-technology-drug-industry-b28d19036dee#.seg6n7dls.

[21] Meridian Medical Technologies 10-K Filing (Jul. 31, 1997); Marilyn Case, *EpiPen Recall Points to Broader Concerns*, WALL ST. J. (May 10, 1998), http://www.wsj.com/articles/SB895440623631960000.

[22] MYLAN N.V. 10-K (2015), https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdo c.htm.

[23] Cynthia Koons and Robert Langreth, *How Marketing Turned the EpiPen Into a Billion-Dollar Busines*s, BLOOMBERG (Sep. 23, 2015), https://www.bloomberg.com/news/articles/2015-09-23/how-marketing-turned-the-epipen-into-a-billion-dollar-business.

85.     The EpiPen provides a 0.3 mg dose of epinephrine, while the EpiPen Jr., for kids, contains a 0.15 mg dose. EpiPens generally have a one-year expiration period and patients are advised to replace them after their expiration date. The EpiPen Jr. has a retail price that is the same as the EpiPen, despite containing half the medicine (0.15 mg instead of 0.3mg) of the EpiPen.

86.     Mylan has worldwide rights to the EpiPen, which is supplied to Mylan by the Pfizer Defendants. EpiPen is the most prevalent EAI device with nearly 4 million prescriptions written in 2016.

87.     The EpiPen has been the number-one prescribed EAI drug device in the United States for over 25 years. Mylan admitted that the EpiPen has effectively been the EAI drug device market, with a fixed U.S. market share consistently over 90%. In December 2012, Mylan touted that the EpiPen "has been the number one prescribed epinephrine auto-injector for more than 20 years and constitutes more than 99% of the epinephrine auto-injector market."[24]

88.     Beyond Mylan's EpiPen market share, Mylan's monopoly power is evidenced by its ability to raise prices without any loss of sales. Since Mylan purchased the EpiPen in 2007, it has been able to raise prices more than six-fold:

---

[24] Mylan Press Release, "Mylan Specialty Offers Tips for Parents of Children with Life-Threatening Allergies to Help Prepare for Seasonal Celebrations" (Dec. 18, 2012), http://newsroom.mylan.com/press-releases?item=123064.



Exhibit 1. EpiPen WAC Package Price

Source: Medi-Span, Clinical Drug Information, LLC and Wells Fargo Securities, LLC

89.     From 2013, the EpiPen surpassed $1 billion in annual revenue for Mylan.[25]

90.     According to Kevin Deane, head of medical technologies for PA Consulting Group, a global technology and design firm that sold a drug delivery technology company to Pfizer in 2004, "the base components for each EpiPen, including the plastic cap, tube, and needle, might cost between $2 to $4 to purchase." However, the EpiPen contains "essentially [the] same core technology that [has been] there for many years."[26] In addition, two engineering industry experts peg the total cost of making an EpiPen 2-Pak at between $8.02 and $10.03, and that "even include[s] the bright-yellow box."[27]

---

[25] Mylan N.V., Annual Report (Form 10-K) 60 (Mar. 1, 2017).

[26] Ben Popken, *Industry Insiders Estimate EpiPen Costs No More Than $30*, NBC NEWS (Sep. 6, 2016), https://www.nbcnews.com/business/consumer/industry-insiders-estimate-epipen-costs-no-more-30-n642091.

[27] Tracy Seipel, *EpiPen Outrage: Silicon Valley Engineers Figure Real Cost to Make Lifesaving Auto-Injector Two-Pack — about $8*, Mercury News (Oct. 1, 2016).

B.      **Mylan Unlawfully Extends Its EpiPen Monopoly**

(1)      **Mylan's Patent Litigation and Citizen Petition**

91.      Mylan or its co-Defendants hold four patents on the EpiPen. However, Defendants do not hold a patent on the drug delivered by the EpiPen (epinephrine). The patent holders have twice filed patent infringement lawsuits against potential competitors, claiming that they infringe patents protecting the EpiPen through 2025.

92.      During a question and answer period of its Q-1 2009 Earnings Call with Wall Street analysts, Mylan CEO Heather Bresch ("Bresch") was asked about generic competition to the EpiPen and whether that posed a challenge to Mylan's earnings. In response, Bresch announced that Mylan was adding yet another patent to the already-patented EpiPen device that "will also put in another barrier to entry because … now that market preferential would be the needle protected device and drug of which we have IP and stuff around. So I just think it is a very, very difficult hurdle to get through, and so feel confident that EpiPen is in good shape."[28] Bresch further assured the Wall Street analysts that Mylan was confident that no generics could compete because Mylan was adding to its patents on the EpiPen, and that any generic has "to match identically" the underlying drug or device, which is "really the hurdle when you talk about a drug and device product such as EpiPen."[29] Shortly after this call, Meridian – not Mylan – secured the '432 patent.

93.      As noted above, in 2011, Pfizer acquired King Pharmaceuticals, Inc. As part of that acquisition, Pfizer acquired a subsidiary, Meridian, which develops and manufactures the EpiPen sold by Mylan.

---

[28] *Mylan Inc. Q1 2009 Earnings Call Transcript*, SEEKING ALPHA (May 1, 2009), http://seekingalpha.com/article/134619-mylan-inc-q1-2009-earnings-call-transcript?part=single.

[29] *Id.*

94.     Pfizer and its subsidiaries own the patents protecting the EpiPen and are the contract suppliers of the product. Mylan owns the trademarked brand names and controls the worldwide marketing and sale of the products. The divided intellectual property ownership of the EpiPen and licensing agreements have caused the two companies to work collaboratively to enhance sales volume and profitability. If the EpiPen patents are invalidated, or if other competitors gain market share, both companies stand to lose.

95.     Once Mylan acquired the rights to market and sell the EpiPen from Merck in 2007, it purchased its EpiPen components exclusively from King and its subsidiary, Meridian. King supplied the generic epinephrine, and Meridian supplied the injection pens.

96.     Once Pfizer purchased King (and, thereby, Meridian) in October 2010, Pfizer did not compete with Mylan. Rather, Pfizer agreed to continue supplying the device to Mylan under non-public terms. On information and belief, that agreement provides for the sale of EpiPens to Mylan at a contract price which has recently escalated along with EpiPen's market dominance, recently rising from roughly $80 per unit to $86 per unit. Pfizer's revenue on sales of the EpiPen has also increased along with Mylan's as EpiPen's market dominance has grown[30]:

| Year | Unit Sales Volume of EpiPen | Pfizer's EpiPen Revenue | Unit Price |
|------|------|------|------|
| 2012 | 3,310 | $263M | $79.50 |
| 2013 | 3,416 | $273M | $80.00 |
| 2014 | 3,656 | $294M | $80.00 |
| 2015 | 3,930 | $339M | $86.00 |

---

[30] From Pfizer's Financial Statements, Appendix A, 2012-2015.

97.     In 2014, for unclear reasons, Mylan Specialty LP replaced Meridian as the sponsor of the EpiPen patents in the Orange Book. Although the reasons for the change were unclear, it demonstrates further concerted action by Mylan and Pfizer to share in the benefits and burdens of the EAI market monopoly.

### a.  Teva Litigation

98.     Teva filed an ANDA seeking approval to market a generic EpiPen in December 2008.

99.     On August 8, 2009, Defendants conspired to have King and Meridian sue Teva in *King Pharm., Inc., v. Teva Parenteral Med., Inc.,* No. 09-cv-652 (D. Del.), alleging infringement of U.S. Patent No. 7,449,012. King filed a First Amended Complaint on November 11, 2010 to add a claim of infringement on U.S. Patent No. 7,794,432.

100.    King and Meridian subsequently dropped all claims related to the alleged infringement of the '012 patent, leaving only the claims related to the '432 patent. *See id.* at Doc. No. 124.

101.    Pfizer reported the following to investors in 2011[31]:

> King brought patent-infringement actions against Sandoz in the U.S District Court for the District of New Jersey in July 2010 and against Teva Pharmaceutical Industries and Intelliject, Inc. (Intelliject) in the U.S. District Court for the District of Delaware in August 2009 and January 2011, respectively, as the result of their abbreviated new drug applications with the FDA seeking approval to market epinephrine injectable products. The two actions in Delaware subsequently were consolidated. Sandoz and Teva Pharmaceutical Industries are challenging and Intelliject challenged two patents, which expire in 2025, covering the next generation auto-injector for use with epinephrine that is sold under the EpiPen brand name. In February 2012, the action against Intelliject was settled. Under the settlement agreement, Intelliject may launch its epinephrine

---

[31] *Id.*

injectable product no earlier than November 15, 2012, subject to
final approval by the FDA.

102.     Following discovery, the case against Teva proceeded to a four-day bench trial in

March 2012.

103.     According to Pfizer's counsel, the most important claim terms at issue in the bench

trial, all present in claims 19 or 20 of the '432 Patent, were "a first locked retracted position," the

claim that "energy released from the stored energy source to drive the needle during the

medicament dispensing operation is not transferred to the needle cover," and "attenuating

kickback."

104.     Teva argued that its generic version of the next-generation epinephrine auto-

injector, as submitted in its ANDA, did not infringe the '432 Patent for a number of reasons. First,

Teva's generic equivalent relied on manual insertion of the needle into the patient, not requiring

"a stored energy source capable of driving the plunger within the cartridge to dispense the

medicament through the needle assembly." Second, Teva's generic equivalent did not have a

needle cover that locks in place, as opposed to the '432 Patent which requires "the needle cover

having a first locked retracted position." Third, Teva's generic equivalent did not have energy

released from the stored energy source, in direct contradiction to the claims of the '432 Patent.

105.     In addition to the obvious differences in Teva's auto-injector, as well as favorable

claim constructions by the court, the bench trial included evidence of three pieces of "prior art

references" which Teva contended invalidated the '432 Patent.

106.     The parties settled on April 27, 2012. The actual settlement agreement is

confidential and has not been made public. Under the terms of the settlement, Teva agreed to delay

the launch of its generic auto-injector for three years, until June 22, 2015,[32] which also effectively foreclosed all other auto-injector generic competition for the same time period.

107.    Defendants knew that an agreed-to delay with Teva would be subject to the Hatch-Waxman Act's 180-day exclusivity award, which grants a six-month exclusivity period to the first generic to challenge a brand firm's patent by claiming it is invalid or not infringed. The exclusivity period does not begin to run until the first-filing generic enters the market. In the case of Teva – as the first filer – that became a minimum of three years in the future because of its settlement with Defendants. Thus, as a result of Teva's delayed market entry, Defendants delayed all generics seeking ANDA applications based on the EpiPen for three years, plus an additional 180 days under the Hatch-Waxman Act because Teva was the first-filer on the patents-in-suit.

108.    Upon information and belief, Defendants conspired with each other and Teva to enter into an anticompetitive agreement to settle the Teva litigation, whereby Defendants provided significant consideration, incentives, and benefits to Teva to delay bringing its competing product to market.

109.    It can be reasonably inferred that King and Meridian made a substantial "reverse payment" to Teva to convince it to delay bringing its competing generic auto-injector to market because: (a) the Teva Court's *Markman* rulings on the interpretation of the '432 patent were favorable to Teva; (b) at the time of settlement, a full bench trial had been conducted and further anticipated litigation expenses would have been marginal compared to expenses already incurred; and (c) no rational economic actor with a viable product (which had spent millions of dollars

---

[32] *Mylan and Pfizer Announce Epinephrine Auto-Injector Settlement Agreement with Teva*, MYLAN INC. (Apr. 26, 2012), http://newsroom.mylan.com/press-releases?item=123144.

developing it) would refrain from entering a lucrative "blockbuster" market for 36 months unless it had received monetary compensation in exchange for non-entry.

110.    Mylan noted that despite the settlement allowing Teva to bring a generic EpiPen to market, high regulatory barriers continued to exist for the generic to be listed as an AB-rated substitutable EAI drug device. Indeed, Bresch has "been pretty vocal about the fact that [she] think[s] the bar to get an AB-rated substitutable product is very high."

111.    On April 26, 2012, Mylan issued a press release about the Teva settlement:

> Mylan Inc. (Nasdaq: MYL) and Pfizer Inc. (NYSE: PFE) today announced that Meridian Medical Technologies, a Pfizer subsidiary, has entered into a settlement agreement with Teva that will resolve pending patent litigation related to its abbreviated new drug application (ANDA) for a generic epinephrine auto-injector.
>
> According to the terms of the settlement, Teva may launch a generic epinephrine auto-injector covered by its ANDA on June 22, 2015 or earlier under certain circumstances, subject to receipt of approval from the U.S. Food and Drug Administration. Teva currently does not have tentative approval from the FDA for its epinephrine auto-injector product.
>
> Meridian manufactures EpiPen Auto-Injector and Mylan Specialty markets and distributes the product in the United States.

112.    On July 26, 2012, Bresch stated in an earnings call with company analysts, "So we certainly have seen a benefit [to growing the EpiPen market] and obviously, now with the runway absolutely clear for us through 2015, through our settlement with Teva, I can assure you, we are going to continue as we see those response[s] continue to invest in EpiPen as a franchise."

113.    It is reasonable to infer that the settlement was an unlawful pay-for-delay agreement entered into for the benefit of all Defendants, and that while Mylan was not a party to the patent lawsuits, it was participating in the concerted action as addressed throughout this Second Amended Complaint. The trial court record shows that the '432 patent would likely have been found invalid,

which would have removed the most significant barrier to market entry for Teva or any other putative generic manufacturer. The settlement allowed Defendants to continue building "the franchise" without competition and making the market more lucrative for Teva when and if it finally came to market.

114.     Around the same time as the EpiPen patent litigation, Teva was involved in patent litigation against Mylan related to Mylan's ANDA to market a generic version of another drug, Nuvigil. In December 2009, Teva's predecessor, Cephalon, filed a patent infringement action against Mylan after Mylan filed an ANDA to market a generic version of Nuvigil. Nuvigil was a critical drug for Cephalon, at the time accounting for nearly $1 billion in sales annually, or roughly half the company's total sales. The case was filed in the District of Delaware, like the EpiPen litigation, and proceeded at a similar pace. Teva acquired Cephalon in October 2011 and with trial set for July 2012, the parties abruptly announced a settlement of the EpiPen litigation. The Nuvigil litigation likewise settled.

115.     In the EpiPen litigation, the settlement delayed Teva's market entry until June 2015, while in the Nuvigil litigation, the settlement delayed Mylan's market entry until June 2016. Nuvigil was also a blockbuster drug and generic delay of several years was worth hundreds of millions of dollars for the parties.

**b.  Intelliject/Auvi-Q Litigation**

116.     On November 30, 2009, Sanofi-Aventis U.S. LLC ("Sanofi") announced it had obtained the rights to Intelliject's epinephrine auto-injector. Under the license, Sanofi would be responsible for manufacturing and commercializing the product while Intelliject would be responsible for ongoing development and obtaining regulatory approval.

