## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**KPH HEALTHCARE SERVICES,
INC., individually and on behalf of
all others similarly situated, a/k/a
KINNEY DRUGS, INC.,**

   **Plaintiff,**

**v.**

            **Case No. 20-2065-DDC-TJJ**

**MYLAN N.V., et al.,**

   **Defendants.**

---

## MEMORANDUM AND ORDER

The case arises out of the manufacture and sale of the EpiPen—an epinephrine auto-injection ("EAI") drug device used to treat anaphylaxis. Plaintiff KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc. brings this lawsuit on behalf of itself and a putative class of direct purchasers of the EpiPen. They bring this lawsuit against two sets of defendants. The first group of defendants includes Mylan N.V., Mylan Specialty L.P., and Mylan Pharmaceuticals, Inc. (collectively, "the Mylan defendants"). The Mylan defendants sell the EpiPen in the United States. The second group of defendants includes Pfizer, Inc., King Pharmaceuticals, Inc., and Meridian Medical Technologies, Inc. (collectively, "the Pfizer defendants"). The Pfizer defendants manufacture the EpiPen and hold EpiPen patents.

Generally, plaintiff asserts that defendants—by manufacturing and selling the EpiPen—engaged in unlawful monopolization of the EAI market, violating Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14. This matter comes before the court on motions to dismiss filed by each set of defendants. For reasons explained below, the court grants both the Pfizer defendants' Motion to Dismiss (Doc. 76) and

the Mylan defendants' Motion to Dismiss (Doc. 78) because plaintiff lacks antitrust standing to assert the claims alleged in its Second Amended Class Action Complaint (Doc. 72). The court dismisses plaintiff's Second Amended Class Action Complaint, but without prejudice. The court also grants plaintiff leave to file a Third Amended Complaint that properly alleges claims for which plaintiff has antitrust standing to assert.

## I.    Factual Background

The following facts come from plaintiff's Second Amended Class Action Complaint ("SAC"). Doc. 72. The court accepts them as true and views them in the light most favorable to plaintiff. *Doe v. Sch. Dist. No. 1*, 970 F.3d 1300, 1304 (10th Cir. 2020) (explaining that on a motion to dismiss the court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to" plaintiff (citation and internal quotation marks omitted)).

EpiPen "is a disposable, prefilled EAI drug device" that delivers epinephrine to treat "severe allergic reactions known as anaphylaxis." Doc. 72 at 5 (SAC ¶ 6). The Pfizer defendants manufacture epinephrine, hold EpiPen patents, and supply EpiPens to Mylan. *Id.* at 9–10 (SAC ¶¶ 25, 29). The Mylan defendants sell EpiPen in the United States. *Id.* at 10 (SAC ¶ 29).

This lawsuit alleges that defendants, through their manufacture and sale of the EpiPen, "engaged in a multi-faceted, overarching conspiracy to monopolize" the market for EAI drug devices and that "Mylan engaged in unlawful tying, exclusive dealing, and deceptive conduct, all in an effort to extend and maintain the EAI monopoly, and delay generic competition, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14." *Id.* at 5 (SAC ¶ 3). Plaintiff asserts that defendants' "unlawful

monopolization in the market for [EAI] drug devices" forced EpiPen purchasers to pay

"overcharges" for the product.  *Id.*  And, with this lawsuit, plaintiff "seeks to recover damages in

the form of overcharges incurred by itself and Class Members" for their EpiPen purchases.  *Id.*

Plaintiff "operates retail and online pharmacies[.]"  *Id.* at 7 (SAC ¶ 15).  Plaintiff "is the

assignee of McKesson Corporation" ("McKesson").  *Id.* at 7–8 (SAC ¶ 16).  McKesson

purchased EpiPens directly from Mylan.  *Id.*  And, plaintiff alleges, "McKesson paid

supracompetitive prices for its EpiPen purchases" because of defendants' anticompetitive

conduct.  *Id.*  Plaintiff brings this lawsuit as McKesson's assignee.  *Id.*

Plaintiff's assignment from McKesson is premised on an Agreement for Assignment of

Claims that the parties entered on December 12, 2018.  *Id.* at 8 (SAC ¶ 17).  According to

plaintiff, the Assignment was based on an "understanding that the assignment encompassed all

antitrust claims relating to EpiPen, so long as the complaint addressed generic delay and was

limited to the EpiPens McKesson had purchased and resold to KPH on or after November 1,

2013."  *Id.*

The language of the Agreement for Assignment of Claims[1] reads:

McKesson hereby conveys, assigns and transfers to [plaintiff] one hundred percent
(100%) of all rights, title and interest in and to any antitrust cause of action it may
have against [Mylan Specialty L.P.] under the laws of the United States or of any
State (a) so long as the gravamen of the cause of action is that [Mylan Specialty
L.P.] unlawfully delayed or frustrated the introduction or sale of generic EpiPen
and (b) only to the extent the cause of action arises from McKesson's purchase of
EpiPen that were subsequently resold to [plaintiff] during the period from
November 1, 2013 to present.

---

[1]       The court may consider the Agreement for Assignment of Claims on a Motion to Dismiss under
Rule 12(b)(6) without converting the motion into one for summary judgment. *See Gee v. Pacheco*, 627
F.3d 1178, 1186 (10th Cir. 2010) (explaining that on a motion to dismiss, the court may consider—in
addition to the Complaint's allegations—"(1) documents that the complaint incorporates by reference, (2)
documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties
do not dispute the documents' authenticity, and (3) matters of which a court may take judicial notice"
(citations and internal quotation marks omitted)).

Doc. 79-2 at 2 (Assignment ¶ 1).

