## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

**KPH HEALTHCARE SERVICES,**
**INC., a/k/a KINNEY DRUGS INC.,**
**FWK HOLDINGS, LLC, and**
**CÉSAR CASTILLO, LLC,**
individually and on behalf of all those
similarly situated,

        **Plaintiffs,**

v.

**MYLAN N.V., et al.,**

        **Defendants.**

**Case No. 20-2065-DDC-TJJ**

## MEMORANDUM AND ORDER

This Order decides two Motions to Dismiss in a lawsuit brought by plaintiffs on behalf of themselves and a putative class of direct purchasers of EpiPens. Plaintiffs have filed a Consolidated Fourth Amended Class Action Complaint (Doc. 128). It alleges Sherman Antitrust Act violations against defendants who manufacture and sell the EpiPen. Defendants have filed Motions to Dismiss the Consolidated Fourth Amended Class Action Complaint under Fed. R. Civ. P. 12(b)(6) for failing to state a claim (Docs. 134 & 137). Plaintiffs have submitted a Consolidated Opposition to both motions (Doc. 145). And, defendants have filed Replies (Docs. 147 & 148). Also, defendants have filed a Notice of Supplemental Authority (Doc. 163), and, of course, plaintiffs have filed a Response (Doc. 167). And, defendant Pfizer filed another Notice of Supplemental Authority (Doc. 168), to which plaintiffs responded (Doc. 171). To say the least, the issues are fully briefed. The court has reviewed carefully all of the parties' submissions, and is now prepared to rule.

For reasons explained below, the court grants the motions in part and denies them in part. The court grants Pfizer's Motion to Dismiss plaintiffs' antitrust claims because the Supreme Court's holding in *Illinois Brick* bars plaintiffs—as indirect purchasers—from asserting their antitrust claims premised on a generic delay theory against Pfizer.  The court denies Mylan's Motion to Dismiss because plaintiffs have asserted plausibly that they bring their claims in a timely fashion and have stated plausible claims for relief under the Sherman Antitrust Act.  The court explains how it reaches these conclusions in more detail, below.

## I.    Factual Background

The following facts come from plaintiffs' Consolidated Fourth Amended Class Action Complaint (FAC).  Doc. 128.  The court accepts them as true and views them in the light most favorable to plaintiffs.  *Doe v. Sch. Dist. No. 1*, 970 F.3d 1300, 1304 (10th Cir. 2020) (explaining that on a motion to dismiss the court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to" plaintiffs (citation and internal quotation marks omitted)).

### *EpiPen*

EpiPen "is a disposable, prefilled, FDA-approved epinephrine auto injector ('EAI')" that delivers epinephrine to treat severe allergic reactions known as anaphylaxis.  Doc. 128 at 4 (FAC ¶¶ 2–3).  Between 2013 and 2016, sales of EpiPens in the United States generated more than $1 billion annually.  *Id.* at 33 (FAC ¶ 106).

### *The Parties*

Plaintiffs bring their lawsuit against two groups of defendants.  Doc. 128 at 4 (FAC ¶ 1). The first group includes Mylan N.V., Mylan Specialty L.P., and Mylan Pharmaceuticals, Inc. (collectively, "Mylan").  *Id.*  Mylan markets, sells, and distributes EpiPens in the United States.

2

*Id.* at 31 (FAC ¶ 96). The second group of defendants includes Pfizer, Inc., King Pharmaceuticals, Inc., and Meridian Medical Technologies, Inc. (collectively, "Pfizer"). *Id.* at 4 (FAC ¶ 1). Pfizer manufactures EpiPens, holds EpiPen patents, and supplies EpiPens to Mylan. *Id.* at 4–5 (FAC ¶¶ 4–5).

Three plaintiffs bring this lawsuit on behalf of themselves and a putative class of direct purchasers of the EpiPen. *Id.* at 4 (FAC ¶ 1). The three plaintiffs are: (1) KPH Healthcare Services, Inc., a/k/a Kinney Drugs, Inc. ("KPH"), (2) FWK Holdings, LLC ("FWK"), and (3) César Castillo, LLC ("Castillo"). *Id.*

Plaintiff KPH operates retail and online pharmacies under the name Kinney Drugs, Inc. *Id.* at 7 (FAC ¶ 14). KPH is the assignee of McKesson Corporation, who purchased EpiPens directly from Mylan. *Id.* (FAC ¶ 15). Plaintiff FWK is an Illinois limited liability company. *Id.* at 9 (FAC ¶ 19). FWK is the assignee of Frank W. Kerr Co, who purchased EpiPens directly from Mylan. *Id.* (FAC ¶ 20). Plaintiff Castillo is a Puerto Rico corporation. *Id.* (FAC ¶ 21). Castillo purchased EpiPens directly from defendants. *Id.* at 9–10 (FAC ¶ 21).

### *Alleged Anticompetitive Conduct*

Plaintiffs' lawsuit alleges that defendants, through their manufacture and sale of the EpiPen, engaged in an "anticompetitive and unlawful conspiracy" and entered "agreements in restraint of trade to substantially delay the onset of generic competition for the EpiPen[.]" *Id.* at 4 (FAC ¶ 2). Specifically, plaintiffs allege, "on April 26, 2012, [d]efendants entered into a series of unlawful and anticompetitive agreements with generic drug manufacturer, Teva Pharmaceuticals USA, Inc." and those agreements "agreed to delay entry of Teva's AB-rated generic EpiPen until June 22, 2015 (subject to FDA approval) and settle patent litigation related to Teva's ANDA to manufacture and market an AB-rated generic EpiPen[.]" *Id.* at 5 (FAC ¶ 6).

3

In exchange for Teva's agreement to delay entry of a generic EpiPen, "Teva and Mylan agreed to delay entry of Mylan's generic version of Nuvigil [a prescription drug sold by Teva] until June 1, 2016, and to settle patent litigation related to Mylan's ANDA to market a generic version of Nuvigil." *Id.*

According to plaintiffs, had defendants not entered these agreements with Teva, a generic EpiPen would have entered the EAI market in March 2014. *Id.* at 5–6 (FAC ¶ 7). And, after entry of a generic EpiPen, plaintiffs "and other direct purchasers of EpiPens would have been able to pay significantly lower prices than they were forced to pay because of [d]efendants' unlawful and anticompetitive conduct to delay generic entry." *Id.* Plaintiffs' lawsuit seeks to recover "overcharge damages" that plaintiffs and putative class members purportedly paid for EpiPens and that defendants allegedly caused with their "unlawful, anticompetitive, and exclusionary conduct[.]" *Id.* at 6 (FAC ¶ 9); *see also id.* at 7–10 (FAC ¶¶ 15, 20, 21 ) (alleging that direct purchasers "paid supra-competitive prices for [their] EpiPen purchases" because of "[d]efendants' alleged anticompetitive conduct").

## II.    Procedural Background

Plaintiff KPH filed this action on February 14, 2020. Doc. 1 (Compl.). KPH was the only plaintiff named in the original Complaint. *Id.* The original Complaint alleged Sherman Antitrust Act and Clayton Act violations on behalf of a class of direct purchasers based on a scheme to monopolize (Count I), unlawful tying (Count II), exclusive dealing (Count III), and deceptive conduct (Count IV). *Id.* at 83–89 (Compl. ¶¶ 171–205).

On September 10, 2020, and with defendants' consent, plaintiff KPH filed a First Amended Class Action Complaint. Doc. 54. Like the original Complaint, plaintiff KPH was the only named plaintiff in the First Amended Class Action Complaint. And, again as in the original

Complaint, the First Amended Class Action Complaint alleged federal antitrust claims based on a conspiracy to restrain trade and monopolize (Count I), unlawful tying (Count II), exclusive dealing (Count III), and deceptive conduct (Count IV).  *Id.* at 86–94 (First Am. Compl. ¶¶ 273–315).

On November 3, 2020, plaintiff KPH filed a Second Amended Class Action Complaint (SAC) as a matter of course under Fed. R. Civ. P. 15(a)(1)(B).  Doc. 72 at 4 n.1.  The SAC alleged the same federal antitrust claims asserted in its predecessors.  Defendants filed Motions to Dismiss the SAC.  Docs. 76 & 78.  Defendants' motions asserted several arguments supporting dismissal.  *See generally id.*  But, the court's Memorandum and Order rulings those motions addressed only defendants' first dismissal argument because it was dispositive.  Doc. 113 at 9–10.  The court agreed with defendants that KPH lacked antitrust standing to assert any of the claims alleged in the SAC because those claims exceeded the reach of KPH's Assignment from McKesson.  *Id.* at 10.  So, the court concluded, KPH lacked "antitrust standing to bring the claims as the SAC currently alleges them."  *Id.*  It thus dismissed plaintiff's SAC "but without prejudice and with leave to file a Third Amended Complaint asserting only claims that fall within plaintiff's Assignment from McKesson."  *Id.*

After the court issued its Memorandum and Order granting defendants' Motions to Dismiss but before plaintiff KPH filed a Third Amended Complaint, plaintiff Castillo filed a Motion to Intervene.  Doc. 115.  The motion asked the court to allow Castillo to intervene as a class representative on behalf of an existing class of direct purchasers.  *Id.*

On August 16, 2021, plaintiffs KPH and FWK filed a Third Amended Class Action Complaint (TAC).  Doc. 117.  The TAC added FWK to the lawsuit as a plaintiff.  *Id.* at 4, 8–9 (TAC ¶¶ 1, 19).  Also, it narrowed the scope of the antitrust claims asserted by KPH's earlier

Complaints.  The TAC asserted two claims premised on a generic delay theory:  (1) violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, based on an "unlawful contract, combination, or conspiracy in unreasonable restraint of trade[,]" *id.* at 54 (TAC ¶ 196), and (2) violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, based on a conspiracy "to unlawfully maintain monopoly power in the relevant market by agreeing to delay market entry of Teva's AB-rated generic EpiPen[,]" *id.* at 56 (TAC ¶ 207).

After filing the TAC, plaintiffs KPH, FWK, and Castillo agreed to file a Fourth Amended Complaint naming the three parties as plaintiffs.  Doc. 126.  Also, plaintiffs secured defendants' agreement not to oppose a motion for leave to file a Fourth Amended Complaint.  *Id.*  The court granted plaintiffs' unopposed motion for leave and also denied as moot plaintiff Castillo's Motion to Intervene.  Doc. 127.

On September 21, 2021, the three named plaintiffs filed the FAC.  Doc. 128.  It is, at this juncture, the operative pleading.  The FAC asserts two claims under the Sherman Antitrust Act premised on a generic delay theory:  (1) an unlawful contract, combination, or conspiracy in unreasonable restraint of trade violating 15 U.S.C. § 1, and (2) an unlawful conspiracy to monopolize violating 15 U.S.C. § 2.  Doc. 128 at 65–69 (FAC ¶¶ 239–56).  Defendants' Rule 12(b)(6) Motions to Dismiss target all claims asserted in the FAC.  This Order addresses defendants' dismissal arguments.  But first, the court recites the legal standard governing Motions to Dismiss under Fed. R. Civ. P. 12(b)(6).

### III.    Legal Standard

For a complaint to survive a Rule 12(b)(6) motion to dismiss, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1192 (10th Cir. 2009) ("The question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." (citation omitted)).

When considering a Rule 12(b)(6) motion to dismiss, the court must assume that the factual allegations in the complaint are true. *Iqbal*, 556 U.S. at 678. But the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

In the antitrust context, the Supreme Court has observed that "proceeding to antitrust discovery can be expensive." *Twombly*, 550 U.S. at 558 (applying the plausibility pleading standard to Sherman Act claims). So, in the antitrust setting, courts must "'insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.'" *Id.* (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983)). But still, antitrust cases are not subject to a standard requiring "heightened fact pleading of specifics[.]" *Id.* at 570. Instead, an antitrust Complaint must allege "only enough facts to state a claim to relief that is plausible on its face" and sufficient to "nudge[ ] the[ ] claims across the line from conceivable to plausible[.]" *Id.*; *see also In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067, 1074 (D. Kan. 2009) (explaining on a Rule 12(b)(6) motion to dismiss antitrust claims that "the Court must ensure that plaintiffs have

alleged facts to support those elements sufficient to provide the 'heft' to show an entitlement to relief and to 'nudge' plaintiffs' claims over the line from mere[ ] possibility or speculation to plausibility" (quoting *Twombly*, 550 U.S. at 557, 570)).

The court's analysis, below, applies this governing standard to defendants' Rule 12(b)(6) dismissal arguments.

## IV.    Analysis

Mylan and Pfizer generally assert four arguments for Rule 12(b)(6) dismissal.  They contend:  (1) the statute of limitations bars plaintiffs' claims because they are untimely; (2) plaintiffs lack antitrust standing to assert their antitrust claims against Pfizer under the Supreme Court's holding in *Illinois Brick* because plaintiffs are indirect purchasers of the EpiPen from Pfizer; (3) plaintiff KPH lacks standing to sue Pfizer under its Assignment from McKesson; and (4) the FAC fails to state plausible antitrust claims against defendants.[1]  The court addresses defendants' four arguments, in turn, below.

### A.    Timeliness of Plaintiffs' Antitrust Claims

Defendants assert that the statute of limitations bars plaintiffs' antitrust claims.  The parties agree that the statute of limitations governing Sherman Antitrust Act claims is four years. 15 U.S.C. § 15b (providing that any "action to enforce any cause of action" under the Sherman Antitrust Action "shall be forever barred unless commenced within four years after the cause of action accrued").  Plaintiffs premise their antitrust claims on an alleged unlawful reverse

---

[1]    Mylan and Pfizer have filed separate Motions to Dismiss.  *See* Docs. 134 & 137.  But, Pfizer's motion "adopts and incorporates" certain arguments from Mylan's motion.  Doc. 135 at 10 n.4.  And, Mylan "incorporates" certain arguments asserted by Pfizer's motion.  Doc. 138 at 17, 29 n.12.  The court addresses defendants' joint arguments together in the analysis, below.

payment settlement[2] that defendants entered with Teva on April 26, 2012. Doc. 128 at 5, 38 (FAC ¶¶ 6, 125). They allege that the settlement provided Teva a license to enter the EAI market in June 2015. *Id.* at 38, 40 (FAC ¶¶ 125, 131). And, they allege, but for the alleged unlawful generic delay produced by the unlawful reserve payment settlement, a generic EpiPen would have entered the EAI market months earlier, in March 2014. *Id.* at 5–6, 49 (FAC ¶¶ 7, 163).

Thus, defendants argue, plaintiffs' alleged injuries commenced in March 2014 when, but for the alleged antitrust violation, they could have purchased a generic EpiPen and paid "significantly lower prices than they were forced to pay because of [d]efendants' unlawful and anticompetitive conduct to delay generic entry." *Id.* at 5–6 (FAC ¶ 7); *see also Dodson Int'l Parts, Inc. v. Williams Int'l Co., LLC*, 12 F.4th 1212, 1223 (10th Cir. 2021) ("'Generally, a[n] [antitrust] cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.'" (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971))). But, KPH didn't file this lawsuit for another six years—on February 14, 2020. Doc. 1. Thus, defendants assert, the statute of limitations bars plaintiffs' antitrust claims because plaintiff KPH filed the original Complaint more than four years after plaintiffs' antitrust claims accrued. As a consequence, defendants ask the court to dismiss this lawsuit as untimely.

Plaintiffs disagree. Plaintiffs argue that the tolling and relation back doctrines make their antitrust claims timely. The court addresses these arguments in the analysis that follows, below. It begins with the tolling arguments, and then considers the relation back arguments.

_____

[2]     The First Circuit has explained that a reverse payment settlement "refers to an arrangement in which the brand-name manufacturer and patent holder compensates the generic manufacturer and alleged patent infringer to settle [patent] litigation and delay the generic's market entry. *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 41 (1st Cir. 2016) (citing *FTC v. Actavis, Inc.*, 570 U.S. 136, 145 (2013)).

### 1.   Tolling

Plaintiffs calculate the date when the statute of limitations began to run differently than defendants have.  Plaintiffs argue that the four-year statute of limitations didn't commence until August 22, 2016—the date when Congress announced publicly that it was investigating EpiPen pricing.  Plaintiffs assert that they couldn't have discovered their injuries before that date because defendants fraudulently concealed their unlawful antitrust violations, thus preventing plaintiffs from asserting their claims before Congress's public announcement on August 22, 2016.  Plaintiffs argue that the FAC plausibly alleges facts capable of supporting the doctrines of fraudulent concealment, the discovery rule, and equitable tolling apply and those doctrines apply to toll the statute of limitations until August 22, 2016.  Thus, plaintiffs contend, the original Complaint—filed on February 14, 2020—timely asserted antitrust claims within the governing four-year statute of limitations.

Our Circuit requires that plaintiffs who file a lawsuit after the statute of limitations expires must shoulder "the burden . . . to identify a theory that allows them to overcome the statute of limitations and thereby render their claims timely."  *Herrera v. City of Espanola*, 32 F.4th 980, 992 (10th Cir. 2022).  As already noted, plaintiffs rely on the doctrines of fraudulent concealment, the discovery rule, and equitable tolling to toll the statute of limitations on their antitrust claims.  These doctrines permit tolling of a statute of limitations when plaintiff plausibly alleges that defendant engaged in wrongful conduct that prevented plaintiff from asserting the claims in a timely fashion.  *See Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1042 (10th Cir. 1980) (explaining that "allegations, asserting affirmative conduct to conceal the fraud, are sufficient to invoke the doctrine of equitable tolling at [the Rule 12(b)(6) motion to dismiss] stage in the proceeding"); *see also In re Urethane Antitrust Litig.*, 683 F. Supp. 2d 1214, 1227–

28 (D. Kan. 2010) (discussing "the rule for tolling based on fraudulent concealment and the discovery rule" and explaining that these doctrines toll the statute of limitations until plaintiff "discovers (or should have discovered, through the exercise of due diligence) that it has an antitrust conspiracy claim").

Our Circuit has explained that the "question of whether a plaintiff should have discovered the basis of his suit under the doctrine of equitable tolling does not lend itself to determination as a matter of law." *Aldrich*, 627 F.2d at 1042.  And, at the pleading stage, a plaintiff's "allegations, asserting affirmative conduct to conceal the fraud, are sufficient to invoke the doctrine of equitable tolling at this stage in the proceeding." *Id.* (reversing district court's Rule 12(b)(6) dismissal of securities act violations on statute of limitations grounds because plaintiffs' complaint sufficiently alleged fraudulent concealment to toll statute of limitations and render claims timely).

Here, plaintiffs have shouldered their burden to allege facts capable of supporting a plausible finding or inference that the discovery rule, fraudulent concealment, and equitable tolling apply to toll the statute of limitations and thus make their antitrust claims timely. Specifically, plaintiffs allege that they and putative class members "had no knowledge of the unlawful conduct alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until on or about August 22, 2016, the date that Congress publicly announced an investigation into EpiPen pricing."  Doc. 128 at 60–61 (FAC ¶ 218).[3]  They allege "[n]o information in the public domain was available to [them] concerning [d]efendants' unlawful activities, including the combination or conspiracy alleged herein, before August 22, 2016, the date the public first learned of a Congressional investigation into Mylan's unlawful

---

[3]          The original Complaint asserted the same allegation.  *See* Doc. 1 at 80 (Comp. ¶ 245).

pricing practices." *Id.* at 61 (FAC ¶ 219).  They allege that before "that date, [d]efendants had disclosed only incomplete and selective information to the public, which was insufficient for [p]laintiffs and Class members to evaluate whether they had been harmed by [d]efendants' conduct." *Id.*[4]  Also, plaintiffs allege, "the doctrine of fraudulent concealment tolls the statute of limitations on the claims asserted herein by [p]laintiffs and Class Members" because they "did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conduct alleged herein, until on or about August 22, 2016, the date Congress publicly announced its investigation of EpiPen pricing." *Id.* (FAC ¶ 221).[5]  They assert that defendants engaged in "affirmative acts" that "were wrongfully concealed and carried out in a manner that precluded detection." *Id.* at 62 (FAC ¶ 223).  And, they contend that defendants' "anticompetitive conspiracy and fraudulent scheme were inherently self-concealing" because "EpiPens and their generics are not exempt from federal antitrust laws, and [p]laintiffs and Class members reasonably considered the EAI industry to be a competitive industry." *Id.* (FAC ¶ 224).  So, plaintiffs allege, "a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of [d]efendants' EpiPen prices before August 22, 2016." *Id.*[6]

Defendants offer several arguments why tolling doesn't apply to plaintiffs' antitrust claims here.  The court rejects each argument.

