## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

KPH HEALTHCARE SERVICES, INC.,
a/k/a KINNEY DRUGS, INC., individually
and on behalf all others similarly situated,
FWK HOLDINGS, LLC, and CÉSAR
CASTILLO LLC,

                    **Plaintiffs**,

v.

MYLAN N.V., MYLAN SPECIALTY L.P.,
and MYLAN PHARMACEUTICALS,
INC.,

                    **Defendants**.

Case No. 20-2065-DDC-TJJ

## MEMORANDUM AND ORDER

      This matter comes before the court on defendants[1] Mylan N.V., Mylan Specialty L.P.,

and Mylan Pharmaceuticals, Inc.'s Motion for Partial Judgment on the Pleadings (Doc. 386).

Plaintiffs KPH Healthcare Services, Inc.; FWK Holdings, LLC; and César Castillo LLC, on

behalf of themselves and all others similarly situated, responded.  And defendants replied.  This

Order denies Defendants' Motion for Partial Judgment on the Pleadings (Doc. 386).  The court

explains, below.

---

[1]     Plaintiffs' Consolidated Fourth Amended Class Action Complaint (Doc. 128)—the operative
complaint in this action—also lists Pfizer, Inc.; King Pharmaceuticals, Inc.; and Meridian Medical
Technologies, Inc. (collectively, "Pfizer") as defendants.  The court certified a Direct Purchaser
Settlement Class for the purposes of settlement against Pfizer and preliminarily approved a settlement
between plaintiffs (including the Direct Purchaser Settlement Class) and Pfizer.  Doc. 394 at 3–4.  The
court then granted final approval of that settlement, Doc. 414 at 3, and entered Judgment, dismissing the
Pfizer defendants with prejudice.  Doc. 415 at 2–3 (Judgment ¶ 1).  Now, only the three Mylan defendants
remain.

I.      **Background**

The court briefly recaps the factual allegations in plaintiffs' Consolidated Fourth

Amended Class Action Complaint (FAC).  Doc. 128.  As it must, the court accepts these

allegations as true and views them in the light most favorable to the plaintiffs.  *Ramirez v. Dep't*

*of Corr.*, 222 F.3d 1238, 1240 (10th Cir. 2000) (explaining that on a motion for judgment on the

pleadings, the court "accept[s] the well-pleaded allegations of the complaint as true and

construe[s] them in the light most favorable to" plaintiffs).  The court then explains the

procedural posture of defendants' motion.

### *EpiPen and The Parties*

EpiPen is "a disposable, prefilled, FDA-approved epinephrine auto injector ('EAI')" that

delivers epinephrine to treat severe allergic reactions known as anaphylaxis.  Doc. 128 at 4 (FAC

¶¶ 2–3).  Between 2013 and 2016, sales of EpiPens in the United States generated more than $1

billion annually.  *Id.* at 33 (FAC ¶ 106).  Defendants market, sell, and distribute EpiPens in the

United States.  *Id.* at 31 (FAC ¶ 96).  Plaintiffs are business entities who purchased EpiPens

directly from defendants.[2]  *Id.* at 4–5, 9–10 (FAC ¶¶ 15, 20–21).

### *Alleged Anticompetitive Conduct*

The Complaint alleges that defendants, through their manufacture and sale of EpiPens,

engaged in an "anticompetitive and unlawful conspiracy" and entered "agreements in restraint of

trade to substantially delay the onset of generic competition for the EpiPen[.]"  *Id.* at 4 (FAC ¶

2).  Plaintiffs allege that "on April 26, 2012, [d]efendants entered into a series of unlawful and

anticompetitive agreements with generic drug manufacturer, Teva Pharmaceuticals USA, Inc."

*Id.* at 5 (FAC ¶ 6).  Under those agreements, defendants "and Teva agreed to delay entry of

---

[2]      Plaintiff KPH is the assignee of McKesson Corporation, who purchased EpiPens directly from
defendants.  Doc. 128 at 7–8 (FAC ¶ 15).

Teva's AB-rated generic EpiPen until June 22, 2015 (subject to FDA approval) and settle patent litigation related to Teva's ANDA to manufacture and market AB-rated generic EpiPen[.]" *Id.* In exchange for Teva's agreement to delay entry of a generic EpiPen, Teva and defendants "agreed to delay entry of Mylan's generic version of Nuvigil—a blockbuster drug owned by Teva—until June 1, 2016, and to settle patent litigation related to Mylan's ANDA to market a generic version of Nuvigil." *Id.*

According to plaintiffs' allegations, had defendants not entered these agreements with Teva, a generic EpiPen would have entered the EAI market around March 2014. *Id.* at 5–6 (FAC ¶ 7). And, after entry of a generic EpiPen, plaintiffs "and other direct purchasers of EpiPens would have been able to pay significantly lower prices than they were forced to pay because of [d]efandants' unlawful and anticompetitive conduct to delay generic entry." *Id.* Plaintiffs' lawsuit seeks to recover "overcharge damages" that plaintiffs and putative class members purportedly paid for EpiPens and that defendants allegedly caused with their "unlawful, anticompetitive, and exclusionary conduct[.]" *Id.* at 6 (FAC ¶ 9); *see also id.* at 7–10 (FAC ¶¶ 15, 20, 21) (alleging that direct purchasers "paid supra-competitive prices for [their] EpiPen purchases" because of "[d]efandants' alleged anticompetitive conduct").

The FAC asserts two claims under the Sherman Antitrust Act premised on this generic delay theory: (1) an unlawful contract, combination, or conspiracy in unreasonable restraint of trade violating 15 U.S.C. § 1; and (2) an unlawful conspiracy to monopolize violating 15 U.S.C. § 2. Doc. 128 at 65–69 (FAC ¶¶ 239–56).