117.     When the Intelliject device, dubbed the e-cue (and later renamed Auvi-Q), was ready to embark on the approval process, Intelliject submitted an NDA (not an ANDA) with the FDA on September 29, 2010. The EpiPen and Auvi-Q were very different devices, both in appearance and operation.

118.     The EpiPen is a device shaped like a writing pen, with a safety cap on one end and a spring-loaded needle on the other end. In order to activate the EpiPen, the safety cap must be removed and the end with the spring-loaded needle must be pressed against the thigh.

119.     Auvi-Q, on the other hand, was shaped flat and rectangular, like a credit card, and incorporated a safety tab mechanism on the needle end of the device. The Auvi-Q also used a voice prompt system that provided step-by-step instructions on how to use the device in order to prevent accidental needle sticks. The device also did not require a safety cap because its needle retracts, requires less piercing time (less than 1 second compared to 5 seconds for EpiPen), and is less painful because its needle is designed to pierce the skin at exactly 90 degrees.

120.     Defendants conspired to have King file a patent infringement lawsuit against Intelliject on January 19, 2011 to block FDA approval of its NDA. *King Pharm., Inc. v. Intelliject, Inc.*, No. 09-cv-652 (D. Del.). King alleged that the Auvi-Q device infringed the '432 Patent, entitled "Automatic Injector with Kickback Attenuation." The '432 Patent was not obtained by Meridian until September 14, 2010, over a year after Intelliject had begun developing the Auvi-Q and only two weeks before Intelliject filed its NDA.

121.     Meridian listed the '432 Patent in the Orange Book on September 15, 2010, the same day it was issued by the PTO. On the other hand, Meridian had not listed the '012 Patent in the Orange Book for more than eight months after the patent was granted. Upon information and

belief, Meridian rushed to submit the '432 Patent in the Orange Book so it would be listed before Intelliject filed its NDA.

122.   On August 1, 2011, Intelliject announced that the FDA had given the Auvi-Q tentative approval. According to Intelliject's press release:

> Obtaining a tentative approval means that the product review is complete and the submission met the FDA's requirements to be approved. The FDA reserves final approval of the product, however, until all exclusivity or patent challenges have been resolved, specifically the current patent litigation brought against Intelliject by King Pharmaceuticals, Inc. (King) and Meridian Medical Technologies, Inc. (Meridian). Final FDA approval is required before a product can be marketed in the United States.

123.   Upon information and belief, Defendants conspired with each other, and with Intelliject and Sanofi, to enter into an anticompetitive agreement whereby Defendants provided significant consideration, incentives, and benefits to Intelliject and Sanofi to delay bringing their competing product to market.

124.   On February 16, 2012, about two months before the Teva settlement, Mylan and Pfizer (again jointly) announced that they had reached a settlement with Intelliject over their patent litigation. Mylan was not a party to the litigation but made a public announcement regarding the settlement. Although the terms of that deal are confidential, the parties did reveal that the agreement prevented Intelliject and Sanofi from launching their Auvi-Q device for another nine months, until November 15, 2012. Upon information and belief, Intelliject and Sanofi agreed to this in exchange for valuable consideration. The relatively short duration of delay before entry of the Auvi-Q likely indicates the strength of Intelliject's defenses to the patent litigation.

125.   On August 10, 2012, the FDA granted final approval of Intelliject's NDA, but pursuant to the settlement, consumers did not have access to the Auvi-Q until November 2012.

### c. Sandoz Litigation

126.    In 2010, Sandoz, Inc. ("Sandoz") attempted to enter the market by filing an ANDA for a generic alternative to EpiPen, and in response, Defendants conspired to have King file a patent infringement suit against Sandoz. A 2016 Form 10-Q filing by Pfizer stated that Sandoz's ANDA was outstanding.[33]

127.    The litigation stalled with the court entering an order staying the FDA process and administratively terminating the action, to be reopened upon letter request by any of the parties.[34] No party has requested that the case be reopened. Staying the litigation also stays any definitive ruling on this challenge to the EpiPen patents.

128.    On information and belief, Defendants conspired with each other and Sandoz to enter into an anticompetitive agreement with Sandoz to stay the case indefinitely in exchange for valuable consideration to Sandoz.

### d. Mylan's Meritless Citizen Petition

129.    In January 2015, six months before Teva would have been permitted under the settlement agreement to launch its generic, as part of Defendants' conspiracy, Mylan filed a citizen petition asking the FDA to refrain from approving Teva's ANDA application unless the FDA determined that Teva's product was the "same as" Mylan's EpiPen.[35]

---

[33] Pfizer SEC Form 10-Q for the quarterly period ended July 3, 2016, filed August 11, 2016, at 33.

[34] *King Pharmaceuticals, Inc. v. Sandoz, Inc.*, No. 10-cv-3568 (D.N.J. May 10, 2011) (Doc. No. 66).

[35] U.S. Food & Drug Admin., Citizen Petition Denial Response from FDA CDER to Mylan Specialty L.P. (June 15, 2015), available at https://www.regulations.gov/document?D=FDA-2015-P-0181-0009.

130.    A leading antitrust scholar of Rutgers Law School, Michael Carrier, noted that "Mylan received significant unwanted attention in 2016 for its price hike for EpiPen, but its citizen petition escaped notice. The lifecycle of EpiPen reveals how Mylan used citizen petitions along with settlements to delay generic entry."[36] He continued:

> But as Teva's entry loomed, Mylan reached into its toolkit to pull out a citizen petition, which it filed on January 16, 2015, a mere six months before Teva was scheduled (pursuant to the settlement) to enter the market. In its petition, Mylan contended that Teva should be required to demonstrate that its product was the "same as" Mylan's EpiPen. In other words, even though the parties had already agreed through settlement to delay Teva's generic entry for more than three years, Mylan sought to *further* delay the entry of Teva's generic through its citizen petition.
>
> In addition to its January 2015 petition, the company waited almost *five months* after filing and only weeks before the FDA was required to respond, until May 2015, to supplement its petition with a 48-page independent study purportedly showing that patients would not use Teva's generic product correctly.
>
> Given that Teva's generic product had been in development for at least *six years* before the petition's filing, this late-filing of a supplemental study implicates significant timing questions. Why would such a study be submitted only weeks before the FDA was required to respond under the FDA's 150-day clock?[37]

131.    Mylan waited until just before the FDA's response was due to submit a supplemental "study" from a consulting firm. Although the study purportedly found that Teva's device would not be effective, the study had numerous flaws that demonstrate Mylan was not acting in good faith in relying on it. For example, (a) the study lacked a control group; (b) the study did not use the actual generic device, but instead used a prototype; (c) the study used a small

---

[36] Carrier & Wander, "*Citizens Petitions: An Empirical Study*", 34 CARDOZA L. REV. 249, 279 (Oct. 2012) (citing *The Generic Drug Maze: Speeding Access to Affordable, LifeSaving Drugs: Hearing Before the S. Spec. Comm. on Aging*, 109th Cong. 6 (2006)).

[37] *Id.*

number of participants; and (e) the researchers merely told the participants to watch a video rather than actually use the prototype.[38] Professor Carrier further opined:

> Shedding even more light on the questionable petition and supplemental study is its timing. In a development of which the industry would be keenly aware, Teva filed its ANDA against the Epi-Pen in 2008. And court documents show that Teva produced its ANDA filing in the course of litigation on September 17, 2010. This material included "detailed product descriptions, drawings, and instructions for use" for Teva's proposed generic.

> At the time (and to this day), Mylan was working hand-in-hand with Meridian/King, with the former taking over Orange Book sponsorship of the drug application and the latter targeting rivals in litigation.
> …

> We think it reasonable to conclude that Mylan's (1) filing of a petition years after invariably knowing about Teva's generic, (2) filing of a petition calculated to delay entry after settlement, and (3) late-filing of a supplemental study together comprised a strategy to delay Teva's ANDA approval ***beyond*** the ***already-delayed*** agreed entry date of July 22, 2015.

132.    Mylan's citizen petition relied on a medical statement from Dr. Eli Meltzer that sought to downplay the generic device from Teva. Meltzer, however, was paid roughly $95,000 in fees in 2014 and 2015 by Mylan, according to the Open Payments federal database.

133.    Although the FDA ultimately rejected the citizen's petition, these submissions disrupted the trajectory of approval for Teva's generic EpiPen and EpiPen Jr. products, ultimately causing approval for those products to be delayed by more than three additional years, until August 2018.

---

[38] Ed Silverman, *How Mylan Tried to Keep Teva from Selling a Generic* EpiPen, STAT (Aug. 31, 2016), http://www.statnews.com/pharmalot/2016/08/31/mylan-teva-generic-epipen/.

### (2)    Mylan Stifles Competition from Sanofi's Auvi-Q

134.    Over the years, other drug companies have attempted to make in-roads in the EAI drug device market but failed to obtain significant market share because there are significant barriers to entry in the EAI drug device market. In 2003, the first alternative to EpiPen – Twinject®, later renamed Adrenaclick™ ("Adrenaclick") – was introduced to the market. Adrenaclick shared EpiPen's basic design but failed to gain significant market share. Since 2003, various companies have produced Adrenaclick, with Impax acquiring the rights in March 2015. Impax currently produces both Adrenaclick and a generic version. Adrenaclick's market share has ranged from only 2% in 2013 to 8% in 2016. Pfizer, meanwhile, through its generic division, Greenstone, has distributed and sold an authorized generic of Adrenaclick.

135.    Mylan viewed Sanofi's Auvi-Q® ("Auvi-Q") product, launched in January 2013, as a credible threat to Mylan's monopoly in the U.S. EAI drug device market.[39]

136.    In December 2012, prior to Sanofi's launch of Auvi-Q, Mylan touted that EpiPen "has been the number one prescribed epinephrine auto-injector for more than 20 years and constitutes more than 99% of the epinephrine auto-injector market."[40] On August 1, 2013, Mylan told investors that the EpiPen had a "93.3% market share".[41]

---

[39] *See* Sanofi's Complaint against Mylan for monopolization in violation of the Sherman Act in *Sanofi-Aventis U.S. LLC v. Mylan Inc. and Mylan Specialty, L.P.*, 3:17-cv-02763 (D.N.J.) (Doc. No. 1) ("Sanofi Complaint"). On August 3, 2017, the Judicial Panel on Multidistrict Litigation transferred Sanofi's case to the U.S. District Court for the District of Kansas for coordinated and consolidated proceedings in *In re: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation*, No. 17-md-2785-DDC-TJJ (D. Kan.).

[40] Mylan Specialty Press Release, "Mylan Specialty Offers Tips for Parents of Children with Life-Threatening Allergies to Help Prepare for Seasonal Celebrations" (Dec. 18, 2012), http://newsroom.mylan.com/press-releases?item=123064.

[41] Presentation, Mylan Inc., Mylan Investor Day: Seeing is Believing, at 109 (Aug. 1, 2013).

137.    Sanofi licensed Auvi-Q from Intelliject, Inc. in 2009. According to Sanofi, Mylan considered licensing Auvi-Q from Intelliject but decided not to bring another EAI drug device to the market to compete with EpiPen.[42]

138.    Sanofi designed Auvi-Q for the smartphone generation to be smaller and easier to carry than an EpiPen, which is about the size of a magic marker.[43] Auvi-Q also included voice instructions to help patients or caregivers administer epinephrine during a person's anaphylactic episode, when there may not have been any prior training and time is of the essence to administer an injection. This is important because EAI drug devices are often administered not only by first responders, but by parents, other caregivers, or patients themselves. Many patients have multiple EAI drug devices to keep in their home, school, work, car, bag or backpack. EAI drug devices are not used very often in hospitals or medical clinics. Further, the battery that powers the voice instructions of Auvi-Q was designed to last for several years, well beyond the one-year shelf life of the epinephrine in the device (the same epinephrine shelf life as in similar epinephrine auto-injectors). The device was also designed so that Auvi-Q's injection mechanism works independently of the battery and other electronic features of Auvi-Q. That way, Auvi-Q would not need battery power to deliver its life-saving medicine.

139.    As discussed above, the EpiPen patent allegedly infringed by Auvi-Q relates to a mechanism to cover the needle after use, despite the fact that Auvi-Q's needle retracts, and plainly uses an entirely different mechanism to prevent accidental sticking with its needle.

140.    When Auvi-Q was launched in January 2013, many doctors, caregivers and advocates recognized that the smaller size and different shape of Auvi-Q made it more likely that

---

[42] Sanofi Complaint at ¶ 44.

[43] *Id*. at ¶ 4, 27.

at-risk children and adults would carry their EAI drug device, and that the voice instructions of Auvi-Q would increase the likelihood of proper use during an emergency. Auvi-Q quickly gained traction in the marketplace in the immediate few months after its launch. Below is a comparison of the size of Auvi-Q and other EAI devices, including the EpiPen[44]:



141.    The FDA determined that the epinephrine used in Auvi-Q was bioequivalent to the epinephrine in the EpiPen.[45] However, because the devices were not identical, and were designed

---

[44]    Image from the website "Amazing and Atopic," available at http://www.amazingandatopic.com/2013/06/adrenaclick-re-launch.html.

[45] U.S. Food & Drug Admin., Cross-Discipline Team Leader Review, NDA No. 201739, at 2 (July 8, 2011), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/201739Orig1s000MedR.pdf ("The PK trial, which was not a requirement for the application, demonstrated bioequivalence (BE) between e-cue [the brand name proposed for Auvi-Q at that time] 0.3 mg and the reference 0.3

to use different procedures, Auvi-Q could not be substituted automatically for the EpiPen by a pharmacist because EAI drug devices require the patient or caregiver to be trained on a particular device.

142.    Despite this, when Auvi-Q® was released in 2013, Mylan's CEO stated, "EpiPen has been tried and true for 25 years…. It's not easily confused with a Blackberry or your phone in your purse or your backpack."[46]

143.    Sanofi matched Mylan's promotional programs, including a school discount program and patient coupons.[47] Sanofi also launched Auvi-Q at price parity with EpiPen.[48] Further, when Auvi-Q launched, it was generally covered (either at a T2 or T3 level) on drug formularies with key third-party payors. In general, third-party payors told Sanofi that Auvi-Q would be covered on their formularies, in keeping with how the EAI drug device category was not restricted historically.

144.    Mylan proceeded with erecting artificial barriers to U.S. consumers' access to and use of Auvi-Q. In particular, Mylan offered new, and much higher, rebates to commercial insurance companies and pharmaceutical benefit managers ("PBMs") (collectively "third-party payors") conditioned exclusively on Auvi-Q not being an EAI drug device that those payors would reimburse for use by U.S. consumers. The overwhelming majority of U.S. consumers rely on prescription drug coverage for the purchase of EAI drug devices. As a result of Mylan's unlawful

---

mg product [EpiPen®] using a scaled BE approach which is an analytic approach that may be applied in situations of high intra- and inter-individual variability.").

[46] N.Y. Times, Brothers Develop New Device to Halt Allergy Attacks.

[47] Sanofi Complaint at ¶ 51.