On August 30, 2020—some six months after plaintiff filed this action—plaintiff and McKesson entered an Addendum to December 12, 2018 Agreement for Assignment of Claims.[2] Doc. 72 at 8 (SAC ¶ 18).  In its allegations, among other places, plaintiff describes the Addendum as "effective *nunc pro tunc* as of the original agreement date of December 12, 2018, to 'further define . . . assigned rights.'"  *Id.*; *see also* Doc. 79-4 at 1–2 (Addendum ¶¶ A, D, & 5) (explaining that the "parties have agreed that this Addendum to the Agreement for Assignment of Claims is to be effective as of December 12, 2018 nunc pro tunc" and through the Addendum, the parties "seek to further define [plaintiff's] assigned rights against" Mylan Specialty L.P., Mylan NV, Mylan Pharmaceuticals, Inc., Pfizer Inc., King Pharmaceuticals Inc., and Meridian Medical Technologies Inc.).  Plaintiff asserts that the parties executed the Addendum "to clarify the scope of the original agreement and to erase any doubt about the parties' intent."  Doc. 72 at 8 (SAC ¶ 18).  Plaintiff alleges that the Addendum "confirmed that McKesson assigned to [plaintiff] its 'rights, title and interest in and to any antitrust cause of action . . . so long as the cause(s) of action include that the Manufacturers/Suppliers unlawfully delayed or frustrated the introduction or sale of generic EpiPen and/or participated in conduct which violated the Sherman Act or Clayton Act.'"  *Id.* (quoting Doc. 79-4 at 2 (Addendum ¶ 1)).

The language of the Addendum to December 12, 2018 Agreement for Assignment of Claims reads:

> McKesson hereby conveys, assigns, and transfers to [plaintiff] one hundred percent (100%) of all rights, title and interest in and to any antitrust cause of action it may have against [Mylan Specialty L.P., Mylan NV, Mylan Pharmaceuticals, Inc., Pfizer Inc., King Pharmaceuticals Inc., and Meridian Medical Technologies Inc.] and co-conspirators under the laws of the United States or of any State, (a) so long as the cause(s) of action include that [Mylan Specialty L.P., Mylan NV, Mylan

---

[2]     The court also may consider the Addendum to December 12, 2018 Agreement for Assignment of Claims on this Motion to Dismiss.  *See Gee*, 627 F.3d at 1186.

Pharmaceuticals, Inc., Pfizer Inc., King Pharmaceuticals Inc., and Meridian Medical Technologies Inc.] unlawfully delayed or frustrated the introduction or sale of generic EpiPen and/or participated in conduct which violated the Sherman Act or Clayton Act; and (b) only to the extent the cause of action arises from purchases of EpiPen that were subsequently resold to [plaintiff] during the period from November 1, 2013 through the present.

Doc. 79-4 at 2 (Addendum ¶ 1).

Plaintiff's Second Amended Complaint asserts four causes of action against the Mylan and Pfizer defendants. Count I alleges violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, through an overarching conspiracy to restrain trade and monopolize against all defendants. Doc. 72 at 90–93 (SAC ¶¶ 286–99). Count I's claim asserts that all defendants "have knowingly and intentionally engaged in an overarching conspiracy of anticompetitive conduct designed to restrain trade and maintain monopoly power in the relevant market with the specific intent to restrain trade and monopolize the market for EAI drug devices in the U.S.," violating the Sherman Act, "including sham patent infringement lawsuits, exclusive dealing, deceptive marketing, and requiring schools to agree to exclusively stock EpiPens to participate in Mylan's discounted EpiPen program." *Id.* at 90 (SAC ¶ 288).

Count II alleges unlawful tying against Mylan, violating Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14. Doc. 72 at 93–95 (SAC ¶¶ 300–09). Plaintiff asserts that Mylan engaged in illegal tying by switching from selling the EpiPen in single doses to selling the EpiPen exclusively as a 2-Pak in the United States. *Id.* at 93 (SAC ¶ 301). Plaintiff alleges that no "medical basis supported the hard switch to the 2-Pak," and that "Mylan's unlawful tying proximately caused damages to [plaintiff] and Class Members in the form of overcharges for EpiPen." *Id.* at 93–94 (SAC ¶¶ 301, 307).

Count III alleges exclusive dealing against Mylan, violating Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14. Doc. 72 at 95–97 (SAC ¶¶

310–19).  This claim asserts that "Mylan excluded competitors from the market by conditioning rebates on formulary exclusivity in order to foreclose competitors from the market and to maintain monopoly power."  *Id.* at 95 (SAC ¶ 311).  Plaintiff alleges that Mylan's unlawful exclusive dealing forced them to pay "prices for such products that were substantially greater than the prices that they would have paid absent the illegal conduct alleged herein, because:  (1) Plaintiff and Class Members were deprived of the opportunity to purchase lower priced generic or bioequivalent versions of EpiPen or other EAI devices instead of expensive brand-name EpiPen; and/or (2) the price of branded EpiPen was artificially inflated by Mylan's illegal conduct[.]"  *Id.* at 96 (SAC ¶ 318).

Finally, Count IV alleges deceptive conduct against Mylan, violating Section 2 of the Sherman Act, 15 U.S.C. § 2.  Doc. 72 at 97–99 (SAC ¶¶ 320–32).  Plaintiff asserts that "Mylan made public statements and circulated marketing materials that falsely suggested a competing EAI drug device, Auvi-Q, was not bioequivalent to the EpiPen, and that formularies had listed Auvi-Q as [not covered] or [required prior authorization] based on clinical recommendations."  *Id.* at 97 (SAC ¶ 321).  Plaintiff contends that Mylan's "illegal conduct enabled Defendants to continue to charge supracompetitive prices for EpiPen without substantial loss in sales[,]" and that the "deceptive conduct proximately caused damages to Plaintiff and Class Members in the form of overcharges for EpiPen."  *Id.* at 98 (SAC ¶¶ 329–30).

## II.     Procedural Background

Plaintiff filed this action on February 14, 2020.  Doc. 1 (Compl.).  The original Complaint generally alleged the same four claims alleged by the SAC.  It alleged Sherman Act violations on behalf of a class of direct purchasers based on a scheme to monopolize (Count I), unlawful tying (Count II), exclusive dealing (Count III), and deceptive conduct (Count IV).  *Id.*

at 83–89 (Compl. ¶¶ 171–205).  And, the original Complaint alleged, generally, that "KPH is McKesson's assignee, who had directly purchased EpiPens from" defendants during the relevant time period.  *Id.* at 4 (Compl. ¶ 14).  But, the pleading included no allegations describing or explaining the parties' December 12, 2018 Agreement for Assignment of Claims or explaining precisely what rights it assigned to plaintiff.