---

[4]     The original Complaint asserted similar allegations.  *See* Doc. 1 at 79–80 (Comp. ¶ 244) ("Defendants concealed their efforts to exclude generic competition through the assertion and prosecution of invalid patents, ultimately reaching unlawful settlements that to this date have been kept confidential.").

[5]     The original Complaint asserted the same allegation.  *See* Doc. 1 at 80 (Comp. ¶ 246).

[6]     The original Complaint asserted similar allegations.  *See* Doc. 1 at 80 (Comp. ¶ 246).

*First*, defendants argue that plaintiffs are "sophisticated corporate entities" and "serial plaintiffs" with experienced class counsel who "were on notice and had ample resources to begin investigating any potential claim related to the Teva Settlement as early as April 2012, when Pfizer publicly announced the settlement and Teva's June 2015 license entry date." Doc. 135 at 21, 23; *see also* Doc. 138 at 23–24 (describing plaintiffs as "sophisticated" entities who "regularly file[ ] antitrust suits all over the county" and calling them "serial antitrust plaintiffs"). Defendants assert that plaintiff KPH is a "sophisticated plaintiff" who "regularly files antitrust suits all over the country." Doc. 138 at 23 & n.7 (citing six other cases where KPH is a plaintiff in an antitrust suit against pharmaceutical companies); *see also* Doc. 135 at 41–44 (listing 72 cases where KPH was a named plaintiff since January 1, 2016). Defendants allege plaintiff FWK "was created for the express purpose of filing antitrust lawsuits such as these." Doc. 135 at 21–22; *see also id.* at 45–48 (listing 79 cases where FKW was a named plaintiff since January 1, 2016); Doc. 138 at 23 n.8 (listing cases where FKW is a named plaintiff). And, defendants assert, plaintiff Castillo is a provider of "state-of-the-art distribution and logistics services . . . to the world's biggest pharmaceutical, medical and consumers goods companies," who is represented by experienced antitrust litigation counsel. Doc. 135 at 22–23 (citation and internal quotation marks omitted); *see also id.* at 49–52 (listing 78 cases where KPH was a named plaintiff since January 1, 2016).[7]

Also, defendants contrast plaintiffs in this case with the indirect purchaser plaintiffs in the MDL where EpiPen consumers asserted allegations similar to those alleged here—*i.e.*, that

---

[7]    Plaintiffs respond that the 78 cases defendants identify where Castillo is a plaintiff actually are just nine cases. *See* Doc. 145 at 23 n.8 (explaining that 59 of the 78 listed cases are part of an MDL pending in the Eastern District of Pennsylvania). However one counts the cases, plaintiffs assert that Castillo's involvement in other litigation has no bearing on the question whether it brings viable claims here.

defendants violated the antitrust laws by, among other things, entering an unlawful reverse payment settlement with Teva that delayed generic EpiPens from entering the EAI market.  *See In Re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1330 (D. Kan. 2018) (concluding that class plaintiffs' allegations that (1) they were "consumers and third-party payors who had no direct contact or interaction with Defendants and had no means from which they could have discovered the combination and conspiracy described in this Complaint before" August 2016, (2) "defendants actively concealed their anticompetitive conspiracy and also . . . defendants' scheme was self-concealing[,]" and (3) "a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of the Defendants' EpiPens prices before August 22, 2016" sufficed to assert "affirmative conduct to conceal the fraud" and was "sufficient to invoke the doctrine of equitable tolling at this stage in the proceeding" (citation and internal quotation marks omitted)).  Defendants say that the court can't apply the same standard here that it applied to the indirect purchaser/consumer class plaintiffs because they are sophisticated commercial entities who did business directly (or who are assignees of an entity who did business directly) with pharmaceutical manufacturers and suppliers.

But, as plaintiffs correctly respond, "when defendants are guilty of concealing their anticompetitive activities," "the overwhelming weight of authority treats 'inquiry notice' as an objective standard."  *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 835 (11th Cir. 1999);[8] *see also Sullivan v. Harris*, No. 18-CV-141-SWS, 2019 WL 5258045, at *4 (D. Wyo.

---

[8]     The parties don't cite—and the court's research hasn't revealed—any Tenth Circuit authority on this issue.  The court predicts that the Circuit, if presented with this issue, would find the Eleventh Circuit's reasoning persuasive and also apply an objective standard to the injury notice question presented here.

Jan. 23, 2019) (explaining that courts "apply an *objective test based on what a reasonable person would have done* in the plaintiff[']s situation if given the same information the plaintiff had" and declining to consider plaintiff's "grief and the difficulties of aging she may face" because those facts "are irrelevant to an objective 'reasonable person' analysis" of whether plaintiff was on notice of her RICO claims sufficient to start the limitations clock (citation and internal quotation marks omitted)).

The court applies this objective standard below to defendants' arguments that fraudulent concealment, the discovery rule, and equitable tolling don't apply to toll the statute of limitations.  It considers objectively whether plaintiffs were on notice of their antitrust claims based on the information available to them about defendants' alleged anticompetitive activity.[9] But, the court declines to find that these tolling doctrines don't apply simply because plaintiffs are corporate entities with experienced counsel who have filed other antitrust litigation.

*Second*, defendants assert that plaintiffs cannot rely on the fraudulent concealment doctrine to toll their claims because they had access to public information before August 22, 2016 (the date Congress announced its investigation into EpiPen pricing) that put them on notice of their generic delay claims and started the limitations clock running.  As our Circuit has instructed, "the federal doctrine of fraudulent concealment requires the plaintiff to show (1) the use of fraudulent means by the party who raises the ban of the statute; (2) successful

---

[9]     Defendants' cited cases apply this same standard to antitrust plaintiffs—*i.e.*, an objective standard that considers whether plaintiffs had actual or constructive notice of their claims based on information available to it.  *See Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1061, 1064 (9th Cir. 2012) (affirming district court's use of "the objective standard of actual or constructive notice, based on the record evidence before it" to conclude that plaintiff's claims were time-barred because plaintiff "had knowledge of both the specific agreements and the industry-wide anticompetitive practices . . . more than a decade before the filing of its complaint"); *see also Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 993–94 (N.D. Cal. 2020) (concluding that plaintiffs "had constructive knowledge of the facts that give rise to their claims" because those facts "were widely publicized" in the media).

concealment from the injured party; and (3) that the party claiming fraudulent concealment did not know or by the exercise of due diligence could not have known that he might have a cause of action." *Ballen v. Prudential Bache Sec., Inc.*, 23 F.3d 335, 336–37 (10th Cir. 1994) (citation and internal quotation marks omitted).

Defendants' argument thus asserts that plaintiffs' allegations fail the third requirement of the Circuit's fraudulent concealment test. That is, defendants contend, plaintiffs haven't alleged facts capable of supporting a plausible finding or inference that plaintiffs did not know or could not have known about their causes of action because defendants fraudulently concealed information from them. Specifically, defendants assert that plaintiffs' own allegations contain information from which they knew or should have known about their claims before August 22, 2016. Specifically, defendants cite plaintiffs' allegations about the April 26, 2012 press release that Mylan issued, announcing the Teva Settlement. Doc. 128 at 40 (FAC ¶ 131). Also, plaintiffs allege that Mylan's CEO stated in an earnings call on July 26, 2012, that "the runway [was] absolutely clear for [Mylan] through 2015, through [Mylan's] settlement with Teva[.]" *Id.* at 41 (FAC ¶ 133) (internal quotation marks omitted). Plaintiffs allege that, in a May 2012 Teva earnings call, financial analysts questioned the rationality of the Nuvigil settlement—which, plaintiffs allege, makes more sense when viewed in conjunction with the Teva/EpiPen Settlement. *Id.* at 43 (FAC ¶ 142). Plaintiffs assert that the FDA publicly denied Mylan's Citizen Petition in January 2015. *Id.* at 45–46 (FAC ¶ 155). And, defendants cite several public news articles dated between 2012 and 2015 that discussed the settlement and—defendants contend—should have placed plaintiffs on notice of their claims.

Plaintiffs correctly respond that these materials didn't include any information about an alleged pay-for-delay settlement. Instead, the materials just recited the fact of the Teva

Settlement, and—in some instances—identified the June 2015 date that the parties had agreed to as the entry date for the Teva generic.  But, otherwise, the materials didn't provide any other specific terms of the Teva Settlement or any other information that would have given plaintiffs notice of their generic delay claims.  In similar circumstances involving limited disclosure of public information, some courts have declined to find that plaintiffs knew or should have known about their claims, and thus, the courts refused to impose a statute of limitations bar against those claims.  *See, e.g.*, *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 416–36 (2d Cir. 2008) (agreeing with plaintiffs that media coverage, public SEC filings, and four lawsuits provided information that was "too vague and non-specific to suggest . . . the probability of fraud[,]" and thus holding that these materials didn't give plaintiffs inquiry notice of their securities fraud claims); *In re Auto. Parts Antitrust Litig.*, No. 12-md-02311, 2017 WL 7689654, at *5 (E.D. Mich. May 5, 2017) (concluding that "the SEC filings and the media coverage of a criminal investigation would not have provided [Indirect Purchaser Plaintiffs] sufficient information either to put them on notice of a likely conspiracy claim or to sustain adequate pleadings that could survive the Rule 12(b)(6) standard").

In contrast, defendants invoke other cases where courts have refused to find plausible allegations of fraudulent concealment.  But each of defendants' cases involved public disclosure of material facts that, the courts concluded, sufficed to place plaintiffs on notice of their claims. *See, e.g.*, *In re Lamictal Indirect Purchaser & Antitrust Consumer Litig.*, 172 F. Supp. 3d 724, 744–45 (D.N.J. 2016) (holding that "equitable tolling" didn't "preserve [plaintiffs'] claims" because defendants "made public filings with the SEC and issued press releases that, though they did not include the *full* terms of the settlement, did disclose material facts sufficient to inform [p]laintiffs of the nature of their claims, or at least to allow them to discover the claims with

17

reasonable diligence"); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 249 (D. Conn. 2015) (holding that plaintiff "failed to meet its pleading burden for tolling the statute of limitations" based on fraudulent concealment because, although defendants didn't "publicly disclose the precise terms of the challenged settlement or their associated dollar values[,]" they had "overtly publiciz[ed] the settlement in more general terms," and there was "an FTC investigation and other litigation challenging the agreement" that should have put plaintiffs on notice of their claims); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 748 (E.D. Pa. 2014) (holding that plaintiffs failed to plead facts capable of supporting fraudulent concealment where defendants hadn't concealed "the material terms of the settlement" but instead had "affirmatively disclosed these terms to the public, including in press releases and in SEC filings" (citation and internal quotation marks omitted)); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 225 (E.D.N.Y. 2003) (holding plaintiff couldn't "credibly claim ignorance of the operative facts of their claims" when agreements' terms "were publicly disclosed" and "dozens of nearly identical complaints were filed against some of the defendants in several state courts within four years of the challenged settlement, in some cases by the exact same lawyers who represent [plaintiffs] in this case").

Here, in contrast, plaintiffs allege defendants didn't disclose publicly the *material terms* of their Teva Settlement that would have alerted plaintiffs about the existence of an unlawful reverse payment settlement—*i.e.*, that the Teva Settlement included an agreement by Teva to delay entry of a generic EpiPen in exchange for Mylan's agreement to delay entry of a generic version of Nuvigil and settle patent litigation based on Mylan's ANDA to market a generic version of Nuvigil.  Indeed, plaintiffs' Complaint alleges specifically that defendants entered

"unlawful settlements" and the terms of those agreements "have been kept confidential[.]"  Doc. 128 at 60 (FAC ¶ 217).

Defendants also cite an article that purportedly "raised the possibility that the Teva Settlement included a reverse payment[.]"  Doc. 135 at 30 (citing Larry Smith, *Antares: Settlement of Litigation on EpiPen is a Positive (AID, $3.08)*, SmithOnStocks (Apr. 28, 2012)).  But the quoted passage simply speculates that the Teva Settlement involved a payment.  It never provides any facts suggesting that the Teva Settlement actually included a reverse payment or that the payment was an unlawful reverse payment settlement delaying competition by paying Teva to delay its launch of a generic product.  This article—and defendants' other cited information—don't suffice to put plaintiffs on notice of their generic delay claims.  They simply describe the fact of Teva's Settlement but include no information about the specific terms of the Settlement or other facts that would have provided plaintiffs notice of their antitrust claims.

Last, defendants cite a lawsuit that one member of the indirect purchaser class filed in New York state court.  This suit sought to discover the Teva Settlement Agreement and alleged that Pfizer and Teva had entered an unlawful reverse payment settlement that delayed Teva from launching a generic EpiPen.  Doc. 136-1 at 6–7 (Decl. ¶ 9).  Defendants concede that the discovery action "lasted several years[,]" Doc. 135 at 30, and plaintiffs assert, defendants don't cite a single document from that lawsuit confirming that an unlawful reverse payment settlement existed, Doc. 145 at 26.  Also, the New York Petition attached to defendants' motion doesn't assert, at least not precisely, the same antitrust claims asserted here—*i.e.*, that in exchange for Teva's agreement to delay entry of a generic EpiPen, "Teva and Mylan agreed to delay entry of Mylan's generic version of Nuvigil [a prescription drug sold by Teva] until June 1, 2016, and to

settle patent litigation related to Mylan's ANDA to market a generic version of Nuvigil."  Doc.

128 at 5 (FAC ¶ 6).  The New York Petition only addressed the Teva Settlement.

Although "filing of related lawsuits can suffice to put plaintiffs on inquiry notice, where

the alleged fraud is similar," *In re Initial Pub. Offering Sec. Litig.*, 341 F. Supp. 2d 328, 349

(S.D.N.Y. 2004), the "mere filing of a lawsuit 'is not *as a matter of law* tantamount to actual or

constructive know[ledge] of their claim[,]'" *United Nat'l Records, Inc. v. MCA, Inc.*, 609 F.

Supp. 33, 37 (N.D. Ill. 1984) (quoting *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1171 (5th

Cir. 1979)).  Instead, "[c]lass members cannot be charged with knowledge of a potential claim

'unless they are aware of *some evidence* tending to support it.'"  *Id.* (quoting *In re Beef Industry*

*Antitrust Litig.*, 600 F.2d at 1171); *see also id.* (holding that defendants had "failed to establish

that class members should be charged with knowledge of the alleged price fixing conspiracy

merely because [another plaintiff] filed a similar lawsuit" years earlier because "the facts giving

rise to [the other plaintiff's] suit appear to be nothing more than assumptions based upon his

observation of the parallel price structure of the industry"); *In re Beef Indus. Antitrust Litig.*, 600

F.2d 1171 (denying summary judgment on statute of limitation grounds because there was "no

evidence" that another lawsuit "turned up any verification for the allegations" or that "plaintiffs

had independent access before that time to any information, beyond the [other lawsuit] itself, that

tended to verify their suspicions").

Here, on the current record, this case is a close call.  On one hand, the New York lawsuit

asserted allegations similar to those plaintiffs allege here—*i.e.*, that the Teva Settlement was an

unlawful reverse payment settlement.  On the other hand, the allegations in the New York

lawsuit are just that—allegations without "'*some evidence* tending to support'" them.  *United*

*Nat'l Records*, 609 F. Supp. at 37 (quoting *In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1171);

*see also In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1171 ("The mere filing of a similar lawsuit, without more, does not necessarily give 'good ground' because that suit might well be frivolous or baseless."). And, plaintiffs here didn't have "independent access" to other information that "tended to verify their suspicions." *In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1171. As already discussed, the other sources defendants cite—such as Mylan's press release or media coverage—simply report the fact of the Teva Settlement but provide no information about the material terms of the Settlement that would have supplied plaintiffs with requisite notice of their claims.

As several courts have noted, "'in the antitrust conspiracy context, it is generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage, particularly where the proof relating to the extent of the fraudulent concealment is alleged to be largely in the hands of the alleged conspirators.'" *Thompson v. 1-800 Contacts, Inc.*, No. 2:16-CV-1183-TC, 2018 WL 2271024, at *10–11 (D. Utah May 17, 2018) (quoting *In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007)); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1119–20 (N.D. Cal. 2008) (finding it "inappropriate to dismiss any claims as time-barred at this stage of the litigation" because "plaintiffs have sufficiently alleged fraudulent concealment" but observing that "[d]efendants may renew these contentions upon a fuller factual record"); *In re Vitamins Antitrust Litig.*, No. MISC 99-197(TFH), 2000 WL 1475705, at *8 (D.D.C. May 9, 2000) (agreeing "with the many courts which have held that the issues of fraudulent concealment and due diligence are questions of fact that should not be decided on a motion to dismiss"). At this stage of the litigation, plaintiffs here have alleged enough to make plausible their claim that defendants fraudulently concealed an unlawful reverse payment settlement. The current record doesn't allow the court to

find that other publicly known information, like the New York discovery action, gave plaintiffs

notice of their claims—before the August 22, 2016 Congressional announcement—because the

other public sources of information didn't provide any *material* facts that could support

plaintiffs' generic delay claims.  As a consequence, the court concludes that plaintiffs have

asserted facts sufficient to allege at the motion to dismiss stage that the fraudulent concealment

doctrine applies to toll plaintiffs' claims.[10]

*Third*, defendants argue that plaintiffs haven't alleged that defendants committed any

fraud—much less alleged fraud with the particularity that Fed. R. Civ. P. 9(b) requires for fraud

claims.  Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances

---

[10]     Defendants also assert that plaintiffs never allege specific information that they learned from the Congressional announcement about an EpiPen pricing investigation that provided them notice of their generic delay claims.  Defendants argue that "nothing about that announcement had anything to do with the EpiPen or Nuvigil patent settlements or any supposed generic delay."  Doc. 148 at 12.  But, the court must view plaintiffs' factual allegations as true and in the light most favorable to them.  And plaintiffs allege that the Congressional announcement was their first notice of defendants' alleged "unlawful pricing practices" and before August 22, 2016, plaintiffs didn't know about defendants' "unlawful conduct to monopolize the EAI market" or that "they were paying supra-competitive prices for EpiPens during the Class Period as a result of [d]efendants' anticompetitive conduct."  Doc. 128 at 61 (FAC ¶¶ 219, 222).  Viewing these allegations in plaintiffs' favor, plaintiffs plainly have alleged that the Congressional announcement first provided them notice that they had paid supracompetitive prices for EpiPens—something that plaintiffs allege was a consequence of defendants' alleged unlawful reverse payment settlement delaying generic competition.  Specifically, plaintiffs allege that defendants' generic delay forced them to pay overcharges for EpiPens that they would not have paid otherwise had a generic EpiPen entered the EAI market sooner.  *Id.* at 58–59 (FAC ¶¶ 206, 208, 209, 211).  Plaintiffs allege that "the Congressional investigation and information made public from it caused [p]laintiffs and [c]lass [m]embers to further investigate and inquire into the allegations" about generic delay.  *Id.* at 61–62 (FAC ¶ 222).  They assert:  "Pharmaceutical antitrust claims are inherently complex, encompassing several areas of law;" but nevertheless, "[p]laintiffs and [c]lass [m]embers have been diligently researching their claims and investigating their damages since disclosure by the Congressional investigation."  *Id.*

        These allegations support a plausible finding or inference that plaintiffs couldn't have known about their claims before August 22, 2016, because it wasn't until that date when they learned they were paying overcharges for their EpiPen purchases based on defendants' alleged monopolization of the market through certain conduct, including the generic delay alleged in this lawsuit.  And, as already discussed, plaintiffs have alleged sufficiently that they could not have known or discovered by exercise of reasonable diligence that they had a generic delay claim because the information disclosed publicly about the Teva Settlement before August 22, 2016 was limited and—as plaintiffs allege—omitted material facts about the Settlement.

constituting fraud[.]" Fed. R. Civ. P. 9(b). And, in the context of asserting a fraudulent concealment claim to toll the statute of limitations, our Circuit requires a plaintiff to plead "with particularity as required by Rule 9(b)" that defendants used "fraudulent means" to conceal their conduct from plaintiffs. *In re Urethane Antitrust Litig.*, 409 F. Supp. 2d 1275, 1284 (D. Kan. 2006) (citing *Ballen*, 23 F.3d at 337). Our Circuit has interpreted Rule 9(b) to require a fraud claim "to set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (citation and internal quotation marks omitted). This requirement means "'the plaintiff must set out the "who, what, where, and when" of the alleged fraud.'" *In re Urethane Antitrust Litig.*, 409 F. Supp. 2d at 1285 (quoting *Plastic Packaging Corp. v. Sun Chem. Corp.*, 136 F. Supp. 2d 1201, 1203 (D. Kan. 2001)). But, as our court has recognized, "allegations of concealment, as opposed to an affirmative act [of fraud], do not require the same level of specificity because often it is impossible to know of the exact 'who, when, and where' in relation to an omission." *AKH Co., Inc. v. Universal Underwriters Ins. Co.*, No. 13-2003-JAR, 2015 WL 1809157, at *13 (D. Kan. Apr. 21, 2015) (first citing *Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1267 (C.D. Cal. 2007); then citing *Near v. Crivello*, 673 F. Supp. 2d 1265, 1280 (D. Kan. 2009)); *see also Near*, 673 F. Supp. 2d at 1280 (explaining the heightened Rule 9(b) pleading standard "is often applied more liberally to fraud by silence claims because it may be difficult to identify exactly when, where, and by whom a representation should have been made").