*Procedural Background*

The court recounts—albeit in highly summarized fashion[3]—the procedural posture of defendants' pending motion.  Defendants moved to dismiss the FAC for failure to state a claim.  Doc. 137 at 1–2.  Part of that motion argued that plaintiffs failed to "plausibly allege a reverse-payment settlement."  *Id.* at 2; Doc. 138 at 33–34.  Defendants argued that plaintiffs "allege no facts showing the Nuvigil settlement constituted a 'large' or 'unjustified' payment to Teva."  Doc. 138 at 34 (emphasis omitted).  The court disagreed.  Doc. 241-1 at 72–76, 79.  The court rejected defendants' argument that plaintiffs didn't allege plausibly a reverse payment, explaining that the economic substance—not form—of the payment was relevant.  *Id.* at 74–75.  And the court concluded that "a reasonable factfinder reasonably could find or infer that the parties entered an unlawful reverse payment settlement based on plaintiffs' allegations[.]"  *Id.* at 76.

Now, defendants have filed a Motion for Partial Judgment on the Pleadings (Doc. 386).  Defendants' motion relies almost entirely on the Seventh Circuit's opinion in *Mayor & City Council of Baltimore v. AbbVie Inc.*, 42 F.4th 709 (7th Cir. 2022).  Doc. 387 at 1–2, 7–10.  The crux of defendants' position is that "one entry-date-only settlement" in exchange "for another entry-date-only settlement" cannot constitute an unlawful reverse payment.  *Id.* at 1–2; *id.* at 8 ("[C]ombining one lawful, procompetitive settlement with another does not create an antitrust claim.").

After plaintiffs responded and before defendants' reply was due, the court rejected an argument—essentially identical to the one defendants present here—in another case premised on the same alleged exchange-of-monopolies arrangement.  *Edgar v. Teva Pharm. Indus., Ltd.*, No.

---

[3]     For a fuller procedural history of the early stages of this case, see Doc. 241-1 at 4–6.

22-2501-DDC-TJJ, 2024 WL 1282436, at *22–26 (D. Kan. Mar. 26, 2024). Defendants then filed their Reply brief, which responds to the court's explanation for its ruling in *Edgar*. Doc. 395 at 3–6. Defendants' Reply also asks—for the first time—the court to certify the issue for interlocutory appeal. *Id.* at 6. Plaintiffs then filed a Motion to Strike, or in the Alternative, to Permit Filing of a Sur-Reply (Doc. 397). In that motion, plaintiffs contend that the court should disregard both the new arguments and the new relief—certification of an issue for interlocutory appeal—defendants had raised in their Reply. Doc. 397 at 2–5. Alternatively, plaintiffs ask the court to consider the proposed surreply they attached to their motion. Doc. 397 at 5; Doc. 397-1. Finally, defendants filed a Response to plaintiffs' Motion to Strike. Doc. 401.

This Order proceeds as follows: *First*, the court decides plaintiffs' Motion to Strike (Doc. 397), as it determines the range of filings the court will consider on defendants' motion. *Second*, the court recites the governing legal standard for a motion for judgment on the pleadings. *Third*, the court addresses the substance of defendants' Motion for Partial Judgment on the Pleadings (Doc. 386). *Last*, the court tackles defendants' alternative request asking the court to certify this Order for interlocutory appeal.

## II.    Motion to Strike or File Surreply

The court denies plaintiffs' Motion to Strike (Doc. 397) but grants their alternate request to permit filing of a surreply. Our court has explained that "a motion to strike is not the proper procedure" "[w]hen a reply raises a new argument[.]" *N. Ala. Fabricating Co. v. Bedeschi Mid-W. Conveyor Co., LLC*, No. 16-2740-DDC-TJJ, 2017 WL 1836973, at *6 (D. Kan. May 8, 2017); *Skerce v. Torgeson Elec. Co.*, No. 18-CV-02040-HLT, 2019 WL 8017822, at *2 (D. Kan. Aug. 9, 2019) (explaining that a motion to strike only may target "material included in a pleading" (quotation cleaned up)). Instead, when "a reply raises a new argument, 'the proper course of action for the nonmoving party to respond to such arguments is to seek leave to file a

surreply.'" *Fox v. Pittsburg State Univ.*, 258 F. Supp. 3d 1243, 1251 (D. Kan. 2017) (quoting *N. Ala. Fabricating*, 2017 WL 1836973, at *6). So, the court denies plaintiffs' Motion to Strike (Doc. 397) and takes up their request for leave to file a surreply, next.

"Our court's local rules limit briefing on motions to the motion (with memorandum in support), a response, and a reply." *Hamptom v. Barclays Bank Del.*, 478 F. Supp. 3d 1113, 1142 (D. Kan. 2020) (citing D. Kan. Rule 7.1(a), (c)), *aff'd on other grounds*, No. 20-3175, 2021 WL 3237082 (10th Cir. July 30, 2021). "'Surreplies are not typically allowed.'" *Id.* (quoting *Taylor v. Sebelius*, 350 F. Supp. 2d 888, 900 (D. Kan. 2004), *aff'd on other grounds*, 189 F. App'x 752 (10th Cir. 2006)). At the same time, "when a moving party raises new material for the first time in a reply, the district court has discretion to grant leave to file a surreply to afford the opposing party an opportunity to respond to the new material[.]" *Id.* (citing *Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005)).