[48] *Id*. at ¶ 52.

exclusive dealing, Auvi-Q was blocked from nearly 50% of the EAI drug device market nationally, and the blockage was even higher in some of the largest states.[49]

145.    PBMs are third-party administrators of prescription drug programs for commercial health plans, self-insured employer plans, Medicare Part D plans, the Federal Employees Health Benefits Program, and state government employee plans. According to the American Pharmacists Association ("APhA"):

> PBMs are primarily responsible for developing and maintaining the formulary, contracting with pharmacies, negotiating discounts and rebates with drug manufacturers, and processing and paying prescription drug claims. For the most part, they work with self-insured companies and government programs striving to maintain or reduce the pharmacy expenditures of the plan while concurrently trying to improve health care outcomes.[50]

146.    According to a joint report on competition in the health care industry by the U.S. Department of Justice and the Federal Trade Commission, commercial third-party payors commonly use the following "tiers" when placing drugs on formularies:[51]

- Tier 1 (T1) to Tier 3 (T3) – "The ascending rates of the co-pays are designed to create an incentive for the enrollee to prefer the lowest cost, yet clinically effective, alternative. Co-pays significantly influence drug utilization."

- "Prior Authorization" (PA) is normally reserved for drugs that treat conditions or illnesses not otherwise covered by plans, have high costs, have a high potential for abuse, or are ordered in unusual quantities.

- "Not Covered" (NC) requires patients to pay full retail price – without rebates – rather than a co-pay under their insurance plans.

---

[49] *Id*. at ¶ 6.

[50] *Pharmacy Benefit Management*, https://www.pharmacist.com/sites/default/files/files/Profile_24_PBM_SDS_FINAL_090707.pdf.

[51] U.S. Dep't of Justice & FTC, Improving Health Care: A Dose of Competition, Ch. 7, IV. B (2004), https://www.ftc.gov/sites/default/files/documents/reports/improving-health-care-dose-competition-report-federal-trade-commission-and-department-justice/040723healthcarerpt.pdf.

147.    If an EAI drug device is blocked from formulary and listed as NC or PA, patients will not have access to that product at all, or will only have access as a last resort with prior authorization from a doctor.

148.    According to the U.S. government, drugs are normally listed as PA only when they "treat conditions or illnesses not otherwise covered by plans, have high costs, have a high potential for abuse, or are ordered in unusual quantities."[52] EAI drug devices do not meet these criteria: they are used for the treatment of illnesses that are covered by health plans, they do not have potential for abuse, and they are ordered in a regular quantity and typically refilled once per year.

149.    EAI drug devices historically were not a "managed" drug category on formularies. This means that payors' formularies typically covered all available EAI drug devices and would not list any as NC or PA. Some formularies listed EAI drug devices at different coverage tiers from T2 to T3, but typically did not exclude devices from coverage altogether. As a result, before Sanofi launched Auvi-Q in early 2013, the EpiPen and competing EAI drug devices were generally equally available to patients on third-party payors' drug formularies, which typically did not list EAI drug devices as NC or PA.

150.    When Auvi-Q was launched, it was generally covered (either at a T2 or T3 level) on drug formularies with key third-party payors. In general, third-party payors told Sanofi that Auvi-Q would be covered on their formularies, which was in keeping with how the EAI drug device category was not restricted historically.[53]

---

[52] U.S. General Accounting Office, Effects of Using Pharmacy Benefit Managers on Health Plans, Enrollees, and Pharmacies (2003), available at http://www.gao.gov/new.items/d03196.pdf.

[53] Sanofi Complaint at ¶ 53.

151.    State-based Medicaid plans, which also use drug formularies, made up an additional 16% of the Epinephrine auto-injector market during the 2013 to 2015 period. Together, commercial payors and Medicaid made up nearly 90% of the Epinephrine auto-injector market in the U.S. over these three years. Having access to the drug formularies of these third-party payors is crucial to entering and competing vigorously in the epinephrine auto-injector market.

152.    Prescription drug insurance plans only cover costs for drugs that appear on their PBMs' formulary, or list of covered drugs. They do not cover any of the costs for drugs that do not appear on their formularies. Express Scripts and CVS Caremark are the two largest PBMs in the United States. In 2014, they combine to cover well over 50% of the PBM market in the United States. In 2013, CVS Caremark became the first PBM to issue a list of excluded drugs that would not be covered by insurance plans for which it provided services. In 2014, Express Scripts followed suit and issued its own Preferred Drug List Exclusions.

153.    Mylan used several tactics to get Auvi-Q off of drug formularies. Upon information and belief, beginning around May 2013, Mylan began to pitch to third-party payors large rebates of 30% or higher and expressly conditioned the rebates on the EpiPen gaining exclusive position on the formulary, thereby causing Auvi-Q to be removed from a formulary and put in a NC or PA formulary position.[54] Mylan used its monopoly market share and large rebates to coerce third-party payors to choose between accepting Mylan's huge rebates to exclusively cover the EpiPen, or foregoing those rebates to allow Auvi-Q to compete on the market. In some cases, Mylan's offers caused third-party payors to revisit and reverse decisions to cover Auvi-Q, after those payors had already agreed to cover Auvi-Q on their formularies.[55]

---

[54] *Id*. at ¶ 54, 59.

[55] *Id*. at ¶ 60.

154.    Mylan's new rebates were unusual because, according to Sanofi, research of third-party payors conducted pre-launch of Auvi-Q showed that pre-launch, Mylan did not typically offer rebates for the EpiPen and, where it did so, Mylan's rebates were generally low, often below 10%. [56]

155.    Mylan hiked prices by 15% in July 2013. It then tacked on four more successive 15% increases in February 2014, September 2014, April 2015 and November 2015, taking the price from $304 all the way up to $530 in the course of less than 30 months. In doing so, Mylan created additional profit margin from which it could pay a portion of these monopoly profits to PBMs in the form of significantly higher rebates and percentage discounts. For example, in congressional testimony, Mylan's CEO offered a chart that showed that while the Wholesale Acquisition Cost for EpiPen two-packs rose from $401 in September 2014 to $530 in November 2015, Mylan's profit per two-pack actually dropped from $235 to $219 respectively. On information and belief, this temporary drop in profit margin was due to larger rebates Mylan paid to PBMs.

156.    Many of the largest third-party payors announced formulary decisions in the 2nd half of 2013 (to be effective then or as of January 1, 2014) that Auvi-Q would not be covered, but listed as NC or PA.[57] On information and belief, in exchange for Defendants' increased rebates and discounts, Express Scripts added Auvi-Q to its 2014 Preferred Drug List Exclusions, and CVS Caremark added Adrenaclick to its 2014 list of Formulary Drug Removals.

---

[56] *Id.* at ¶ 56.

[57] *Id.* at ¶ 67.

157.     Mylan offered similar rebates to other third-party payors, such as state-based Medicaid formularies. Mylan was successful in having Auvi-Q excluded from coverage in many states due to these rebates.

158.     One year after its launch, Mylan had blocked close to 50% of the U.S. EAI drug device market to Auvi-Q. Auvi-Q's share of the market dropped by nearly 50% in one month between December 2013 and January 2014, after all of Mylan's conditional rebates blocking Auvi-Q took effect. Sanofi's U.S. commercial payor market share had grown to around 13% by December 2013. In January 2014, its share dropped to around 8%, further dropping to around 7% by May 2014.[58]

159.     Further, physicians were less likely to prescribe Auvi-Q if they knew that patients' insurance may not cover Auvi-Q. Mylan distributed materials to physicians touting EpiPen as the preferred brand for major health plans covering 95 million patients, such as the marketing material below:



---

[58] *Id.* at ¶ 69.

160.    Mylan paid formularies large rebates to exclude Auvi-Q from coverage, yet misleadingly claimed that Auvi-Q was excluded for clinical reasons as follows[59]:





161.    In 2013, around the time that Auvi-Q launched, Mylan for the first time announced a $0 co-pay coupon for the EpiPen.[60] Sanofi also offered a $0 co-pay coupon, to match the EpiPen. However, the EpiPen was often listed at a higher coverage tier than Auvi-Q and the EpiPen's co-pay was typically much lower than Auvi-Q's co-pay. Sanofi had to pay significantly more to reimburse pharmacies for the $0 co-pay for Auvi-Q than Mylan did for the EpiPen.[61]

---

[59] *Id*. at ¶ 53.

[60] *See* Mylan Press Release, "Mylan Specialty L.P. Announces 25th Anniversary Celebration of EpiPen® (epinephrine) Auto-Injector," (April 25, 2013), http://newsroom.mylan.com/press-releases?item=122761 ("In recognition of this important milestone, Mylan Specialty recently introduced the 25th anniversary '$0 Co-Pay Offer.'").

[61] Sanofi Complaint at ¶ 71.

162.    In January 2014, just after all of Mylan's anticompetitive rebates went into effect blocking Auvi-Q from some of the largest third-party payors, Mylan sent physicians marketing materials stating that Mylan was the "Preferred" EAI device for 99% of patients, while Auvi-Q was "Preferred" for only 2%:



163.    In an October 2013 earnings call, Bresch noted that, for EpiPen and the EAI drug device marketplace, "we believe we'll continue to get our very much disproportionate share around the marketplace, again, for years to come. And I think as far as pricing our formulary position, we are in a number one formulary position with all the major formularies and don't see any of that changing next year [2014]."

164.     In an August 7, 2014 earnings call, Bresch stated, "I think that given the breadth and scope of our business that we've been able to manage and to obviously remain very competitive in that structure. But with that being said, we're going to do whatever we need to do to really maintain that market leadership, and like I said, and continue to look at ways that we can enhance and add to this franchise."[62]

165.     In a Q4 2015 analyst call Bresch stated:

> [T]hroughout 2015, especially at the beginning of the year . . . Mylan had been very proactive, in maintaining our market share in a very competitive multi-epinephrine marketplace. And that involved entering contracts with our payers, long-term multi-year contracts.
> …
> I think what we did say, is that we were very proactive. And I had very – I think very straightforward conversations with all of the investors and shareholders, that we were maintaining market share. And to do so, that required aggressive rebating, and that's why that we absorbed much of that during 2015.
> …
> As far as the contracts that I mentioned, look we were – as I mentioned in 2015, the aggressiveness came from the current multi-epinephrine market and the players that were in there, including Auvi-Q and Sanofi.[63]

166.     Mylan also aggressively sought the exclusive use of EpiPen in schools. A number of state legislatures passed laws allowing school personnel to keep and administer non-student-specific EAI drug devices to students during anaphylactic emergencies. In addition, in 2013, President Obama signed into law the School Access to Emergency Epinephrine Act, which encouraged more states to enact similar laws. Mylan had spent a reported $4 million specifically lobbying Congress to pass the School Access to Emergency Epinephrine Act. A prominent health care law professor, Nicholson Price, has compared Mylan's tactics to those of a drug dealer: "'It's

---

[62] *See* Transcript, Mylan Inc., Earnings Call (Aug. 7, 2014).

[63] Mylan Q4 2015 Earning Conference Call, Feb. 10, 2016.

kind of like the first hit's for free,' says Nicholson Price, an assistant professor at the University of Michigan Law School. 'You want to start people off with your product, and getting these products in at schools is a great way.'"[64]

167.    Mylan noted that epinephrine access laws for schools are "a game changer in expanding access" to EAI drug devices and promoted the importance of these programs for expanding awareness of anaphylaxis and the EpiPen® brand.[65] Mylan and Sanofi had programs designed to provide free or discounted EAI drug devices to schools. Mylan, however, required that a school taking part in Mylan's discounted EpiPen program certify in writing that the school would not purchase any products that are competitive products to EpiPen:

**CERTIFICATION FORM:**
**EpiPen® Auto-Injectors School Discount Program**

The school and/or school district identified below (the "School") hereby acknowledges and agrees that the EpiPen® (epinephrine) Auto-Injectors School Discount Program made available by Mylan Specialty L.P. ("Mylan Specialty") to the School is because it is a school and is conditioned upon the undersigned making this certification to Mylan Specialty.

The School represents and warrants to Mylan Specialty that:

(vi)    the School hereby certifies that it will not in the next twelve (12) months purchase any products that are competitive products to EpiPen® Auto-Injectors;

168.    Suspiciously, Mylan later eliminated the exclusivity requirement for schools. Criticism by government authorities and antitrust experts may have been the cause. On September 6, 2016, New York's Attorney General identified Mylan's school exclusivity policy as anti-competitive and launched an investigation into Mylan's anti-competitive business practices.[66]

---

[64] Pauline Bartolone, *EpiPen's Dominance Driven by Competitors' Stumbles and Tragic Deaths*, NATIONAL PUBLIC RADIO (Sep. 7, 2016), https://www.npr.org/sections/health-shots/2016/09/07/492964464/epipen-s-dominance-driven-by-competitors-stumbles-and-tragic-deaths.

[65] Presentation, Mylan Inc., Mylan Investor Day: Seeing is Believing, (Aug. 1, 2013).

[66] Dan Mangan, *New York attorney general launches antitrust probe of Mylan's EpiPen contracts*, CNBC (Sept. 6, 2016), http://www.cnbc.com/2016/09/06/new-york-attorney-general-launches-antitrust-probe-of-mylans-epipen-contracts.html.

Then University of Iowa professor Herbert Hovenkamp noted, "It is illegal to issue a discount on the condition the customer not acquire a competitor's goods — if the effect may be to substantially lessen competition."[67] The elimination of the school discount program qualifies as an admission of guilt by Mylan.

169.   In September 2016, U.S. Senators Richard Blumenthal and Senator Amy Klobuchar asked the Federal Trade Commission to investigate whether Mylan violated federal antitrust laws to protect EpiPen from competition.[68] When testifying to Congress on September 21, 2016, Bresch claimed, "And we've made great strides in providing access to EpiPen Auto-Injectors in public places, starting with schools. In the last four years alone, Mylan provided seven hundred thousand free EpiPen Auto-Injectors to more than 66,000 schools across America, with no strings attached."[69] However, Mylan did attach strings to the schools who received EpiPens in the form of a contract signed by the schools agreeing not to purchase any products from Mylan's competitors for a period of 12 months.

170.   In regard to the school program, Defendants' anticompetitive conduct lies not with its lobbying efforts, but with their restraints against competitors' products being placed in schools

---

[67] Ike Swetlitz & Ed Silverman, *Mylan may have violated antitrust law in its EpiPen sales to schools*, PBS Newshour (Aug. 26, 2016), http://www.pbs.org/newshour/rundown/mylan-may-violated-antitrust-law-epipen-sales-schools-legal-experts-say/.

[68] Richard Blumenthal, Blumenthal & Klobuchar, *Call for Immediate Federal Investigations into Possible Antitrust Violations by EpiPen Manufacturer* (Sept. 6, 2016), https://www.blumenthal.senate.gov/newsroom/press/release/blumenthal-and-klobuchar-call-for-immediate-federal-investigation-into-possible-antitrust-violations-by-epipen-manufactrurer.