On September 10, 2020, and with defendants' consent, plaintiff filed a First Amended Class Action Complaint ("FAC").  Doc. 54.  Like the original Complaint, it alleged four antitrust claims based on a conspiracy to restrain trade and monopolize (Count I), unlawful tying (Count II), exclusive dealing (Count III), and deceptive conduct (Count IV).  *Id.* at 86–94 (FAC ¶¶ 273–315).  And like the original Complaint, the FAC alleged generally that plaintiff is McKesson's assignee, who had purchased EpiPens directly from defendants.  *Id.* at 7 (FAC ¶ 14).  The FAC included no allegations about the language of the December 12, 2018 Agreement for Assignment of Claims or the August 30, 2020 Addendum to that Agreement—which the parties had executed just 10 days before filing the FAC.

On November 3, 2020, plaintiff filed the SAC as a matter of course under Fed. R. Civ. P. 15(a)(1)(B).  Doc. 72 at 4 n.1.  The SAC is the operative pleading.  And so, this Order analyzes whether plaintiff's SAC plausibly states claims for relief that can survive defendants' Motions to Dismiss.

### III.    Legal Standard

Defendants ask the court to dismiss the SAC under Fed. R. Civ. P. 12(b)(6).[3]  For a complaint to survive a Rule 12(b)(6) motion to dismiss, the pleading "must contain sufficient

---

[3]      The Mylan defendants also assert that they seek dismissal under Fed. R. Civ. P. 12(b)(1) because plaintiff lacks standing to assert the claims in this lawsuit, and thus, the court lacks subject matter jurisdiction over this action.  Doc. 79 at 15.  The court disagrees that Rule 12(b)(1) applies to the Mylan defendants' motion.

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1192 (10th Cir. 2009) ("The question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." (citation omitted)).

---

The Mylan defendants argue that plaintiff lacks antitrust standing. As several Courts of Appeals have explained, antitrust standing is a prudential limitation to bringing suit under the antitrust laws but it "does not affect the subject matter jurisdiction of the court, as Article III standing does[.]" *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 232 (3d Cir. 2013); *see also Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1256 (9th Cir. 2008) ("Lack of antitrust standing affects a plaintiff's ability to recover, but does not implicate the subject matter jurisdiction of the court."); *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449 (6th Cir. 2007) ("[A]ntitrust standing and Article III standing are not one and the same, and we not only may—but we must—reject claims under Rule 12(b)(6) when antitrust standing is missing."); *In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98, 107–08 (D.C. Cir. 2002) ("Unlike constitutional standing, this court's [subject matter] jurisdiction does not turn on antitrust standing.").

Our Circuit has noted that "antitrust standing . . . despite the name is not a jurisdictional requirement." *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1305 n.9 (10th Cir. 2017). *Cf. Tal v. Hogan*, 453 F.3d 1244, 1253–55 (10th Cir. 2006) (recognizing Article III standing differs from "the standing requirements in the antitrust context" which "are more rigorous than that of the Constitution" and affirming dismissal of plaintiff's antitrust claims under Rule 12(b)(6) based on lack of antitrust standing). And, other district courts in our Circuit also have concluded that "[c]hallenges to antitrust standing are properly brought under rule 12(b)(6) of the Federal Rules of Civil Procedure." *Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.*, 801 F. Supp. 2d 1163, 1186 (D.N.M. 2011); *see also Total Renal Care, Inc. v. W. Nephrology & Metabolic Bone Disease, P.C.*, No. 08-cv-00513-CMA-KMT, 2009 WL 2596493, at *2, 4–6 (D. Colo. Aug. 21, 2009) (analyzing antitrust standing dismissal arguments under Rule 12(b)(6) and explaining that "[a]ntitrust standing is not jurisdictional in the way that constitutional standing is" (citation and internal quotation marks omitted)).

Consistent with this controlling and persuasive authority, the court considers the Mylan defendants' antitrust standing dismissal arguments under Rule 12(b)(6) because antitrust standing does not implicate Article III or the court's subject matter jurisdiction.

When considering a Rule 12(b)(6) motion to dismiss, the court must assume that the factual allegations in the complaint are true. *Iqbal*, 556 U.S. at 678. But the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

In the antitrust context, the Supreme Court observed in *Twombly* that "proceeding to antitrust discovery can be expensive." *Twombly*, 550 U.S. at 558 (applying the plausibility pleading standard to Sherman Act claims). So, courts must "'insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.'" *Id.* (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983)). But still, antitrust cases are not subject to a standard requiring "heightened fact pleading of specifics[.]" *Id.* at 570. Instead, an antitrust Complaint must allege "only enough facts to state a claim to relief that is plausible on its face" sufficient to "nudge[ ] the[ ] claims across the line from conceivable to plausible[.]" *Id.*; *see also In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067, 1074 (D. Kan. 2009) (explaining on a Rule 12(b)(6) motion to dismiss antitrust claims that "the Court must ensure that plaintiffs have alleged facts to support those elements sufficient to provide the 'heft' to show an entitlement to relief and to 'nudge' plaintiffs' claims over the line from mere[ ] possibility or speculation to plausibility" (quoting *Twombly*, 550 U.S. at 557, 570)).

The court's analysis, below, applies this governing standard to defendants' Rule 12(b)(6) dismissal arguments.

## IV.     Analysis

The Mylan and Pfizer defendants assert several arguments supporting their Motions to Dismiss. But, the court only reaches the first argument that the Mylan defendants raise in their

Motion to Dismiss because it is dispositive.  The Mylan defendants assert that plaintiff lacks antitrust standing for all of its claims because (1) the original assignment from McKesson doesn't confer standing to assert any of the four claims alleged in the SAC, and (2) plaintiff can't cure that problem with the Addendum that the parties executed several months after plaintiff commenced this lawsuit.[4]  Doc. 79 at 16–25.  For reasons explained, the court agrees with defendants.  Plaintiff lacks antitrust standing to bring the claims as the SAC currently alleges them.  So, the court dismisses plaintiff's SAC but without prejudice and with leave to file a Third Amended Complaint asserting only claims that fall within plaintiff's Assignment from McKesson.