Here, plaintiffs assert that defendants "took active steps to conceal their unlawful activities" by "(a) asserting invalid patents against potential competitors and ultimately reaching unlawful settlements that to this date have been kept confidential and have operated to keep

competitors from the market; and (b) filing citizen petitions with the FDA that were executed and timed solely to delay generic entry in the EAI market."  Doc. 128 at 60 (FAC ¶ 217). Plaintiffs allege that defendants "disclosed only incomplete and selective information to the public" about their "unlawful activities[.]"  *Id.* at 61 (FAC ¶ 219).  Viewing plaintiffs' allegations in their favor, this "incomplete and selective information" includes public information about the Teva Settlement—like the Mylan press release announcing the Settlement. And, as alleged, this publicly-available information omitted material facts about the Settlement that, if disclosed, plaintiffs say, they could have discovered that the Teva Settlement was not an lawful settlement but, instead, was an unlawful reverse payment settlement.  Plaintiffs allege that defendants' affirmative acts "were wrongfully concealed and carried out in a manner that precluded detection."  *Id.* at 62 (FAC ¶ 223).  Also, plaintiffs allege that "[b]y their very nature, [d]efendants' anticompetitive conspiracy and fraudulent scheme were inherently self-concealing" because "EpiPens and their generics are not exempt from federal antitrust laws, and [p]laintiffs and [c]lass members reasonably considered the EAI industry to be a competitive industry."  *Id.* (FAC ¶ 224).  So, plaintiffs allege, "a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of [d]efendants' EpiPen prices before August 22, 2016."  *Id.*

        Although these allegations don't provide "the exact 'who, when, and where'" of defendants' omissions, they suffice to allege a plausible claim of fraudulent concealment "[g]iven th[e] relaxed standard" for "allegations of concealment[.]"  *See AKH Co., Inc.*, 2015 WL 1809157, at *13 (concluding that fraudulent concealment claims were "sufficiently specific" where insured "failed to disclose a host of facts" to its insurer "for [the insurer] to evaluate [a] settlement" before it "reasonably relied" on the incomplete information the insured provided "in

approving the $5 million policy limits payment"); *see also Baggett*, 582 F. Supp. 2d at 1267 (finding that plaintiff "adequately . . . alleged fraudulent behavior under Rule 9(b)" by asserting that defendant "fraudulently concealed that there was a significant amount of ink left in the cartridges when its printers displayed 'empty' signals and ceased functioning" and because plaintiff alleged "a failure to act instead of an affirmative act," plaintiff wasn't required to "point out the specific moment when the defendant failed to act").

*Fourth*, defendants argue that plaintiffs weren't diligent in filing their antitrust claims. As discussed, the third element of a fraudulent concealment claim requires a plaintiff to show that it "did not know *or by the exercise of due diligence* could not have known that [plaintiff] might have a cause of action."  *Ballen*, 23 F.3d at 337 (emphasis added) (citation and internal quotation marks omitted); *see also Crowe v. Servin*, 723 F. App'x 595, 597 (10th Cir. 2018) ("A litigant seeking equitable tolling must show (1) that [s]he has been pursuing [her] rights diligently, and (2) that some extraordinary circumstances stood in [her] way." (citation and internal quotation marks omitted)).  The Supreme Court has instructed that the "diligence required for equitable tolling purposes is reasonable diligence[.]"  *Holland v. Florida*, 560 U.S. 631, 653 (2010) (citation and internal quotation marks omitted).

With this argument, defendants assert that plaintiffs weren't diligent in pursuing their claims because "numerous public sources between 2012 and 2015 (at the latest) disclosed more than sufficient information to charge [p]laintiffs with constructive knowledge of their potential claim and triggered their duty to investigate with diligence[.]"  Doc. 135 at 28–29; *see also* Doc. 138 at 24–25 (arguing that plaintiffs "have been far from diligent" and "the facts supporting [p]laintiffs' claims were already in the public record well before August 22, 2016").  For reasons already discussed, the court disagrees that plaintiffs knew or should have known by exercise of

reasonable diligence that they might have a generic delay claim before August 22, 2016.  The court already has described how the cited public sources provided only limited information—for example, by reporting the fact of the Teva Settlement and Teva's agreement to a 2015 generic entry date—but the public sources omitted other information about the Settlement's terms.  As plaintiffs allege, these omissions included the Teva Settlement's agreement that Teva would delay entry of a generic EpiPen in exchange for Mylan's agreement to delay entry of its generic version of Nuvigil and settle patent litigation related to Mylan's generic version of Nuvigil. Plaintiffs allege these omissions prevented them from discovering that they had antitrust claims premised on a generic delay theory.  And, plaintiffs assert, they "could not have discovered through the exercise of reasonable diligence" their claims until August 22, 2016, when Congress announced publicly its investigation into EpiPen pricing.  Doc. 128 at 61 (Am. Comp. ¶ 221); *see also id.* at 62 (Am. Compl. ¶ 225) (alleging plaintiffs "could not have discovered the unlawful activity described herein at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by [d]efendants to avoid detection of, and fraudulently conceal, their unlawful conduct"); *id.* (Am. Compl. ¶ 226) ("Because the alleged unlawful conduct was self-concealing and affirmatively concealed by [d]efendants, [p]laintiffs and [c]lass [m]embers had no knowledge of the alleged unlawful conduct, or of any facts or information that would have caused a reasonably diligent person to investigate, before August 22, 2016.").  Thus, the court concludes, plaintiffs have alleged sufficiently that they could not have discovered through exercise of reasonable diligence that they had a generic delay claim against defendants before the Congressional announcement on August 22, 2016.

*Last*, defendants assert, even if the statute of limitations is tolled to August 22, 2016, plaintiffs didn't file this lawsuit within a reasonable time after discovering their claims.  To support this argument, defendants cite out-of-Circuit authority holding that "[t]o invoke an estoppel as a shield against a statute of limitations defense, a plaintiff must show that he brought his action within a reasonable time after the facts giving rise to the estoppel have ceased to be operational." *Buttry v. Gen. Signal Corp.*, 68 F.3d 1488, 1494 (2d Cir. 1995).  The Second Circuit has said that "the reasonableness of the plaintiff's delay must be evaluated on a case-by-case basis," requiring a reasonableness determination "on the facts and circumstances of each case." *Id.*  Other courts have defined the "'outside limit' of what will be regarded as a 'reasonable time'" as the "applicable statute of limitations[.]" *See Sarfati v. Antigua & Barbuda*, 565 F. App'x 6, 7 (D.C. Cir. 2014) (citing *Simcuski v. Saeli*, 377 N.E.2d 713, 717 (N.Y. 1978)). *Id.*  So, even if the court applied this out-of-Circuit authority to this case, plaintiffs filed their lawsuit within the "reasonable time" limits because plaintiff KPH filed the original Complaint on February 14, 2020, less than four years after the Congressional announcement of the investigation into EpiPen pricing, and thus, within the applicable limitations period.

But, that's the rule from the Second Circuit.  Defendants don't cite (and the court's own research hasn't revealed) any similar rule within the Tenth Circuit.  Instead, our Circuit has explained that "although a plaintiff has an obligation of diligence, the plaintiff need not show the actual exercise of diligence in order to toll the limitations period." *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1202 n.20 (10th Cir. 1998) (citation and internal quotation marks omitted); *see also Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 836 (11th Cir. 1999) ("The actual exercise of diligence is irrelevant because the standard is an objective one.").  Instead, when "deciding whether the statute should be tolled," the court must determine "whether a reasonably

diligent plaintiff would have discovered the fraud." *Sterlin*, 154 F.3d at 1202 n.20 (citation and internal quotation marks omitted). As already discussed, plaintiffs sufficiently have alleged that they could not have discovered through reasonable diligence the existence of their generic delay claims from public sources before the August 22, 2016 Congressional announcement. So, plaintiffs' allegations suffice to toll the statute of limitations to August 22, 2016. And, beginning that date, plaintiffs had four years under the statute of limitations to file suit. As discussed, KPH timely filed the original Complaint in this case within that four-year statute of limitations period. So, this lawsuit is timely.

Even so, defendants assert that plaintiffs should have filed their claims earlier than 2020—for example, plaintiffs could have filed their lawsuit in 2017, when the MDL indirect purchaser plaintiffs brought similar generic delay claims. *See* Transfer Order, *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. and Antitrust Litig.*, No. 17-2785-DDC-TJJ (D. Kan. Aug. 4, 2017), ECF No. 1 (Judicial Panel on Multidistrict Litigation Order transferring five actions involving antitrust claims based on EpiPen pricing to the District of Kansas for coordinated or consolidated proceedings). Also, defendants note, on April 25, 2017, plaintiff Castillo filed a class action lawsuit based on EpiPen price increases in the District of New Jersey, some four years before it moved to intervene here. Doc. 135 at 32; Complaint, *Cesar Castillo, Inc. v. Mylan Inc.*, No. 17-cv-02813 (D.N.J. Apr. 25, 2017), ECF No. 1 at 16–17 (Compl. ¶ 36) (alleging that the Teva Settlement provided "unjustifiable consideration, incentives and benefits" to Teva "in exchange for the agreed-to market entry delay" and "EpiPen prices more than doubled during the period in which Teva did not enter the market[,]" causing the Settlement to "come under congressional scrutiny as an illegal 'pay for delay' agreement"). But, plaintiff Castillo voluntarily dismissed the New Jersey case without prejudice on August 9, 2017. Notice

of Voluntary Dismissal of Action Without Prejudice, *Cesar Castillo, Inc. v. Mylan Inc.*, No. 17-cv-02813 (D.N.J. Aug. 9, 2017), ECF No. 28.

None of these facts make this suit untimely.  As discussed, at the motion to dismiss stage, plaintiff KPH has established it timely filed the original Complaint within the four-year statute of limitations.  KPH filed the lawsuit on its own behalf and on behalf of other similarly situated direct purchasers of EpiPens.  Although plaintiff Castillo didn't move to intervene as a class representative in this lawsuit until August 2021 (Doc. 115), these facts don't make Castillo's claims untimely because (as discussed more below) its claims relate back to the timely-filed original Complaint.  Defendants accuse plaintiff Castillo of "gamesmanship" and its intervention in this lawsuit as "misuse of judicial resources."  Doc. 135 at 33.  But, plaintiff Castillo's litigation tactics don't change the fact that plaintiff KPH timely filed the original Complaint and it asserted class action claims on behalf of a direct purchaser class.  Plaintiff Castillo plausibly asserts that it is a putative class member in the timely-filed class action brought by plaintiff KPH on behalf of similarly situated direct purchasers.  As the Seventh Circuit has explained, "plaintiffs who are part of the original putative class and who seek only to take on a new role in an existing action are not required" to file their own timely lawsuit "where, as here, the statute of limitations was already tolled on their behalf by the initial class complaint."  *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 616 (7th Cir. 2020).  Thus, at the motion to dismiss stage at least, plaintiffs have shown that they have asserted their antitrust claims in a timely fashion through KPH's filing of the original Complaint in 2020.  KPH filed the original Complaint within four years of the date of the Congressional announcement of its investigation in EpiPen pricing—*i.e.*, the date, plaintiffs plausibly allege, they first discovered that the existence of their antitrust claims.

In sum, the court finds, at the Rule 12(b)(6) pleading stage of the litigation, plaintiffs

adequately have alleged facts capable of supporting a finding or inference that the discovery rule,

fraudulent concealment, and equitable tolling apply to toll the statute of limitations.  And, based

on those tolling doctrines, plaintiff KPH timely filed the original Complaint within the four-year

statute of limitations period governing Sherman Antitrust Act claims.[11]

### 2.  Relation Back

Next, defendants assert, even if circumstances toll the statute of limitations to commence

on August 22, 2016, the FAC is time-barred because it was filed more than four years later, on

September 21, 2021.  Plaintiffs respond, arguing that the FAC is timely because it relates back to

the original Complaint which plaintiff KPH filed in February 2020.  Indeed, as our Circuit has

recognized, in "limited circumstances, [Federal Rule of Civil Procedure] 15(c) saves an

otherwise untimely amendment by deeming it to 'relate back' to the conduct alleged in the

timely original complaint."  *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 961 (10th Cir.

2012).  Specifically, Fed. R. Civ. P. 15(c)(1)(B) provides that an "amendment to a pleading

relates back to the date of the original pleading when . . . the amendment asserts a claim or

defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set

out—in the original pleading[.]"  But, "relation back is improper when the amended claim

'asserts a new ground for relief supported by facts that differ in both time and type from those

---

[11]     Plaintiffs also allege that their claims are timely under a continuing violations theory.  *See* Doc.
128 at 63 (FAC ¶ 229) (alleging that defendants' unlawful acts "have created continuing and repeated
injuries to [p]laintiffs and [c]lass members each time [p]laintiffs and [c]lass members have been or are
overcharged for EpiPens").  Defendants disagree.  They argue that the continuing violations doctrine
doesn't apply to plaintiffs' claims because the FAC doesn't allege plausibly that defendants committed
any unlawful conduct or that plaintiffs sustained any injury within the four years preceding the filing of
this lawsuit.  Doc. 135 at 24–26; Doc. 138 at 20–21.  Because the court finds that plaintiffs have asserted
timely claims by alleging plausibly that the discovery rule, fraudulent concealment, and equitable tolling
apply to toll the statute of limitations, the court need not address the parties' arguments about the
continuing violations doctrine.

the original pleading set forth.'"  *Hernandez*, 684 F.3d at 962 (quoting *Mayle v. Felix*, 545 U.S. 644, 650 (2005)).

Here, plaintiffs correctly assert that the FAC alleges a subset of the same claims that the original Complaint asserted.  The FAC alleges violations of Sections 1 and 2 of the Sherman Antitrust Act against Mylan and Pfizer based on a generic delay theory involving an alleged unlawful reverse payment settlement with Teva.  Doc. 128 at 4–6, 10–11, 65–69 (FAC ¶¶ 1, 6–7, 22–30, 239–56).  The original Complaint likewise asserted Sherman Antitrust Act claims against the same defendants for several types of conduct, including allegedly delaying generic competition for the EpiPen by entering an unlawful reverse payment settlement with Teva.  Doc. 1 at 1, 3, 27–29, 83–89 (Compl. ¶¶ 1, 7, 96–99, 103, 171–205).  The court agrees with plaintiffs. The FAC's generic delay claims against defendants based on the allegedly unlawful reverse payment settlement with Teva "fall[ ] squarely within Rule 15(c)(1)(B)" because they arise from the same conduct alleged in the original Complaint.  *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 616 (7th Cir. 2020).

As the Supreme Court has explained, Rule 15 "mandates relation back once the Rule's requirements are satisfied; it does not leave the decision whether to grant relation back to the district court's equitable discretion."  *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 553 (2010).  Thus, the court finds that the FAC's antitrust claims that are premised on a generic delay theory and seek to recover overcharge damages for EpiPen purchases are timely filed because they relate back to the original Complaint under Rule 15.

Defendants nonetheless contend that the relation back doctrine applies here.  They assert several reasons for their position, and thus, in their judgment, the doctrine can't save the FAC's

antitrust claims from dismissal.  The court addresses each argument advanced by defendants, below.

### a.  Standing

Defendants begin with the argument that the FAC doesn't relate back to the original Complaint because plaintiff KPH lacked standing to assert the claims alleged in the original Complaint.  This argument is two-pronged.  *First*, defendants argue, the FAC can't relate back to the original Complaint because plaintiff KPH filed it without complying with McKesson's contractual ADR obligation.  *See generally* Doc. 49.  Thus, defendants contend, KPH had "no legal right to file that lawsuit" when it filed the original Complaint.  Doc. 138 at 17.  *Second*, defendants argue, the FAC can't relate back to any of the earlier-filed Complaints because, as the court concluded in its Order granting defendants' Motions to Dismiss KPH's Second Amended Class Action Complaint, the SAC alleged claims that exceeded the scope of KPH's Assignment from McKesson.  *See* Doc. 113 at 10.  So, defendants argue, KPH lacked "Article III standing" to assert any of the claims in the earlier Complaints, rendering them a "legal nullity."  Doc. 138 at 18; *see also* Doc. 148 at 8.  As a consequence, defendants contend the FAC cannot relate back to the original Complaint.  The court disagrees.

Defendants' argument confuses Article III standing with antitrust standing.  As the court explained in an earlier Order, "antitrust standing is a prudential limitation to bringing suit under the antitrust laws but it 'does not affect the subject matter jurisdiction of the court, as Article III standing does[.]'"  Doc. 113 at 7–8 n.3 (quoting *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 232 (3d Cir. 2013)).  Our Circuit unequivocally has concluded that "antitrust standing . . . despite the name is not a jurisdictional requirement."  *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1305 n.9 (10th Cir. 2017).  And, the Circuit has

explained that Article III standing differs from "the standing requirements in the antitrust context" which are "more rigorous than that of the Constitution." *Tal v. Hogan*, 453 F.3d 1244, 1253 (10th Cir. 2006). While "[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact" under Article III, the antirust standing requirement demands that "the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Id.* (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983)).

In its earlier Order, the court concluded that KPH lacked *antitrust standing* to assert the claims alleged in the SAC. Doc. 113 at 10–17. The court explained that the McKesson Assignment assigned KPH the right to bring an antitrust claims so long as the "gravamen" of the cause of action was a generic delay claim. *Id.* at 11. But, the court found, the "gravamen" of the SAC's claims was not generic delay. *Id.* at 11–17. So, KPH lacked antitrust standing to assert the claims alleged in the SAC. *Id.* at 17. But, the court noted, some of the SAC's allegations alleged generic delay. *Id.* at 16. Those allegations just weren't the "gravamen" of the action. *Id.* Thus, the court permitted KPH to amend its pleading to allege claims that McKesson's Assignment assigned to KPH. *Id.* at 25.

The court's conclusion doesn't mean that KPH's original Complaint was a "legal nullity," however. Instead, the court simply concluded that KPH lacked antitrust standing to assert all the claims asserted by the SAC.[12] Nevertheless, defendants urge the court to conclude now that KPH also lacked Article III standing when it filed its lawsuit. *See* Doc. 148 at 9.

Article III standing requires a plaintiff to "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed

---

[12]     As the court already has noted, the "original Complaint generally alleged the same four claims alleged by the SAC." Doc. 113 at 6.

by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). The original Complaint sufficiently alleged injury in fact by asserting: "As a result of [d]efendants' alleged anticompetitive conduct, KPH paid supracompetitive prices for its EpiPen purchases and KPH was injured by the illegal conduct alleged herein." Doc. 1 at 4 (Compl. ¶ 14). As plaintiffs correctly assert, these allegations suffice to allege "'[h]arm to the antitrust plaintiff . . . to satisfy the constitutional standing requirement of injury in fact[.]'" *Tal*, 453 F.3d at 1253 (quoting *Assoc. Gen. Contractors*, 459 U.S. at 535 n.31).