Defendants' Reply brief plainly presents new arguments and a new request for relief. Doc. 395. And ordinarily, courts decline to consider arguments raised for the first time in a reply brief. *E.g.*, *United States v. Leffler*, 942 F.3d 1192, 1197 (10th Cir. 2019); *Bordertown, LLC v. AmGUARD Ins. Co.*, No. 22-cv-01683-REB-GPG, 2022 WL 17538186, at *2 (D. Colo. Oct. 5, 2022) (collecting cases). But here, the court is persuaded that it should consider defendants' responses to the court's rationale for its decision in *Edgar* because the court published that opinion after defendants had filed their motion. So, defendants' Reply brief represented their first opportunity to try to rebut the court's explanation. *See Mike v. Dymon, Inc.*, No. 95-2405-EEO, 1996 WL 427761, at *2 (D. Kan. July 25, 1996) (denying motion to strike and granting leave to file surreply where new issues in reply brief "involve[d] facts learned subsequent to the filing of the original motion"). Because defendants' Reply raises new arguments, the court

6

exercises its discretion and grants plaintiffs' alternative request for leave to file a surreply.[4]  And so, the court considers the proposed surreply plaintiffs filed alongside their Motion to Strike. Doc. 397-1.

The court now moves on to defendants' Motion for Partial Judgment on the Pleadings (Doc. 386), starting with the governing legal standard.

## III.      Legal Standard

Courts evaluate a Rule 12(c) motion using the same standard used to evaluate a motion to dismiss under Rule 12(b)(6).  *Borde v. Bd. of Cnty. Comm'rs*, 514 F. App'x 795, 799 (10th Cir. 2013) (citing *Atl. Richfield Co. v. Farm Credit Bank*, 226 F.3d 1138, 1160 (10th Cir. 2000)). The court can grant a motion for judgment on the pleadings only when the factual allegations in the complaint fail "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Although this Rule "does not require 'detailed factual allegations,'" it demands more than "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, as the Supreme Court explained, "'will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

"Under this standard, 'the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims.'" *Carter v.*

---

[4]      Also, defendants do not oppose plaintiffs' request for leave to file a surreply.  Doc. 401 at 1.

7

*United States*, 667 F. Supp. 2d 1259, 1262 (D. Kan. 2009) (emphasis in original) (quoting *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007)).  And while the court must assume that the complaint's factual allegations are true, it is "'not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Id.* at 1263 (quoting *Iqbal*, 556 U.S. at 678).  "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice'" to state a claim for relief.  *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678).

## IV.    Motion for Partial Judgment on the Pleadings[5]

Now, the meat and potatoes of this Order.  Defendants contend that "an exchange of entry-date-only patent settlements" doesn't violate antitrust law and that plaintiffs' allegations

---

[5]    Before jumping to the merits of defendants' motion, the court addresses plaintiffs' procedural argument.  Plaintiffs contend that defendants' motion is a disguised request for reconsideration of the court's order on defendants' Motion to Dismiss.  Doc. 391 at 7–9.  According to plaintiffs, that request for reconsideration is improper because defendants didn't comply with our local rules.  *Id.* at 7–8.  D. Kan. Rule 7.3 governs motions to reconsider and requires parties to file them "within 14 days after the order is served."  Plaintiffs cite a slew of district court opinions that have characterized motions for judgment on the pleadings as untimely motions to reconsider.  *Id.* at 8–9 (citations omitted).

For their part, defendants assert their argument is entirely new and based on *AbbVie*, which the Seventh Circuit didn't publish until days before the court's Motion-to-Dismiss Order.  Doc. 395 at 2.  In any event, defendants argue that Fed. R. Civ. P. 12(h)(2)(B) allows "successive motions under Rule 12(b)(6) and Rule 12(c)."  *Id.* at 2 n.1 (citing *Mex. Infrastructure Fin., LLC v. Corp. of Hamilton*, No. 17-cv-6424 (VSB), 2020 WL 4572679, at *2–3 & n.1 (S.D.N.Y. Aug. 7, 2020)).

The court needn't decide this procedural question because the court denies defendants' motion on the merits, as explained below.  Before proceeding, however, the court notes that it disagrees with some aspects of defendants' characterization of their argument.  Defendants are correct about this much, though:  The court didn't consider *AbbVie* when it issued its Motion-to-Dismiss Order.  *See generally* Doc. 241-1.  But *AbbVie* is neither controlling nor on-point.  *See below* § IV.C.  And defendants already made essentially the same argument they make here.  Namely, defendants argue yet again that the FAC fails to allege a plausible unlawful reverse payment.  Doc. 137 at 2; Doc. 138 at 33–34.  The court already has considered and rejected that argument.  Doc. 241-1 at 72–76, 79.  So regardless whether defendants' Motion for Partial Judgment on the Pleadings is procedurally proper, the court is "loathe" to reconsider its prior holding when "extraordinary circumstances" are absent.  *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) ("A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a

about the collusive exchange of settlements between Teva, Pfizer, and defendants fails as a matter of law to state a Sherman Act claim. Doc. 387 at 5. Defendants rely on *AbbVie* to support this position. *Id.* at 7–10 (citing *AbbVie*, 42 F.4th 709). Defendants' argument doesn't persuade the court.

This Order's analysis unfolds in this sequence. *First*, the court starts with a brief background on *Actavis* and reverse payment settlements. *Second*, the court recites its rationale for denying defendants' Motion to Dismiss. *Third*, the court explains *AbbVie* and why it doesn't alter the court's conclusion that the FAC plausibly pleads an antitrust claim under *Actavis*.

### A.    *Actavis* and Reverse Payment Settlements

A reverse payment settlement refers to an agreement by a brand-name manufacturer (and patent holder) to compensate a generic manufacturer (and alleged patent infringer) in exchange for settling patent infringement litigation. *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 41 (1st Cir. 2016). Such an agreement delays the generic manufacturer's entry into the market. *Id.* The Supreme Court provided this explanation of a typical reverse payment settlement: "Company A sues Company B for patent infringement. The two companies settle under terms that require (1) Company B, the claimed infringer, not to produce the patented product until the patent's term expires, and (2) Company A, the patentee, to pay B many millions of dollars." *FTC v. Actavis, Inc.*, 570 U.S. 136, 140 (2013). In *Actavis*, the Supreme Court held that "reverse payments . . . can sometimes violate the antitrust laws." *Id.* at 141.[6] *Actavis* held

---

manifest injustice." (quotation cleaned up)). In any event, the substance of defendants' argument doesn't persuade the court.