[69] *Bresch Testimony*, U.S. House of Rep. Comm. on Oversight and Gov't Reform (Sep. 21, 2016), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/2016-09-21%20Mylan%20CEO%20Bresch%20-%20Testimony.pdf.

during the exclusivity period contemplated in the exclusive contracts it forced schools to sign in exchange for free or discounted EpiPens.

171.    It is reasonable to infer that Defendants' exclusive contracts with schools foreclosed a substantial share of the EAI drug device market to EpiPen competitors.

172.    Mylan made other public comments disparaging competition, such as this comment by Bresch about Auvi-Q after its launch in 2013: "EpiPen has been tried and true for 25 years…. It's not easily confused with a Blackberry or your phone in your purse or your backpack."[70]

173.    Mylan also funded a study entitled "Auvi-Q® versus EpiPen® Auto-Injectors: Failure to Demonstrate Bioequivalence of Epinephrine Delivery Based on Partial Area Under the Curve." However, the FDA had already determined that the epinephrine in Auvi-Q is bioequivalent to the epinephrine in the EpiPen.[71] An example of Mylan's misleading marketing follows:

---

[70] Katie Thomas, *Brothers Develop New Device to Halt Allergy Attacks*. N.Y. TIMES, Feb. 3, 2013, *available at* http://www.nytimes.com/2013/02/02/business/auvi-q-challenges-epipen-with-a-new-shape-and-size.html.

[71] U.S. FDA, Cross-Discipline Team Leader Review, NDA No. 201739, at 2 (July 8, 2011), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/201739Orig1s000MedR.pdf   ("The PK trial, which was not a requirement for the application, demonstrated bioequivalence (BE) between e-cue [the brand name proposed for Auvi-Q at that time] 0.3 mg and the reference 0.3 mg product [EpiPen®] using a scaled BE approach which is an analytic approach that may be applied in situations of high intra- and inter-individual variability.").



174. For patients in the United States covered by third-party payors who had Auvi-Q on formulary at similar co-pay terms to the EpiPen, Auvi-Q reached over 20% market share by the end of 2013 and reached over 30% market share in 2015. In Canada, Auvi-Q® (there known as Allerject®) did not face the same type of anti-competitive conduct from EpiPen, although the EpiPen® similarly dominated the Canadian EAI drug device market there. Canadian provincial authorities control drug formularies, and the Allerject® was treated at parity with the EpiPen, and the two devices were equally available for physicians to prescribe to consumers. After its launch, Allerject® exceeded its projections, growing to 21% market share by the end of 2013, its first year on the market. In 2014 and 2015, Allerject® had continued to gain market share, reaching 25% market share by the end of 2014, and peaking at 32% market share in 2015.

175. Thus, Mylan substantially increased the price of the EpiPen before the launch of Auvi-Q, which ensured that, once Mylan began to offer its new, large conditional rebates from the higher price level, third-party payors found it practically impossible to refuse these rebates that

Mylan had leveraged across its virtual 100% share of the EAI drug device market. Mylan artificially raised Sanofi's costs to market Auvi-Q, and patients' costs to purchase Auvi-Q, by ensuring that Auvi-Q would be covered with a higher co-pay than the EpiPen. Mylan further engaged in misleading advertising and other promotional activities in order to persuade doctors, key thought leaders, and consumers that Auvi-Q was not a good alternative.

176.    In October 2015, Sanofi voluntarily recalled Auvi-Q following reports of manufacturing issues affecting some devices.[72] However, Mylan's conduct ultimately contributed to Sanofi foregoing its investment in Auvi-Q and returning the rights to the drug to kaléo, inc. in February 2016, rather than re-launching Auvi-Q.[73]

177.    Due to Mylan's anticompetitive conduct, Sanofi only sold Auvi-Q in the U.S. from January 2013 until October 2015.

178.    On December 21, 2017 in Sanofi's lawsuit against Mylan, Judge Crabtree granted in part and denied in part Mylan's motion to dismiss and found the following[74]:

a.    Sanofi alleges facts sufficient to establish that Mylan possessed monopoly power in the relevant market, satisfying the first element of a Sherman Act, Section 2 claim;

---

[72] Sanofi Press Release, "Sanofi U.S., UPDATED: Sanofi US Issues Voluntary Nationwide Recall of All Auvi-Q® Due to Potential Inaccurate Dosage Delivery" (Oct. 30, 2016), http://www.multivu.com/players/English/7673951-sanofi-auto-injector-recall/.    Mylan also undertook a recall of EpiPens in March-April 2017. *See* Mylan Press Release, "Mylan Provides Update on Meridian Medical Technologies', a Pfizer Company, Expanded Voluntary Worldwide Recall of EpiPen® Auto-Injector" (Mar. 31, 2017) http://newsroom.mylan.com/2017-03-31-Mylan-Provides-Update-on-Meridian-Medical-Technologies-a-Pfizer-Company-Expanded-Voluntary-Worldwide-Recall-of-EpiPen-R-Auto-Injector.

[73] Sanofi Press Release, "Sanofi US to Return Auvi-Q® (epinephrine injection, USP) Rights to kaléo" (Feb. 23, 2016), http://www.news.sanofi.us/2016-02-23-Sanofi-US-to-Return-Auvi-Q-epinephrine-injection-USP-Rights-to-kal-o.

[74] *See* Memorandum and Order, *Sanofi-Aventis U.S. LLC v. Mylan Inc. and Mylan Specialty, L.P.*, 3:17-cv-02763 (D.N.J.) (Doc. No. 98).

b. Sanofi alleges facts about Mylan's rebate offers to non-governmental third-party payors that plausibly state a claim for exclusive dealing in violation of the Sherman Act;

c. "[T]he Sanofi Complaint alleges that Mylan's rebate program involved anticompetitive conduct—beyond pricing itself—that was designed to block customer access to Auvi-Q® and protect Mylan's monopoly in the EAI drug market";

d. "Sanofi has alleged that Mylan's rebate program involved exclusionary conduct capable of supporting a finding or inference that the probable effect of Mylan's rebate program—conditioned on exclusivity—substantially foreclosed competition" and "Sanofi thus states a plausible exclusive dealing claim under the Sherman Act";

e. The *Noerr-Pennington* doctrine immunized Mylan's petitioning of federal and state governments to exclude Auvi-Q from the drug formularies in exchange for rebates, and the court dismissed Sanofi's exclusive dealing claims based on discounts or rebates provided to state-based Medicaid agencies because they are barred by the *Noerr-Pennington* doctrine;

f. Sanofi states a plausible Sherman Act, Section 2 claim based on Mylan's deceptive speech;

g. Sanofi alleges anticompetitive conduct sufficient to state a plausible claim against Mylan for an overall scheme to monopolize violating the Sherman Act, Section 2;

h. that Sanofi's allegations about Mylan's significant price increases allege harm to consumers sufficiently to state an antitrust injury;

i. Sanofi's allegations are sufficient to allege harm to competition in the EAI drug device market, and "[t]hese allegations of antitrust injury are sufficiently plausible to support Sanofi's Sherman Act § 2 claims"; and

j. Sanofi plausibly alleged that Mylan caused its injuries.

179.    Thus, other than dismissing Sanofi's exclusive dealing claims based on discounts or rebates that Mylan offered to state or state agencies, the Court denied Mylan's motion to dismiss.[75]

---

[75] *Id.*

C. **Mylan's Anticompetitive Tying.**

180.     On August 24, 2011, Mylan began requiring the purchase of EpiPens in pairs in the U.S. When it launched the EpiPen 2-Pak, Mylan announced simultaneously that it would stop selling individual EpiPens in the United States. The EpiPen 2-Pak is comprised of two individual EpiPens held together with a grey plastic holder. There is no medical reason for Mylan to sell EpiPens in pairs rather than individually; the 2-Pak was a simple marketing ploy to sell more EpiPens. A photo of a 2-Pak appears below[76]:



Mylan lobbied state legislatures for laws that require schools to stock EpiPens.
Rich Pedroncelli/AP

181.     EpiPen is sold individually outside the U.S.

182.     Before Mylan made the hard switch to selling the EpiPen 2-Pak, sufficient independent demand existed for the individual EpiPen, and patients were regularly prescribed one EpiPen. Only if needed, purchasers bought two EpiPens, or an EpiPen and another EAI drug device

---

[76] Pauline Bartolone, *EpiPen's Dominance Driven by Competitors' Stumbles and Tragic Deaths*, NPR (Sep. 7, 2016), https://www.npr.org/sections/health-shots/2016/09/07/492964464/epipen-s-dominance-driven-by-competitors-stumbles-and-tragic-deaths.

as the spare. After the hard switch to the 2-Pak, purchasers could only buy a pack with two EpiPens.

183.    On August 24, 2011, Mylan issued via interstate wire from Basking Ridge, NJ, a news release entitled, "Dey Pharma to Offer EpiPen 2-Pak and EpiPen Jr 2-Pak Exclusively" with the sub-headline: "Decision aligns with recent clinical guidelines for patients at risk for or who have experienced anaphylaxis to have immediate access to two doses of epinephrine." In that release, Mylan stated that it would "exclusively offer the EpiPen 2-Pak and EpiPen Jr 2-Pak (epinephrine) Auto-Injector 0.3/0.15 mg, to encourage physicians and patients to follow recommendations by the National Institute of Allergy and Infectious Diseases (NIAID). While there is no safety issue with the EpiPen and EpiPen Jr single package, Dey will transition away from distributing and marketing these configurations in the U.S."[77]

184.    In the August 24, 2011 press release, Mylan suggested that requiring all U.S. consumers to buy the 2-Pak was designed to comply with the NIAID December 2010 report. Reading the whole report, however, exposes that Mylan misrepresented the NIAID findings to manufacture a pretext for the "hard switch." Read closely, the NIAID's guidelines apply to patients who have already suffered food allergy-induced anaphylaxis requiring hospital treatment.[78] The guidelines do not support Mylan's decision to force consumers to a hard switch.

---

[77] Dey Pharma, L.P., *Dey Pharma to Offer EpiPen 2-Pak and EpiPen Jr 2-Pak Exclusively*, PR NEWSWIRE (Aug. 24, 2011), https://www.prnewswire.com/news-releases/dey-pharma-to-offer-epipen-2-pak-and-epipen-jr-2-pak-exclusively-128306923.html.

[78] Boyce, *et al., Guidelines for the Diagnosis and Management of Food Allergy in the United States*: *Report of the NIAID-Sponsored Expert Panel*, 126 J. Allergy Clin. Imunol. 6, S19 (Dec. 2010) (emphasis added) ("6.4.2. ***Discharge plan following treatment for food induced anaphylaxis. All patients who have experienced anaphylaxis*** should be sent home with the following: Anaphylaxis emergency action plan; Epinephrine auto-injector (2 doses); Plan for monitoring auto-injector expiration dates; Plan for arranging further evaluation; Printed

185.   The statements in the August 24, 2011 press release were misleading for the following reasons:

    a.   The NIAID study Mylan cited did not apply to the general population. It applied only to a narrow subset: allergy sufferers who had already (1) been hospitalized for (2) a food allergy.

    b.   Despite purporting to rely on the WAO global standard, Mylan did not impose a forced sale of the EpiPen 2-Pak globally. In the same August 24, 2011 press release, in fact, Mylan stated: "The single EpiPen Auto-Injector package configuration will continue to be available outside of the U.S."

    c.   Patients and their doctors already had "access to two doses of epinephrine." Doctors could and often did write a prescription for two EpiPens. There was no need to mandate something patients could already purchase.

    d.   The medical guideline recited by Mylan did not state that only two doses of epinephrine should be sold. Instead, as a fraudulent pretext, Mylan used the vague statement by the allergy association (which it had already tainted by paying the members to endorse the 2-Pak) to provide a false pretext for selling only the 2-Pak.

    e.   Nothing mandated that Mylan sell the EpiPen exclusively as a 2-Pak or not at all.

    f.   No medical studies support the decision to sell the EpiPen exclusively as a 2-Pak.

    g.   From 1987 until 2011, the EpiPen was sold individually without incident and with sufficient demand for the individual EpiPen, and nothing suddenly changed in 2011 that required Mylan to only sell the 2-Pak.

---

information about anaphylaxis and its treatment; The treating health care professional should consider referral of the patient to a specialist such as an allergist/immunologist. 6.4.2.1. Anaphylaxis emergency action plan. Patients should be given a written anaphylaxis emergency action plan that contains information about self-injection of epinephrine prior to discharge 261,303 (see sample action plan in Appendix E). Patients should be instructed on the value of medical identification jewelry to easily identify themselves as patients with anaphylaxis potential and their food allergen triggers. 6.4.2.2. Epinephrine auto-injector (or 2-dose prescription). All patients experiencing anaphylaxis should be provided directly with an epinephrine auto-injector or, if this is not possible, with a prescription (recommended prescription is for 2 doses of epinephrine), and advised to fill it immediately.").

h. When Mylan switched to the 2-Pak in 2011, it did not order a recall or insist that all U.S. EpiPen patients immediately go buy a second EpiPen. If, in fact, the second EpiPen was so critical for medical reasons, it would have done so.

i. Mylan's global sales and marketing for a single EpiPen prove the medical need for a 2-Pak was a false pretext. Mylan's 2011 interstate wire relied on the World Health Organization, but the U.S. is the only country where consumers must purchase a 2-Pak of the EpiPen.

j. According to a study conducted by the American Academy of Allergy, Asthma & Immunology, only a "small number of patients . . . require a second dose" and "the device is mainly sold in packs of two due to imperfect product design" causing "14 percent of parents [to] . . . accidentally stick the needle in their own thumb instead of in their child's leg, as compared to zero percent of parents using" a competitor's product.[79]

k. Mylan's evidence that between 1-20% of patients might need a second device makes no scientific sense. The margin of 1-20% is so wide as to be meaningless, and further evidences that Mylan stretched the facts to provide a false justification for the hard switch to the 2-Pak.

186. Further, the NIAID panel relied on by Mylan was the subject of Mylan financial contributions to panel members. In the August 24, 2011 press release, Mylan quoted Dr. Phillip Lieberman, a member of the NIAID panel:

> Dr. Phillip Lieberman, Clinical Professor of Medicine and Pediatrics at University of Tennessee College of Medicine, and member of the NIAID-sponsored expert panel added: "The guidelines recognize that up to 20**%** of those who receive epinephrine will require more than one dose before symptoms are relieved. In addition, the need for additional epinephrine cannot be reliably predicted at the onset of a reaction. Therefore, consistent with the guidelines, patients prescribed an epinephrine auto-injector should be given a prescription which allows two doses."

---

[79] Lucy Bayly & Emma Margolin, *How Mylan's Multimillion-Dollar Marketing Convinced Us We Need the EpiPen*, NBC NEWS (Aug. 25, 2016), https://www.nbcnews.com/business/business-news/how-mylan-s-multimillion-dollar-marketing-convinced-us-we-need-n637781.