### A.    Antitrust Standing

The Supreme Court has held that, generally, only direct purchasers, and not subsequent indirect purchasers, have antitrust standing to sue and recover damages under the antitrust laws. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 728 (1977); *see also In re Wy. Tight Sands Antitrust Cases*, 866 F.2d 1286, 1290 (10th Cir. 1989) (explaining that "only the direct purchaser, and no other [person] in the distribution chain, is the 'party injured'" who "may sue for and recover the full amount of the illegal overcharge" (first citing *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968); then citing *Illinois Brick*, 431 U.S. 720)); *In re Urethane Antitrust Litig.*, 237 F.R.D. 454, 462 (D. Kan. 2006) (explaining that *Illinois Brick* held that an indirect purchaser can't establish antitrust "standing by demonstrating that the direct purchaser passed on the additional costs" (citing *Illinois Brick*, 431 U.S. at 728–29)).

Our Circuit has explained the reasoning of *Illinois Brick* this way:

> The *Illinois Brick* rule selects the better plaintiff between two possible types of plaintiffs—direct purchasers and indirect purchasers.  The Court chose the direct

---

[4]    The Pfizer defendants adopt and incorporate this argument in their Motion to Dismiss.  Doc. 77 at 9 n.4.

purchaser primarily to simplify damages determinations and limit the possibility of multiple recovery against the defendant.  But it also concluded that allowing the direct purchaser to bring the claim supported "the longstanding policy of encouraging vigorous private enforcement of the antitrust laws."

*Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 889 (10th Cir. 1997)

(quoting *Illinois Brick*, 431 U.S. at 745).

Here, defendants argue that plaintiff lacks antitrust standing to sue because—as plaintiff concedes—it never purchased EpiPens directly from defendants.  Instead, as plaintiff alleges, it purchased EpiPens directly from McKesson who had purchased them directly from defendants. Doc. 72 at 7–8 (SAC ¶ 16).  Thus, plaintiff is an indirect purchaser.  And, *Illinois Brick* precludes plaintiff—as an indirect purchaser—from bringing suit under the antitrust laws.

But, plaintiff asserts that it has standing to bring antitrust claims against defendants as McKesson's assignee under the Agreement for Assignment of Claims signed on December 12, 2018, and as "clarified" in the August 30, 2020 Addendum.  Doc. 86 at 18.  The Mylan defendants assert that neither the original Assignment nor the Addendum confer antitrust standing on plaintiff.  Thus, they argue, the court must dismiss plaintiff's SAC for lack of standing.  The court considers the Mylan defendants' arguments in the next two subsections.

## B.    Plaintiff Doesn't Have Standing Under the Assignment.

The Mylan defendants argue that plaintiff doesn't have standing under the original Assignment with McKesson to assert the antitrust claims that plaintiff alleges in its SAC.  The Mylan defendants correctly explain that the Assignment conveys to plaintiff the rights to bring "any antitrust cause of action [McKesson] may have against [Mylan Specialty L.P.] . . . *so long as the gravamen of the cause of action* is that [Mylan Specialty L.P.] unlawfully delayed or frustrated the introduction or sale of generic EpiPen[.]"  Doc. 79-2 at 2 (Assignment ¶ 1) (emphasis added).  The Mylan defendants assert that the "gravamen" of plaintiff's SAC is not a

generic delay claim.  So, the Mylan defendants argue, plaintiff lacks standing under the

Assignment to assert the claims alleged in the SAC.[5]

The Mylan defendants' motion requires the court to determine what the Assignment

conveyed when it transferred the rights to assert antitrust claims where the "gravamen" of the

cause of action is a generic delay claim.  The Supreme Court has described "gravamen" as the

"crux" of a plaintiff's pleading.  *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 755 (2017).  And,

our court has cited, approvingly, a Pennsylvania case describing the "'gravamen of the action'"

as the "'essence'" of the claim.  *Sports Unlimited, Inc. v. Lankford Enters., Inc.*, 93 F. Supp. 2d

1164, 1168 (D. Kan. 2000) (quoting *Evans v. Phila. Newspapers, Inc.*, 601 A.2d 330, 333 (Pa.

Super. Ct. 1991)).  Black's Law Dictionary defines gravamen as the "substantial point or essence

of a claim, grievance, or complaint."  *Gravamen*, Black's Law Dictionary (11th ed. 2019).

Plaintiff cites the Merriam-Webster Dictionary, which provides a similar definition, defining

"gravamen" as "the material or significant part of a grievance or complaint."  Doc. 86 at 23

(citing *Gravamen*, Merriam-Webster.com Dictionary, https://www.merriam-

webster.com/dictionary/gravamen (last visited July 20, 2021)).

Under any of these definitions, the term "gravamen" unambiguously means the "essence"

or the "material" part of the SAC.  Here, the "essence" or "material" part of plaintiff's SAC is

not the generic delay claims that the original Assignment conveyed plaintiff the rights to assert.

To be sure, plaintiff's SAC asserts generic delay allegations, and it includes many paragraphs

---

[5]     The court's analysis here discusses the claims asserted in the SAC because that is the current and
operative Complaint and defendants' motions seek dismissal of the claims asserted in that pleading.  But
the court's analysis applies equally to the claims plaintiff asserted in the original Complaint (Doc. 1) and
FAC (Doc. 54).  As already discussed, *supra* Part II., plaintiff's three Complaints generally assert the
same four antitrust claims:  (1) an unlawful scheme or conspiracy to monopolize (Count I), (2) unlawful
tying (Count II), (3) exclusive dealing (Count III), and (4) deceptive conduct (Count IV).  Doc. 1 at 83–89
(Compl. ¶¶ 171–205); Doc. 54 at 86–94 (FAC ¶¶ 273–315); Doc. 72 at 90–99 (SAC ¶¶ 286–332).

reciting facts that allegedly support a claim for unlawful generic delay.  But, these allegations aren't the gravamen of the lawsuit.

Counts II, III, and IV have nothing to do with generic delay.  Count II alleges unlawful tying based on Mylan's switch to selling the EpiPen exclusively in 2-Paks.  Doc. 72 at 93 (SAC ¶ 301).  Plaintiff asserts the factual allegations to support its tying claim in paragraphs 180 through 189 of the SAC.  *Id.* at 58–62 (¶¶ 180–89).  None of these paragraphs reference generic delay.  Also, the SAC alleges that Mylan implemented the 2-Pak switch in 2011.  *Id.* at 58 (SAC ¶ 180).  Thus, the 2-Pak switch occurred *before* defendants allegedly entered any of the unlawful reverse payment settlements or filed the Citizen Petitions that, according to plaintiff's allegations, caused generic delay.  *See id.* at 31–32, 36–37 (SAC ¶¶ 106, 124, 129) (alleging defendants announced the Teva settlement on April 27, 2012, announced the Intelliject settlement on February 16, 2012, and filed a meritless Citizen Petition in January 2015).  Putting it simply, Count II just doesn't assert a generic delay claim.