Defendants disagree, arguing that KPH never bought EpiPens from defendants—only McKesson did. Thus, defendants argue, KPH can't allege harm from McKesson's alleged overpayment for EpiPens. But, as already discussed, McKesson's Assignment to KPH conferred to KPH the right to assert certain generic delay claims arising from harm sustained by McKesson for paying supracompetitive prices for EpiPen. This alleged harm suffices to establish Article III standing. So, the original Complaint never was a "legal nullity." Instead, KPH established Article III standing to assert its antitrust claims, but it fell short of pleading *antitrust standing*.[13]

---

[13]     Defendants never explain how KPH's failure to comply with the McKesson contract's ADR obligation strips KPH of Article III standing. Instead, the contract's ADR obligation was a "condition precedent" that KPH was required to satisfy before filing suit. *See, e.g.*, *S'holder Representative Servs. LLC v. Shire US Holdings, Inc.*, No. 2017-0863-KSJM, 2020 WL 6018738, at *17 (Del. Ch. Oct. 12, 2020) (explaining under Delaware law that "[w]here a contractual obligation is subject to a 'condition precedent,' that obligation will only mature on satisfaction of a contractually specified condition"); *see also* Doc. 49 at 4 n.3 (applying Delaware law to McKesson's ADR obligation). As one Florida court has noted, a plaintiff's "standing to bring an action is distinct from questions arising from the claimant's noncompliance with one or more conditions precedent to maintaining the action." *See Progressive Express Ins. Co. v. McGrath Cmty. Chiropractic*, 913 So.2d 1281, 1284 (Fla. Dist. Ct. App. 2005) (describing a Florida Supreme Court case where failure to satisfy a condition precedent "before filing the action was not a fatal jurisdictional defect requiring dismissal of the action" but, instead, the court held plaintiff could satisfy the condition precedent "after filing the original complaint but before filing an

See *Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd.*, 836 F.3d 261, 272 (3d Cir. 2016) (rejecting

defendants' argument that indirect purchaser plaintiff couldn't assert Article III standing based

on an assignment because the "complaint plainly and repeatedly emphasize[d] that, as a result of

the Defendants' anticompetitive behavior in suppressing generic equivalents of [certain drug

products], [plaintiff] has paid inflated prices for those products" and such "allegations, together

with the complaint's specific descriptions of anticompetitive behavior indulged in by the

Defendants, are sufficient to establish a judicially redressable injury-in-fact that is fairly

traceable to the Defendants—or, in other words, an Article III case or controversy").

Also, defendants' out-of-Circuit cases involving suits considered a "nullity" at the time of

filing involve questions about substituting plaintiffs under Rule 17—not relation back under Rule

15. *See, e.g.*, Doc. 138 at 18 (citing *House v. Mitra QSR KNE LLC*, 796 F. App'x 783, 790–91

(4th Cir. 2019) (explaining that a "suit is a nullity at the time it is filed for want of a living

plaintiff," and thus, "there is no underlying 'action' at all[,]" and such "nullity . . . cannot be

cured by substitution under Rule 17")); *see also id.* at 17 (citing *Sonterra Cap. Master Fund Ltd.

v. Credit Suisse Grp. AG*, 409 F. Supp. 3d 261, 271 (S.D.N.Y. 2019), *vacated and remanded by*

No. 19-3367, 2021 WL 4997939 (2d Cir. Sept. 21, 2021)).  These Rule 17 cases don't apply

here.  And, even if they did, other Rule 17 cases recognize that "filing a complaint in the name of

a deceased or non-existent nominal plaintiff is akin to an error in the complaint's *allegations* of

jurisdiction" and "it is well-understood that a plaintiff may cure defective jurisdictional

allegations, unlike defective jurisdiction itself, through amended pleadings[,]" thus "Article III

---

amended complaint pleading compliance with" the condition precedent (citing *Holding Elec. Inc. v. Roberts*, 530 So.2d 301 (Fla. 1988)).  Here, KPH's failure to comply with the ADR obligation before filing suit doesn't render its original Complaint a "nullity."  To the contrary, and as already described, KPH had Article III standing when it filed suit.  KPH's failure to comply with the ADR obligation before filing suit is an argument going to the merits of its antitrust claims.  But, it didn't divest KPH of Article III standing.

would therefore seem to be satisfied so long as the real party in interest is willing to join the case and has had standing since the case's inception." *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 388–89 (2d Cir. 2021); *cf. Esposito v. United States*, 368 F.3d 1271, 1272, 1277–78 (10th Cir. 2004) (rejecting defendant's argument that "the attempted suit by a decedent was a nullity, and therefore provides nothing to relate back to[,]" and, instead, holding that the decedent's "lack of capacity at the time the suit was filed does not prevent the substitution [of the proper party with capacity to sue] from relating back to the date the suit was filed under Rule 17(a)").

Similarly, here, KPH cured defective allegations about antitrust standing when it filed its FAC. But, KPH didn't lack Article III standing when it originally filed suit. The court thus concludes that the original Complaint wasn't a legal nullity. Instead, the original Complaint properly tolled the statute of limitations as of its filing date. And, as discussed above, the FAC relates back to the original Complaint—which was timely filed—because the FAC's claims arise out of the same conduct alleged in the original Complaint.

### b. Addition of Claims Based on Teva Purchases

Next, defendants assert that the FAC can't relate back to the original Complaint because the FAC alleges—for the first time—claims on behalf of persons or entities who had purchased EAI devices directly *from Teva*. *See* Doc. 128 at 63 (FAC ¶ 231) (defining putative class as "[a]ll persons or entities . . . who purchased EpiPen or generic EpiPen directly from Mylan *or Teva*" (emphasis added)). In contrast, KPH's earlier Complaints asserted claims merely for persons or entities who had purchased EAIs *from Mylan*. *See* Doc. 1 at 3–4 (Compl. ¶ 10) ("Plaintiff and a class of all other persons or entities in the U.S. who purchased EpiPen *directly from Mylan* at any time during the Class Period seek treble damages for overcharges *paid to*

*Mylan*." (emphasis added)); *see also* Doc. 54 at 80 (First. Am. Compl. ¶ 243) (alleging that

"during the Class Period, [p]laintiff and [c]lass [m]embers directly purchased EpiPen *from*

*Mylan*" (emphasis added)); Doc. 72 at 83 (SAC ¶ 256) (same).  In this sense, defendants argue,

the FAC expands the "conduct alleged in the timely original complaint."  *Hernandez*, 684 F.3d at

961.

      Plaintiffs respond, asserting that the original Complaint also included claims based on

Teva purchases because it defined the putative class as "[a]ll persons or entities in the United

States . . . who purchased EpiPen in any form, or who purchased generic EpiPen directly . . . ."

Doc. 1 at 80 (Compl. ¶ 248).  Plaintiffs argue that this broad definition includes purchases from

both Mylan and Teva.  And so, plaintiffs contend, the FAC's new allegations specifically

reference Teva purchases just to "clarify" that the class includes purchasers buying both from

Mylan and Teva.

      Plaintiffs' argument proves too much.  As our Circuit has explained, the "rationale" of

Rule 15(c)'s relation back requirement "'is that a party who has been notified of litigation

concerning a particular occurrence has been given all the notice that statutes of limitations were

intended to provide.'"  *McClelland v. Deluxe Fin. Servs., Inc.*, 431 F. App'x 718, 723 (10th Cir.

2011) (quoting *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 149 n.3 (1984)).  "The

same general standard of notice applies regardless of whether a litigant seeks to add defendants,

plaintiffs, or claims."  *Id.* (citing Fed. R. Civ. P. 15 advisory committee's note).  Here, the

original Complaint's allegations never provided defendants with notice that plaintiffs intended to

assert claims on behalf of persons who purchased EpiPens *from Teva*.  Instead, the original

Complaint unequivocally asserted claims on behalf of a putative class who had purchased

EpiPens *from Mylan*.  *See* Doc. 1 at 3–4 (Compl. ¶ 10) ("Plaintiff and a class of all other persons

or entities in the U.S. who purchased EpiPen *directly from Mylan* at any time during the Class Period seek treble damages for overcharges *paid to Mylan*." (emphasis added)); *see also id.* at 78 (Compl. ¶ 236) (alleging that during "the Class Period, [p]laintiff and [c]lass [m]embers directly purchased EpiPen *from Mylan*" (emphasis added)).  The original Complaint includes no claims based on Teva purchases.  Thus, the FAC's allegations about Teva purchasers fail to satisfy Rule 15(c)'s notice requirements that would permit those allegations to relate back to the original Complaint.  *Cf. Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1132 (11th Cir. 2004) (holding that "the district court did not clearly err when it concluded that" plaintiff's original complaint asserting claims on behalf of a putative class of Florida consumers "did not provide [defendant] with adequate notice of the nationwide class," and thus plaintiffs' amended complaint asserting claims on behalf of a nationwide class did not relate back to the original complaint under Rule 15(c)).

Also, and as defendants correctly argue, the original Complaint never asserted claims based on Teva purchases because such allegations aren't within the scope of KPH's Assignment from McKesson.  The Assignment conveyed to KPH the right to assert antitrust claims against Mylan and "only to the extent the cause of action arises from McKesson's purchase of EpiPen[.]"  Doc. 44-1 at 1 (Assignment ¶ 1); *see also id.* (Assignment ¶ A) (defining "EpiPen" as "a brand-name drug manufactured and/or marketed" by Mylan).  Thus, KPH—the only named plaintiff in the original Complaint—couldn't have asserted claims based on purchases from Teva because its Assignment from McKesson didn't assign it a right to assert such claims.  Instead, KPH only had secured the right to assert claims based on McKesson's purchases *from Mylan*. The court concludes that the FAC's claims asserted on behalf of persons or entities who purchased EAI devices directly *from Teva* don't relate back to the original Complaint.  Since

those claims don't relate back, they're untimely under the governing statute of limitations. Thus, the court dismisses plaintiffs' claims premised on EpiPen purchases *from Teva*.

### c. Addition of New Plaintiffs FWK and Castillo

Defendants' last argument contends that adding plaintiffs FWK and Castillo's claims to the FAC doesn't relate back to the original Complaint. They make two basic arguments supporting dismissal of FWK and Castillo's claims.

*First*, defendants argue that plaintiffs fail to satisfy Rule 15(c)(1)(C)'s requirements for relation back when an amended pleading adds new plaintiffs. The text of Rule 15(c)(1)(C) provides that an amended pleading relates back to the original pleading when:

the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1)(C).[14] Defendants assert that plaintiffs haven't satisfied part (ii) of this requirement because they haven't alleged that the failure to name plaintiffs FWK and Castillo in the original Complaint was "a mistake" about "the proper party's identity." *Id.*

For support, defendants rely on a case from our court where Judge Vratil recognized that courts are "split" on how to apply Rule 15(c)(1)(C)'s requirements to new plaintiffs. *Pipeline*

---

[14]     Our court has recognized that "[w]hile it is well established that Rule 15(c)(1)(C) applies to the addition of new defendants, courts are split as to whether and how it applies to the addition of new plaintiffs." *Pipeline Prods., Inc. v. Madison Cos., LLC*, 428 F. Supp. 3d 591, 603 (D. Kan. 2019) (citation omitted). But, as *Pipeline Products* notes, Rule 15's "advisory notes state that 'the attitude taken in revised Rule 15(c) toward change of defendants extends by analogy to amendments changing plaintiffs.'" *Id.* (quoting Fed. R. Civ. P. 15(c) advisory committee's note). Thus, "most courts allow for the addition of both new defendants and new plaintiffs under Rule 15(c)(1)(C)." *Id.* Although the Tenth Circuit hasn't decided this question, the court predicts that the Circuit would find the language of Rule 15's advisory committee notes persuasive and, like "most courts[,]" hold that Rule 15(c)(1)(C) applies to an amended pleading adding new plaintiffs. *Id.*

*Prods., Inc. v. Madison Cos., LLC*, 428 F. Supp. 3d 591, 604 (D. Kan. 2019).  Judge Vratil

recognized that for new plaintiff amendments, "[s]ome courts 'dispense with examination of

each of the literal requirements of Rule 15(c), and instead focus on the questions of fair notice

and absence of undue prejudice.'"  *Id.* (quoting *Olech v. Vill. of Willowbrook*, 138 F. Supp. 2d

1036, 1042 (N.D. Ill. 2000)).  But, she also noted that "other courts" including two decisions by

district courts within the Tenth Circuit "hold that the new plaintiffs must satisfy each of the . . .

express requirements under the Rule."  *Id.* (citations omitted).  Judge Vratil held that the *Pipeline*

*Products* plaintiffs had failed to show that the newly added plaintiffs' claims related back under

Rule 15(c)(1)(C) because they never argued that they "mistakenly omitted [the new plaintiffs]

from the original complaint."  *Id.*  Judge Vratil noted that "it would be difficult for [plaintiffs to]

make this claim" because the newly added plaintiffs were the owner and parent company of the

original plaintiffs.  *Id.*  Thus, Judge Vratil found, "it is difficult to imagine how—after more than

two years of litigation—plaintiffs could argue that they omitted [the newly added plaintiffs]

because of a 'mistake concerning the proper party's identity.'"  *Id.* (quoting Fed. R. Civ. P.

15(c)(1)(C)) (footnote omitted).

    The facts in *Pipeline Products* differ from the ones presented here.  The FAC here adds

new plaintiffs—FWC and Castillo—as new class representatives, asserting the same antitrust

claims as asserted by the original plaintiff, KPH.  Other courts—including some district courts in

our Circuit—have declined to apply Rule 15(c)(1)(C)'s "mistake" requirement to similar

situations involving newly added plaintiffs who don't add any new claims to the lawsuit.  *See,*

*e.g.*, *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 298 (3d Cir. 2010) (refusing to apply the "mistake

requirement" to "an amended class complaint that adds a new named plaintiff" because such a

pleading "could never relate back to the initial complaint" under this interpretation of the Rule

and holding, instead, that "the better conclusion may be that an amended complaint adding a

class member as a new named plaintiff need only satisfy Rule 15(c)(1)(B) to relate back to an

earlier complaint" by showing that the new "claims 'arose out of the conduct, transaction, or

occurrence set out . . . in the original pleading'" (quoting Fed. R. Civ. P. 15(c)(1)(B))); *Deakin v.*

*Magellan Health, Inc.*, No. 1:17-CV-00773-WJ-KK, 2019 WL 5212805, at *5 (D.N.M. Oct. 16,

2019) (finding that Rule 15(c)(1)(C)'s requirements are "ill-suited to the class action context,

where all members of the class are parties, albeit unnamed" and concluding that newly named

class representatives were "not new" plaintiffs but, instead, had "been part of the putative class

since the beginning of this suit and have affirmatively opt-ed in as class members"); *U.S. ex rel.*

*Koch v. Koch Indus., Inc.*, 188 F.R.D. 617, 629–30 (N.D. Okla. 1999) (declining to apply the

"mistake" requirement where an amended pleading "added no new claims against Defendants"

and "Defendants' potential liability under the first amended complaint was identical to their

potential liability under the original complaint" because "absent a showing of prejudice to the

defendant, an amendment which substitutes one plaintiff or a group of plaintiffs for the original

plaintiff or group of plaintiffs, with no corresponding change in the claims asserted against the

defendant, will relate back under Rule 15(c), and no 'mistake of identity' need be shown");

*Plummer v. Farmers Grp., Inc.*, 388 F. Supp. 2d 1310, 1315 n.6 (E.D. Okla. 2005) (declining to

apply Rule 15(c)'s "mistake" requirement to an amended pleading adding new plaintiffs and

noting that "the controlling authority is not clear at all[,]" "no clear authority exists in Oklahoma,

the Tenth Circuit, or the Supreme Court[,]" and "the balance of secondary sources of law appears

to tilt in favor of ignoring the mistaken identity requirement for purposes of adding plaintiffs");

*cf. Raymond v. Spirit Aerosystems Holdings, Inc.*, No. 16-1282-JWB, 2020 WL 4596862, at *12

n.7 (D. Kan. Aug. 11, 2020) (explaining that the "court need not determine whether Plaintiffs

must show a 'mistake concerning the proper party's identity' for their amendment to relate back under Rule 15(c)[,]" but noting that "it is not at all clear how a mistake concerning identity would apply where *new plaintiffs* are added").

While the Tenth Circuit hasn't yet addressed this issue, the court predicts that our Circuit would find these cases persuasive and decline to apply Rule 15(c)(1)(C)'s "mistake" requirement to an amended pleading that adds new class representatives as named plaintiffs. As an Illinois federal court concluded, "mechanically applying the mistake requirement to the addition of a new plaintiff would make little sense" and "would serve no substantive purpose, but only would erect a needless barrier to adjudication of claims on the merits, contrary to the 'spirit and inclination' of Rule 15." *Olech*, 138 F. Supp. 2d at 1044–45 (quoting *Schiavone v. Fortune*, 477 U.S. 21, 27 (1986)). Following this guidance, the court declines to require plaintiffs to allege that the failure to name plaintiffs FWK and Castillo in the original Complaint was "a mistake." *Id.* at 1044. Instead, the court "focus[es] on the questions of notice and absence of prejudice to the defendants" to decide "whether the . . . amendment here will relate back to the date of the original complaint." *Id.*

Here, the court concludes, the original Complaint gave defendants plenty of notice about the newly added plaintiffs' claims. As discussed, the original Complaint asserted class action claims on behalf of direct purchasers of the EpiPen. The new plaintiffs—FWK and Castillo—allege they are just that—direct purchasers of the EpiPen. Thus, they are members of the putative class described in the original Complaint. And, they have "been part of the putative class since the beginning of this suit and have [now] affirmatively opt-ed in as class members." *Deakin*, 2019 WL 5212805, at *5. Adding these plaintiffs as newly named class representatives doesn't change the scope of the claims asserted by the original Complaint. Instead, and as

already discussed, the FAC's claims arise from the same conduct alleged in the original Complaint. Thus, defendants had fair notice of the new plaintiffs' claims asserted in the FAC.

Also, adding these new plaintiffs will impose no undue prejudice. The case is just in the beginning stages of discovery, and adding FWK and Castillo as plaintiffs won't change the amount or type of discovery required. Because defendants had fair notice of these new plaintiffs and adding them to the action won't prejudice defendants, the court concludes that plaintiffs FWK and Castillo's claims properly relate back to the original Complaint.[15]

*Second*, defendants argue that FWK and Castillo's class claims aren't tolled by KPH's original Complaint. When a court denies class certification, the Supreme Court has held "the commencement of the original class suit tolls the running of the statute [of limitations] for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status." *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553 (1974). The Court later extended its holding in *American Pipe* to "'all asserted members of the class,' not just as to interveners." *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983) (quoting *Am. Pipe*, 414 U.S. at 554). As the Supreme Court explained, "Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied." *Id.* at 354. "At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action." *Id.*

---

[15]     Defendants assert that the court should dismiss Castillo as a class representative because it "first filed its claims four and a half years ago, but then inexplicably dropped them even though no other direct purchaser action was pending at the time." Doc. 138 at 28. As an Illinois court has noted, "when a plaintiff belatedly seeks to join the suit, the fundamental question is not why the plaintiff failed to act sooner, but rather whether the late addition to the case comes without fair notice to the defendants and would cause undue prejudice." *Olech*, 138 F. Supp. 2d at 1047. The court declines to question Castillo's motivations for filing and dismissing its other lawsuit. Instead, as discussed above, it considers whether adding Castillo to this lawsuit violates the fair notice and undue prejudice requirements. It doesn't.

Defendants assert that *American Pipe*'s tolling rule applies only to a class member's *individual* claims and doesn't toll the statute of limitations for *class* claims. To support this argument, defendants rely on language from the Supreme Court's opinion in *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800 (2018). There, the Court held that "*American Pipe* tolls the statute of limitations during the pendency of a putative class action, allowing unnamed class members to join the action *individually or file individual claims* if the class fails[,]" but *American Pipe* "does not permit the maintenance of *a follow-on class action* past expiration of the statute of limitations." *Id.* at 1804 (emphasis added). Defendants argue that FWK and Castillo's class claims—ones that they seek to add to an existing class action—constitute a "follow-on class action" that *China Agritech* prohibits. At least two Circuit Courts of Appeal have considered similar arguments and have declined to read *China Agritech* as broadly as defendants read it.