[6]    While this holding might sound like it reveals little, *Actavis* was a turning point. Before it, some Circuits had held, in a nutshell, that patent holders could settle patent litigation as they saw fit because the patentee had a right to exclude others from the market. Under this theory, courts didn't need to apply antitrust scrutiny to reverse payment settlements because "'absent sham litigation or fraud in obtaining the patent, a reverse payment settlement is immune from antitrust attack so long as its anticompetitive effects

that a patent settlement involving a "large, unjustified reverse payment" can violate the antitrust laws if its "objective is to maintain supracompetitive prices to be shared among the patentee and the challenger rather than face what might have been a competitive market" because that objective is "the very anticompetitive consequence that underlies the claim of antitrust unlawfulness." *Id.* at 157–58.

To be certain, *Actavis* blessed some "commonplace forms" of settlements. *Id.* at 152. And it implied that settlements merely "allowing the generic manufacturer to enter the patentee's market prior to the patent's expiration, without the patentee paying the challenger to stay out prior to that point" aren't subject to antitrust scrutiny. *Id.* at 158. On the other hand, courts have rejected resoundingly the contention that cash transfers are the only form of consideration that may qualify as unlawful reverse payments. *E.g.*, *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 252 (3d Cir. 2017) ("[A] reverse payment underlying an *Actavis* antitrust claim need not be in cash form." (citing *King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*, 791 F.3d 388, 403–09 (3d Cir. 2015)); *In re EpiPen (Epinephrine, USP) Mktg., Sales Practices & Antitrust Litig.*, 545 F. Supp. 3d 922, 993 (D. Kan. 2021) (compiling cases and explaining "courts have held that pay-for-delay settlements don't require a monetary payment in the actual settlement agreement when other evidence suggests that the parties to the litigation exchanged some form of consideration in separate, side agreements"). Instead, a "reverse payment's legality depends mainly on its economic substance, not its form." *FTC v. AbbVie Inc*, 976 F.3d 327, 356 (3d Cir. 2020).[7]

---

fall within the scope of the exclusionary potential of the patent.'" *Actavis*, 570 U.S. at 146 (quoting *FTC v. Watson Pharms., Inc.*, 677 F.3d 1298, 1312 (11th Cir. 2012)).

[7]     When short citing the Third Circuit decision *FTC v. AbbVie Inc*, 976 F.3d 327 (3d Cir. 2020), as the court does later in this Memorandum and Order, the court references it as *FTC v. AbbVie* to avoid confusion with the Seventh Circuit case known *Mayor & City Council of Baltimore v. AbbVie Inc.*, 42

Applying these principles, the court denied defendants' Motion to Dismiss, as the court recounts next.

**B.     Motion-to-Dismiss Order**

Defendants already have argued that the FAC fails to allege a plausible unlawful reverse payment. Doc. 137 at 2; Doc. 138 at 33–34. And the court already has considered and rejected that argument. Doc. 241-1 at 72–76, 79. Now, defendants—wielding *AbbVie* to cloak essentially the same argument—ask the court to revisit its earlier holding. *See generally* Doc. 387. The court declines. Neither defendants' renewed presentation nor *AbbVie* convinces the court that it got it wrong the first time. Before addressing *AbbVie* in particular, the court rearticulates its previous holding. This Motion-to-Dismiss Order explained the following key points.

*First*, the FAC plausibly alleges that Teva agreed to delay its launch of an EpiPen generic in exchange for Mylan's agreement to delay its launch of a Nuvigil generic and to settle patent litigation with Teva over Mylan's Nuvigil generic. Doc. 241-1 at 73 (citing Doc. 128 at 39 (FAC ¶ 127)).

*Second*, based on that exchange, the FAC alleges facts from which a reasonable factfinder could infer an unlawful reverse payment settlement. *Id.* at 73–76. Plaintiffs assert that "[d]efendants and Teva entered into an unlawful agreement whereby [d]efendants provided significant consideration, incentives, and benefits to Teva in the form of a settlement of the patent litigation related to Nuvigil . . . to delay bringing their competing product to market" and that defendants "gave Teva years of additional Nuvigil exclusivity in exchange for Teva's

_____

F.4th 709 (7th Cir. 2022), which the court short cites as *AbbVie*. This approach conforms with the parties' convention. *E.g.*, Doc. 387 at 2, Doc. 391 at 14.

agreement not to market its AB-rated generic EpiPen until June 22, 2015." Doc. 128 at 39, 43 (FAC ¶¶ 127, 143). The court also explained that the "FAC includes additional facts about the alleged merits of the Teva and Nuvigil litigation, the status of each litigation when the parties settled, and the parties' motivations for entering an unlawful reverse payment settlement." Doc. 241-1 at 75.[8] Among those additional facts alleged is that the delay of Mylan's generic version of Nuvigil "was worth hundreds of millions (if not billions) of dollars to Teva." Doc. 128 at 43 (FAC ¶ 141). In short,

> a reasonable factfinder reasonably could find or infer that the parties entered an unlawful reverse payment settlement based on plaintiffs' allegations about the circumstances surrounding the Teva and Nuvigil litigation, the timing of the two settlements, the involvement of the same actors in both settlements, and the parties' motivations for entering a settlement that protected Mylan's EpiPen monopoly in the EAI market in exchange for an agreement to delay Mylan's launch of a Nuvigil generic to compete with Teva's product in a different market.

Doc. 241-1 at 76.

---

[8]    In particular, in the Teva litigation, plaintiffs assert that:

(a) the Teva Court's *Markman* rulings on the interpretation of the '432 patent were favorable to Teva; (b) at the time of a settlement, a full bench trial had been conducted and further anticipated litigation expenses would have been marginal compared to expenses already incurred at the time of the settlement; and (c) no rational economic actor with a viable product (and who had spent millions of dollars developing it) would refrain from entering a lucrative "blockbuster" market for 36 months unless it received substantial value in return[.]