187.    Dr. Lieberman does not explain why all patients were forced to buy a 2-Pak. Because of subsequently enacted medical disclosure laws, Dr. Lieberman now is forced to disclose that he has "[s]erved as an advisor or consultant" and also "[s]erved as a speaker or a member of a speakers' bureau" for Mylan Laboratories Inc.[80] In 2015, Dr. Lieberman was paid to speak by Mylan Specialty on the topic of "Bridging the Gaps in Anaphylaxis Care: A Clinical Case Review."

188.    At the time he made his statements on August 24, 2011, Dr. Lieberman did not disclose that he was being paid by Mylan as a consultant.

189.    Mylan's advertising and exclusive sale of 2-Paks was designed to capture, and did capture, not only the market for the primary EAI device, but also the market for the spare EAI device.

### D.    The Effects of Mylan's Conduct on EpiPen Prices

190.    The goal, purpose and effect of Mylan's conduct described herein was to artificially inflate EpiPen prices.

191.    Since late 2009, Mylan has raised the price of the EpiPen 15 times. On October 12, 2009, Mylan raised the price of two EpiPens to $124. In October 2011, two years and four price increases later, Mylan increased the price of an EpiPen 2-Pak to $181. After four more price increases, by July 17, 2013, an EpiPen 2-Pak cost $265. Three more price increases raised the price of an EpiPen 2-Pak to $401 in November 2014.

192.    After the EpiPen price had more than doubled by 2014, a group of Mylan executives repeatedly raised concerns internally over Mylan's profiteering at the expense of children. When

---

[80] Phillip L. Lieberman, *Bridging the Gaps in Anaphylaxis Care: A Clinical Case Review*, MEDSCAPE (July 30, 2015), http://www.medscape.org/viewarticle/847839_sidebar1.

confronted with those concerns, Mylan Chairman Robert Coury reportedly "raised both his middle fingers and explained, using colorful language, that anyone criticizing Mylan, including its employees, ought to go copulate with themselves."[81]

193.    In 2014, Mylan executed a tax inversion to transform itself on paper into a Netherlands corporate shell. Upon information and belief, Mylan did this in order to avoid paying taxes in the U.S. "[Tax] filings also show that under a special, one-time stock grant created in 2014, top executives—including Ms. Bresch—stand to reap further riches at least partly on the back of price increases on the EpiPen," and "the timing of the one-time stock grant to executives is striking—especially when set against the history of EpiPen price rises…. Mylan began significantly stepping up the pace of its EpiPen price increases just a few months after the company announced the special grant in February 2014. While price increases in the previous four years averaged 22% annually, in 2014 and 2015 Mylan increased EpiPen prices 32% each year.""[82]

194.    Mylan then continued to hike the price of the EpiPen 2-Pak throughout 2015 and into 2016. One of those increases came in November 2015, one month after the Auvi-Q, a competing device, was removed from the market. In May 2016, an EpiPen 2-Pak cost around $608.

195.    The chart below shows the exponential increase in wholesale EpiPen prices within the timeframe of Mylan's unlawful conduct[83]:

---

[81] Charles Duhigg, *Outcry Over EpiPen Prices Hasn't Made Them Lower*, N.Y. TIMES (June 4, 2017),   https://mobile.nytimes.com/2017/06/04/business/angry-about-epipen-prices-executive-dont-care-much.html.

[82] Gretchen Morgenson, *EpiPen Price Rises Could Mean More Riches for Mylan Executives*, N.Y. TIMES (Sep. 1, 2016),   https://www.nytimes.com/2016/09/04/business/at-mylan-lets-pretend-is-more-than-a-game.html.

[83] *See* Wells Fargo Equity Research, "Mylan N.V.: MYL: Despite Recent Drop, We Remain on the Sidelines," Feb. 19, 2016, at 18.



196.    An equity research group reported that, "We believe that Mylan has been raising list price consistently for years, and we believe that Mylan has realized most of that benefit – not the PBMs [(pharmacies)] and not the distributors."[84]

197.    The large price increases are not related to any corresponding or significant increase in manufacturing costs. The estimated cost of manufacture for a two-pack of EpiPens is about $8.00.[85] From 2012 to 2016, Mylan tripled the price of the EpiPen, even though its costs increased only about 15%.

---

[84] Leerink Partners Equity Research, "Pharmacy Benefit Managers: PBMs Use Competing Products to Reduce Costs – EpiPen's Price is Mylan's Issue," Aug. 26, 2016, at 2.

[85] Tracy Seipel, *EpiPen outrage: Silicon Valley engineers figure real cost to make lifesaving auto-injector two-pack – about $8*, THE MERCURY NEWS, https://www.mercurynews.com/2016/10/01/epipen-outrage-silicon-valley-engineers-figure-true-cost-to-make-lifesaving-auto-injector-about-10/.

198.     Upon information and belief, Mylan had implemented an incentive plan to

motivate the company to increase profits.[86] This is addressed in an article as follows:

> Drug maker Mylan (MYL), under fire for sharply raising prices of a
> life-saving allergy treatment, two years ago urged executives to hit
> ambitious five-year sales and profit targets with a special incentive
> plan.
>
> If achieved, the special one-time award, offered to more than 100
> "key employees," would mean tens of millions of dollars in bonuses
> for the executives of the Netherlands-based company.
>
> The plan's goal is to double Mylan's 2013 adjusted earnings per
> share of $2.89 to $6 by the end of 2018, an "ambitious" 16%
> compound annual growth rate, according to the company's 2014
> proxy statement.
>
> Since the incentive plan was enacted, the cost of EpiPen two-packs
> negotiated by insurers and employers has risen from less than $400
> to more than $600…. The Wall Street Journal reported Thursday on
> the incentive plan, which was also detailed last week by Business
> Insider. With a potential increase of $82 million to the top five
> executives, Mylan management might see EpiPen price hikes as a
> way to make the aggressive targets.
>
> "When they thought they would have a revenue or profit shortfall
> somewhere else they decided to get more aggressive on EpiPen,
> because that is where they thought they would be able to raise some
> prices, make some more profit and make their targets," Ronny Gal,
> an analyst at Sanford C. Bernstein, told USA TODAY.

199.     Mylan has blamed price hikes on the cost of outreach programs[87]:

> Mylan has tried to make a case that there are reasons for the EpiPen's
> price hikes. The company says it has spent millions on anaphylaxis
> and allergy awareness campaigns, and that it has given away
> 700,000 EpiPens in 65,000 schools since 2012. Mylan might refer

---

[86] Mike Snider, *EpiPen Maker Ties Bonuses to Profit Targets*, USA TODAY, (Sept. 1, 2016),
http://www.usatoday.com/story/money/business/2016/09/01/epipen-maker-ties-bonuses-profit-targets/89710582/.

[87] Brad Tuttle, *Mylan Cuts EpiPen Prices, Blames Obamacare Rather Than Greed for High Costs*,
Time, Aug 25, 2016, available at: http://time.com/money/4466052/epipen-prices-cut-mylan-gouging/.

> to these efforts as "outreach." However, you might think of them by
> another term: "marketing." The point of these campaigns, like the
> millions Mylan has spent annually on advertising and lobbying, is
> to create an atmosphere in which it can maximize EpiPen sales.
> Mylan is trying to say that its product's price is so high because the
> company spends so much money trying to sell it to people.

200.    In October 2015, Auvi-Q left the market, leading to a "substantial increase in EpiPen volume growth."[88]

201.    EpiPens are cheaper outside of the U.S. The cost for a set of two EpiPens in Europe ranges from only about $100 in France and the United Kingdom to just over $200 in Germany. In the United Kingdom, non-contractual price agreements between the Department of Health and the Association of the British Pharmaceutical Industry ("ABPI") are established under the Pharmaceutical Price Regulation Scheme ("PPRS") for all branded medicines available from the National Health Service ("NHS"). "The purpose of the scheme is to achieve a balance between reasonable prices for the NHS and a fair return for the pharmaceutical industry." In February 2009, the PPRS reduced prices by an estimated 3.9%. There are two alternative products currently available in the United Kingdom that have prevented Mylan from achieving the same dominant market share it has in the United States. Jext, sold by Alk-Abello and approved for sale in Europe in 2011, has gained an estimated 11% of the European market for epinephrine auto-injectors. A set of two Jext pens costs the NHS about 48 pounds, a decrease of about 17% since 2013. The other alternative to EpiPen, Emerade, was introduced in 2014 and has an estimated 20% of the market in the United Kingdom and Sweden and 6% of the market in Germany.

---

[88] BTIG Equity Research, "Mylan N.V.: Epipen Market Shares Surge Post Auvi-Q Recall; Buy," Nov. 30, 2015, at 1.

202.    In late August 2016, Mylan announced plans to introduce a generic version of the EpiPen with a list price of $300. At $300, Mylan's generic was still triple the 2007 price of EpiPen.

203.    Mylan's generic is "a calculated maneuver. If Mylan is prepared to offer a $300 generic injector, made in the same factories with the same components, why doesn't it just sell the EpiPen for the lower price? The answer is all business and no medicine: Mylan can hang onto the market for doctors and patients who demand the trusted brand name, while cornering an incipient generic market."[89]

204.    The epinephrine auto-injector market is now worth an estimated $1.3 billion annually with Mylan's EpiPen sales accounting for 85%.

**E.    Mylan has been the Subject of Government Investigations**

205.    Mylan, a recidivist violator of competition laws, is the subject of ongoing state and federal government investigations.

**(1)    Exclusive Deadline Agreements for Lorazepam and Clorazepate**

206.    In 1998, the Federal Trade Commission ("FTC") and 32 states filed suit against Mylan and four other companies alleging Mylan had leveraged its dominant market position to extract exclusive dealing agreements from three of the defendants that had supplied the Active Pharmaceutical Ingredient ("API") used to manufacture two other generic drugs – lorazepam and clorazepate. In exchange for these exclusive dealing agreements, Mylan had offered to share a percentage of its gross profits with the other defendants. The FTC and state attorneys general

---

[89] Elisabeth Rosenthal, *The Lesson of EpiPens: Why Drug Prices Spike, Again and Again*, N.Y. TIMES (Sept. 2, 2016), https://www.nytimes.com/2016/09/04/opinion/sunday/the-lesson-of-epipens-why-drug-prices-spike-again-and-again.html.

alleged that in so doing, Mylan had effectively denied its competitors access to the most important ingredient for producing these drugs.

207.    The states also alleged Mylan had tried to enter into an exclusive licensing agreement with the fourth defendant to control the distribution of lorazepam made with an alternative API, a formulation Mylan did not even have FDA approval yet to sell. The states alleged that Mylan's attempt to control the supply of that alternate formulation, when it was not yet approved to sell it, further demonstrated the anticompetitive nature of Mylan's actions.

208.    The complaints averred that after securing the exclusive dealing agreements, Mylan raised the price of clorazepate tablets in amounts ranging from 1,900% to over 3,200%, and raised the price of lorazepam tablets by amounts ranging from 1,900% to 2,600%. In 2000, Mylan agreed to pay $147 million to the Federal Trade Commission, the "largest ever" settlement at the time "reached by the [FTC] in an anti-competitive case," after Mylan had "improperly cornered the market on raw materials for two widely prescribed drugs and then raised the price of those drugs, in some instances more than 3,000 percent."[90]

### (2)    Underpayments of Medicaid Rebates

209.    In 2009, the DOJ announced that Mylan and several other companies agreed to a settlement of $118 million as follows:

> Mylan and UDL agreed to pay $118 million to resolve allegations that they underpaid their rebate obligations with respect to several Mylan drugs (nifedipine extended release tablets, flecainide acetate, selegiline HCL, Orphenadrine Citrate Aspirin and Caffeine tablets, Triamterene/Hydrochlorothiazide, Propoxyphene HCL, Propoxyphene HCL/Aspirin/Caffeine, Propoyxphene Napsylate/Acetaminophen, Ibuprofen tablets, Bumetanide,

---

[90] Stephen Labaton, *Generic-Drug Maker Agrees to Settlement in Price-Fixing Case*, N.Y. TIMES, (July 13, 2000), https://www.nytimes.com/2000/07/13/business/generic-drug-maker-agrees-to-settlement-in-price-fixing-case.html.

Cephalexin and Cefactor) and several UDL drugs (nifedipine extended release tablets, selegiline HCL, Triamterene & HCTZ, Propox Naps & APAP, Flecainide Acetate, Trihexyphenidyl, Ranitidine HCL syrup, Sucralfate Suspension, Selegiline HCL and Bumetanide). Because the Medicaid program is funded by both the federal and state governments, the federal government received $60,896,476.00, the states $49,824,389.00 of the settlement amount and $7,279,135.00 will be paid to entities that participated in the Public Health Service's Drug Pricing Program.[91]

210.    With respect to EpiPen, on September 28, 2016, Senators Richard Blumenthal, Chuck Grassley, and Amy Klobuchar sent a letter to U.S. Attorney General Loretta Lynch inquiring whether the DOJ had considered an investigation into whether Mylan had violated the law when it apparently misclassified its EpiPen for purposes of the Medicaid Drug Rebate Program ("MDRP").[92]

211.    As explained in the letter, Congress created the MDRP to help protect states from high pharmaceutical prices by requiring drug companies to pay a percentage of their revenues to states in the form of rebates. Companies pay a rebate of only 13% for non-innovator (generic) drugs, but must pay at least 23.1% for innovator (brand name) drugs.

212.    For years, Mylan had been misclassifying the EpiPen® as a "non-innovator" drug in the Medicare and State-based Medicaid space to limit the rebates that Mylan would have to pay. Because Mylan misclassified the EpiPen to federal and state governments, Mylan paid hundreds

---

[91] U.S. Department of Justice Press Release, *Four Pharmaceutical Companies Pay $124 Million for Submission of False Claims to Medicaid*, Oct. 19, 2009, available at https://www.justice.gov/opa/pr/four-pharmaceutical-companies-pay-124-million-submission-false-claims-medicaid.

[92] Letter from Senators Richard Blumenthal, Chuck Grassley & Amy Klobuchar to Attorney General Loretta E. Lynch, Sept. 28, 2016, available at http://www.grassley.senate.gov/news/news-releases/senators-ask-justice-department-consider-investigating-mylans-medicaid-rebates.

of millions less in required rebates for patients covered by Medicaid.[93] The EpiPen maintained its status on the MDRP as a non-innovator drug, even though it did not meet these criteria and the Center for Medicaid and CHIP Services had "expressly told Mylan that the product is incorrectly classified."[94]

213.    In October 2016, Mylan announced it had agreed to a $465 million settlement with the U.S. Department of Justice Department of Health and Human Services, and other agencies, related to its misclassification of EpiPen as a non-innovator drug.[95] Mylan also ended its plans to seek a waiver from a new FDA rule requiring Mylan to re-classify the EpiPen as a brand-name drug.[96]

214.    In March 2017, in its 2016 Annual Report, Mylan disclosed that Mylan had been investigated by the DOJ, the U.S. Federal Trade Commission, the U.S. Securities and Exchange Commission, the New York Attorney General, and the West Virginia Attorney General, over Mylan's commercial practices and pricing of the EpiPen.[97] The improper rebate classification for

---

[93] *See* Mylan Press Release, "Mylan Agrees to Settlement on Medicaid Rebate Classification for EpiPen® Auto-Injector" (Oct. 7, 2016), http://newsroom.mylan.com/2016-10-07-Mylan-Agrees-to-Settlement-on-Medicaid-Rebate-Classification-for-EpiPen-Auto-Injector; Letter from Andrew M. Slavitt, Acting Administrator, Centers for Medicare & Medicaid Services, to Senator Ron Wyden (Oct. 5, 2016), https://www.finance.senate.gov/imo/media/doc/Wyden%20EpiPen%20Medicaid%20Letter%20from%20CMS%2010.5.16.pdf.