The court recognizes, though, that plaintiff has included in Count II something the Mylan defendants call "boilerplate language" about generic delay.  Doc. 79 at 23.  Count II makes a conclusory assertion that "Mylan's delay and frustration of competition from generics and other EAI devices allowed Mylan to hard switch to 2-Pak EpiPen because purchasers did not have ready access to other EAI drug devices."  Doc. 72 at 94 (SAC ¶ 306).  But, defendants correctly argue, the SAC contains no facts to support that conclusory assertion.  So, the court rejects plaintiff's attempt to turn its tying claim based on the 2-Pak switch into a generic delay claim because it's just not the claim that Count II asserts.

Count III alleges exclusive dealing against Mylan based on its use of rebates conditioned on excluding competitors from drug formularies.  *Id.* at 95 (SAC ¶ 311).  Plaintiff asserts the

factual allegations to support its exclusive dealing claim in paragraphs 134 through 179 of the SAC. *Id.* at 40–57 (¶¶ 134–79). None of these paragraphs allege generic delay. Also, the heading describing these paragraphs recites: "Mylan Stifles Competition from Sanofi's Auvi-Q." *Id.* at 40. Auvi-Q is a branded product, not a generic version of EpiPen. *See Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations, Product Details for NDA 201739*, FDA, https://www.accessdata.fda.gov/scripts/cder/ob/results_product.cfm?Appl_Type=N&Appl_No=2 01739#34237 (last visited July 20, 2021) (showing that Auvi-Q is not AB-rated to EpiPen, meaning that it's not a generic).[6] Thus, Count III doesn't allege a generic delay claim.

Like Count II, Count III includes some "boilerplate" allegations about generic delay. For instance, plaintiff alleges "Mylan's delay and frustration of competition from generics or other EAI drug devices allowed Mylan to offer an exclusive rebate program, which in turn solidified the market place, which created another market barrier to further delay and to frustrate competition." Doc. 72 at 96 (SAC ¶ 315). But again, plaintiff alleges no facts to support this conclusionary assertion. Plaintiff can't remake its exclusive dealing claim into a generic delay claim by inserting this boilerplate language into the SAC.

Count IV asserts a deceptive conduct claim. *Id.* at 97–99 (SAC ¶¶ 320–32). It alleges that "Mylan made public statements and circulated marketing materials that falsely suggested a competing EAI drug device, Auvi-Q, was not bioequivalent to the EpiPen, and that formularies had listed Auvi-Q as [not covered] or [required prior authorization] based on clinical recommendations." *Id.* at 97 (SAC ¶ 321). As discussed, Auvi-Q was a branded competitive

---

[6]     When ruling a motion to dismiss, the court can take judicial notice of this information from a government website. *See Garling v. U.S. EPA*, 849 F.3d 1289, 1297 n.4 (10th Cir. 2017) (explaining that the court can take judicial notice of factual information from government websites).

EAI drug device—not a generic.  And, the factual allegations that plaintiff recites to support its deceptive conduct claim, *id.* at 48–50, 54–55 (SAC ¶¶ 159–60, 162, 173), never mention generic delay.  Instead, the deceptive conduct factual allegations describe conduct that Mylan directed at the branded product—Auvi-Q—in an attempt to stifle competition from this branded competing EAI.  Count IV does not allege a generic delay claim.

Like its predecessor claims, Count IV includes "boilerplate language" referencing generic delay.  The SAC alleges "Mylan's delay and frustration of competition from generics or other EAI devices bolstered Mylan's ability to gain traction with its false and misleading marketing information about Auvi-Q, which in turn created another market barrier and further delayed and frustrated competition from generics or other EAI drug devices."  *Id.* at 98 (SAC ¶ 327).  But once again, the SAC contains no facts to support this conclusory assertion that alleged generic delay bolstered Mylan's ability to engage in deceptive conduct.

Also, as defendants note, plaintiff asserts Counts II, III, and IV against the Mylan defendants only.  The Pfizer defendants are not named as defendants in any of these Counts.  But it is the Pfizer defendants who plaintiff accuses of committing the acts producing the generic delay by filing sham patent litigation.  *See id.* at 30, 33, 36 (SAC ¶¶ 99, 111, 124) (alleging King Pharmaceuticals Inc. and Meridian Medical Technologies Inc. filed a sham patent lawsuit against Teva, defendants announced on April 26, 2012 that "Meridian Medical Technologies, a Pfizer subsidiary, has entered into a settlement agreement with Teva[,]" and, on February 16, 2012, defendants jointly announced the Intelliject settlement).  The omission of this set of defendants from these claims provides another reason for the court to conclude that Counts II, III, and IV assert no plausible generic delay claims.

15

In sum, the SAC's Counts II, III, and IV don't assert a generic delay claim.  This conclusion leaves the SAC's only other claim—Count I.  Count I alleges an overarching conspiracy to restrain trade and monopolize against all defendants.  Doc. 72 at 90–93 (SAC ¶¶ 286–99).  Count I indeed alleges that defendants' alleged antitrust conspiracy included "sham patent infringement lawsuits" that allegedly delayed generic competition.  *Id.* at 90 (SAC ¶ 288).  But that is only one of the four types of unlawful antitrust activity that plaintiff accuses defendants of committing as part of an overarching scheme to monopolize and restrain trade.  Count I alleges "an overarching conspiracy of anticompetitive conduct . . . including sham patent infringement lawsuits, exclusive dealing, deceptive marketing, and requiring schools to agree to exclusively stock EpiPens to participate in Mylan's discounted EpiPen program."  *Id.*  As discussed above, plaintiff's exclusive dealing and deceptive marketing claims have nothing to do with generic delay, and neither do plaintiff's allegations about Mylan's use of its EpiPen schools program.  By no means are the generic delay claims the "gravamen" of Count I.  Also, as the Mylan defendants argue, if one were to strip all of the generic delay allegations out of the SAC, plaintiff still could assert a claim for an overarching antitrust conspiracy based on the other alleged unlawful antitrust activity that has nothing to do with generic delay.  So, generic delay can't qualify as the "crux" or "essence" or "material" part of plaintiff's SAC.[7]