When addressing an argument that *China Agritech* prohibited an amendment to add a new plaintiff as a class representative in a class action, the Seventh Circuit recognized that *China Agritech* considered "whether *American Pipe* tolling applies to successive attempts to file *entirely new class actions*, effectively stacking class actions in the hope that a court somewhere can be convinced to certify a class in another case, filed perhaps many years after the statute of limitations has expired." *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 615 (7th Cir. 2020) (emphasis added). The Seventh Circuit concluded that *China Agritech* held that *American Pipe* tolling doesn't apply to that situation. *Id.* ("[W]hen class certification is denied, a member of the putative class may join the existing suit or promptly file an individual action, but she may not start a new class action beyond the time allowed by the statute of limitations." (citing *China Agritech*, 138 S. Ct. at 1806)). But, the Seventh Circuit also held that, *China Agritech*'s rule doesn't extend to "prohibit any addition or substitution of a new class representative within the

original class action after the statute of limitations period would have run[.]"  Instead, the

Seventh Circuit explained, "*American Pipe* tolling is intended to promote efficiency and

economy in litigation."  *Id.* (citing *Am. Pipe*, 414 U.S. at 553).  And, "[p]rohibiting its use within

the original class action to add new class representatives, whether because they would be better

representatives, because class definitions are modified, because subclasses are needed, or for any

other case-management reason, would arbitrarily—even randomly—undermine those goals of

efficiency and economy."  *Id.*  Also, such a prohibition "would . . . undermine the benefits of

*American Pipe* by encouraging as many individual members of the putative class to join as

parties as quickly as possible."  *Id.*

So, the Seventh Circuit held, *China Agritech* didn't prohibit plaintiffs from adding a new

plaintiff as a class representative.  *Id.* at 616.  It explained that the proposed amendment

"amounted to an ordinary pleading amendment governed by Federal Rule of Civil Procedure 15"

that "relat[ed] back to the initial pleading within the meaning of Rule 15(c)(1)."  *Id.*  The

Seventh Circuit described plaintiffs' proposed amendment as one seeking "only to rearrange the

seating chart within a single, ongoing action."  *Id.*  And, it concluded, such an amendment is

permissible under Rule 15 and existing Supreme Court precedent.  *Id.*

The Second Circuit reached a similar conclusion in *Fund Liquidation Holdings LLC v.*

*Bank of America Corporation*, 991 F.3d 370 (2d Cir. 2021).  In that case, the Second Circuit

remanded to the trial court a request to add a new plaintiff as a new class representative plaintiff.

*Id.* at 393.  It held that the trial court had erred by concluding that the new class representative

plaintiff's claims were "untimely as they were no longer subject to equitable tolling under

*American Pipe*."  *Id.*  The Second Circuit explained that the trial court's decision "was based on

an overly expansive reading of the Supreme Court's decision in" *China Agritech*.  *Id.*  It

explained that *China Agritech* "focused its analysis on *follow-on* class actions." *Id.* (citing *China Agritech*, 138 S. Ct. at 1804). But, "[n]othing in *China Agritech* purports to say that equitable tolling does not apply to new class representatives joined within the *same* class action." *Id.* Thus, the Second Circuit held, "so long as the amendment to add the [new plaintiffs] as class representatives satisfies the requirements of Federal Rule of Civil Procedure 15(c)(1)(B), and so long as the proposed fourth amended complaint otherwise plausibly states a claim on which relief can be granted, the district court should grant [plaintiff's] motion to amend." *Id* (citing *In re Allstate Corp. Sec. Litig.*, 966 F.3d at 616).

The Tenth Circuit hasn't addressed this issue. But if it did—as it may in this case—the court predicts that it would follow the sound reasoning of the Second and Seventh Circuits and hold that *China Agritech* doesn't prohibit amending a pleading to add a new class plaintiff representative to an existing class action before the court decides class certification. Indeed, several district courts have done exactly that—applying the Second and Seventh Circuit's decisions and holding that a pleading that adds a new plaintiff to an existing class action is not "follow-on class action" that *China Agritech* prohibits. *See, e.g.*, *Bos. Ret. Sys. v. Uber Techs., Inc.*, No. 19-cv-06361-RS, 2021 WL 4503137, at *4 (N.D. Cal. Oct. 1, 2021) (concluding that "addition of the New Plaintiffs to the existing class action is not an 'untimely successive class action[ ],'" so "*China Agritech* does not pose a barrier to the addition of new proposed class representatives" (quoting *China Agritech*, 138 S. Ct. at 1806)); *Pelletier v. Endo Int'l PLC*, No. 17-cv-5114, 2021 WL 398495, at *13 (E.D. Pa. Feb. 4, 2021) (explaining that *China Agritech* didn't "address[ ] a situation like this one, where a court seeks to add new lead plaintiffs to an *ongoing class action* after the statute of limitations has run" but "[c]ourts in this circuit and around the country, however, have ruled that *China Agritech* does not bar a court from doing

so"); *Schultz v. Midland Credit Mgmt., Inc.*, No. 16-4415 (JLL), 2019 WL 2083302, at *10 (D.N.J. May 13, 2019) (finding that "*China Agritech* does not prohibit *American Pipe* tolling from applying in these circumstances to allow the addition or substitution of a named plaintiff in an ongoing putative class action following the expiration of the statute of limitations but prior to a decision on class certification").[16]  Following this persuasive guidance, the court concludes that *China Agritech* doesn't prohibit adding plaintiffs FWK and Castillo as new class representative plaintiffs to this pending class action before the court decides the class certification question.  All the amendment does is add these two plaintiffs as named class representatives.  It doesn't change anything about the scope of the claims asserted.  Like the amendment permitted in *In re Allstate*, adding FWK and Castillo as new class representative plaintiffs just serves "to rearrange the seating chart within a single, ongoing action."  966 F.3d at 616.  So, the court concludes, *American Pipe* tolling applies to toll the statute of limitations for plaintiffs FWK and Castillo's claims.

### 3.  Conclusion

For reasons explained, the court concludes that the FAC's claims are timely-filed.  The doctrines of tolling and relation back apply to bring the FAC's claims within the statute of

---

[16]      Defendants cite two district court cases holding that *China Agritech* barred class action claims asserted by new plaintiffs. Doc. 148 at 18.  But the facts of those cases don't resemble the ones presented here.  Defendants' first-cited case involved a newly-filed class action brought by members of a putative class who were "carved out of a related class action, after the putative class representative in that case amended their complaint to narrow the definition of the proposed class."  *Ochoa v. Pershing LLC*, No. 3:16-CV-1485-N, 2021 WL 5163196, at *1 (N.D. Tex. Nov. 5, 2021) (citation omitted).  The Texas court held that the new lawsuit was "follow-on class litigation" to which *American Pipe* tolling didn't apply. *Id.* at *2.  Defendants' second case was "the third successive class action case" filed by the same counsel against the same defendants alleging the same facts.  *Prac. Mgmt. Support Servs., Inc. v. Cirque du Soleil, Inc.*, No. 14 C 2032, 2018 WL 3659349, at *1 (N.D. Ill. Aug. 2, 2018).  The Illinois court concluded that *American Pipe* didn't toll the class claims because the case was "a follow-on class action that was filed well after the four-year statute of limitations expired."  *Id.* at *3.  For reasons already explained, the amendment adding FWK and Castillo as plaintiffs to this case's operative Complaint isn't a "follow-on class action" that *China Agritech* prohibits.  Defendants' cited cases just don't apply.

limitations governing Sherman Antitrust Act claims.  Thus, the court denies defendants' request to dismiss plaintiffs' FAC as untimely.

### B.  Plaintiffs' Antitrust Standing to Sue Pfizer under *Illinois Brick*

Next, the court addresses Pfizer's argument that plaintiffs lack antitrust standing under the Supreme Court's holding in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  *Illinois Brick* held that, in general terms, only direct purchasers—and not subsequent indirect purchasers— have antitrust standing to sue and recover damages under the antitrust laws.  *Id.* at 728; *see also Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019) ("The bright-line rule of *Illinois Brick* . . . means that indirect purchasers who are two or more steps removed from the antitrust violator in a distribution chain may not sue.  By contrast, direct purchasers—that is, those who are the immediate buyers from the alleged antitrust violators—may sue." (citation and internal quotation marks omitted)); *In re Wy. Tight Sands Antitrust Cases*, 866 F.2d 1286, 1290 (10th Cir. 1989) (explaining that "only the direct purchaser, and no other [person] in the distribution chain, is the 'party injured'" who "may sue for and recover the full amount of the illegal overcharge" (first citing *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968); then citing *Illinois Brick*, 431 U.S. 720)); *In re Urethane Antitrust Litig.*, 237 F.R.D. 454, 462 (D. Kan. 2006) (explaining *Illinois Brick*'s holding that an indirect purchaser can't establish antitrust "standing by demonstrating that the direct purchaser passed on the additional costs" (citing *Illinois Brick*, 431 U.S. at 728–29)).  Pfizer argues that plaintiffs lack antitrust standing to sue Pfizer under *Illinois Brick*'s holding because—as plaintiffs allege—they purchased EpiPens directly from Mylan—not Pfizer.  *See* Doc. 128 at 7 (FAC ¶ 15) (alleging plaintiff KPH is "the assignee of McKesson Corporation," who made "direct purchases of EpiPen from Mylan during the Class Period"); *see also id.* at 9 (FAC ¶ 20) (alleging plaintiff FWK "is the assignee of Frank W. Kerr.

Co. ('Kerr') which, through its direct purchases of EpiPens from Mylan during the Class Period, was the first innocent purchaser within the chain of EpiPen purchasers"); *id.* at 4–5, 32–34 (FAC ¶¶ 4, 100–01, 104, 106–07) (alleging that Mylan owns the exclusive right to sell and market EpiPens in the U.S.).  Thus, even accepting plaintiff's allegations as true, plaintiffs are indirect purchasers of EpiPens from Pfizer.  And, as a consequence, Pfizer argues that *Illinois Brick* precludes plaintiffs—indirect purchasers—from bringing suit against Pfizer under the antitrust laws.

Plaintiffs respond, arguing that they qualify as direct purchasers from Pfizer under a "co-conspirator exception" to *Illinois Brick* because they have alleged plausibly that Mylan and Pfizer conspired together to violate the antitrust laws.  Doc. 145 at 50–55.  But, neither the Supreme Court nor the Tenth Circuit has recognized a "conspiracy exception" to *Illinois Brick*. Instead, the Supreme Court has recognized just two exceptions to the *Illinois Brick* rule: (1) when a direct purchaser has a preexisting fixed quantity, cost-plus contract with the indirect purchaser, or (2) "'where the direct purchaser is owned or controlled by its customer.'"  *Zinser v. Cont'l Grain Co.*, 660 F.2d 754, 761 (10th Cir. 1981) (first citing *Hanover Shoe*, 392 U.S. at 494; then quoting *Illinois Brick*, 431 U.S. at 736 n.16); *see also Merican, Inc. v. Caterpillar Tractor Co.*, 713 F.2d 958, 968 n.22 (3d Cir. 1983) ("The Supreme Court noted two exceptions in *Illinois Brick*.  Where there exists a fixed quantity, cost-plus contract between the direct purchaser and its customer or where the direct purchaser is owned or controlled by its customer the indirect purchaser would not be barred by the rule of *Illinois Brick*.").

Plaintiffs don't argue—and the FAC doesn't contain any facts supporting a plausible finding or inference—that either of the Supreme Court's exceptions to *Illinois Brick* apply to the facts of this case.  Instead, plaintiffs rely on out-of-Circuit cases to argue that a conspiracy

exception to *Illinois Brick* applies here.  When considering plaintiffs' argument, the court is mindful that both the Supreme Court and our Circuit have cautioned against expanding the narrow and limited exceptions to the *Illinois Brick* rule.  *See Apple Inc.*, 139 S. Ct. at 1524 (instructing that courts "should not engage in an unwarranted and counterproductive exercise to litigate a series of exceptions" (citations and internal quotation marks omitted)); *see also Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 216 (1990) ("We nonetheless believe that ample justification exists for our stated decision not to 'carve out exceptions to the [direct purchaser] rule for particular types of markets.'  The possibility of allowing an exception, even in rather meritorious circumstances, would undermine the rule." (quoting *Illinois Brick*, 431 U.S. at 744)); *Zinser*, 660 F.2d at 761 (explaining that "the Supreme Court has indicated that exceptions to *Illinois Brick* are exceedingly narrow in scope" and expressing the Circuit's belief that those exceptions "should be few in number").

Plaintiffs correctly assert that some Circuit courts outside our Circuit have "recognized a conspiracy 'exception' to *Illinois Brick*, in which plaintiffs who purchase from one member of an antitrust conspiracy may bring suit against any member of the conspiracy."  *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 342 (7th Cir. 2022); *see also Dickson v. Microsoft Corp.*, 309 F.3d 193, 214 (4th Cir. 2002) (explaining that "[d]espite" the Supreme Court's "admonition" that lower federal courts shouldn't create new exceptions to *Illinois Brick*, "several courts have recognized a 'co-conspirator exception' to *Illinois Brick*").  But, as defendants correctly assert, the out-of-Circuit cases applying the co-conspirator exception have done so in only certain types of cases.  And, no court ever has applied a co-conspirator exception to an antitrust conspiracy claim premised on a generic delay theory—the theory plaintiffs allege here.

Instead, the Fourth and Eleventh Circuits have limited the co-conspirator exception to "the more narrow proposition that *Illinois Brick* is inapplicable to a particular type of conspiracy—price-fixing conspiracies." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 215 (4th Cir. 2002); *see also Lowell v. Am. Cyanamid Co.*, 177 F.3d 1228, 1228 (11th Cir. 1999) (holding that "*Illinois Brick* has no application in a vertical [price fixing] conspiracy with no allegations of 'pass-on'").[17]  When reaching this conclusion, the Eleventh Circuit recognized that "*Illinois Brick* is not some formulaic 'remoteness' doctrine wherein a plaintiff who proves he purchased from a conspiring party—any conspiring party—automatically escapes the *Illinois Brick* bar." *Lowell*, 177 F.3d at 1232.  "Instead," the Eleventh Circuit reasoned, "*Illinois Brick* is a decision based on avoiding risks; . . . the risks of (1) double liability; and (2) economic and legal complexity." *Id.*  But, the Eleventh Circuit concluded, "[n]either of the rationales applie[d] to the very different case of vertical conspiracy with no allegations of passing on" because:  (1) "[t]here is no problem of duplication or apportionment [in a vertical price fixing case] because the consumer is the only party who has paid any overcharge" and "[a]lthough the manufacturer did not sell directly to the consumer, he is a fellow conspirator with the direct-selling dealer and therefore jointly and severally liable with the dealer for the consumer's injury[,]" *id.* at 1230 (quoting 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* 264 (rev. ed. 1995)); and (2)

---

[17]     Defendants also assert that the Fifth and Sixth Circuit only have recognized the existence of a co-conspirator exception in the limited context of vertical price fixing arrangements.  *See generally In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1161–63 (5th Cir. 1979) (recognizing that some courts have permitted an exception to *Illinois Brick* for suits involving vertical price fixing conspiracies but holding that the allegations in that case didn't bring the case within that limited exception); *see also Jewish Hosp. Ass'n of Louisville, Ky., Inc. v. Stewart Mech. Enters., Inc.*, 628 F.2d 971, 977 (6th Cir. 1980) (holding that plaintiff "never pleaded the existence of a vertical conspiracy nor alleged facts sufficient to sustain such an allegation" so the court "need not decide whether . . . such conspiracies are outside the rationale of *Illinois Brick*").  Although these cases don't contain language expressly limiting the co-conspirator exception to vertical price fixing arrangements, defendants correctly assert that these Circuit Courts of Appeals haven't applied the exception outside that narrow context.

"the economic and legal complexities outlined in *Illinois Brick*" were "absent" in the facts alleged in *Lowell*, *id.*[18]

Here, the Fourth and Eleventh Circuit's exceptions don't apply to plaintiffs' allegations because the FAC never alleges a vertical price fixing arrangement from Pfizer to Mylan to the direct purchaser. Instead, the FAC alleges that Pfizer modestly increased its contract prices over the years on its EpiPen sales to Mylan, while Mylan increased the EpiPen's wholesale acquisition cost by 500% between 2007 and 2016. *Compare* Doc. 128 at 35–36 (FAC ¶¶ 112–14) (alleging that Mylan "controls the worldwide marketing and sale of" EpiPens, Mylan purchases EpiPens "exclusively" from Pfizer subsidiaries, and that Pfizer's "contract price" for "the sale of EpiPens to Mylan" has increased "from roughly $80 per unit to $86 per unit"), *with id.* at 49 (FAC ¶¶ 166–67) (alleging that since "late 2009, Mylan has raised the price of the EpiPen at least 15 times" and that Mylan increased the price from $181 in 2011 to $530 in November 2015); *see also id.* at 57–58 (FAC ¶ 203).

Other Circuits—the Third and Ninth Circuits—have refused to apply the *Illinois Brick* bar to cases involving output restrictions. *See In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1157 (9th Cir. 2019) (holding that allegations that defendants "work[ed] together as a single conspiracy to limit the output of NFL telecasts[,]" which "in turn result[ed] in prices for out-of-market games being higher than they would be in the absence of the conspiracy" was sufficient to avoid the *Illinois Brick* bar because the allegations about "a single conspiracy" did not "require calculating the pass-through effects of an indirect injury or

---

[18]     Also, at least one court in our Circuit has held that *Illinois Brick* doesn't bar suits involving vertical price fixing arrangements with a "straight cost passthrough" because *Illinois Brick*'s concerns about "the complexities of tracing the amount of overcharge passed on to an indirect purchaser" weren't at issue in that case and "[m]ultiple liability [was] also not a significant concern" based on the claims. *In re N.M. Nat. Gas Antitrust Litig.*, MDL No. 403, 1982 WL 1827, at *9–10 (D.N.M. Jan. 26, 1982).

raise a risk of claims for duplicative harms"); *see also In re Linerboard Antitrust Litig.*, 305 F.3d 145, 159–60 (3d Cir. 2002) (holding that *Illinois Brick* didn't bar suit by plaintiff who purchased corrugated sheets or boxes from defendants and which contained a price-fixed product as an ingredient because "the corrugated sheets and boxes contain [the price-fixed ingredient] that was subject to an agreement on output, which is equivalent to a price-fixing agreement").[19]   In reaching their conclusions, both Circuits explained there's no difference between price fixing conspiracies and output-restriction conspiracies.  *See In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1158 (9th Cir. 2019) ("[P]rice-fixing conspiracies are functionally indistinguishable from output-restricting conspiracies."); *see also In re Linerboard Antitrust Litig.*, 305 F.3d at 159 (recognizing that "an agreement on output . . . is equivalent to a price-fixing agreement").  But, here, the FAC contains no similar allegations of output restrictions.  And nothing else persuades the court to apply the reasoning of the Third and Ninth Circuits or otherwise apply the two Circuits' exception to the *Illinois Brick* bar.