Doc. 128 at 39 (FAC ¶ 128).

In the Nuvigil litigation, plaintiffs assert that:

(1) before the Nuvigil Settlement, the FDA had "tentatively approved Mylan's ANDA to manufacture and sell a generic version of Nuvigil, signifying that Mylan's ANDA met substantive requirements for final approval[;]" (2) "[l]eading up to May 2012, Mylan maintained its ability to launch its generic product upon approval[;]" (3) trial in the Nuvigil litigation was scheduled for June 2012—less than two months after the parties entered the settlement; and (4) Nuvigil was "a blockbuster drug and generic delay of several years was worth hundreds of millions (if not billions) of dollars to Teva."

*Id.* at 42–43 (FAC ¶¶ 138–41).

The court remains fixed in its conclusion. *Actavis* requires plaintiffs to allege plausibly that a reverse payment is large and unjustified. *See* 570 U.S. at 158; *Watson Lab'ys, Inc.*, 101 F.4th 223, 238 (2d Cir. 2024) ("A reverse payment can violate the antitrust laws only if it is both (1) large and (2) unjustified, or unexplainable. Both of these prongs must be plausibly alleged at the pleading stage pursuant to the general pleading principles set forth in *Twombly* and *Iqbal*." (quotation cleaned up)). Plaintiffs' pleading hits that mark. And "plaintiff plausibly alleges that an agreement's anticompetitive effects outweigh its procompetitive virtues," so the court "must accept that allegation and allow the plaintiff to take discovery." *FTC v. AbbVie*, 976 F.3d at 356.

The Seventh Circuit's opinion in *AbbVie* doesn't persuade the court that it got it wrong, as the court explains next.

### C.    *AbbVie*

The court's Order in *Edgar* offered three rationales for distinguishing *AbbVie*. 2024 WL 1282436, at *22–25. Defendants take issue with all three rationales. Doc. 395 at 3–5. The court tackles these distinguishing features in order, addressing why defendants' arguments don't persuade the court to change its tack. Then, the court explains why—*AbbVie* notwithstanding— it remains confident that plaintiffs have alleged a plausible antitrust claim. But first, the court provides some background about the Seventh Circuit's decision in *AbbVie*.

In *AbbVie*, the Seventh Circuit addressed antitrust claims brought by indirect purchasers of the drug/biologic Humira. 42 F.4th at 711–12. Defendant AbbVie owned the patent for Humira. *Id.* Plaintiffs argued that AbbVie settled its Humira patent litigation with "terms of the settlements [that] established a cartel among AbbVie and the potential [biosimilar[9]] entrants." *Id.* at 714. AbbVie's Humira patent litigation settlement allowed biosimilar drugs to enter the

---

[9]    Humira is a biologic, not a synthetic substance. *AbbVie*, 42 F.4th at 712. Drugs that compete with a biologic are called "biosimilars" instead of "generics." *Id.*

U.S. market during 2023, though many of AbbVie's Humira patents extended beyond 2023. *Id.* Plaintiffs didn't have a problem with this particular settlement. *Id.* Instead, plaintiffs' reverse payment settlement theory asserted that AbbVie (and its affiliates) had settled litigation in the European Union in exchange for the U.S.-based settlement. *Id.* Specifically, plaintiffs claimed that AbbVie had settled its E.U. litigation with an October 2018 entry date, "gift[ing] the biosimilar makers with 4+ years of profits in Europe, in exchange for their agreement not to enter the U.S. market until 2023." *Id.* The district court rejected plaintiffs' theory because in "each [settlement] AbbVie agreed to entry before the last patents expired and didn't pay anyone to delay entry." *Id.* at 715. The Seventh Circuit affirmed. *Id.*

The Seventh Circuit explained its reasoning this way: "0 + 0 = 0." *Id.* That is, AbbVie's settlement in the U.S. was "normal . . . without any payment to the entrants, a settlement of the kind that *Actavis* says is not problematic." *Id.* (citing *Actavis*, 570 U.S. at 152). And in "Europe[,] AbbVie and the potential entrants struck the same kind of deal[.]" *Id.* Defendants ask the court to apply this same reasoning here because—according to defendants—plaintiffs have alleged a similar 0 + 0 equation. Doc. 387 at 9. But before explaining why *AbbVie* differs from this case's allegations factually, the court emphasizes a couple of top-level points.

Defendants' argument—insisting that the 0 + 0 = 0 reasoning applies here—is reductive. Defendants ask the court to consider each settlement agreement at issue here separately—in a vacuum. But taking that view of the allegations doesn't comport with the factual allegations made by the FAC. More specifically, plaintiffs assert that that the EpiPen generic and the Nuvigil generic settlements are intertwined. An instructive opinion from the Third Circuit sheds light on the reductive character of defendants' 0 + 0 = 0 argument. In *FTC v. AbbVie Inc*, the FTC alleged that AbbVie unlawfully settled with Teva. 976 F.3d at 356–57. According to the

FTC, Teva had agreed to "drop its patent challenge and refrain from competing" with AbbVie in the AndroGel[10] market until December 2014. *Id.* at 357. In exchange, AbbVie agreed to sell Teva a supply of TriCor—"a popular brand-name cholesterol drug"—and authorize "Teva to sell a generic version of TriCor." *Id.* at 344, 357. The district court analyzed both agreements separately. *Id.* at 358. It held that Teva's entry in the AndroGel market was a type of agreement that *Actavis* "specifically states . . . does not run afoul of the antitrust laws[.]" *Id.* And it held that AbbVie's agreement to sell TriCor to Teva and allow Teva to sell a generic version of it was procompetitive because "it allowed Teva to enter the cholesterol drug market with a generic product[.]" *Id.* (quotation cleaned up). Thus, the district court concluded, "the settlement was procompetitive and unactionable." *Id.*