[94] *Id*.

[95] Katie Thomas, *Mylan to Settle EpiPen Overpricing Case for $465 Million,* N.Y. Times (Oct. 7, 2016), https://www.nytimes.com/2016/10/08/business/epipen-mylan-justice-department-settlement.html.

[96] *Id*.

[97] *See* Mylan N.V., Annual Report (Form 10-K) 170-71 (Mar. 1, 2017); *see also* Gillian Mohney, *West Virginia Attorney General Investigates EpiPen Maker Mylan*, ABC News (Sept. 20, 2016), http://abcnews.go.com/Health/west-virginia-attorney-general-investigates-epipen-maker-

Medicaid, in turn, allowed Mylan to subsidize its deep conditional rebates to commercial third-party payors and states.

215.    On August 17, 2017, the DOJ confirmed the settlement and its terms requiring Mylan to "pay $465 million to resolve claims that they violated the False Claims Act by knowingly misclassifying EpiPen as a generic drug to avoid paying rebates owed primarily to Medicaid." According to then Acting United States Attorney William D. Weinreb, "Mylan misclassified its brand name drug, EpiPen, to profit at the expense of the Medicaid program." According to the DOJ's release:

> The settlement resolves the government's allegations that Mylan, by erroneously reporting EpiPen as a generic drug to Medicaid despite the absence of any therapeutically equivalent drugs, was able to demand massive price increases in the private market while avoiding its corresponding rebate obligations to Medicaid. Between 2010 and 2016, Mylan increased the price of EpiPen by approximately 400 percent yet paid only a fixed 13 percent rebate to Medicaid during the same period. The government further alleged that although Mylan was well-aware that its drug was not a generic, it nevertheless claimed generic status for EpiPen in the Medicaid program to avoid paying a higher rebate.[98]

216.    As a condition of the settlement, Mylan was required to enter into a Corporate Integrity Agreement ("CIA") with the Department of Health and Human Services Office of Inspector General (HHS-OIG) that requires, among other things, an independent review organization to annually review multiple aspects of Mylan's practices relating to the Medicaid

---

mylan/story?id=42231963; Gillian Mohney, *EpiPen Maker Mylan Pharmaceuticals Under Investigation by NY Attorney General*, ABC News (Sept. 6, 2016), http://abcnews.go.com/Health/epipen-maker-mylan-pharmaceuticals-investigation-ny-attorney-general/story?id=41897805.

[98] Department of Justice – Office of Public Affairs, *Mylan Agrees to Pay $465 Million to Resolve False Claims Act Liability for Underpaying EpiPen Rebates*, Aug. 17, 2017, available at https://www.justice.gov/opa/pr/mylan-agrees-pay-465-million-resolve-false-claims-act-liability-underpaying-epipen-rebates.

drug rebate program. Mylan will be monitored for a period five years and has been required to establish and maintain a Compliance Program that includes, among other requirements:

    a. the immediate appointment of a Compliance Officer for the entire term of the CIA who shall be responsible for, among other things, developing and implementing policies, procedures, and practices designed to ensure compliance with the CIA and federal health care program requirements, and who shall make periodic (at least quarterly) reports regarding compliance matters and make written documentation of such reports available to the OIG;

    b. the immediate creation of a Compliance Committee, to be chaired by the Compliance Officer, which shall support the Compliance Officer in fulfilling his/her responsibilities and make minutes of the Compliance Committee meetings available to the OIG; and

    c. the delegation to the Board of Directors of individual responsibility for the review and oversight of matters related to compliance with federal health care program and CIA requirements, and the disclosure to the OIG of a description of documents and other materials reviewed in complying with this requirement, and, for each reporting period, the adoption of a resolution, signed by each member of the Board, summarizing its review and oversight of Mylan's compliance with federal health care program and CIA requirements.[99]

217. Gregory E. Demske, Chief Counsel to the Inspector General for the U.S. Department of Health and Human Services, stated "Our five-year corporate integrity agreement requires intensive outside scrutiny to assess whether Mylan is complying with the rules of the Medicaid drug rebate program…. In addition, the CIA requires individual accountability by Mylan board members and executives."[100]

---

[99] Corporate Integrity Agreement Between the Office of Inspector General of the Department of Health and Human Services and Mylan Inc. and Mylan Specialty L.P, August 16, 2017, available at https://oig.hhs.gov/fraud/cia/agreements/Mylan_Inc_and_Mylan_Specialty_LP_08162017.pdf.

[100] DOJ Release, Aug. 17, 2017.

### (3)   Congressional Investigation of EpiPen Pricing

218.   Bresch has testified before the U.S. Congress regarding Mylan's commercial practices and pricing of the EpiPen. Bresch did not acknowledge that Mylan sets the price for EpiPens but admitted to Congress that Mylan's payment of rebates and other "allowances" to PBMs has directly contributed to the sky-rocketing price of the EpiPen: "Bresch said that for every $608 EpiPen two-pack, Mylan receives $274. The remaining $334 go to other players in the supply chain – middle men, including pharmacy benefit managers, or PBMs."[101]

219.   "Bresch asserted [that] Mylan had little choice but to jack up the EpiPen list price to accommodate the middlemen's demands for rebates and fees."[102] Bresch also claimed, "[T]he only face that you see on that medicine is the pharmaceutical manufacturer, … [w]here in reality … there's at least five entities touching that product."[103]

220.   Mylan created a misleading chart that suggests the PBMs are in the supply chain, when in fact the PBMs are not and do not actually "touch" the product, though PBMs do have an impact on product usage and thus pricing of EpiPens:

---

[101] CBS News, *Mylan CEO on EpiPen drug price controversy: "I get the outrage"* (Jan. 27, 2017), http://www.cbsnews.com/newsepipen-price-hike-controversy-mylan-ceo-heather-bresch-speaks-out.pdf.

[102] Michael Hiltzik, *How 'price-cutting' middlemen are making crucial drugs vastly more expensive*, L.A. Times (June 9, 2017), http://www.latimes.combusiness/hiltzik/la-fi-hiltzik-pbm-drugs-20170611-story.html.

[103] *Id.*



221.    The Wall Street Journal reported that:

Ms. Bresch came to the hearing with a poster that showed how various costs along the way resulted in a $100 profit per two-pack. A major factor, the poster said, were 'direct EpiPen related' costs that Mylan pegged at $105 per two-pack.

The poster didn't say anything about tax costs, which it turns out made up the majority of the $105. Mylan's chief executive similarly didn't mention the tax calculation in her testimony, even when Rep. Jason Chaffetz (R., Utah), the committee chairman, zeroed in on the $105 direct-cost figure and asked 'what is in that number?'

Ms. Bresch cited sales, marketing and disease-awareness costs.

The $100 profit figure, or $50 per pen, was greeted with incredulity by committee members. Rep. Stephen Lynch (D., Mass.) said 'the numbers don't work, based on the documents you've given us.'

Rep. Buddy Carter (R., Ga.), a pharmacist, called Ms. Bresch's explanation of EpiPen's pricing a 'shell game.' He reminded Ms. Bresch she was under oath and asked: 'Is that the truth, $50 per pen?

222. The Financial Times reported:[104]

The auto-injector contains roughly $1 worth of adrenalin, which can ward off anaphylactic shock if injected quickly enough following a severe allergic reaction.

"When the juice is a dollar and you're selling it for $600, there's some room for profit," said Jason Chaffetz, a Republican congressman from Utah, and chair of the House Committee on Oversight and Government Reform.

In a heated exchange with Ms Bresch, Mr Chaffetz said he found it hard to believe her claim that Mylan only generated $50 of profit on each EpiPen, and drew attention to the outsized pay packet received by the company's executives in recent years.

"You have five executives in five years that earned nearly $300m," Mr Chaffetz said.

223. Bresch displayed a poster during her congressional testimony that provided misleading information regarding Mylan's profits:



[104] David Crow, *Mylan Chief Comes Under Fire Over Costs of EpiPen*, FINANCIAL TIMES (Sept. 21, 2016), https://www.ft.com/content/64f0cb22-8040-11e6-bc52-0c7211ef3198.

224.     Bresch testified that Mylan's profit on the EpiPen is only $100 per sale; however, "According to the *Wall Street Journal*, the company tweaked that number around by adding in a 37.5% U.S. tax rate to those calculations. Without that assumption, the company's take on a pair of pens leaps from the $100 per two-pack that Bresch cited to about $160 per two-pack."[105]

225.     Bresch testified to Congress that Mylan had to raise the price of EpiPens from $100 to $600 in order to recoup the more than one billion dollars Mylan has invested "to enhance the product and make it more available."[106] However, Mylan does not manufacture the EpiPen. It is manufactured by Meridian, a Pfizer subsidiary.

226.     According to PA Consulting Group, a UK-based technology consulting firm that designs auto-injectors for pharmaceutical companies, Mylan's improvements to the EpiPen since 2009 likely required redesign and capital costs running into the "double-digit millions." In her testimony, Bresch claimed that the cost was around $1 billion. Most Mylan's costs were not on creating a superior product but on marketing and lobbying costs, or "access and awareness programs."

227.     The below image shows that the most notable difference between the original and redesigned EpiPen is a plastic sheathing, which does not justify a 500% price increase[107]:

---

[105] Emily Willingham, *Whoops, Mylan Underreported EpiPen Profits to Congress,* FORBES (Sep. 26, 2016), https://www.forbes.com/sites/emilywillingham/2016/09/26/whoops-mylan-underreported-epipen-profits-to-congress/?sh=4d317a57574f#4b2ef1016e2.

[106] *Bresch Testimony*, U.S. House of Rep. Comm. on Oversight and Gov't Reform (Sep. 21, 2016), *see supra*.

[107]     https://www.nbcnews.com/business/consumer/mylan-says-it-upgraded-epipen-2009-so-experts-looked-inside-n652651.



228.    When asked by investigative reporters about the company's 400-500% increase in prices, Mylan provided the following list of improvements:

**Next-Generation Auto-Injector Product Features**

- Built-in needle protection with a Never-See-Needle® -- there is no exposed needle before or after use

- An ergonomically-designed, easy-to-grasp oval barrel with illustrated instructions that allow for rapid understanding and proper use of EpiPen® Auto-Injector. The oval shape also prevents the device from rolling out of reach during an emergency

- One-step flip-top carry case that allows for rapid, single-handed removal

- Bright orange colors and arrows to help quickly identify the needle end of the device and reduce the risk of accidental thumb puncture and accidental injection of the product into the patient's or caregiver's finger

- Color changes made so the two strengths looked different from one another – yellow for 0.3mg and green for 0.15mg – to help patients, caregivers and healthcare providers quickly distinguish between the two strengths.

- Trainer changed to a grey body so there would be no confusion between Trainer and EpiPen® Auto-Injector to decrease the likelihood a patient or caregiver would accidentally use the trainer (which has no drug) instead of the actual device to treat an anaphylactic reaction.

Thanks,
Lauren

Lauren Kashtan
Head of North America Communications
Mylan
1000 Mylan Boulevard
Canonsburg, PA 15317

229.    According to Dr. Julie C. Brown, a University of Washington School of Medicine pediatric emergency physician, Mylan's "redesign" uses the same core device that's been in use for some time.[108]

## VII.    DEFENDANTS' ACTIONS IMPACT INTERSTATE TRADE AND COMMERCE

230.    As described herein, during the Class Period, Mylan sold EpiPens throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this District. Pfizer contributed to these sales as it manufactured EpiPens for Mylan.

231.    The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

232.    Defendants' conduct, including Mylan's marketing and sale of EpiPen, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

233.    The anticompetitive conduct alleged in this Second Amended Class Action Complaint has directly and substantially affected interstate commerce as Defendants deprived Plaintiff and Class Members of the benefits of free and open competition in the purchase of EAI within the United States.

234.    Defendants' inflating, fixing, raising, maintaining, or artificially stabilizing EpiPen price, was intended to have, and had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States and on import trade and commerce with foreign nations.

---

[108] Ben Popken, *Mylan's Upgraded EpiPen Torn Apart By Experts*, NBC NEWS (Sept. 20, 2016), http://www.nbcnews.com/business/consumer/mylan-says-it-upgraded-epipen-2009-so-experts-looked-inside-n652651.

## VIII.   MONOPOLY POWER AND MARKET DEFINITION

235.    The relevant geographic market is the United States, its territories and possessions, and the Commonwealth of Puerto Rico.

236.    During the Class Period, EpiPen has dominated the EAI drug device market. Mylan's 2010 Form 10-K states that the "principal market" for the company's specialty segment, which includes EpiPen sales, is "pharmaceutical wholesalers and distributors, pharmacies and healthcare institutions primarily in the U.S."[109]

237.    To the extent that Plaintiff and Class Members may be required to prove market power circumstantially by first defining a relevant product market, Plaintiff alleges that the relevant product market is EAI, both brand and generic, in all forms and dosage strengths sold in the U.S.

238.    Non-EAI drugs cannot be substituted automatically for EAI by pharmacists, do not exhibit substantial cross-price elasticity of demand with respect to EAI, and thus are not economic substitutes for, nor reasonably interchangeable with, EAI. The FDA does not consider EAI and non-EAI medications to be interchangeable.

239.    Further, non-EAI products designed to treat anaphylaxis are not substitutes for EpiPen, its generic equivalents, or other EAIs, and their existence has not significantly constrained the pricing of EpiPen.

240.    A small but significant, non-transitory price increase by Defendants to EpiPen would not have caused a significant loss of sales to other drugs or products used for the same purposes.

---

[109] Mylan SEC Form 10-K for the fiscal year ended December 31, 2010, filed February 24, 2011, at 80.

241.    Mylan needed to control only EpiPen and other EAI drug devices, and no other products, in order to maintain the price of EpiPen profitably at supracompetitive prices. Only the market entry of a competing EAI drug device would render Mylan unable to profitably maintain its prices for EpiPen without losing substantial sales.