For all these reasons, the court concludes that the "gravamen" of plaintiff's SAC is not generic delay claims premised on allegations that defendants "unlawfully delayed or frustrated the introduction or sale of generic EpiPen[.]"  Doc. 79-2 at 2 (Assignment ¶ 1).  Thus, plaintiff

---

[7]     Plaintiff asserts Count I against both the Mylan and Pfizer defendants.  But the original Assignment only conveyed the right to assert generic delay claims against Mylan Specialty L.P.  Doc. 79-2 at 2 (Addendum ¶ A) (defining the "Manufacturer/Supplier" as "Mylan Specialty L.P.").  The original Assignment includes no references to Pfizer or any of its subsidiaries.  So, plaintiff has no standing under the original Assignment to sue the Pfizer defendants as it does in Count I.

lacks standing to assert the claims asserted in the SAC under the original Assignment from McKesson.

### C.     Plaintiff Can't Rely on the Addendum to Confer Standing.

Also, the Mylan defendants argue that plaintiff cannot rely on the Addendum to the Assignment that the parties executed on August 30, 2020—more than six months after plaintiff filed this lawsuit—to establish antitrust standing.  The Mylan defendants assert that the Addendum can't confer antitrust standing on plaintiff for three reasons.

*First*, the Mylan defendants argue that the court shouldn't consider the Addendum because plaintiff didn't include any allegations about the Addendum in its FAC, even though the parties had executed the Addendum just days before filing the FAC, and thus, plaintiff knew about the Addendum before it filed that pleading.  The court need not address this argument because the Mylan defendants' other arguments provide two sufficient reasons for refusing to consider the Addendum when determining the scope of plaintiff's assignment from McKesson.

*Second*, the Mylan defendants argue that plaintiff can't rely on the Addendum to broaden the scope of the original Assignment because the Addendum is a new assignment that cannot fix the standing defects that existed when plaintiff filed its original Complaint.  To support their argument that the Addendum can't confer standing after plaintiff filed suit, the Mylan defendants cite cases where courts have held that plaintiffs asserting patent claims "cannot use a *nunc pro tunc* assignment to repair its deficiencies in standing" that existed when plaintiffs initially filed suit because the "'existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed.'"  *Wacoh Co. v. Chrysler LLC*, Nos. 08-cv-456-slc, 08-cv-691-slc, 2009 WL 36666, at *8–9 (W.D. Wis. Jan. 7, 2009) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 n.4 (1992)); *see also Abraxis Biosciences, Inc. v. Navinta LLC*, 625 F.3d 1359, 1367

(Fed. Cir. 2010) (holding that plaintiff lacked standing to bring patent claims based on a *nunc pro tunc* agreement because "despite [plaintiff's] delayed attempt to obtain title to the asserted patents" through the *nunc pro tunc* agreement, "the action must be dismissed because [plaintiff] lacked standing on the day it filed the action"); *Baggage Airline Guest Servs., Inc. v. Roadie, Inc.*, No. 6:17-cv1253-Orl-37GJK, 2017 WL 10084146, at *2 (M.D. Fla. Sept. 1, 2017) (dismissing patent infringement claim based on lack of standing because "a plaintiff must be the patentee at the time it initiates an infringement action, and a subsequent assignment will not defeat a motion to dismiss for lack of patent standing").

Also, several courts—including our own—have held that a plaintiff cannot establish Article III standing retroactively, curing a standing deficiency that existed when plaintiff filed suit. *See Blair-Naughton, L.L.C. v. Diner Concepts, Inc.*, No. 06-1183-JTM, 2007 WL 4463584, at *2 (D. Kan. Dec. 17, 2007) (holding that defendant had "no standing" to assert counterclaim against plaintiff where "the purported assignment occurred after [defendant] initiated its claims against [plaintiff] and after [plaintiff] moved to dismiss those claims" and "only two days prior to [defendant's] response to the motion to dismiss" because "[s]tanding is determined at the time an action is commenced" and "courts have rejected retroactive attempts to create standing by use of eleventh-hour assignments" (citations omitted)); *see also MSP Recovery Claims, Series LLC v. QBE Holdings, Inc.*, 965 F.3d 1210, 1219–21 (11th Cir. 2020) (explaining that an "assignee must possess the assigned right on the day it filed the complaint" and this "requirement cannot be met retroactively" (citation and internal quotation marks omitted)); *Berger v. Weinstein*, 348 F. App'x 751, 756 n.4 (3d Cir. 2009) (affirming trial court's dismissal of action based on lack of Article III standing and noting that the "assignments [plaintiff] received from Payees" after the lawsuit was commenced "do nothing to establish standing under Article III because standing

must be established as of the time the lawsuit is brought" (citing *Davis v. FEC*, 554 U.S. 724, 734 (2008)).

None of these cases involve the precise scenario that exists here—whether an addendum executed after an antitrust lawsuit was filed properly can confer antitrust standing on an indirect purchaser.  But, the Northern District of California has faced that question, and it reached the same conclusion as the cases cited by the preceding paragraph.  The California court concluded that an indirect purchaser could not assert antitrust standing as a direct purchaser based on an assignment executed post-filing of the Complaint.  *In re Ditropan XL Antitrust Litig.*, No. M:06-CV-01761-JSW, MDL No. 1761, 2007 WL 2978329, at *2  (N.D. Cal. Oct. 11, 2007).  The court explained that whether "a plaintiff has standing to sue is determined as of the date of filing the complaint" and a "party invoking the jurisdiction of the court cannot rely on events that unfolded after the filing of the complaint to establish its standing."  *Id.* (citation and internal quotation marks omitted).  Thus, an assignment which "attempt[ed] to cure [the standing] defect by submitting another assignment from" the assignor to plaintiff was "insufficient to confer standing" because "any such assignment post-dates [plaintiff's] filing of the" Complaint.  *Id.*

The parties have not cited and the court's research has not located any Tenth Circuit authority addressing this standing question in the antitrust context.  But, as already discussed, the Tenth Circuit has observed that "the standing requirements in the antitrust context are more rigorous than that of the Constitution" and require the court to "'make a further determination whether the plaintiff is a proper party to bring a private antitrust action.'"  *Tal v. Hogan*, 453 F.3d 1244, 1253 (10th Cir. 2006) (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983)).  So, the court predicts that, if the Tenth Circuit is presented with this question, it would hold—as the cited cases have required—that an

antitrust plaintiff must possess antitrust standing on the date when it files its Complaint.  And likewise, it cannot rely on a post-Complaint assignment to confer antitrust standing.  Here, as explained *supra* Part IV.B., plaintiff lacked antitrust standing to bring the four claims that it asserted in its original Complaint when it filed that pleading on February 14, 2020.  Plaintiff cannot use the Addendum—which it executed more than six months after filing the Complaint and which broadens the scope of the originally assigned antitrust claims—to confer antitrust standing for this action.