The Third Circuit also has recognized another co-conspirator exception to *Illinois Brick*. It applies to conspiracies involving exclusive dealing or price fixing at the manufacturer level. *Howard Hess Dental Labs Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 378–79 (3d Cir. 2005).  But, the Third Circuit explained, its *Howard Hess* decision recognized only a "limited" exception to

---

[19]      Plaintiffs also cite an Eighth Circuit case that held—without much reasoning or analysis—that "indirect purchasers may bring an antitrust claim if they allege the direct purchasers are 'party to the antitrust violation' and join the direct purchasers as defendants." *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 542 (8th Cir. 2015) (quoting *Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1170–71 & nn. 3–4 (8th Cir. 1998)).  Pfizer argues that *Insulate* is inapposite because the case it relies on—*Campos*—permitted an indirect purchaser to pursue claims for injunctive relief.  *See Campos*, 140 F.3d at 1172.  But, Pfizer argues, *Illinois Brick*'s concerns about duplicative recovery aren't present in cases seeking only injunctive relief.  Doc. 147 at 12 n.3.  The court isn't persuaded by *Insulate*'s holding. It's an out-of-Circuit case that applied the co-conspirator exception without significant explanation for its decision to do so.  And, that application doesn't comport with the Tenth Circuit's directive that "exceptions to *Illinois Brick* are exceedingly narrow in scope" and those exceptions "should be few in number."  *Zinser*, 660 F.2d at 761.

the *Illinois Brick* rule that "would only exist in circumstances where the middlemen would be barred from bringing a claim against their former co-conspirator—the manufacturer—because their involvement in the conspiracy was 'truly complete' (*i.e.*, if the middlemen would be barred from suing by the 'complete involvement defense' of a manufacturer)." *Id.* at 379 (citation omitted). The Tenth Circuit has not adopted any similar exception to *Illinois Brick*.[20] Indeed, the Tenth Circuit never has applied any co-conspirator exception to the *Illinois Brick* rule. Just the opposite, our Circuit has cautioned that "the Supreme Court has indicated that exceptions to *Illinois Brick* are exceedingly narrow in scope" and has expressed its belief that those exceptions "should be few in number." *Zinser*, 660 F.2d at 761. According to the Circuit, "any exception should not be given an expansive application, lest it swallow the rule and become the rule itself." *Id.*

Heeding this directive, the court declines to adopt a broad co-conspirator exception to the *Illinois Brick* rule. While some Circuit Courts of Appeals have recognized a co-conspirator exception, they have done so in limited cases—ones involving vertical price fixing or similar antitrust violations. Plaintiffs haven't alleged those types of antitrust violations here. Also, as defendants correctly assert, no court ever has applied a co-conspirator exception to an antitrust claim involving an alleged conspiracy to delay entry of a generic competitor—like plaintiffs allege here. This court isn't inclined to be the first. And, it isn't persuaded that it should create such an exception in this case when both the Supreme Court and the Tenth Circuit explicitly

---

[20] Nor could the Tenth Circuit adopt such an exception, according to defendants. Defendants assert that the Tenth Circuit wouldn't apply the *Howard Hess* exception because our Circuit never has recognized the "complete involvement defense." *See Semke v. Enid Auto. Dealers Ass'n*, 456 F.2d 1361, 1369 (10th Cir. 1972) ("The Supreme Court has many times disapproved of the *in pari delicto* doctrine in antitrust cases and . . . rules it out in cases in which the plaintiff was charged with participating in the unlawful scheme."). Because the court concludes that it can't extend the exceptions to *Illinois Brick* beyond that authorized by the Supreme Court and Tenth Circuit, it need not reach this interesting argument.

have warned lower courts not to create more exceptions to *Illinois Brick*, other than the two

limited exceptions the Supreme Court already has recognized.  *See, e.g.*, *Apple Inc.*, 139 S. Ct. at

1524 (instructing that courts "should not engage in an unwarranted and counterproductive

exercise to litigate a series of exceptions" (citations and internal quotation marks omitted));

*Zinser*, 660 F.2d at 761 (explaining that "the Supreme Court has indicated that exceptions to

*Illinois Brick* are exceedingly narrow in scope" and expressing the Circuit's belief that those

exceptions "should be few in number").

Plaintiffs' other arguments don't persuade the court that a different outcome is warranted.

Plaintiffs argue that the court should apply a co-conspirator exception here because—they

contend—our court previously recognized the existence of a co-conspirator exception to *Illinois*

*Brick* in *In re Wyoming Tight Sands Antitrust Cases*, 695 F. Supp. 1109 (D. Kan. 1988).  In that

case, plaintiffs urged Judge Saffels to apply a co-conspirator exception.  *Id.* at 1117.  Judge

Saffels recognized that the co-conspirator exception was "one that has not been addressed by the

Supreme Court[.]"  *Id.*  But, Judge Saffels noted, it "is not really an 'exception' at all" but

instead applies "when the direct purchaser participated in the allegedly illegal activities," thus

making "the indirect purchaser . . . the proper plaintiff."  *Id.*  Judge Saffels explained, in that

situation, the indirect purchasers "would become the 'direct purchasers' . . . because they would

be the first purchasers outside the conspiracy[,]" and thus, "would not be considered 'indirect

purchasers' at all."  *Id.*

There's one critical difference between the *Wyoming Tight Sands* case and the facts

alleged here.  Judge Saffels made his observations in the context of analyzing plaintiffs' antitrust

conspiracy claims against suppliers of natural gas—including a pipeline company and utilities—

who allegedly "conspired to fix inflated prices in violation of the federal antitrust laws."  *Id.* at

1111.  Like the out-of-Circuit cases applying the co-conspirator exception, *Wyoming Tight Sands* was a price fixing case.  *Wyoming Tight Sands* didn't involve monopolization claims based on a generic delay theory, the theory plaintiffs allege here.  And, as already discussed, this case contains no vertical price fixing allegations similar to the ones alleged by the *Wyoming Tight Sands* plaintiffs.  Even so, Judge Saffels held that there was "no credible evidence that the utilities were part of the antitrust conspiracy" and thus, he concluded, "the co-conspirator theory [was] inapplicable" to the *Wyoming Tight Sands* case.  *Id.* at 1117.   The court isn't persuaded that Judge Saffels's discussion of a co-conspirator exception to *Illinois Brick* in a price fixing case warrants expanding the narrow exceptions to *Illinois Brick*.

Also, plaintiffs rely heavily on a Seventh Circuit case where the Circuit held that the co-conspirator exception to the *Illinois Brick* rule isn't limited to vertical price fixing arrangements.  *See Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 340 (7th Cir. 2022) ("We see nothing in either the *Illinois Brick* line of cases or the conspiracy line that supports this distinction" between "the existence of a conspiracy . . . for cases of price fixing, as opposed to other forms of anticompetitive activity").  The Seventh Circuit held that the "district court thus erred in holding that the *Illinois Brick* rule bars the first purchasers outside of a conspiracy from suing under the antitrust laws except in cases where vertical price fixing is alleged."  *Id.* at 841.  And, it concluded that plaintiffs who "have properly alleged a conspiracy, . . . may sue for whatever form of anticompetitive conduct they are able plausibly to allege."  *Id.*

This *Marion Healthcare* case, decided in March 2020, is now more than two years old.  No court outside the Seventh Circuit has applied its broad exception to *Illinois Brick*.  Also, the court is reluctant to adopt such a broad conspiracy exception to *Illinois Brick* because it could "'open the door to duplicative recoveries'"—something that the Supreme Court meant to prevent

when it adopted the *Illinois Brick* rule. *Illinois Brick*, 431 U.S. at 730–31; *see also Howard Hess*, 424 F.3d at 379 ("*Illinois Brick*'s first policy concern—the risk of duplicative liability— cuts against the unlimited [co-conspirator] exception" to that rule). And, as already discussed, the court isn't inclined to follow *Marion Healthcare* when it is a case from outside our Circuit contradicting the Tenth Circuit's directive against expanding the narrow and limited exceptions to *Illinois Brick*. *Zinser*, 660 F.2d at 761. The Circuit's directive is grounded, of course, in similar direction by the Supreme Court. *See UtiliCorp*, 497 U.S. at 216 (finding "ample justification exists for [the Court's] stated decision not to 'carve out exceptions to the [direct purchaser] rule for particular types of markets' and recognizing that the "possibility of allowing an exception, even in rather meritorious circumstances, would undermine the rule" (quoting *Illinois Brick*, 431 U.S. at 744).

For all these reasons, the court declines plaintiffs' invitation to apply a co-conspirator exception to *Illinois Brick* to the antitrust conspiracy alleged here, one invoking generic delay claims. By doing so, the court joins other courts who have refused to apply a broad co-conspirator exception to *Illinois Brick*. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 215 (4th Cir. 2002) (refusing to adopt plaintiff's "broader interpretation" that "*Illinois Brick* is inapplicable when any conspiracy has been alleged" because "the *Illinois Brick* rule would be inverted solely based upon artful pleading" and "[s]uch a result is contrary to *Illinois Brick* itself as well as the Supreme Court's clear directive in *UtiliCorp United* against crafting new exceptions to the *Illinois Brick* rule" (citing *UtiliCorp*, 497 U.S. at 216)); *see also Harris Cnty., Tex. v. Eli Lilly & Co.*, No. H-19-4994, 2022 WL 479943, at *11 (S.D. Tex. Feb. 16, 2022) (dismissing antitrust and RICO claims because allegations that "OptumRx engaged in a horizontal conspiracy to price-fix with the PBM defendants from whom [plaintiff] directly

paid—does not surmount *Illinois Brick*'s tall wall against indirect purchaser suits"). Here, the court concludes that *Illinois Brick*'s "tall wall" bars plaintiffs' antitrust claims against Pfizer. *Harris Cnty.*, 2022 WL 479943, at *11.

The FAC alleges that plaintiffs are indirect purchasers of EpiPens from Pfizer. *Illinois Brick* precludes plaintiffs—as indirect purchasers from Pfizer—from bringing antitrust claims against Pfizer. None of plaintiffs' allegations bring their claims within either of the two limited exceptions to *Illinois Brick*. And, the court declines to expand the exceptions to the *Illinois Brick* rule to encompass the facts alleged here. The court thus dismisses plaintiffs' claims against Pfizer because *Illinois Brick* bars them.[21]

### C.   Plausibility of Plaintiffs' Alleged Antitrust Claims

*Last*, defendants argue that the FAC fails to state plausible antitrust claims under the Sherman Antitrust Act.[22] Defendants assert that plaintiffs have failed to allege several elements of their antitrust claims, thus requiring the court to dismiss the claims under Fed. R. Civ. P. 12(b)(6). The court addresses each argument, in turn, below.

### 1.   Existence of a Conspiracy

*First*, defendants argue that plaintiffs have failed to allege plausibly any agreement or conspiracy between Mylan and Pfizer to delay entry of Teva's generic EpiPen.

---

[21]   Pfizer also argues that plaintiff KPH lacks standing to sue Pfizer under its Assignment from McKesson because its original Assignment from McKesson only conveyed a right to assert generic delay claims against Mylan Specialty L.P. Because the court concludes that *Illinois Brick* bars plaintiffs' claims against Pfizer because plaintiffs are indirect purchasers of EpiPens, the court need not decide whether plaintiff KPH's claims against Pfizer fail because of a lack of standing to sue Pfizer under the original Assignment.

[22]   Both Mylan and Pfizer move to dismiss plaintiffs' claims arguing that they fail to state plausible claims for relief. And, Mylan has incorporated by reference Pfizer's arguments for dismissal for failing to state a claim. *See* Doc. 138 at 29 n.12. So, the court addresses both Mylan and Pfizer's dismissal arguments in this section, even though the court already has dismissed plaintiffs' claims against Pfizer because *Illinois Brick* bars plaintiffs' indirect purchaser claims.

58

The Supreme Court has instructed that, to state a plausible claim under Sherman Act § 1, a complaint must allege "enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *see also TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1027 (10th Cir. 1992) ("To state a claim for a violation of section one [of the Sherman Act] the plaintiff must allege facts which show: the defendant entered a contract, combination or conspiracy that unreasonably restrains trade in the relevant market."). "An agreement or conspiracy under federal antitrust laws is said to exist when 'there is a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme.'" *Suture Express, Inc. v. Cardinal Health 200, LLC*, 963 F. Supp. 2d 1212, 1223 (D. Kan. 2013) (quoting *W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010)).

"'A plaintiff may plead an agreement by alleging direct or circumstantial evidence, or a combination of the two,' but allegations of direct evidence, that are adequately detailed, are sufficient alone." *Id.* at 1223–24 (quoting *W. Penn Allegheny*, 627 F.3d at 99). However, "[b]are bones accusations of a conspiracy without any supporting facts are insufficient to state an antitrust claim." *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006) (citation omitted).

Here, plaintiffs have alleged facts—albeit in the form of circumstantial evidence—from which a reasonable factfinder plausibly could find or infer that Mylan and Pfizer unlawfully conspired to restrain trade and maintain monopoly power by delaying generic competition in the EAI market. Specifically, the FAC alleges that defendants conspired to maintain monopoly power in the EAI market by entering an agreement with Teva to delay entry of Teva's generic EpiPen to that market. Doc. 128 at 65, 68 (FAC ¶¶ 240, 251). Plaintiffs allege: "While some of the alleged anticompetitive acts were performed by only one or a subset of [d]efendants, all were

accomplished as part of [d]efendants' overarching conspiracy to restrain trade and delay entry of Teva's AB-rated generic EpiPen." *Id.* at 66 (FAC ¶ 244). They also assert that "[e]ach [d]efendant played its respective role in that overarching conspiracy, as addressed in detail above, which collectively allowed the conspiracy to succeed and resulted in the unreasonable restraint of trade." *Id.*

More specifically, the FAC alleges facts which would permit a reasonable factfinder to find or infer—based on defendants' alleged conduct—that they unlawfully conspired to restrain trade and maintain monopoly power. Plaintiffs allege that some 72% of the EAI market consists of the EpiPen and Mylan's authorized generic and that defendants have maintained monopoly power in that market. *Id.* at 32, 66–67 (FAC ¶¶ 103, 241, 250). Plaintiffs assert that Pfizer manufactures and supplies 100% of the EpiPens Mylan had sold in the U.S. *Id.* at 5, 11, 31, 35 (FAC ¶¶ 5, 26, 98, 113). And, plaintiffs allege, defendants have "divided intellectual property ownership of the EpiPen" with Pfizer owning the EpiPen patents and Mylan owning the trademarked brand names which has "resulted in the two companies working collaboratively to enhance sales volume and profitability." *Id.* at 35 (FAC ¶ 112). This relationship also means that "both companies stood to lose" if EpiPen patents were invalided or if other competitors gained market share. *Id.*

Defendants entered a Supply Agreement that requires Pfizer "to prosecute and maintain any patents or patent applications." *Id.* at 31 (FAC ¶ 98). But, plaintiffs allege, Mylan participated in concerted action with Pfizer to prosecute and settle patent litigation under terms that delayed generic entry and protected defendants' monopoly. *Id.* at 34–45 (FAC ¶¶ 108–54). Plaintiffs allege that the "Supply Agreement between Mylan and Pfizer" requires the parties "to notify each other of potential infringement and 'jointly determine in good faith the appropriate

course of action[.]'" *Id.* at 40–41 (FAC ¶ 132).  Plaintiffs assert that, although Pfizer holds the

EpiPen patents, Mylan's CEO announced in a 2009 earnings call that "*Mylan* was adding another

patent to the already-patented EpiPen device that "'will also put in [place] another barrier to

entry'" and will present "'a very, very difficult hurdle to get through, and so'" the CEO reported

that she felt "'confident that EpiPen is in good shape.'" *Id.* at 34–35 (FAC ¶ 110) (emphasis

added).  Later, a Pfizer subsidiary—not Mylan—secured another EpiPen patent, the '432 patent.

*Id.*  Then, plaintiffs allege, in July 2013, Mylan Specialty LP replaced a Pfizer subsidiary as

sponsor of the EpiPen patents in the Orange Book.  *Id.* at 36 (FAC ¶ 115).  Plaintiffs assert that

these changes "demonstrates further concerted action by Mylan and Pfizer to share in the

benefits and burdens of the EAI market monopoly."  *Id.*

      Plaintiffs allege that in 2017, Mylan and Pfizer entered a Common Interest Agreement in

connection with the EpiPen patent infringement litigation against Teva.  *Id.* at 36–37 (FAC ¶

117).  Although Mylan wasn't a party to the litigation, plaintiffs allege that Mylan was involved

in negotiating and executing the term sheet to settle that litigation—which included an agreement

that Teva would delay the launch of its generic until June 22, 2015—and Mylan executed a

covenant not to sue attached to the term sheet.  *Id.* at 38 (FAC ¶ 125).  Plaintiffs assert that

Mylan issued a press release jointly with Pfizer announcing the settlement.  *Id.* at 40 (FAC ¶

131).  And, in a July 26, 2012 earnings call, Mylan's CEO referred to the Teva/EpiPen

settlement as "*our* settlement with Teva[.]"  *Id.* at 41 (FAC ¶ 133) (emphasis added).

      On the same day when the parties entered the term sheet to settle the Teva/EpiPen

litigation, plaintiffs allege that Teva and Mylan entered a term sheet to settle the Nuvigil

litigation.  *Id.* at 42–43 (FAC ¶¶ 141, 143).  Plaintiffs allege that the "EpiPen and Nuvigil ANDA

settlements were negotiated by the same individuals and entered into on the same date."  *Id.* at 43

(FAC ¶ 143).  Plaintiffs contend that "[n]either settlement makes economic sense by itself" and allege that defendants "gave Teva years of additional Nuvigil exclusivity in exchange for Teva's agreement not to market its AB-rated generic EpiPen until June 22, 2015." *Id.*; *see also id.* at 42 (FAC ¶ 136) ("The valuable consideration Teva received in exchange for dropping its meritorious challenge to the EpiPen patents was the settlement of the patent litigation between Teva and Mylan relating to the blockbuster drug Nuvigil.").

Even after the parties resolved the Teva/EpiPen litigation, plaintiffs allege that Mylan and Pfizer conspired to delay generic competition from Teva by having Mylan file a meritless Citizen Petition with the FDA seeking to delay the launch of Teva's generic. *Id.* at 45–48, 60 (FAC ¶¶ 155–60, 217).  Also, plaintiffs allege that Mylan and Pfizer conspired to enter an anticompetitive agreement "whereby [d]efendants provided significant consideration, incentives, and benefits to Intelliject [a competing EAI] and Sanofi [the company who held the rights to Intelliject] to delay bringing their competing product to market." *Id.* at 44 (FAC ¶ 151).  Again, Mylan wasn't a named defendant in the Intelliject litigation and it wasn't a party to the settlement agreement but Mylan drafted the press release announcing the settlement. *Id.* at 45 (FAC ¶ 152).  The parties revealed that their agreement prevented Intelliject from launching a competing EAI device for nine months and, plaintiffs allege, Intelliject and Sanofi agreed to this delay "in exchange for valuable consideration." *Id.*  All of these facts—if proved true—could support a reasonable finding or inference that Mylan and Pfizer entered an unlawful agreement or conspiracy—one that included a conscious commitment to a common scheme to delay generic competition in the EAI market.

Defendants disagree, arguing the FAC merely alleges "loosely parallel conduct" that cannot state a plausible conspiracy claim.  Doc. 138 at 30 (citing *Twombly*, 550 U.S. at 556

("[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice.")).
Defendants assert that plaintiffs base their antitrust claims on various patent infringement
litigation and settlements but, defendants contend, they are different cases with different patents
and different parties—and sometimes different products. Defendants contend that one cannot
infer plausibly from these allegations that defendants agreed to join a conspiracy. Instead,
defendants assert, these allegations just show unilateral and independent conduct—not a
horizontal agreement—and thus, defendants argue, the allegations cannot suffice to state a
conspiracy claim.

The court is unpersuaded by defendants' arguments. The court recognizes that the
Supreme Court has instructed: "[W]hen allegations of parallel conduct are set out in order to
make a § 1 claim, they must be placed in a context that raises a suggestion of preceding
agreement, not merely parallel conduct that could just as well be independent action." *Twombly*,
550 U.S. at 557. This is so because "lawful parallel conduct fails to bespeak unlawful
agreement." *Id.* at 556; *see also Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873
F.2d 1357, 1361 (10th Cir. 1989) ("[C]onscious parallel business behavior, standing alone, is
insufficient to prove conspiracy."). Thus, "an allegation of parallel conduct and a bare assertion
of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and
a conclusory allegation of agreement at some unidentified point does not supply facts adequate to
show illegality." *Twombly*, 550 U.S. at 556–57. Instead, a plaintiff must allege "conspiracy
evidence [that] tend[s] to rule out the possibility that the defendants were acting
independently[.]" *Id.* at 554.