The Third Circuit reversed, finding the district court's reasoning "unpersuasive." *Id.* It rejected the district court's disjointed approach—one where the district court analyzed each piece of the overall alleged conspiracy independently—because it violated two important principles. *One*, it "elevate[d] form over substance because companies could avoid liability for anticompetitive reverse payments simply by structuring them as two separate agreements—one in which the generic company agrees to delay entry until patent expiration, and the other in which the brand-name company agrees to split monopoly profits." *Id.* That approach effectively would make *Actavis* "a penalty for bad corporate lawyering instead of anticompetitive conduct." *Id.* And *two*, the district court's disjointed approach "contradict[ed] pleading law." *Id.* That's so because the plaintiff there explicitly had alleged that the two agreements were really part of the same global agreement, and the district court thus was bound "to accept that allegation as true" and analyze it as such. *Id.*

---

[10]    Androgel is a "blockbuster testosterone replacement therapy[.]" *FTC v. AbbVie*, 976 F.3d at 338. Androgel was the drug at issue in *Actavis*.

These very same principles apply here. Plaintiffs' FAC doesn't allege that Mylan, Pfizer, and Teva agreed to two independent settlements. Instead, plaintiffs have pleaded a single global agreement that involved two separate component settlements. Doc. 128 at 5 (FAC ¶ 6). And, as plaintiffs note, binding Tenth Circuit precedent requires the court to analyze plaintiffs' antitrust allegations "'without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.'" *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1522 n.18 (10th Cir. 1984) (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). The court thus isn't convinced that defendants' 0 + 0 = 0 argument is of any moment here.

Separately, and contrary to defendants' suggestion, the early-entry patent settlements that plaintiffs allege here weren't "procompetitive as a matter of law." Doc. 395 at 3. Again, it's true that *Actavis* provides that parties needn't fear antitrust liability if they settle "by allowing the generic manufacturer to enter the patentee's market prior to the patent's expiration, without the patentee paying the challenger to stay out prior to that point." 570 U.S. at 158. But this statement assumes that early entry is the *whole* settlement. That is, the Supreme Court's statement presupposes that the challenger is a rational market actor, seeking to enter that drug market as early as possible. It doesn't contemplate a side deal, where the challenger is willing to accept a later generic entry to prolong its monopoly power over a distinct drug product and distinct product market. The court simply doesn't read *Actavis* to approve the sort of collusive, horse-trading-of-monopolies arrangement that plaintiffs allege here. *See id.* at 149 (noting that "the Sherman Act 'imposes strict limitations on the concerted activities in which patent owners may lawfully engage'" and that agreements may violate antitrust laws "'although settling patent disputes'" (quoting and citing *United States v. Singer Mfg. Co.*, 374 U.S. 174, 195, 197 (1963));

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (characterizing "collusion" as "the supreme evil of antitrust").

Next, the court explains what differentiates *AbbVie* from this case. The court recounts the three reasons it offered in *Edgar* for distinguishing *AbbVie* and then explains why defendants' responses to those rationales don't alter the court's conclusion.

### 1. Different Parties

*First*, as the court explained in its *Edgar* opinion, *AbbVie* involved "unique complexities" that don't apply to plaintiffs' allegations. 2024 WL 1282436, at *23. In particular, the Seventh Circuit explained that "three of the potential U.S. entrants . . . d[id] not plan to sell in Europe yet agreed to 2023 dates for entry in the United States." *AbbVie*, 42 F.4th at 715. The Seventh Circuit found it implausible that defendant would have swapped a 2023 U.S. entry date for a 2018 E.U. entry date when the parties to the E.U. and U.S. settlements weren't the same. *See id.* In contrast, the key allegation here is much simpler: Mylan delayed entry of its generic version of Nuvigil and in exchange Teva delayed entry of its generic version of EpiPen. Doc. 128 at 5 (FAC ¶ 6).

Defendants challenge this distinction. Doc. 395 at 3. They argue that the parties to the EpiPen and Nuvigil settlements weren't the same ones either. *Id.* Specifically, defendants contend, "Pfizer was not a party to the Nuvigil Settlement" and "Mylan was not a party to the EpiPen settlement[.]" *Id.* So, according to defendants, neither defendants here (Mylan) nor Pfizer could have exchanged settlements. *Id.*

This argument isn't persuasive. The FAC alleges that defendants and Pfizer colluded because they had "divided intellectual property ownership of . . . EpiPen" and that if the "EpiPen patents were invalidated, or if other competitors gained market share, both companies stood to lose." Doc. 128 at 35 (FAC ¶ 112). And as plaintiffs ably point out, Doc. 397-1 at 4,

defendants' own filings appear to confirm this overlapping interest.  Doc. 182 at 8 (Resp. to Pls.' Mot. to Compel) (arguing that Mylan and Pfizer shared "a substantially identical legal interest in protecting the patents and other intellectual property relating to EpiPen devices").  Plaintiffs also maintain that defendants—though not a party to the EpiPen patent litigation— "executed a covenant not to sue attached to the term sheet and [were] heavily involved in negotiating the term sheet" for the EpiPen patent litigation.  Doc. 128 at 38 (FAC ¶ 125).  *AbbVie*'s plaintiffs alleged no such collusion nor any other overlapping interest among the settling parties.  So, the court remains convinced that the "different parties to the settlement" is and remains an important distinction between the allegations in *AbbVie* and those at issue here.