242.    Mylan has admitted that EAI drug devices are a relevant product market, that the EpiPen dominates that market, and that Mylan controls the EAI drug device market with close to a 100% market share. For example, on April 26, 2012, John Sheehan, the CFO of Mylan, has stated that "we are the market for anaphylactic shock with over 98% market share."[110] Similarly, on August 1, 2013, Mylan touted to investors that the EpiPen had a "93.3% market share".[111]

243.    Mylan's market share in the market for epinephrine injector devices in the United States has constantly remained above 80% since at least January 1, 2009. EpiPen maintained a 94% share of the epinephrine auto-injector market from 2009 to 2012, decreasing slightly from 2009 to 2010 and increasing to nearly 100% in 2012. According to one report, "[a]s Epipen has been able to maintain its share despite Twinject competition, we would not be surprised to see ongoing price increases for the franchise."[112]

244.    Mylan admitted that market factors affected the ability of competitors to enter the market, as noted by Mylan's CFO John Sheehan on a March 4, 2014 earnings call:

> We believe that given the brand equity, given the fact that you only renew a script for EpiPen one time per year, not every single month, given the importance of the product for it being used in a life-saving situation, we don't believe that even in a situation where a competitor was to receive a generic approval that the uptake would

[110] Transcript, Mylan Inc., Earnings Call (April 26, 2012).

[111] Presentation, Mylan Inc., Mylan Investor Day: Seeing is Believing, (Aug. 1, 2013).

[112] J.P. Morgan North American Equity Research, "Mylan Inc.: A Closer Look at Dey," Apr. 1, 2009, at 4.

> be anything near let's say a typical oral solid dose product generic
> uptake. We would see the uptake being slow and ramp up slowly
> over time. And I think you'd measure that time over a period of years
> as opposed to a period of months.

245.    At competitive price levels, EpiPen does not exhibit significant positive cross-price

elasticity of demand with any product other than EAI drug devices.

246.    Mylan also sold branded EpiPen well in excess of marginal costs, and in excess of

the competitive price, and enjoyed unusually high profit margins.

247.    At all relevant times, there were high barriers to entry with respect to competition

in the market for EAI due to patent and/or other regulatory protections, and high costs of entry and

expansion for competitors, some of which were created intentionally by Mylan. For example,

Sanofi incurred significantly higher costs as a result of Mylan's conduct. Only after Auvi-Q

launched did Mylan decide to begin offering consumers $0 co-pay coupons for the EpiPen, so

Sanofi also offered $0 co-pay coupons for Auvi-Q. Because of Mylan's rebate offers to third-party

payors, most of Auvi-Q's coverage was at less preferential T3 level versus T2 level. This typically

meant the co-pay for an EpiPen was $25 and a co-pay for Auvi-Q was $50-$75. As a result, Sanofi

absorbed two to three times the cost Mylan absorbed. Thus, Mylan drove up Sanofi's costs to cover

patients' co-pays.

248.    Defendants' conduct suppressed innovation. U.S. consumers were prevented from

gaining access to a new EAI drug device (Auvi-Q) that represented viable competition for the

EpiPen.

249.    According to the 2016 Orange Book, Defendants listed four patents related to

epinephrine auto-injectors, all of which are set to expire in November 2025. Defendants' control

over these patents means that firms seeking entry with a generic auto-injector product prior to 2025

can do so only by certifying, through the filing of a Paragraph IV certification with the FDA, that each patent is invalid or will not be infringed by a generic device.

250.    A 2012 analyst report noted that defendants "ha[ve] been taking steps on multiple fronts to stymie generics, including the introduction of a redesigned auto-injector in 2009 that offers some incremental safety features and carries additional IP protection."[113] In a 2009 earnings call, Bresch "told investors that the company would be introducing a new version of EpiPen's auto-injector device, one with patent protection that would make it more difficult for a generic competitor to enter. The month that the company launched the improved product, Mylan boosted the list price of the drug by 20 percent." According to Jacob Sherkow, an associate professor at New York Law School, by revising its product, Mylan was "essentially wiping the slate clean – if any generic company wants to create a generic version, they're going to have to start a lawsuit."[114] The delivery device is an additional barrier to entry.

251.    Other drug manufacturers would have been able to compete in the market for EAI drug devices but for Defendants' anticompetitive conduct. For example, Sanofi has extensive experience in the pharmaceutical industry, including marketing generic pharmaceutical products and manufacturing commercial launch quantities adequate to meet market demand. Since 2005, three other EAI drug devices, Twinject®, Adrenaclick™, and Teva's generic EpiPen® attempted to enter the EAI market. Twinject® failed to make inroads in the market Adrenaclick™ due to the high barriers to market entry, and Teva did not enter the market until August 2018.

---

[113] *See* Susquehanna Financial Group, "Mylan, Inc.: A Good Growth Story that Should Have Legs," Mar. 14, 2012, at 12.

[114] Carolyn Y. Johnson & Catherine Ho, *How Mylan, the maker of EpiPen, became a virtual monopoly*, Washington Post, Aug. 26, 2016.

252.    Defendants have maintained and exercised the power to exclude and restrict competition to EpiPen.

253.    Alternatively, Defendants' market and monopoly power over EAI drug devices can be shown through circumstantial evidence, including a high share of a relevant market of EAI drug devices, with substantial barriers to entry.

254.    Mylan was also able to increase the wholesale acquisition cost for EpiPen throughout the relevant time period. As noted above, since 2007, the EpiPen WAC has increased by 500%. Despite Mylan's price increases, the EpiPen's market share remained stable.

## IX.    DEFENDANTS' VIOLATIONS OF THE ANTITRUST LAWS

255.    Defendants' anticompetitive conduct had the following effects in the EAI market:

   a.   Competition in the EAI market has been reduced or eliminated;

   b.   Prices have been maintained at supracompetitive levels; and

   c.   U.S. purchasers have been deprived of the benefit of price competition in the EAI market.

256.    As described herein, during the Class Period, Plaintiff and Class Members directly purchased EpiPen from Mylan. Thus, the unlawful conduct of Defendants deprived Plaintiff and Class Members of the benefits of competition that the antitrust laws were designed to ensure.

257.    As a result of Defendants' anticompetitive conduct, Plaintiff and Class Members paid more for EpiPen than they otherwise would have and thus suffered substantial damages. Plaintiff and members of the Class have sustained substantial losses and damage to their business and property in the form of overcharges. This is a cognizable antitrust injury and constitutes harm to competition under the federal antitrust laws.

258.    Defendants' anticompetitive conduct had the purpose and effect of restraining competition unreasonably and injuring competition by protecting Defendants' EpiPen monopoly

and limiting competition after entry of a generic or other EAI drug device. Defendants' actions allowed it to maintain a monopoly and exclude competition in the EAI market.

259.    Defendants' exclusionary conduct has delayed competition and unlawfully enabled them to sell EpiPen without competition. But for the illegal conduct of Defendants, additional generics or other EAIs would have earlier captured market share.

260.    As a result of Defendants' illegal conduct, Plaintiff and Class Members have paid, and will continue to pay, artificially inflated prices for EpiPen. The prices paid were substantially higher than the prices that Plaintiff and Class Members would have paid absent the illegal conduct alleged in this Second Amended Class Action Complaint.

261.    The prices that Mylan charged in the United States were inflated as a direct and foreseeable result of its anticompetitive conduct.

262.    As a consequence, purchasers of EpiPen have sustained injury to their business and property in the form of continuing overcharges. The full amount, forms, and components of such damages will be calculated after discovery and upon proof at trial.

263.    But for Defendants' anticompetitive conduct, Plaintiff and Class Members would have paid less for EpiPen by: (a) substituting purchases of less-expensive EAI drug devices for their purchases of more expensive branded EpiPen; (b) receiving discounts on their remaining brand EpiPen purchases; and/or (c) purchasing other EAI drug devices or generic EpiPen at lower prices sooner.

## X.    TOLLING OF STATUTES OF LIMITATION

264.    Plaintiff incorporates and realleges all previous paragraphs in this Second Amended Class Action Complaint as though fully set forth below.

265.    At all times relevant to this Second Amended Class Action Complaint, Defendants took active steps to conceal their unlawful activities, including the unlawful monopolization alleged herein, as discussed in the preceding paragraphs. For example, and without limitation, Defendants concealed their conspiracy to exclude generic competition by: (a) asserting invalid patents against potential competitors and ultimately reaching unlawful settlements that to this date have been kept confidential and have operated to keep competitors from the market; (b) filing citizen petitions with the FDA that were executed and timed solely to delay generic competition in the EAI market; and (c) falsely claiming that the switch to a 2-Pak sales format was driven by medical necessity.

266.    Plaintiff and Class Members had no knowledge of the unlawful conduct alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until on or about August 22, 2016, the date that Congress publicly announced its investigation of EpiPen pricing.

267.    No information in the public domain was available to Plaintiff and Class Members concerning Defendants' unlawful activities, including the conspiracy alleged herein, before August 22, 2016, the date the public first learned of a Congressional investigation into Mylan's unlawful pricing practices. Prior to that date, Defendants had disclosed only incomplete and selective information to the public, which was insufficient for Plaintiff and Class Members to evaluate whether they had been harmed by Defendants' conduct.

268.    For these reasons, the statute of limitations as to Plaintiff's and Class Member's claims did not begin to run and has been tolled with respect to the claims that Plaintiff and Class Members have alleged in this Second Amended Class Action Complaint.

269.    In the alternative, the doctrine of fraudulent concealment tolls the statute of limitations on the claims asserted herein by Plaintiff and Class Members. Plaintiff and Class Members did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conduct alleged herein until on or about August 22, 2016, the date Congress publicly announced its investigation of EpiPen pricing.

270.    Before August 22, 2016, Plaintiff and Class Members were unaware of Defendants' unlawful conduct to monopolize the EAI market as disclosed in this Second Amended Complaint and did not know before that date that they were paying supracompetitive prices for EpiPens during the Class Period as a result of Defendants' anticompetitive conduct. Defendants provided no information, actual or constructive, to Plaintiff and Class Members that indicated that they were being injured by Defendants' unlawful conduct. The Congressional investigation and information made public from it caused Plaintiff and Class Members to further investigate and inquire into the allegations described previously. Pharmaceutical antitrust claims are inherently complex, encompassing several areas of law; Plaintiff and Class Members have been diligently researching their claims and investigating their damages since disclosure by the Congressional investigation.

271.    The affirmative acts of Defendants alleged herein were wrongfully concealed and carried out in a manner that precluded detection.

272.    By their very nature, Defendants' anticompetitive conspiracy and fraudulent scheme were inherently self-concealing. EpiPens are not exempt from antitrust laws. Plaintiff and Class Members reasonably considered the epinephrine auto-injector industry to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' EpiPen prices before August 22, 2016.

273.     Plaintiff and Class Members could not have discovered the alleged unlawful activity at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their unlawful conduct as described in this Second Amended Complaint.

274.     Because the alleged unlawful conduct was self-concealing and affirmatively concealed by Defendants, Plaintiff and Class Members had no knowledge of the alleged unlawful conduct, or of any facts or information that would have caused a reasonably diligent person to investigate, before August 22, 2016.

275.     For these reasons, the statute of limitations applicable to Plaintiff's and Class Members' claims was tolled and did not begin to run until August 22, 2016.

276.     Further, Defendants are estopped from relying on any statute of limitations defense because their illegal, deceptive, and fraudulent practices as alleged herein, which are continuing violations, have created continuing and repeated injuries to Plaintiff and Class Members each time Plaintiff and Class Members have been or are overcharged for EpiPens.

## XI.     CLASS ACTION ALLEGATIONS

277.     Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this action on behalf of a Direct Purchaser Class defined as follows:

> All persons or entities in the United States, including its territories, possessions, and the Commonwealth of Puerto Rico, who purchased EpiPen or generic EpiPen directly from Mylan, for resale, at any time during the period from November 1, 2013 until the anticompetitive effects of Defendants' conduct cease (the "Class Period"). Excluded from the Class are Defendants and their officers, directors, management and employees, predecessors, subsidiaries and affiliates, and all federal governmental entities.

278.    Members of the Direct Purchaser Class are so numerous and/or geographically dispersed that joinder is impracticable. While the exact number of Class members is unknown to Plaintiff, it is believed to number in the hundreds. The Class is readily identifiable from information and records in Defendants' possession.

279.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff's interests are not antagonistic to the claims of the other Class Members, and there are no material conflicts with any other member of the Class that would make class certification inappropriate. Plaintiff and all members of the Class were damaged by the same wrongful conduct of Defendants.

280.    Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiff are coincident with, and not antagonistic to, those of the Class.

281.    Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation and who have particular experience with class action litigation involving alleged violations of antitrust law.

282.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class Members because Defendants have acted on grounds generally applicable to the entire Class, thereby determining damages with respect to the Class as a whole is appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

283.    The common legal and factual questions, which do not vary from Class member to Class member and which may be determined without reference to individual circumstances of any Class member, include, but are not limited to, the following:

    a.   whether the conduct alleged herein constitutes a violation of the antitrust laws and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14;

b.  whether Defendants engaged in an overarching conspiracy to monopolize in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2;

c.  whether Mylan engaged in unlawful tying in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14;

d.  whether Mylan engaged in exclusive dealing in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14;

e.  whether Mylan engaged in deceptive conduct in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

f.  whether a relevant market needs to be defined in this case in light of the existence of direct evidence of Defendants' power to exclude competition and charge supracompetitive prices for EpiPen;

g.  if a relevant market needs to be defined, the definition of the relevant market for analyzing Defendants' monopoly power, and a determination of whether Defendants had monopoly power in the relevant market;

h.  whether Defendants illegally maintained their monopoly power in the relevant market;

i.  whether Defendants' conduct as alleged herein substantially affected interstate commerce;

j.  whether, and to what extent, Defendants' conduct caused antitrust injury (overcharges) to Plaintiff and the Direct Purchaser Class; and

k.  if so, the appropriate measure of damages.

284.  Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

285.     Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## XII.   CAUSES OF ACTION

### COUNT I
**VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT, 15 U.S.C. §§ 1, 2, OVERARCHING CONSPIRACY TO RESTRAIN TRADE AND TO MONOPOLIZE – AGAINST ALL DEFENDANTS**

286.     Plaintiff incorporates and realleges all paragraphs in this Second Amended Class Action Complaint as though fully set forth below.

287.     During the relevant period, Mylan had monopoly power in the U.S. EAI drug device market.

288.     Defendants have knowingly and intentionally engaged in an overarching conspiracy of anticompetitive conduct designed to restrain trade and maintain monopoly power in the relevant market with the specific intent to restrain trade and monopolize the market for EAI drug devices in the U.S., in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, including sham patent infringement lawsuits, exclusive dealing, deceptive marketing, and requiring schools to agree to exclusively stock EpiPens to participate in Mylan's discounted EpiPen program.

289.     While some of the alleged anticompetitive acts were performed by only one or a subset of Defendants, all were accomplished as part of Defendants' overarching conspiracy to restrain trade and monopolize the EAI drug device market. Each Defendant played its respective role in that overarching conspiracy, as addressed in detail above, which collectively allowed the conspiracy to succeed and resulted in the restraint of trade and monopolization of the EAI drug device market.