Plaintiff tries to navigate around the case law by citing two cases where courts have permitted a party to rely on an assignment executed after the suit's filing to establish standing. But, in both cases, the parties executed an assignment that merely corrected technical or clerical errors.  *See Sw. eFuel Network, L.L.C. v. Transaction Tracking Techs., Inc.*, No. 2:07-cv-311-TJW, 2009 WL 4730464, at *4 (E.D. Tex. Dec. 7, 2009) (holding that *nunc pro tunc* assignment executed to correct a "clerical error in the original assignment" that mistakenly identified the wrong corporate entity as the signatory and "was an honest, good-faith mistake" didn't preclude plaintiff from establishing standing to sue because the corrected assignment "was undertaken to merely conform the [original] Assignment to correctly express what was the true agreement of the parties from the date of the" original assignment); *see also Gipson v. Mattox*, 511 F. Supp. 2d 1182, 1190–91 (S.D. Ala. 2007) (permitting one of the plaintiffs "to cure the technical defect in the assignment executed . . . prior to the filing of this lawsuit by completing a new, corrected assignment" because the parties "had always intended this assignment to encompass all of [plaintiff's] rights in the '048 Patent" but "an apparent drafting error in that assignment had rendered it ineffective to convey [plaintiff's] rights in the '048 Patent").

That's not what we have here.  The Addendum doesn't cure just a technical or clerical error.  Instead, here, the Addendum explicitly recites that the parties entered it because they "seek to *further define* [plaintiff's] assigned rights against" Mylan Specialty L.P., Mylan NV, Mylan Pharmaceuticals, Inc., Pfizer Inc., King Pharmaceuticals Inc., and Meridian Medical Technologies Inc.  Doc. 79-4 at 2 (Addendum ¶¶ A & D) (emphasis added).  And, as discussed above, the language of the Addendum broadens—significantly so—the scope of the original Assignment.  The Addendum assigned plaintiff the right to assert any antitrust cause of action so long as the cause of action includes a generic delay claim while the original Assignment only gave plaintiff the right to assert antitrust claims so long as the gravamen of the cause of action is a generic delay claim.  *Compare* Doc. 79-4 at 2 (Addendum ¶ 1) (assigning plaintiff "all rights, title and interest in and to any antitrust cause of action . . . *so long as the cause(s) of action include* that the Manufacturers/Suppliers unlawfully delayed or frustrated the introduction or sale of generic EpiPen and/or participated in conduct which violated the Sherman Act or Clayton Act" (emphasis added)), *with* Doc. 79-2 at 2 (Assignment ¶ 1) (assigning plaintiff "all rights, title and interest in and to any antitrust cause of action . . . *so long as the gravamen of the cause of action* is that [Mylan Specialty L.P.] unlawfully delayed or frustrated the introduction or sale of generic EpiPen" (emphasis added)).

Also, the Addendum expanded the scope of who plaintiff could sue on the assigned antitrust claims.  The original Assignment conveyed the rights to sue "the Manufacturer/Supplier" which the Assignment defined as "Mylan Specialty L.P."  Doc. 79-2 at 2 (Assignment ¶ A).  But then the Addendum "further define[d]" the term "Manufacturers/Suppliers" to include "Mylan Specialty L.P., Mylan NV, Mylan Pharmaceuticals, Inc., Pfizer Inc., King Pharmaceuticals Inc., and Meridian Medical

Technologies Inc." and also conveyed plaintiff the rights to assert antitrust causes of action against "co-conspirators[.]"  Doc. 79-4 at 2 (Addendum ¶¶ A, D, & 1).  The changes made to the Assignment through the Addendum aren't revisions that correct mere technical or clerical errors, as plaintiff's cited cases permitted.  Instead, the Addendum's revisions expand the scope of the original Assignment to confer standing on plaintiff after it had filed suit.  The prevailing, persuasive case law just won't permit plaintiff to establish standing retroactively.  So, the court can't consider the Addendum here.

The court also rejects plaintiff's efforts to allege that the Addendum is just a "clarification" of the original Assignment.  Plaintiff's SAC asserts that the parties executed the Addendum "to clarify the scope of the original agreement and to erase any doubt about the parties' intent."  Doc. 72 at 8 (SAC ¶ 18).  Plaintiff correctly asserts that the court must take as true plaintiff's factual allegations on a motion to dismiss.  *See Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir. 2006) (explaining that on a motion to dismiss "all facts alleged in the complaint are taken as true and all reasonable inferences are indulged in favor of the plaintiffs" (citation and internal quotation marks omitted)).  But it's equally certain at the motion to dismiss stage, the court "disregard[s] conclusory statements" because "mere 'labels and conclusions'" don't suffice to state a plausible cause of action.  *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Twombly*, 550 U.S. at 555).  Instead, the court must "look only to whether the remaining, factual allegations plausibly suggest the defendant is liable."  *Id.*

Here, the court disregards plaintiff's conclusory description of the Addendum as a "clarification."  *See Wacoh Co.*, 2009 WL 36666, at *9 (rejecting plaintiffs' argument that "the *nunc pro tunc* assignment does nothing more than clarify . . . the scope of its" legal rights because "a closer look at the applicable law related to standing reveals that [plaintiff's] argument

is simply lawyerly prestidigitation").  And, considering only the remaining factual allegations, the Addendum itself isn't simply a "clarification" as plaintiff characterizes it.  Instead, as already discussed, the Addendum significantly expanded the scope of the rights that McKesson assigned to plaintiff.  So, plaintiff can't rely on the Addendum to establish standing after it commenced the litigation.