Our Circuit has held that "parallel behavior may, however, support the existence of an
illegal agreement 'when augmented by additional evidence from which an understanding among

the parties may be inferred.'"  *Mitchael v. Intracorp., Inc*, 179 F.3d 847, 859 (10th Cir. 1999)

(quoting *Monument Builders of Greater Kan. City, Inc. v. Am. Cemetery Ass'n*, 891 F.2d 1473,

1481 (10th Cir. 1989) (further citation and internal quotation marks omitted)).  "'Such evidence

may include a showing that the parties are acting against their own individual business interests,

or that there is motivation to enter into an agreement requiring parallel behavior.'"  *Id.* (quoting

*Monument Builders*, 891 F.2d at 1481 (further citation and internal quotation marks omitted)).

Here, the FAC's allegations suffice—at least at the pleading stage—to state a plausible

antitrust claim under these governing standards.  Plaintiffs allege parallel conduct by asserting,

plausibly, that both Mylan and Pfizer participated in a scheme to initiate patent infringement

litigation and then settle those lawsuits with reverse payment settlements.  Also, the court finds

that the FAC—viewed in plaintiffs' favor—alleges additional facts that augment plaintiffs'

allegations and permit an inference of an unlawful conspiracy or agreement.  Specifically, the

FAC alleges facts supporting a plausible inference that Mylan and Pfizer were motivated to enter

an agreement to exclude competitors from entering the EAI market.  *See* Doc. 128 at 35 (FAC ¶

112) (alleging that defendants have "divided intellectual property ownership of the EpiPen" with

Pfizer owning the EpiPen patents and Mylan owning the trademarked brand names which has

"resulted in the two companies working collaboratively to enhance sales volume and

profitability" and also means that "both companies stood to lose" if EpiPen patents were

invalidated or if other competitors built market share).  And, the FAC plausibly alleges that

defendants worked together to effectuate this scheme by litigating patent infringement lawsuits

and entering into reverse payment settlements that unlawfully delayed generic competition in the

EAI market.  *Id.* at 5, 34–45, 65, 68 (FAC ¶¶ 5, 108–54, 240, 251).  The court recognizes that

"each of [these] allegations of circumstantial agreement standing alone may not be sufficient to

imply agreement," but, "taken together, they provide a sufficient basis to plausibly contextualize the agreement necessary for pleading a § 1 claim." *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 47 (1st Cir. 2013) (holding that complaint "alleges facts concerning when agreement occurred and providing circumstantial evidence to establish a setting to make agreement plausible").

In sum, the court concludes that the FAC sufficiently alleges facts capable of supporting a reasonable finding or inference that Mylan and Pfizer entered an unlawful agreement or conspiracy to delay generic competition in the EAI market. The FAC alleges parallel behavior and augments that allegation with other factual allegations. Those additional allegations, if proved true, would provide circumstantial evidence permitting a plausible finding or inference of an unlawful agreement or conspiracy that violated the antitrust laws. So, the court declines to dismiss the FAC on this basis.

## 2.  Causation

*Second*, defendants argue that the FAC fails to allege an antitrust violation because the facts fail to support a plausible finding or inference that defendants' alleged anticompetitive conduct caused plaintiffs' alleged injuries. Defendants correctly assert that a plaintiff must establish antitrust standing by alleging "(1) an 'antitrust injury'; and (2) a direct causal connection between that injury and a defendant's violation of the antitrust laws." *Tal v. Hogan*, 453 F.3d 1244, 1253 (10th Cir. 2006) (citations and internal quotation marks omitted); *see also Sharp v. United Airlines, Inc.*, 967 F.2d 404, 406 (10th Cir. 1992) (explaining that antitrust standing requires "causal connection between the antitrust violation and the plaintiff's injury"). Defendants make three arguments about causation. None persuade the court that plaintiffs have failed to plead causation sufficiently.

*First*, defendants assert that the FAC fails to allege plausibly that any patent litigation settlement caused any generic delay because neither Teva's generic EAI nor Intelliject could have launched in the EAI market before the entry dates that the parties agreed to in their settlements.  For Teva, defendants argue, the FDA didn't approve its generic EAI until August 2018—more than three years after the June 2015 entry date agreed to in the Teva/EpiPen Settlement.  Doc. 135 at 34.  And, for Intelliject, defendants contend, it didn't launch its EAI device until January 2013—more than two months after the agreed-to entry date in the Intelliject/Sanofi settlement.  *Id.* at 35 n.41.  Plaintiffs respond, arguing that the FAC not only alleges the unlawful reverse payment settlements delayed generic entry but also alleges that "[d]efendants' actions disrupted . . . the trajectory of approvals . . . of competitive products[.]"  Doc. 128 at 67 (FAC ¶ 248); *see also id.* at 68–69 (FAC ¶ 256) (same).

More specifically, plaintiffs allege that "Teva dropped the ball between 2011 and 2014 by failing to aggressively pursue its ANDA application or timely respond to the FDA's inquiry regarding same."  *Id.* at 48 (FAC ¶ 161).  Plaintiffs assert that "Teva's responsiveness to the FDA's requests noticeably slowed" during the time it was negotiating the settlement with defendants and after it had settled the litigation.  *Id.*  For example, plaintiffs allege, "in one instance Teva waited until August 2014 to respond to a February 2011 deficiency letter from the FDA."  *Id.*  Plaintiffs assert that "had Teva responded to the FDA's requests regarding its ANDA application in a timely manner during this period, the FDA would have completed its review of Teva's ANDA application by 2014, if not earlier."  *Id.* (FAC ¶ 162).  And, plaintiffs contend, "[b]ut for the EpiPen settlement, Teva's AB-rated generic EpiPen would have entered the EAI market in March 2014 or, at the latest, January 2015."  *Id.* at 49 (FAC ¶ 163).  Plaintiffs support

this assertion by alleging that "Teva's internal documents from 2011 and early 2012 indicate it anticipated to launch its AB-rated generic EpiPen by 2014." *Id.*

Defendants assert that the FAC fails to allege facts showing Teva wouldn't have "dropped the ball" in the "but for" world just as plaintiffs allege Teva did in the real world. Doc. 138 at 32–33. But, a reasonable factfinder could find or infer from the FAC's allegations that Teva wouldn't have "dropped the ball" in the "but for" world because in that comparator world Teva would have been motivated to bring its generic to market as quickly as possible. But, in the real world, plaintiffs allege, Teva slowed its efforts to gain FDA approval for its generic because it knew it couldn't enter the market until the agreed-to entry date in the Teva/EpiPen Settlement. Also, to decide whether Teva would have dropped the ball in the "but for" world requires the court to resolve factual questions and weigh competing views about the FAC's factual allegations. And, the court can't do that on a motion to dismiss. As discussed, it must take plaintiffs' allegations that Teva "dropped the ball" as true and view in their favor their assertions that Teva would have secured FDA approval earlier but for the Teva/EpiPen Settlement.

At the pleading stage, the court finds, plaintiffs' allegations that defendants' settlement negotiations and eventual settlement of patent litigation "disrupted . . . the trajectory of approvals . . . of competitive products" suffice to assert plausible allegations of causation. Doc. 128 at 67–69 (FAC ¶¶ 248, 256). Other courts have concluded that similar allegations plausibly assert causation because the delay for potential competitors entering the market "was a foreseeable consequence of the original antitrust violation." *See In re Flonase Antitrust Litig.*, 798 F. Supp. 2d 619, 629–30 (E.D. Pa. 2011) (denying summary judgment against antitrust claims because, among other things, plaintiffs presented sufficient evidence to raise genuine issues of material fact whether the FDA's deficiency notices sent to a potential competing generic "was indeed

proximately caused by, or was the foreseeable consequences of, [defendant's] alleged antitrust violations"); *see also In re Loestrin 24 Fe Antitrust Litig.*, 261 F. Supp. 3d 307, 336 (D.R.I. 2017) (declining to dismiss generic delay claim based on an argument that pharmaceutical company didn't secure FDA approval to sell a generic until after agreed-to generic entry date because "the facts alleged in the Operative Complaints do not preclude the possibility that" an alleged reverse payment settlement "contributed to the [later] entry date" by "affect[ing] the FDA's and [pharmaceutical company's] behavior during the approval process[,]" and noting that had the settlement "provided for an earlier entry date, [pharmaceutical company] may have been able to obtain FDA approval earlier").

Taking the FAC's allegations as true and viewing them in plaintiffs' favor, the FAC plausibly asserts that defendants' alleged unlawful reverse payment settlements caused both Teva and Intelliject's delay in entering the EAI device market and their delay in securing FDA approval.  These allegations suffice to allege causation.

*Second*, defendants assert that other patents—ones not in issue in the Teva litigation— would have blocked Teva from launching its generic EpiPen product earlier in a "but for" world where there was no Teva/EpiPen Settlement.  But, in the real world where the parties settled the litigation, the Teva/EpiPen Settlement included an agreement by Pfizer to extend the licenses on later-issued patents.  Defendants argue, absent the Teva/EpiPen Settlement, Teva would have had to overcome these later-issued patents and each patent "would have served as an independent barrier to entry for both Teva and Intelliject."  Doc. 135 at 34.

To support their argument, defendants rely on a Northern District of Illinois case where the court held "plaintiffs' theory of antitrust injury [was] not plausible" because the "complaint call[ed] many of [defendant's] patents 'weak,' its patent applications 'dubious,' sa[id] that some

of the patents were 'obvious in light of prior art,' and identifie[d] four patents that were issued as the result of material misrepresentations and omissions to the USPTO" but never alleged that "all of [defendant's] patents were invalid or not infringed." *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 844 (N.D. Ill. 2020) (citations omitted). The court there reasoned, "[i]f a drug is not able to launch because launching would infringe even a single patent, then the injury (if it could still be called that) would be caused not by the settlement but by the patent laws prohibiting the launch." *Id.* (citations and internal quotation marks omitted). And, it explained, "[i]f the reason the biosimilar manufacturers could not make it to market was that [defendant] had a patent that prevented them from doing so, it was the patent—and not [defendant's] other conduct—that was the but-for cause of the monopoly prices." *Id.*

Defendants urge the court to apply the same reasoning here for the later-issued EpiPen patents. The court declines because plaintiffs' allegations about the later-issued patents differ substantially from what plaintiffs alleged in *Humira*. The FAC alleges that "[d]efendants listed four patents related to epinephrine auto-injectors, all of which are set to expire in November 2025" and that "[d]efendants' control over these patents means that firms seeking entry with a generic auto-injector prior to 2025 can do so only by certifying, through the filing of a Paragraph IV certification with the FDA, that each patent is invalid or will not be infringed by a generic device." Doc. 128 at 56–57 (FAC ¶ 199). Plaintiffs also allege that defendants added additional patents to the already-patented EpiPen as part of their scheme to insert barriers to entry into the EAI market. *Id.* at 34–35 (FAC ¶ 110). And, the FAC asserts, "[d]efendants concealed their conspiracy to exclude generic competition" in several ways, including assertion of "invalid patents against potential competitors[.]" *Id.* at 60 (FAC ¶ 217).

Although the FAC doesn't specifically address whether defendant's later-issued patents would have prevented a generic from launching a product earlier, the court finds that such an omission isn't fatal to plaintiffs' antitrust claims. Indeed, Fed. R. Civ. P. 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Plaintiffs have satisfied that obligation here by alleging that defendants procured patents as a method of erecting barriers to entry and asserted invalid patents against potential competitors. Whether the later-issued patents would have prevented a generic from launching earlier depends on factual questions whether those patents were valid and whether the competing product infringed the patents. And, whether Pfizer would have prevailed in patent litigation over these questions presents factual disputes that the court can't decide on a motion to dismiss. Instead, taking plaintiffs' allegations as true, plaintiffs have alleged that defendants asserted invalid patents against potential competitors. And, the court must leave for another day the factual questions whether those later-issued patents would have prevented Teva's generic from launching earlier.

*Third*, defendants assert that plaintiffs have failed to state a claim based on the Intelliject Settlement based on the way plaintiffs have defined the class. Plaintiffs have defined the class period as one beginning on "November 1, 2013 until the anticompetitive effects of [d]efendants' conduct cease[.]" Doc. 128 at 63 (FAC ¶ 231). But, the Intelliject Settlement included an agreed-to entry date of November 1, 2012—one year before the class period begins. And, Intelliject entered the market in January 2013—also before the start of the class period. So, defendants argue, none of the putative plaintiffs have sustained injury from the Intelliject Settlement because no generic delay could have occurred during the class period.

Plaintiffs respond, arguing that the FAC plausibly alleges that putative class members sustained injuries from paying overcharges for EpiPen—even after competing products could enter or did enter the market—because defendants' unlawful conduct affected the price trajectory of EpiPens. *See, e.g.*, Doc. 128 at 67–69 (FAC ¶¶ 248, 256) (asserting that plaintiffs' "injuries consist of paying higher prices for EpiPens and/or generic EpiPens than they would have in the absence of [d]efendants' violations of the Sherman Act" and those "injuries did not end upon the introduction of generic EpiPens because [d]efendants' actions disrupted not only the trajectory of approvals and purchases of competitive products, but also the trajectory of pricing that, upon information and belief, continues at least until the present day"); *see also id.* at 60 (FAC ¶ 213) ("The prices that Mylan charged in the United States were inflated as a direct and foreseeable result of its anticompetitive conduct. As a consequence, direct purchasers of EpiPen have sustained injury to their business and property in the form of continuing overcharges."); *id.* at 55, 59, 66–67 (FAC ¶¶ 193, 212, 246–47).

Based on these allegations, and even if Intelliject entered the market before the class period begins, plaintiffs have alleged plausibly that they have sustained injury from Intelliject's delayed entry because defendants' unlawful reverse payment settlement forced plaintiffs and putative class members to pay higher prices for EpiPens during the class period than they would have paid in the "but for" world where no unlawful generic delay occurred. These allegations suffice to state a plausible claim at the pleading stage. The court thus declines to dismiss the claims based on the Intelliject Settlement.

For all these reasons, the court finds that plaintiffs' antitrust claims plead causation sufficiently at the pleading stage to survive defendants' Rule 12(b)(6) dismissal arguments.

### 3.  Existence of a Large, Unjustified, Reverse Payment Settlement

*Third*, defendants argue that the FAC fails to allege an antitrust violation because the alleged facts can't support a reasonable finding or inference that defendants made a large and unjustified reverse payment settlement.  The Supreme Court has recognized that reverse payment settlements "can sometimes violate the antitrust laws."  *FTC v. Actavis, Inc.*, 570 U.S. 136, 141 (2013).  As discussed, a reverse payment settlement refers to an agreement by a brand-name manufacturer and patent holder to compensate a generic manufacturer and alleged patent infringer in exchange for settling patent infringement litigation, thus delaying the generic's market entry.  *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 41 (1st Cir. 2016) (citing *Actavis*, 570 U.S. at 145).  "When a brand-name manufacturer pays to delay the first filer's generic launch, that reverse payment postpones not only the first filer's product but also those of all other generic manufacturers, who must wait out the 180-day exclusivity period before going to market."  *Id.*  Because a reverse payment settlement effectively delays generic competition in the market, *Actavis* recognized that "a reverse payment, where large and unjustified, can bring with it the risk of significant anticompetitive effects[.]"  *Actavis*, 570 U.S. at 158.

To determine whether a reverse payment settlement has anticompetitive effects, the Supreme Court has instructed that "a detailed exploration of the validity of the patent itself" is not necessary.  *Id.* at 158.  Instead, the anticompetitive effects of a reverse payment depend on "its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification."  *Id.* at 159.  The Supreme Court also recognized that the "existence and degree of any anticompetitive consequence may also vary as among industries."  *Id.*  Because of "[t]hese

complexities," the Supreme Court has held that courts must analyze alleged unlawful reverse payment settlements under the rule of reason.  *Id.*

Here, defendants assert, the FAC fails to plead facts plausibly showing that defendants actually made a large or unjustified payments in the patent litigation settlements with Teva, Intelliject, and Sandoz.  Doc. 138 at 34–35.  Thus, defendants contend, plaintiffs fail to state a plausible claim based on any of these settlements.  The court addresses each one of the three settlements separately, below.

### a.  Teva Settlement

*First*, the court finds that the FAC plausibly alleges that the parties to the Teva/EpiPen Settlement entered an unlawful reverse payment settlement in which:  (a) Teva agreed to delay its launch of an EpiPen generic; (b) in exchange for Mylan's agreement to delay its launch of a Nuvigil generic and settle patent litigation with Teva over Mylan's Nuvigil generic.  Specifically, the FAC asserts:  "Upon information and belief, in settling the Teva litigation, [d]efendants and Teva entered into an unlawful agreement whereby [d]efendants provided significant consideration, incentives, and benefits to Teva in the form of a settlement of the patent litigation related to Nuvigil . . . to delay bringing their competing product to market."  Doc. 128 at 39 (FAC ¶ 127).  To support this assertion, the FAC alleges that "EpiPen and Nuvigil ANDA settlements were negotiated by the same individuals and entered into on the same date" and, plaintiffs contend, "[n]either settlement makes economic sense by itself."  *Id.* at 43 (FAC ¶ 143).

In the Teva litigation, plaintiffs assert that:  (1) the court's "*Markman* rulings on the interpretation of the '432 patent were favorable to Teva;" (2) "at the time of a settlement, a full bench trial had been conducted and further anticipated litigation expenses would have been

marginal compared to expenses already incurred at the time of the settlement;" and (3) "no rational economic actor with a viable product (and who had spent millions of dollars developing it) would refrain from entering a lucrative 'blockbuster' market for 36 months unless it received substantial value in return[.]" *Id.* at 39 (FAC ¶ 128).

In the Nuvigil litigation, plaintiffs assert that: (1) before the Nuvigil Settlement, the FDA had "tentatively approved Mylan's ANDA to manufacture and sell a generic version of Nuvigil, signifying that Mylan's ANDA met substantive requirements for final approval[;]" (2) "[l]eading up to May 2012, Mylan maintained its ability to launch its generic product upon approval[;]" (3) trial in the Nuvigil litigation was scheduled for June 2012—less than two months after the parties entered the Settlement; and (4) Nuvigil was "a blockbuster drug and generic delay of several years was worth hundreds of millions (if not billions) of dollars to Teva." *Id.* at 42–43 (FAC ¶¶ 138–41). From these facts, plaintiffs allege that defendants "gave Teva years of additional Nuvigil exclusivity in exchange for Teva's agreement not to market its AB-rated generic EpiPen until June 22, 2015." *Id.* at 43 (FAC ¶ 143).

Defendants argue that none of these alleged facts can support a plausible finding or inference that defendants made "any payment, let alone a large and unjustified reverse payment" to settle the Teva litigation. Doc. 148 at 24. Other courts have concluded, however, that "a reverse payment's legality depends mainly on its economic substance, not its form" and that a plaintiff plausibly can plead the existence of a large and unjustified reverse payment "without describing in perfect detail the world without the reverse payment, calculating reliably the payment's exact size, or preempting every possible explanation for it." *See FTC v. AbbVie Inc.*, 976 F.3d 327, 356 (3d Cir. 2020); *see also King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*, 791 F.3d 388, 409–10 (3d Cir. 2015) (reversing a district court's Rule 12(b)(6)

dismissal of antitrust claims because "plaintiffs' allegations, and the plausible inferences that can be drawn from them, are sufficient to state a rule-of-reason claim under *Twombly* and *Iqbal* for violation of the Sherman Act on the ground that [defendant] sought to induce [a generic] to delay its entry into the lamotrigine tablet market by way of an unjustified no-AG agreement"); *In re Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538, 552 (1st Cir. 2016) (declining to "'require heightened fact pleading of specifics'" such as "precise figures and calculations at the pleading stage" but holding that "plaintiffs must allege facts sufficient to support the legal conclusion that the settlement at issue involves a large and unjustified reverse payment under *Actavis*" (quoting *Twombly*, 550 U.S. at 570)).  Plaintiffs' allegations here—taken as true and viewed in plaintiffs' favor—satisfy that pleading standard.