### 2.  Inevitable Entry

*Second*, *Edgar* distinguished *AbbVie* based on the E.U.'s market structure.  *Edgar*, 2024 WL 1282436, at *23.  *AbbVie* explained:  "Each member state in the E.U. has its own patent law, and AbbVie held patents that were stronger in some nations than in others or had different expiration dates."  42 F.4th at 715.  Humira was approved to treat nine medical conditions but, by 2018, AbbVie would have exclusive rights for just three of those nine conditions.  *Id.* Because of the many different patent laws at play in the E.U., and because AbbVie's rights differed under each of them, "entry of biosimilar drugs was inevitable" in 2018, "and AbbVie had to negotiate for terms."  *Id.*  Here, in contrast, entry of generic EpiPen wasn't inevitable until 2025, when the EpiPen patents were set to expire.  *See* Doc. 128 at 34 (FAC ¶ 109).  So, entry of generic EpiPen before 2025 depended on the outcome of the EpiPen patent litigation.  This case isn't like *AbbVie*, one where—no matter what the alleged conspirators did—a generic product inevitably was coming to market in the short term, forcing the patent holder to negotiate terms for Humira's three remaining patented uses.

Defendants reject this logic. They contend that the inevitable entry of generic Humira makes the settlements in *AbbVie* "*more* susceptible to antitrust scrutiny than the" settlements here—not less. Doc. 395 at 3 (emphasis in original). Defendants offer no explanation for their conclusory assertion, however. To the contrary, the inevitable entry of Humira in the E.U. market made the plaintiffs' allegations in *AbbVie* implausible. *See* 42 F.4th at 715. That is, it's implausible to allege that AbbVie "paid" generic manufacturers by allowing them to enter the E.U. market in 2018 when that entry date was inevitable even absent the settlement. *See id.* Here, in contrast, the lifespan of defendants' EpiPen monopoly was uncertain. Teva's EpiPen patent lawsuit threatened to derail defendants' EpiPen monopoly in 2012. *See* Doc. 128 at 36–38 (FAC ¶¶ 116–24). But defendants saw an opportunity to keep a generic out of the market for three more years. And they took it. Defendants paid Teva—not with money but in the form of continued monopolistic profits—to forestall Teva's launch of its generic EpiPen. So, unlike *AbbVie*, plaintiffs have alleged a plausible reverse payment.

### 3. Opportunity Costs

*Third*, *Edgar* explained that *AbbVie*'s reasoning about opportunity costs doesn't fit plaintiffs' allegations here. 2024 WL 1282436, at *23. The *AbbVie* plaintiffs alleged a reverse payment based on E.U. litigation because "by leaving money on the table in Europe, AbbVie effectively paid the potential entrants for delay in the United States." *AbbVie*, 42 F.4th at 715. *AbbVie* emphasized that the Supreme Court, in *Actavis*, explicitly had rejected the idea that an opportunity cost could qualify as a reverse payment. *Id.* This is the key passage from *Actavis*:

> [W]hen Company A sues Company B for patent infringement and demands, say, $100 million in damages, it is not uncommon for B (the defendant) to pay A (the plaintiff) some amount less than the full demand as part of the settlement—$40 million, for example. The cited authorities also indicate that if B has a counterclaim for damages against A, the original infringement plaintiff, A might end up paying B to settle B's counterclaim. Insofar as the dissent urges that settlements taking these commonplace forms have not been thought for that reason alone subject to

antitrust liability, we agree, and do not intend to alter that understanding.  But the dissent appears also to suggest that reverse payment settlements—*e.g.*, in which A, the plaintiff, pays money to defendant B purely so B will give up the patent fight— should be viewed for antitrust purposes in the same light as these familiar settlement forms.  We cannot agree.  In the traditional examples cited above, a party with a claim (or counterclaim) for damages receives a sum equal to or less than the value of its claim.  In reverse payment settlements, in contrast, a party with no claim for damages (something that is usually true of a paragraph IV litigation defendant) walks away with money simply so it will stay away from the patentee's market. That, we think, is something quite different.

570 U.S. at 151–52 (internal citations omitted).  To say it all another way, the $60 million left on the table by Company A is the opportunity cost.  The Supreme Court rejected the idea that this $60 million—the amount compromised away by the settling patentee—could qualify as an implicit reverse payment to Company B, the generic manufacturer.  So, in *AbbVie*, the Seventh Circuit rejected plaintiffs' theory that the money AbbVie left on the table in its E.U. settlements qualified as a reverse payment.  42 F.4th at 716.  Instead, that money, left behind on the table, was an opportunity cost.  *Id.*

Here, defendants strive to characterize the payment plaintiffs allege as an opportunity cost.  Doc. 387 at 9.  Defendants contend that they "settled the Nuvigil litigation by agreeing to enter as early as June 2016 rather than holding out for immediate entry, thereby incurring an opportunity cost in the amount of generic Nuvigil profits that it may otherwise have realized." *Id.*  Defendants thus argue "that sort of opportunity cost is not an actionable reverse payment under *Actavis*" "regardless of what other contextual facts [p]laintiffs might allege."  *Id.*  But once more, *Edgar* already has considered—and rejected—this logic.  2024 WL 1282436, at *24.  To be certain, the settlements plaintiffs allege involve opportunity costs.  Defendants left money on the table by agreeing to stay out of the Nuvigil market.  And Teva left money on the table by agreeing to stay out of the EpiPen market.

The reverse payment that plaintiffs allege, however, isn't one based on opportunity cost. Instead, plaintiffs allege defendants paid Teva in the form of preserving monopolistic profits in the Nuvigil market.  *See* Doc. 128 at 43 (FAC ¶ 141) ("Nuvigil was also a blockbuster drug and generic delay of several years was worth hundreds of millions (if not billions) of dollars to Teva.").  Under plaintiffs' theory here, the parties didn't trade "foregone earning opportunit[ies]."  *AbbVie*, 42 F.4th at 715.  Instead, plaintiffs allege that the parties traded one monopoly for another.  That's not *AbbVie*.  Though *AbbVie* involved two settlements, each settlement involved just one drug and one brand name manufacturer.  In *AbbVie*, the defendant couldn't have traded the generic manufacturers a continued monopoly because they never had a monopoly in the first place.