290.    Defendants' willful maintenance of their restraint of trade and monopoly through a course of anticompetitive conduct is an unfair method of competition in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

291.    There is no valid procompetitive business justification for Defendants' anticompetitive conduct, and to the extent Defendants offer one, it is pre-textual and not cognizable. Any procompetitive benefits of Defendants' conduct do not outweigh the anticompetitive harms.

292.    As a result of Defendants' unlawful restraint of trade and maintenance of monopoly power, Plaintiff and members of the Class paid artificially inflated prices for their EpiPen requirements and/or for generic EpiPen. But for Defendants' illegal conduct, EAI competitors would have entered the market sooner and obtained higher profit shares.

293.    If other manufacturers of EAI had been able to enter the market and fairly compete with Defendants in a full and timely fashion, Plaintiff and Class Members would have substituted lower-priced EAI drug devices for some or all of their EAI requirements and/or would have received lower prices on some or all of their remaining branded EpiPen purchases, at earlier periods of time and/or in far greater quantities, and/or would have been able to purchase generic or bioequivalent EpiPen or other EAI drug devices at lower prices than they actually did.

294.    The goal, purpose and/or effect of Defendants' conduct was to maintain and extend Defendants' restraint of trade and monopoly power with respect to EAI drug devices. Defendants' illegal conduct, calculated and designed to prevent, delay, and/or minimize the success of competition from any generic version of EpiPen or other EAI drug device, enabled Defendants to continue charging supracompetitive prices for EpiPen without a substantial loss of sales.

295.    Defendants' illegal conduct was designed to, and did, delay and frustrate competition from generic EpiPen or other EAI drug devices.

296.    Defendants' anti-competitive conduct, described more fully above, was done with the purpose and goal, and had the effect, of delaying and/or frustrating the introduction and the sale of generic EpiPen or other EAI drug devices. Defendants' conduct, as described above, included:

  a.  Using deceptive marketing to restrain and to prevent all competition, including generics and other EAI drug devices, from the market;

  b.  Using restraint of trade and monopoly power to hard switch to selling EpiPen only as two packs to delay generic entry into the market;

  c.  Asserting and prosecuting invalid patents to prevent generics and other EAI drug devices from entering the market;

  d.  Intervening in regulatory proceedings to delay generics and other EAI drug devices entry from the market; and

  e.  Paying generic manufacturers to delay generics from the market.

297.    Defendants' overarching conspiracy to restrain trade and monopolize proximately caused Plaintiff's and Class Members' damages in the form of overcharges for EpiPen.

298.    During the relevant period and as a result of Defendants' illegal conduct alleged herein, Plaintiff and Class Members have been compelled to pay, and have paid, artificially inflated prices for their requirements for EAI. Plaintiff and Class Members paid prices for such products that were substantially greater than the prices that they would have paid absent the illegal conduct alleged herein, because: (1) Plaintiff and Class Members were deprived of the opportunity to purchase lower priced generic versions of EpiPen or other EAI devices instead of expensive brand-name EpiPen; and/or (2) the price of branded EpiPen was artificially inflated by Defendants' illegal conduct in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

299.    Plaintiff and Class Members have been injured in their business and property by Defendants' overarching conspiracy to restrain trade and monopolize. Their injury consists of paying higher prices for EpiPen than they would have in the absence of Defendants' violations of the Sherman Act. Plaintiffs' injuries did not end upon the introduction of competitive products from generic EpiPens or other EAI drug devices, because Defendants' actions disrupted not only the trajectory of approvals, but also the trajectory of pricing that, upon information and belief, continues at least until the present day.

**COUNT II**
**VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2,**
**AND SECTION 3 OF THE CLAYTON ACT, 15 U.S.C. § 14**
**UNLAWFUL TYING – AGAINST MYLAN**

300.    Plaintiff incorporates and realleges all paragraphs in this Second Amended Class Action Complaint as though fully set forth below.

301.    By making the hard switch to selling the EpiPen only as a 2-Pak, Mylan engaged in illegal tying. The FDA did not require the 2-Pak and Mylan does not sell the 2-Pak in any other country except the United States. No medical basis supported the hard switch to the 2-Pak, as explained above. The medical study Mylan cited was a false pretext. The study Mylan cited only applied to a narrow subset of patients, and Mylan latched on to this study to justify a hard switch for the entire U.S. population.

302.    Mylan engaged in unlawful tying with the specific intent to restrain trade, substantially lessen competition and/or monopolize the market in the United States, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

303.    Mylan's advertising and exclusive sale of 2-Paks were designed to capture, and did capture, not only the market for the primary EAI device, but also the market for the spare EAI device.

304.     There is no valid procompetitive business justification for Mylan's anticompetitive conduct, and to the extent Mylan offers one, it is pre-textual and not cognizable. Any procompetitive benefits of Mylan's conduct do not outweigh the anticompetitive harms.

305.     The goal, purpose and/or effect of Mylan's conduct was to maintain and extend Mylan's restraint of trade and monopoly power with respect to EpiPen. Mylan's illegal conduct, calculated and designed to prevent, delay, and/or minimize the success of competition from any generic version of EpiPen or other EAI devices, enabled Mylan to continue charging supracompetitive prices for EpiPen without a substantial loss of sales.

306.     Mylan's delay and frustration of competition from generics and other EAI devices allowed Mylan to hard switch to 2-Pak EpiPen because purchasers did not have ready access to other EAI drug devices. This created another market barrier to further delay and to frustrate competition.

307.     Mylan's unlawful tying proximately caused damages to Plaintiff's and Class Members in the form of overcharges for EpiPen.

308.     During the relevant period and as a result of Mylan's illegal conduct, including tying, alleged herein, Plaintiff and Class Members have been compelled to pay, and have paid, artificially inflated prices for their requirements for EAI. Plaintiff and Class Members paid prices for such products that were substantially greater than the prices that they would have paid absent the illegal conduct alleged herein, because: (1) Plaintiff and Class Members were deprived of the opportunity to purchase single packs of the EpiPen; (2) Plaintiff and Class Members were deprived of the opportunity to purchase lower priced generic versions of EpiPen or other EAI drug devices instead of expensive brand-name EpiPen; and/or (3) the price of branded EpiPen was artificially

inflated by Mylan's illegal conduct in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

309.   Plaintiff and Class Members have been injured in their business and property by Mylan's unlawful tying. Their injury consists of paying higher prices for EpiPen than they would have in the absence of Mylan's violations of the Sherman and Clayton Acts.

**COUNT III**
**VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2,**
**AND SECTION 3 OF THE CLAYTON ACT, 15 U.S.C. § 14**
**EXCLUSIVE DEALING – AGAINST MYLAN**

310.   Plaintiff incorporates and realleges all paragraphs in this Second Amended Class Action Complaint as though fully set forth below.

311.   Mylan excluded competitors from the market by conditioning rebates on formulary exclusivity in order to foreclose competitors from the market and to maintain monopoly power. During the relevant period, Mylan had monopoly power in the U.S. EAI drug device market. Mylan unlawfully restrained trade and maintained its monopoly power through anticompetitive acts of exclusive dealing as described herein.

312.   Mylan engaged in unlawful exclusive dealing with the specific intent to restrain trade, substantially lessen competition and/or monopolize the EAI market in the United States, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

313.   There is no valid procompetitive business justification for Mylan's anticompetitive conduct, and to the extent Mylan offers one, it is pre-textual and not cognizable. Any procompetitive benefits of Mylan's conduct do not outweigh the anticompetitive harms.

314.   The goal, purpose and/or effect of Mylan's conduct was to maintain and extend Mylan's restraint of trade and monopoly power with respect to EAI. Mylan's illegal conduct,

calculated and designed to prevent, delay, and/or minimize the success of competition from any generic version of EpiPen or other EAI drug device, enabled Mylan to continue charging supracompetitive prices for EpiPen without a substantial loss of sales.

315.    Mylan's delay and frustration of competition from generics or other EAI drug devices allowed Mylan to offer an exclusive rebate program, which in turn solidified the market place, which created another market barrier to further delay and to frustrate competition.

316.    Defendants' anti-competitive conduct, described more fully above, was done with the purpose and goal, and had the effect, of delaying and/or frustrating the introduction and the sale of competition from generics or other EAI drug devices. Defendants' conduct, as described above, included requiring schools that took part in Mylan's discounted EpiPen program to certify in writing that the school would not purchase any products that were competitive products to EpiPen.

317.    Mylan's unlawful exclusive dealing proximately caused damages to Plaintiff and Class Members in the form of overcharges for EpiPen.

318.    During the relevant period and as a result of Mylan's illegal conduct, including exclusive dealing, alleged herein, Plaintiff and Class Members have been compelled to pay, and have paid, artificially inflated prices for their requirements for EAI. Plaintiff and Class Members paid prices for such products that were substantially greater than the prices that they would have paid absent the illegal conduct alleged herein, because: (1) Plaintiff and Class Members were deprived of the opportunity to purchase lower priced generic or bioequivalent versions of EpiPen or other EAI devices instead of expensive brand-name EpiPen; and/or (2) the price of branded EpiPen was artificially inflated by Mylan's illegal conduct in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

319. Plaintiff and Class Members have been injured in their business and property by Mylan's unlawful exclusive dealing. Their injury consists of paying higher prices for EpiPen than they would have in the absence of Mylan's violations of the Sherman and Clayton Acts. Plaintiffs' injuries did not end upon the introduction of competitive products from generic EpiPens or other EAI drug devices, or upon the termination of exclusive dealing arrangements, because Defendants' actions disrupted not only the trajectory of approvals and dealings with competitors, but also the trajectory of pricing that, upon information and belief, continues at least until the present day.

**COUNT IV**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**DECEPTIVE CONDUCT – AGAINST MYLAN**

320. Plaintiff incorporates and realleges all paragraphs in this Second Amended Class Action Complaint as though fully set forth below.

321. For years, Mylan made public statements and circulated marketing materials that falsely suggested a competing EAI drug device, Auvi-Q, was not bioequivalent to the EpiPen, and that formularies had listed Auvi-Q as NC or PA based on clinical recommendations.

322. Mylan's statements were material, and were designed to induce buyers, and did induce buyers, to rely on them, and thereby believe that the products were not bioequivalent or sufficiently covered by formularies.

323. Buyers did not have access to information that would have refuted these material and false representations by Mylan, and because these representations were made by a company with monopolistic power in the EAI market, rivals were not able to sufficiently neutralize or offset their effect.

324.     Mylan engaged in deceptive conduct with the specific intent to restrain trade, substantially lessen competition and/or monopolize the market for EAI in the United States, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

325.     There is no valid procompetitive business justification for Mylan's anticompetitive conduct, and to the extent Mylan offers one, it is pre-textual and not cognizable. Any procompetitive benefits of Mylan's conduct do not outweigh the anticompetitive harms.

326.     The goal, purpose and/or effect of Mylan's conduct was to maintain and extend Mylan's restraint of trade and monopoly power with respect to EAI. Mylan's illegal conduct, calculated and designed to prevent, delay, and/or minimize the success of competition from any generic version of EpiPen or other EAI drug device, enabled Mylan to continue charging supracompetitive prices for EpiPen without a substantial loss of sales.

327.     Mylan's delay and frustration of competition from generics or other EAI devices bolstered Mylan's ability to gain traction with its false and misleading marketing information about Auvi-Q, which in turn created another market barrier and further delayed and frustrated competition from generics or other EAI drug devices.

328.     Defendants' anti-competitive conduct, described more fully above, was done with the purpose and goal, and had the effect, of delaying and/or frustrating the introduction and the sale of competition from generics or other EAI drug devices.

329.     Defendants' illegal conduct enabled Defendants to continue to charge supracompetitive prices for EpiPen without substantial loss in sales.

330.     Mylan's deceptive conduct proximately caused damages to Plaintiff and Class Members in the form of overcharges for EpiPen.

331.    During the relevant period and as a result of Mylan's illegal and deceptive conduct, alleged herein, Plaintiff and Class Members have been compelled to pay, and have paid, artificially inflated prices for their requirements for EAI. Plaintiff and Class Members paid prices for such products that were substantially greater than the prices that they would have paid absent the illegal conduct alleged herein, because: (1) Plaintiff and Class Members were deprived of the opportunity to purchase lower priced generic or bioequivalent versions of EpiPen or other EAI drug devices instead of expensive brand-name EpiPen; and/or (2) the price of branded EpiPen was artificially inflated by Mylan's illegal conduct in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

332.    Plaintiff and Class Members have been injured in their business and property by Mylan's deceptive conduct. Their injury consists of paying higher prices for EpiPen than they would have in the absence of Mylan's violations of the Sherman and Clayton Acts. Plaintiffs' injuries did not end upon the termination of Defendants' deceptive conduct, because Defendants' actions disrupted not only the trajectory of approvals and purchases of competitive products, but also the trajectory of pricing that, upon information and belief, continues at least until the present day.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the proposed Class, prays for judgment against all Defendants, jointly and severally, as follows:

1.    That the Court adjudge and decree that Defendants each have violated Sections 1 and 2 of the Sherman Antitrust Act and Section 3 of the Clayton Act;

2.    That Plaintiff and all others similarly situated be awarded damages suffered by reason of these violations and that those damages be trebled in accordance with the law;

3.      That Plaintiff and all others similarly situated be awarded reasonable attorneys' fees and costs; and

4.      That Plaintiff and all others similarly situation be awarded such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of itself and others similarly situated, hereby requests a jury trial, pursuant to Federal Rule of Civil Procedure 38(b), on any and all claims so triable.

**DESIGNATION OF PLACE OF TRIAL**

Pursuant to Local Rule 40.2, Plaintiff requests Kansas City, Kansas as the place for trial.

Dated: November 3, 2020                                    Respectfully submitted,

                                                          */s/ Thomas P. Cartmell*
                                                          Thomas P. Cartmell, KS #17020
                                                          Eric D. Barton, KS #16503
                                                          Tyler W. Hudson, KS #20293
                                                          Wagstaff & Cartmell LLP
                                                          4740 Grand Avenue, Suite 300
                                                          Kansas City, MO 64112
                                                          Tel. (816) 701-1100
                                                          Fax (816) 531-2372
                                                          tcartmell@wcllp.com
                                                          ebarton@wcllp.com
                                                          thudson@wcllp.com

                                                          Dianne M. Nast (*admitted pro hac vice*)
                                                          NASTLAW LLC
                                                          1101 Market Street, Suite 2801
                                                          Philadelphia, Pennsylvania 19107
                                                          Telephone: (215) 923-9300
                                                          Facsimile: (215) 923-9302
                                                          dnast@nastlaw.com

                                                          Michael L. Roberts (admitted *pro hac vice*)
                                                          ROBERTS LAW FIRM, P.A.
                                                          20 Rahling Circle
                                                          Little Rock, AR 72223

Telephone: (501) 821-5575
Facsimile: (501) 821-4474
mikeroberts@robertslawfirm.us

***Attorneys for Plaintiff***