Last, plaintiff argues that courts consistently have allowed plaintiffs—who had standing to assert at least one claim when they filed suit—to execute an assignment after filing suit that confers standing to bring additional claims.  Doc. 86 at 22 (citing *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, No. 14-md-02521-WHO, 2015 WL 4397396, at *6 (N.D. Cal. July 17, 2015) (further citations omitted)).  But, as already discussed *supra* Part IV.B., plaintiff lacked standing to assert all four claims alleged in the original Complaint when it filed suit because the gravamen of none of its claims was a generic delay claim.  So, plaintiff can't use the Addendum to confer standing to assert its claims when it didn't have antitrust standing to assert any of the claims alleged in the original Complaint.  *Cf. In re SLM Corp. Sec. Litig.*, 258 F.R.D. 112, 116 (S.D.N.Y. 2009) (declining "to approve the assignment of claims" because plaintiff "did not have Article III standing at the time this Court appointed it lead plaintiff" and noting that "the majority of courts to allow an assignment of claims after the onset of litigation do so only where plaintiff had constitutional standing on another claim" but that was "not the situation here").

*Third*, the Mylan defendants argue, the Addendum constitutes improper extrinsic evidence that the court cannot consider when interpreting the unambiguous terms of the original Assignment.  As discussed, the original Assignment unambiguously conveyed plaintiff the right to assert antitrust claims where the "gravamen" of the of the cause of action is generic delay

claims.  And where "contractual terms are plain and unambiguous, both the intention of the

parties and the meaning of the contract *must be determined exclusively* from the instrument."

*Rigby v. Clinical Reference Lab., Inc.*, 995 F. Supp. 1217, 1226 (D. Kan. 1998) (applying Kansas

contract law) (emphasis added).[8]  Only when "the contract is ambiguous and requires an

examination of outside materials to clarify its intent, may [the court] consider evidence of the

facts and circumstances surrounding the execution of the instrument."  *Id.*; *see also Bethel v.

Berkshire Hathaway Homestate Ins. Co.*, 822 F. App'x 835, 841 (10th Cir. 2020) ("A court may

refer to external evidence of the parties' intent only if it has already determined that the contract

is ambiguous." (applying Colorado contract law)).

　　　　Here, because the contract isn't ambiguous, the court can't refer to extrinsic evidence to

interpret it.  The court questions whether the Addendum necessarily qualifies as extrinsic

evidence.  As already discussed, the Addendum is a new contract that changed and broadened

the scope of the original Assignment.  But, no reasonable factfinder could infer or conclude that

the parties entered the Addendum just to interpret the original Assignment when the

Assignment's language is unambiguous.  So, the court can't use the Addendum to interpret the

unambiguous language of the original Assignment.  *See MSP Recovery Claims, Series LLC v.

QBE Holdings, Inc.*, 965 F.3d 1210, 1218 (11th Cir. 2020) (affirming district court's dismissal of

plaintiff's claims for lack of standing because, among other reasons, the district court "correctly

---

[8]　　　　Neither the Assignment nor the Addendum contain a choice of law provision.  And, none of the
parties argue whether a particular state's laws govern either the Assignment or the Addendum.  But, as
the Seventh Circuit has observed, a "general proposition" of contract interpretation is "that unambiguous
contracts are to be interpreted as written, without recourse to extrinsic evidence that might contradict the
literal meaning" and "as far as [the Seventh Circuit] know[s], all states allow extrinsic evidence to
'ambiguate' a contract clear as written *only if there is a latent ambiguity*."  *Pastor v. State Farm Mut.
Auto. Ins. Co.*, 487 F.3d 1042, 1046 (7th Cir. 2007) (emphasis added).  Plaintiff—who bears the burden of
establishing standing, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006)—never argues that this
contract interpretation rule doesn't apply to the Assignment because of a particular state's law.

rejected the Addendum as impermissible parol evidence" that existed "only to confirm, ratify, and memorialize the intent of the parties that [HFHP] was an assignor and intended party to the [Recovery] Agreement[,]" and thus, under Florida law, was "extrinsic to the Recovery Agreement" which was "unambiguous[,]" and as a consequence, "the Addendum cannot clarify the intent of the parties to the Recovery Agreement" (internal quotation marks and alterations omitted)).

For all these reasons, the court concludes that the Addendum doesn't confer plaintiff with standing to assert the antitrust claims asserted in the SAC.  So, plaintiff lacks standing to bring this action.  And, the court must dismiss plaintiff's claims.

## V.     Conclusion

For reasons explained, the court grants defendants' Motions to Dismiss plaintiff's Second Amended Class Action Complaint for lack of standing.  The court dismisses plaintiff's Second Amended Class Action Complaint.  But, it does so without prejudice, and it grants plaintiff leave to amend because the Federal Rules of Civil Procedure direct the court to "freely" grant "leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  And, as the Supreme Court has instructed, courts should "afford[ ] [plaintiff] an opportunity to test [its] claim on the merits" and should "freely" grant leave in "the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment[.]"  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Here, nothing suggests bad faith or dilatory motive by plaintiff or prejudice to the opposing party.  And, although plaintiff already has had two opportunities to cure pleading deficiencies, the court will allow plaintiff one more because an amendment here isn't futile if

plaintiff can plead properly the antitrust claims it has standing to assert.  So, the court grants plaintiff leave to file a Third Amended Complaint that alleges only the antitrust claims plaintiff has standing to assert within 30 days of the date of this Order.  If they decline to do so, the court will enter judgment consistent with this Order and close the case.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the Pfizer Defendants' Motion to Dismiss Plaintiff's Second Amended Class Action Complaint (Doc. 76) is granted. The court dismisses plaintiff's Second Amended Class Action Complaint but without prejudice and with leave to amend to file a Third Amended Complaint within 30 days of the date of this Order.

**IT IS FURTHER ORDERED THAT** the Mylan Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. 78) is granted.  The court dismisses plaintiff's Second Amended Class Action Complaint but without prejudice and with leave to amend to file a Third Amended Complaint within 30 days of the date of this Order.

**IT IS FURTHER ORDERED THAT** if plaintiff doesn't file a Third Amended Complaint within 30 days, the court will dismiss this action.

**IT IS SO ORDERED.**

**Dated this 26th day of July 2021, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