Plaintiffs have alleged that "[d]efendants and Teva entered into an unlawful agreement whereby [d]efendants provided significant consideration, incentives, and benefits to Teva in the form of a settlement of the patent litigation related to Nuvigil . . . to delay bringing their competing product to market" and that defendants "gave Teva years of additional Nuvigil exclusivity in exchange for Teva's agreement not to market its AB-rated generic EpiPen until June 22, 2015."  Doc. 128 at 39, 43 (FAC ¶¶ 127, 143).  The FAC includes additional facts about the alleged merits of the Teva and Nuvigil litigation, the status of each litigation when the parties settled, and the parties' motivations for entering an unlawful reverse payment settlement.  These facts allege plausibly that the Teva/EpiPen Settlement involved a large and unjustified reverse payment settlement.

Also, defendants assert that the FAC's alleged facts fail to support a plausible inference of a large and unjustified reverse payment settlement because they don't support a plausible finding or inference of unlawful conduct.  They argue that tentative FDA approval of a

pharmaceutical product has no bearing on patent litigation or whether a product will secure final FDA approval. Also, they assert that settlement on the eve of trial is something that's common in litigation and not suggestive of unlawful conduct. And, they contend that allegations about the billions of dollars at stake in the Nuvigil litigation doesn't permit an inference that the parties entered an unlawful reverse payment settlement. While each of these facts, alone, might not plausibly permit a finding or inference of an unlawful reverse payment settlement, the court must accept all of plaintiffs' allegations as true and view them in plaintiffs' favor. Taking plaintiffs' allegations together, a reasonable factfinder reasonably could find or infer that the parties entered an unlawful reverse payment settlement based on plaintiffs' allegations about the circumstances surrounding the Teva and Nuvigil litigation, the timing of the two settlements, the involvement of the same actors in both settlements, and the parties' motivations for entering a settlement that protected Mylan's EpiPen monopoly in the EAI market in exchange for an agreement to delay Mylan's launch of a Nuvigil generic to compete with Teva's product in a different market. Whether plaintiffs can marshal evidence to support these allegations is a question for another day. But, at this stage in the litigation, plaintiffs have stated plausible antitrust claims based on a large and unjustified reverse payment settlement.

### b.  Intelliject Settlement

*Next*, the court concludes that the FAC plausibly alleges that the parties to the Intelliject Settlement entered an unlawful reverse payment settlement that resolved that litigation and included an agreement to delay competition in the EAI market. The FAC alleges "[u]pon information and belief, [d]efendants conspired with each other, and with Intelliject and Sanofi, to enter into an anticompetitive agreement whereby [d]efendants provided significant consideration, incentives, and benefits to Intelliject and Sanofi to delay bringing their competing product to

market." Doc. 128 at 44 (FAC ¶ 151). Plaintiffs allege that the terms of the parties' settlement of patent litigation "are confidential" but "the parties did reveal that the agreement prevented Intelliject and Sanofi from launching their [competing EAI] device for another nine months, until November 15, 2012." *Id.* at 45 (FAC ¶ 152). Plaintiffs allege that "Intelliject and Sanofi agreed to this in exchange for valuable consideration." *Id.* They support this assertion by alleging that the "relatively short duration of delay before entry of the [competing Intelliject product] likely indicates the strength of Intelliject's defenses to the patent litigation." *Id.* And, they allege, on "August 10, 2012, the FDA granted final approval of Intelliject's NDA, but [under] the settlement, Sanofi could not sell its competing EAI product, Auvi-Q, until after November 15, 2012." *Id.* (FAC ¶ 153). Thus, plaintiffs allege, the Intelliject Settlement denied consumers access to the Intelliject product for three months or so. *Id.* And, like the Teva Settlement, Mylan—despite "not being a party to the litigation or the settlement agreement"—"drafted the press release announcing the settlement" with Intelliject. *Id.* (FAC ¶ 152).

Defendants assert that these allegations fail to support a plausible antitrust claim but, instead, just describe a settlement with a relatively short delay to which the parties agreed based on their predictions about the patent's strength. Defendants say settling patent litigation based on patent strength is something that is completely lawful and fails to support a finding or inference of an antitrust violation. Defendants' descriptions of the alleged facts, however, view those facts in defendants' favor—*i.e.*, construes them in a way that doesn't allow an inference of an unlawful reverse payment settlement. But the court can't apply that viewpoint to a motion to dismiss. Instead, construing plaintiffs' allegations as true and in their favor, they have alleged facts permitting a reasonable trier of fact to find or infer that the Intelliject settlement was an unlawful reserve payment settlement because it involved an agreement to delay entry of a

competing product into the EAI market.  *Id.* (FAC ¶¶ 152–53).  This is so even though the terms of the settlement suggest "the strength of Intelliject's defenses" to the patent litigation and the agreement barred the competing product from launching for three months after it had secured FDA approval.  In sum, the FAC alleges enough facts about the Intelliject Settlement to state a plausible antitrust claim based on an unlawful reverse payment settlement.

### c.   Sandoz Settlement

*Last*, defendants assert that plaintiffs' allegations about the Sandoz litigation involving Sandoz's attempt to enter the EAI market with a "generic alternative to EpiPen by filing an ANDA" allege no facts which could permit a reasonable factfinder to find or infer that the parties to the Sandoz litigation entered an unlawful reverse payment settlement.  Doc. 128 at 45 (FAC ¶ 154).  Plaintiffs' Opposition to defendants' Motions to Dismiss never addresses defendants' arguments about the allegations involving the Sandoz litigation.  Thus, the court can dismiss the antitrust claims premised on the Sandoz litigation because plaintiffs appear to have abandoned these claims.  *See Fullen v. City of Salina, Kan.*, No. 21-4010-JAR-TJJ, 2021 WL 4476780, at *14 (D. Kan. Sept. 30, 2021) (dismissing plaintiffs' claim because they "tacitly concede[d]" that they had failed to state a plausible claim "by failing to respond to" defendants' dismissal arguments).  But also, the court can dismiss these claims because the FAC's allegations about the Sandoz litigation—asserted in conclusory style in just one paragraph—fail to assert any facts from which a reasonable factfinder could find or infer plausibly that the parties to the Sandoz litigation entered an unlawful reverse payment settlement.  Doc. 128 at 45 (FAC ¶ 154).  The court grants, therefore, the motion to dismiss the FAC's antitrust claims to the extent plaintiffs base those claims on the Sandoz settlement.

#### d.   Conclusion

In sum, the court denies defendants' Motion to Dismiss plaintiffs' antitrust claims premised on the Teva and Intelliject patent litigation because the FAC alleges facts from which a reasonable factfinder could find or infer that the parties settled the litigation by entering unlawful reverse payment settlements that included a large and unjustified reverse payment.  But, the court dismisses plaintiffs' claims premised on the Sandoz litigation because the FAC fails to allege facts supporting a reasonable finding or inference that the Sandoz litigation involved an unlawful reverse payment settlement violating the antitrust laws.

### 4.   Direct Purchases from Teva

*Fourth*, defendants assert that the FAC fails to allege antitrust violations against Mylan and Pfizer based on plaintiffs' direct purchases from *Teva*—as opposed to EpiPen purchases from Mylan.  Defendants argue that plaintiffs can't assert antitrust claims against defendants based on Teva purchases because plaintiffs never purchased Teva directly from defendants.  Thus, defendants contend, *Illinois Brick* bars plaintiffs' claims based on Teva purchases.

As already discussed, the court dismisses the claims premised on Teva purchases because they are untimely.  The court already has concluded that these claims don't relate back to the original Complaint because that pleading never asserted any claims based on Teva purchases.  *See supra* Part IV.A.2.b.  But, separately, the court also agrees that defendants' argument provides another reason to dismiss the claims based on Teva purchases.

*Illinois Brick* holds that only direct purchasers can assert Sherman Act Antitrust claims against an alleged antitrust violator.  *See Apple Inc.*, 139 S. Ct. at 1520 ("Our decision in *Illinois Brick* established a bright-line rule that authorizes suits by *direct* purchasers but bars suits by *indirect* purchasers." (citing *Illinois Brick*, 431 U.S. at 746)).  Here, the FAC asserts antitrust

claims against Pfizer and Mylan, but it never alleges that plaintiffs purchased the *Teva* generic directly from Pfizer or Mylan.  Instead, plaintiffs argue that they can allege claims based on Teva purchases under the co-conspirator exception to *Illinois Brick* because they have alleged plausibly that Teva was a co-conspirator with Pfizer and Mylan in a scheme to delay generic competition.  Doc. 145 at 57–58 n.39.  For reasons already explained, the court declines to extend the *Illinois Brick* exceptions beyond those recognized by the Supreme Court and the Tenth Circuit and hold that plaintiffs' allegations here fall within a co-conspirator exception to *Illinois Brick*.  Thus, the court concludes, plaintiffs have failed to state a plausible antitrust claim against defendants based on Teva purchases.  The court thus dismisses the Teva-based claims for this second and independent reason.

### 5.  Citizen Petition

*Last*, defendants assert that plaintiffs fail to allege a plausible antitrust claim based on Mylan's filing of a Citizen Petition with the FDA.  Defendants assert two arguments supporting dismissal of plaintiffs' allegations about the Mylan Citizen Petition.

*First*, defendants assert, the FAC fails to allege plausibly that the Mylan Citizen Petition caused any delay in the launch of Teva's generic EAI.  Defendants assert that plaintiffs have alleged that Teva's negotiations and settlement of the Teva/EpiPen litigation caused Teva to "drop[ ] the ball" in securing FDA approval for its generic.  Doc. 128 at 48 (FAC ¶ 161).  Defendants argue, plaintiffs never allege any connection between the Teva Settlement and the Mylan Citizen Petition to assert plausibly that the Citizen Petition caused generic delay.  But, as plaintiffs rightly respond, their two theories aren't mutually exclusive.  Plaintiffs plausibly have alleged that the Teva Settlement caused Teva to slow its efforts to secure FDA approval.  And, at

the same time, plaintiffs allege that defendants delayed that FDA approval further through
Mylan's filing of a meritless Citizen Petition. *Id.* at 45–48 (FAC ¶¶ 155–60).

Also, defendants argue, plaintiffs assert that Teva could have launched its generic in 2014
in a "but for" world without generic delay. *Id.* at 49 (FAC ¶ 163). But, defendants argue, Mylan
didn't file its Citizen Petition until 2015, so it couldn't have delayed the approval process that,
plaintiffs allege, would have completed in 2014 in the "but for" world. *Id.* at 45–46 (FAC ¶
155). Defendants' argument here conflates the "actual" and "but for" worlds. In the actual
world, plaintiffs allege that the EpiPen Settlement caused Teva to "drop[ ] the ball," thereby
delaying the FDA approval process, and that Mylan further delayed that process by filing the
Citizen Petition in 2015. *Id.* at 45–48 (FAC ¶¶ 155–161). The FAC thus alleges plausibly that
the Mylan Citizen Petition caused delay.

Defendants also cite FDA regulations that prohibit Citizen Petitions from delaying FDA
approval of a pharmaceutical product. *See* 21 U.S.C. § 355(q)(1)(A) ("The Secretary shall not
delay approval of a pending application" because of a Citizen Petition). But, as defendants
recognize, that regulation contains an exception permitting delay if "the Secretary determines,
upon reviewing the petition, that a delay is necessary to protect the public health." *Id.* §
355(q)(1)(A)(ii). Defendants argue that the FAC never alleges that the Secretary made such a
determination based on the Mylan Citizen Petition. Thus, defendants contend, the FAC fails to
allege that the Mylan Citizen Petition caused delay.

But, plaintiffs' FAC addresses these FDA regulations explicitly. It asserts that abuses of
"the citizen petition process in part helped lead Congress to enact the FDA Amendments Act of
2007" which added a new section, one "providing that the FDA shall not delay approval of a
pending ANDA because of a citizen petition unless the FDA determines that a delay is necessary

to protect the public health."  Doc. 128 at 27 (FAC ¶ 82).  But, plaintiffs allege, the FDA

Amendments Act of 2007 "does not, however, provide the FDA with additional resources that

might allow it to more promptly respond to citizen petitions."  *Id.*  Thus, plaintiffs contend, a

"brand-name drug manufacturer can still use the citizen petition process to delay generic

approval while the FDA considers whether the company's citizen petition implicates issues of

public health, regardless of whether the petition has any real merit."  *Id.*  Then, more particularly

to Mylan, plaintiffs allege that Mylan filed a Citizen Petition in January 2015, just "six months

before Teva would have been permitted under the settlement agreement to launch its generic[.]"

*Id.* at 45–46 (FAC ¶ 155).  Also, plaintiffs allege that Mylan waited until May 2015—almost five

months after filing its Citizen Petition and only weeks before the FDA was required to respond—

to supplement its Petition with a 48-page independent study purportedly showing that patients

would not use Teva's generic product correctly.  *Id.* at 46–48 (FAC ¶¶ 156–57).  Although the

FAC alleges that the FDA denied Mylan's Citizen Petition without comment on June 15, 2015,

*id.* at 46 (¶ 155), the FAC also alleges that the submission "delayed the approval for Teva's

generic EpiPen products[,]" *id.* at 48 (FAC ¶ 160).

      At the pleading stage, these allegations—ones that assert, generally, that citizen petitions

can delay the FDA approval process, and, more specifically, that Mylan's Citizen Petition

delayed approval of a generic competitor—"plausibly plead[ ] that the citizen petition resulted in

delay of the FDA's approval of the generic ANDAs."  *In re Suboxone (Buprenorphine

Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2017 WL 3967911, at *18 (E.D.

Pa. Sept. 8, 2017) (denying a Rule 12(b)(6) motion to dismiss antitrust claims based on alleged

delay caused by FDA citizen petition because the Amended Complaint plausibly pleaded delay

and "[w]hether such a delay actually occurred in this case is a subject more properly left for resolution after discovery").

And, while defendants correctly assert that Teva didn't secure approval for its Teva generic until 2018, the court can't find as a matter of law at the pleading stage that the Mylan Citizen Petition didn't delay approval simply because Mylan filed the Citizen Petition three years earlier and the FDA denied it without comment in June 2015.  Accepting plaintiffs' allegations as true and viewing the facts in their favor, they allege that brand-name manufacturers use citizen petitions to delay generic approval and Mylan did just that here by filing its Citizen Petition.  The court finds that these allegations suffice to allege plausibly that the Mylan Citizen Petition caused generic delay.

*Second*, defendants argue that the First Amendment immunizes Mylan's Citizen Petition from antitrust scrutiny.  This argument has its roots in the *Noerr-Pennington* doctrine, which "exempts from antitrust liability any legitimate use of the political process by private individuals, even if their intent is to eliminate competition."  *Tal v. Hogan*, 453 F.3d 1244, 1259 (10th Cir. 2006) (citation and internal quotations marks omitted).  But *Noerr-Pennington* immunity does not apply to "sham" activities.  *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993).  Petitioning the government is a "sham" activity if:  (1) it is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits[,]" and (2) it "use[s] . . .  the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon[.]"  *Id.* (citations and internal quotation marks omitted).

Here, plaintiffs sufficiently have alleged that Mylan's Citizen Petition was (1) "objectively baseless[.]"  *Id.* at 60.  The FAC alleges that Mylan waited to file the Citizen Petition until January 2015—six months before the Settlement's agreed-upon generic entry date;

Mylan then waited five more months to supplement its Petition; Mylan submitted a "flaw[ed]" study to the FDA demonstrating that it wasn't "acting in good faith[;]" and Mylan's Citizen Petition relied on a medical statement from a doctor who Mylan paid $95,000 in fees.  Doc. 128 at 45–48 (FAC ¶¶ 155–160).  A reasonable factfinder could find or infer from these allegations—if accepted as true and viewed in plaintiffs' favor—that Mylan's Citizen Petition was "objectively baseless."  *See In re Suboxone Antitrust Litig.*, 2017 WL 3967911, at *17 (explaining that federal antitrust claims "based on the filing of a sham citizen petition survived dismissal" because the complaint "set[ ] forth multiple facts which could create an inference that the petition was objectively baseless"); *see also La. Wholesale Drug Co. v. Sanofi-Aventis*, No. 07 Civ.7343(HB), 2008 WL 169362, at *5 (S.D.N.Y. Jan. 18, 2008) (denying motion to dismiss antitrust claims based on an alleged sham petition because plaintiff alleged triable fact issues about "the reasonability and viability" of the citizen petition and was entitled to additional discovery to prove the allegations).

Also, plaintiffs sufficiently have alleged that Mylan's Citizen Petition (2) used "the government *process*—as opposed to the *outcome* of that process as an anticompetitive weapon[.]" *Pro. Real Est. Invs.*, 508 U.S. at 61.  The FAC alleges that Mylan used the FDA Citizen Petition process as a means to delay Teva's market entry.  *See* Doc. 128 at 48 (FAC ¶ 160) ("Although the FDA ultimately rejected the citizen's petition, these submissions and Meridian's letters delayed the approval for Teva's generic EpiPen products.").  These allegations suffice to assert plausibly the second requirement of "sham" activity.

The court thus concludes that the FAC plausibly alleges an antitrust claim based on Mylan's Citizen Petition, and this claims falls within the sham exception to the *Noerr-*

*Pennington* doctrine.  As a consequence, the court declines to dismiss plaintiffs' antitrust claims premised on Mylan's Citizen Petition on a Rule 12(b)(6) motion.

### 6.   Failure to State a Claim Conclusion

In sum, the court finds that plaintiffs have failed to state plausible claims for relief based on:  (1) direct purchases from Teva; and (2) the Sandoz litigation.  Thus, the court dismisses the FAC's antitrust claims premised on these theories.  But otherwise, the court declines to dismiss plaintiffs' FAC for failing to state a claim based on any other argument relied on in defendants' motions for dismissal.

## V.     Conclusion

For reasons explained, the court grants Pfizer's Motion to Dismiss (Doc. 134).  Also, the court grants in part Mylan's Motion to Dismiss (Doc. 137), and denies it in part.  Specifically, the court grants:

- Pfizer's Motion to Dismiss the claims asserted against it because *Illinois Brick* bars plaintiffs—as indirect purchasers of EpiPens from Pfizer—from bringing the FAC's antitrust claims against Pfizer.

- The portion of Mylan's Motion to Dismiss asking the court to dismiss claims asserted on behalf of persons or entities who purchased EpiPen directly from *Teva* because (1) such claims don't relate back to the original Complaint's claims asserted on behalf of persons or entities who purchased EpiPens directly from *Mylan*; and (2) plaintiffs—as indirect purchasers of Teva from the named defendants—fail to state plausible claims against Mylan and Pfizer based on Teva purchases.

- The portion of Mylan's Motion to Dismiss asking the court to dismiss plaintiffs' antitrust claims premised on the Sandoz litigation because plaintiffs fail to allege facts from which a reasonable factfinder could find or infer that the parties to the Sandoz litigation entered an alleged unlawful reverse payment settlement.

The court denies Mylan's Motion to Dismiss in all other respects.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the "Pfizer Defendants' Motion to Dismiss Plaintiffs' Fourth Amended Class Action Complaint" (Doc. 134) is granted. The court concludes that *Illinois Brick* bars plaintiffs' Sherman Antitrust Act claims against Pfizer because plaintiffs are indirect purchasers of EpiPens from Pfizer. Thus, the court dismisses plaintiffs' Sherman Antitrust Act claims against Pfizer.

**IT IS FURTHER ORDERED THAT** the "Mylan Defendants' Motion to Dismiss Plaintiffs' Fourth Amended Complaint" (Doc. 137) is granted in part and denied in part. The court grants the Motion to Dismiss: (1) plaintiffs' claims asserted on behalf of persons or entities who purchased EpiPen directly from *Teva* because (a) such claims don't relate back to the original Complaint's claims asserted on behalf of persons or entities who purchased EpiPens directly from *Mylan*, and (b) plaintiffs never purchased Teva directly from Mylan and Pfizer; so, *Illinois Brick* bars plaintiffs' antitrust claims against Mylan and Pfizer based on *Teva* purchases; and (2) plaintiffs' antitrust claims premised on the Sandoz litigation because plaintiffs fail to allege facts from which a reasonable factfinder could find or infer that the parties to the Sandoz litigation entered an alleged unlawful reverse payment settlement. The court denies the "Mylan Defendants' Motion to Dismiss Plaintiffs' Fourth Amended Complaint" in all other respects.

**IT IS SO ORDERED.**

**Dated this 8th day of August, 2022, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**