To no one's surprise, defendants disagree with this logic.  They argue that "the quantification of an implicit net payment or opportunity cost simply doesn't matter."  Doc. 395 at 5.  And so, defendants argue, "an allegation that a patent holder paid a generic entrant by leaving money on the table is legally insufficient to state a claim."  *Id.*  But defendants' formulation is a twisted version of the facts the FAC alleges here.  The FAC alleges that the reverse payment here wasn't in the form of money left on the table.  It was in the form of a monopoly.  And the trading of one monopoly for another is precisely the sort of anticompetitive collusion that can withstand a motion to dismiss or a motion for judgment on the pleadings.  *See AbbVie*, 42 F.4th at 714 ("*Actavis* adds that one kind of settlement, in which the patent holder pays the potential entrant to defer entry, could be unlawful when the payment exceeds any reasonable estimate of the costs of litigation and *is best understood as a portion of the spoils from a market-division agreement*." (emphasis added)).

### 4. Conclusion

Here's the bottom line: the court isn't persuaded that *AbbVie*'s 0 + 0 logic applies to the allegations in this case. Plaintiffs plausibly allege that defendants swapped something of value—Mylan's delayed launch of generic Nuvigil—to forestall Teva's launch of generic EpiPen. One extended monopoly exchanged for another extended monopoly. Under *Actavis* and its progeny, that allegation—clothed with the ample factual detail provided here—suffices to state a plausible antitrust claim. Once more, the consideration in that exchange needn't be cash, a proposition supported by the weight of authority. *See In re Lipitor*, 868 F.3d at 252. And once more, the court doesn't read *Actavis* to furnish blanket immunity for this transaction just because individual *parts* of the alleged scheme could prove lawful under *Actavis*. The question in an antitrust conspiracy case doesn't ask merely whether each part of the conspiracy is lawful. Instead, it asks whether the entire arrangement, viewed as whole, is lawful. *Aspen Highlands*, 738 F.2d at 1522 n.18. Here, plaintiffs have alleged enough facts to support a reasonable finding that the whole arrangement is unlawful.

The court next decides defendants' request for the court to certify this interlocutory Order for appeal.

## V.        Certification for Interlocutory Appeal

Defendants ask the court alternatively to certify for interlocutory appeal the following question: "If a litigant agrees to lawfully settle one lawsuit in exchange for agreeing to lawfully settle another lawsuit, can the exchange of otherwise lawful settlements form the basis for an antitrust claim under *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013)?" Doc. 395 at 6. The court declines.[11]

---

[11]        Plaintiffs argue that defendants' request for certification of a question for interlocutory appeal violates D. Kan. Rule 7.1 because defendants raised a request for relief in their Reply brief. Doc. 397 at

A district judge may certify an interlocutory order for immediate appeal only when the judge is "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation[.]" 28 U.S.C. § 1292(b). And the court has explained already why it disagrees with defendants' position that there is substantial ground for disagreement on this question. *See above* § IV.C. A couple more points deserve highlighting.

*First*, our court has explained that for "substantial ground for a difference of opinion to exist, it is not enough . . . that the only other case on point reached the opposite conclusion." *Freedom Transp., Inc. v. Navistar Int'l Corp.*, No. 18-CV-02602-JAR-KGG, 2020 WL 108670, at \*3 (D. Kan. Jan. 9, 2020) (citations omitted). At best, defendants have pointed to a *single* case from another circuit court that *arguably* disagrees with the court's holding. That won't suffice. *Second*, the framing of defendants' proposed question twists plaintiffs' allegations. Classifying each piece of the overall scheme that plaintiffs allege as "lawful" puts the cart before the horse and "contradicts pleading law." *FTC v. AbbVie*, 976 F.3d at 358. Plaintiffs allege that defendants horse-traded monopolies vis-à-vis linked settlements. At this stage in the litigation, long-standing precedent requires the court to take that allegation as true.

Concluding that defendants haven't presented a question for "which there is substantial ground for difference of opinion[,]" 28 U.S.C. § 1292(b), the court won't certify defendants' proposed question for interlocutory appeal.

---

4. The court appreciates plaintiffs' objection but needn't consider that procedural question. Instead, the court denies defendants' alternative request on its merits. *See Lee v. Max Int'l, LLC*, 638 F.3d 1318, 1231 (10th Cir. 2011) ("[O]ur legal system strongly prefers to decide cases on their merits."); *BVM Merriam, LLC v. Am. Family Mutual Ins. Co.*, No. 17-2563-JWL, 2019 WL 78906, at \*1 (D. Kan. Jan. 2, 2019) ("[T]he Court's preference is always that a claim be decided on its merits.").

**VI.**      **Conclusion**

The court previously considered and rejected defendants' argument that the FAC fails to allege a plausible antitrust claim. The Seventh Circuit's decision in *AbbVie* is legally and factually distinguishable from this case. So, the court doesn't find it persuasive. Plaintiffs plausibly have alleged that defendants furnished a large and unjustified payment to protect their EpiPen monopoly. Under *Actavis* and its progeny, the court must allow plaintiffs to proceed to discovery. The court thus denies defendants' Motion for Partial Judgment on the Pleadings. Likewise, the court denies defendants' alternative request to certify this interlocutory Order for appeal. The court also denies plaintiffs' Motion to Strike (Doc. 397), but it grants their alternative request for leave to file a surreply.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion for Partial Judgment on the Pleadings (Doc. 386) is denied.

**IT IS FURTHER ORDERED THAT** plaintiffs' Motion to Strike, or in the Alternative, to Permit Filing of a Sur-Reply (Doc. 397) is granted in part and denied in part. The court denies plaintiffs' request to strike but grants their alternative request to permit filing of a surreply. The court considered plaintiffs' proposed surreply in its rulings, above.

**IT IS SO ORDERED.**

**Dated this 9th day of December 2024, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**